UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

MASSAMONT INSURANCE
AGENCY, INC.,

**05 - 11897 WGY**

      Plaintiff,

**COMPLAINT**

UTICA MUTUAL
INSURANCE COMPANY,

MAGISTRATE JUDGE Bowler

      Defendant.

RECEIPT # 66992
AMOUNT $250
SUMMONS ISSUED 4
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. tom
DATE 9 20 05

## PARTIES

1. The plaintiff, Massamont Insurance Agency, Inc. (hereinafter "Massamont"), is a
Massachusetts corporation with a principal place of business at 280 Summer Street, Boston,
Suffolk County, Massachusetts. Massamont is a licensed insurance agency that specializes in the
placement and administration of insurance programs for specific markets in New England.

2. The defendant, Utica Mutual Insurance Company ("Utica Mutual"), is an insurance
company domiciled in New York with a principal place of business in New Hartford, New York.
Utica Mutual is licensed to do business in Massachusetts.

## JURISDICTION

3. The parties hereto are citizens of different states and the matter in controversy exceeds
the sum or value of $75,000, exclusive of interest and costs. This Court has original jurisdiction
over the matter under 28 U.S.C. Section 1332.

## FACTS

### A. The Utica Mutual Policy

4. In 2003, Massamont was insured under a claims-made Insurance Agents and Brokers

Errors and Omissions Liability Policy issued by Utica Mutual. The Utica Mutual Policy No.

3445032 EO (hereinafter "the Policy") carried liability limits of $10,000,000 "each loss" and

$11,000,000 "each aggregate," and was effective from July 30, 2003 to July 30, 2004. A true and

accurate copy of the Policy is attached hereto as Exhibit "A."

5. Under Section II(1)(a) of the Policy, Utica Mutual agreed, in part, as follows:

> We will pay on behalf of the insured all "loss" to which this insurance applies.
>
> We will have the right and the duty to defend the insured against any "suit"
> seeking those damages even if the allegations of the "suit" are groundless, false,
> or fraudulent. However, we will have no duty to defend an insured against any
> "suit" seeking damages for a "wrongful act" to which this insurance does not
> apply.

6. Under Section I(1)(e) of the Policy, covered "losses" include those which:

> [A]rise out of "wrongful acts" committed in the conduct of the insured's business,
> wherever committed or alleged to have been committed, by the insured or any
> person for whose "wrongful acts" the insured is legally liable in rendering or
> failing to render professional services as:
>
> (1) A General Insurance Agent;
>
> (2) An Insurance Broker;
>
> (3) An Insurance Agent; [or]
>
> . . .
>
> (5) A Managing, Master or Brokerage General Agent . . ..

7. "Claim" is defined in Section I(1) of the Policy as:

-2-

[A] written notice, including service of "suit" or demand for arbitration, received by one or more insureds asking for money or services.

8. "Loss" is defined in Section I(6) of the Policy as:

[A]ny amount which an insured becomes legally obligated to pay as damages for any "claim" to which this insurance applies and shall include judgments and settlements.

9. "Suit" is defined in Section I(12) of the Policy as:

[A] civil proceeding in which damages because of "loss" from a "wrongful act" are alleged. "Suit" includes:

a.    An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent . . ..

10. "Wrongful act" is defined in Section I(14) of the Policy as:

[A]ny negligent act, error, or omission to which this insurance applies.

11. The Policy was issued by Utica Mutual in Massachusetts to Massachusetts insureds and countersigned in Burlington, Massachusetts.

## B. The Westchester/Massamont Agency Agreement

12. Effective January 1, 2001, Massamont entered into an Agency Agreement to provide professional services to Westchester Fire Insurance Company ("Westchester") as a General Agent. Specifically, Westchester appointed Massamont to handle various duties and responsibilities with respect to two programs involving property insurance for New England schools and municipalities – the Metrogard Program and the Diplomax Program. Under these Programs, schools and municipalities were to purchase insurance policies issued by Westchester through Massamont. By Amendment dated October 22, 2001, the Agency Agreement was to remain in effect until December 31, 2003, unless previously terminated in accordance with other

Agreement provisions.

13. Pursuant to the Agency Agreement, Massamont agreed to follow certain underwriting guidelines promulgated by Westchester, including, but not limited to, maintaining a staff of competent and trained personnel, keeping complete and accurate records of all transactions pertaining to insurance written under the Agreement, and permitting Westchester, at its discretion, to perform routine audits of such records in order to ensure reasonable internal accounting controls.

14. Sometime prior to February 2003 (during the final year of the Agency Agreement), Westchester formed the opinion that premiums generated on the Metrogard and Diplomax Programs were insufficient to generate an adequate underwriting profit. Westchester blamed the Programs' poor performance, at least in part, on alleged underwriting and record-keeping deficiencies by Massamont. According to Westchester, Massamont underwriters failed, among other things, to consider individual risk characteristics, to correctly price windstorm risks, to maintain adequate files on certain risks, and to submit accounts to Westchester in a timely fashion, thereby causing backlogs and delays. In Westchester's view, Massamont's performance as a General Agent under the Agency Agreement was "unsatisfactory" and "fell short" of standards required under the Agreement.

15. In February 2003, Westchester announced to Massamont a demand for a 40 - 47% premium rate increase on the Metrogard and Diplomax Programs effective July 1, 2003. This rate increase was purportedly intended by Westchester to render the Metrogard and Diplomax Programs more profitable and to overcome Massamont's perceived unsatisfactory performance as General Agent.

-4-

16. The timing of Westchester's announcement was calculated to effectively "handcuff" Massamont. While Massamont had submitted a proposed 5% premium rate increase to Westchester a full three months earlier (in November 2002), it had received no response to this proposal from Westchester. Yet, Westchester was aware that the bulk of the Program policies came up for renewal on July 1st and, therefore, the business had to be quoted to prospective insureds in April or May, at the latest.

17. The timing and size of Westchester's proposed premium rate increase shocked Massamont. Indeed, Massamont immediately communicated to Westchester that an increase of this magnitude would effectively decimate the Programs.

18. In response to Massamont's complaints, Westchester modified its stance, but only slightly. In addition to still requiring a large premium rate increase, Westchester also insisted that Massamont employ a new risk specific pricing system in the future, rather than the previously-acceptable class-based rating approach. Massamont complained that this new requirement would prove fatal to the retention of numerous Metrogard and Diplomax accounts, particularly those located in southeastern Massachusetts and Rhode Island (one-third of the book of business), as it eliminated all flexibility Massamont needed in order to achieve the overall rate increase desired by Westchester. In short, Westchester made unrealistic and unprecedented demands of Massamont, then took away the precise tools Massamont needed to meet those demands.

19. For the next several months, Massamont negotiated with Westchester officials in the hopes of further softening their stance and, thereby, salvaging the Programs. Although Westchester made some concessions to Massamont, it continued to insist upon changes that (if

-5-

followed) would ultimately lead to the Programs' demise. Around this time, Massamont
concluded that it could not renew the Agency Agreement with Westchester when it expired on
December 31, 2003.

## C. The Westchester/Massamont Dispute

20. In early 2003, while Massamont was still actively negotiating with Westchester
regarding Westchester's demand for a rate increase and other changes, Axis Specialty Insurance
Company ("Axis") approached Massamont to inquire about writing a portion of the Massamont
property book. Massamont did not seek or solicit Axis to insure the Metrogard or Diplomax
Programs.

21. With the understanding that the Agency Agreement with Westchester was due to
expire at the end of 2003, and in the belief that Westchester had no future desire to write such
insurance on competitive terms, Massamont agreed to participate in discussions with Axis. At
the same time, Massamont continued to work with Westchester with the expectation that their
relationship would continue through the July 1, 2003 Program renewal date.

22. At the time it agreed to participate in discussions with Axis, Massamont reasonably
assumed it would take eight to nine months for Axis to conduct its due diligence and complete all
necessary filings with respect to the Metrogard and Diplomax Programs. If so, Massamont
anticipated that Axis would be prepared to issue insurance under the Programs beginning in
2004. To Massamont's surprise, however, Axis expressed a ready willingness to assume a
portion of the Program business by July 1, 2003, much earlier than previously anticipated.

23. Around this same time, Westchester's actions convinced Massamont that, despite its
representations, Westchester had no interest in writing the Program business on competitive

-6-

terms. Westchester was, in effect, saying one thing, but doing another. Evidence of

Westchester's disinterest was detailed in an internal e-mail communication dated July 1, 2003

and written by William Sharp, Vice President of Westchester:

> Axis came back with an indication for wind loads far below what we were asking
> for. Van [*i.e.,* Hilbert Schenck II, President of Massamont] also checked around
> in Bermuda to find out what the market price would be on the cat exposure for his
> book – and found it to be substantially lower than ours. *The impression that
> Massamont was getting from us as well was that we would be just as happy not to
> write any business on the Cape (which I confirmed was correct)* – at the
> completely inadequate premiums that they had been charging.

(Emphasis added.)

24. Due to Westchester's obvious displeasure with the Programs and diminished appetite

for underwriting certain risks, Massamont accordingly placed a number of problem accounts with

Axis effective July 1, 2003. Massamont did not cherry-pick accounts to give Axis only those that

were most profitable; on the contrary, Massamont placed with Axis primarily those accounts in

which it reasonably assumed Westchester had little or no interest.

25. Massamont did not believe the transfer of unwanted accounts to Axis was in

violation of its Agency Agreement with Westchester. Even assuming the Agency Agreement

established an exclusive agency relationship between Massamont and Westchester (which

Massamont denied), Massamont understood it was still entitled under the Agreement to transfer

to another insurer any Program business that Westchester elected not to write.

### D. The Westchester/Massamont Arbitration

26. By letter dated July 9, 2003, Westchester advised Massamont that it was terminating

the Agency Agreement effective immediately due to Massamont's alleged violation of its terms

in transferring certain Program business to Axis. Massamont, in turn, denied it had breached the

-7-

Agreement. On the contrary, Massamont only transferred to Axis that business which Westchester had declined to write.

27. On October 23, 2003, Westchester submitted to Massamont a Demand for Arbitration of their dispute (hereinafter "Demand.") A true and accurate copy of the Demand is attached hereto as Exhibit "B." Under the Agency Agreement, Massamont was required to submit the dispute to arbitration.

28. In its Demand, Westchester alleged, contrary to Massamont's belief and the admissions contained in Westchester's own internal e-mail, that it had wanted to write the Program business transferred to Axis and that it (Westchester) would have objected to the transfer of such business had it known of the transfer beforehand. Westchester further alleged that Massamont's performance under the Agency Agreement was "unsatisfactory" and "fell short" of required standards. Specifically, Westchester accused Massamont of sloppy underwriting, record-keeping and reporting. Massamont denied Westchester's allegations, and did not agree that its performance under the Agency Agreement was in any way deficient.

29. In its Demand, Westchester further alleged that Massamont failed to underwrite individual accounts properly such that "losses were incurred repeatedly on accounts." Westchester also stated that it "was preserving any and all claims that it had against Massamont for breaching the Agreement and reserved the right to pursue such claims." Finally, Westchester requested Massamont to tender Westchester's Demand to its (Massamont's) errors and omissions insurer.

30. Nowhere in its Demand did Westchester assert any claim for fraud or fraudulent misconduct against Massamont, or seek recovery of punitive damages.

## E. **Utica Mutual's Denial of Coverage**

31. On October 28, 2003, Massamont tendered Westchester's Demand to Utica Mutual for coverage under the Policy.

32. Westchester's Demand qualified as a "suit" seeking damages to which the Policy applied. Further, as set forth in its Demand, Westchester's alleged "loss" arose out of a "wrongful act" or "wrongful acts" within the meaning of the Policy.

33. More than four months later, by letter dated March 4, 2004, Utica Mutual denied coverage to Massamont for Westchester's Demand under the terms and provisions of the Policy. Utica Mutual refused to defend Massamont against the arbitration and refused, as well, to indemnify Massamont for any damages that might be awarded against it and in favor of Westchester.

34. Utica Mutual did not offer a defense to Massamont under a reservation of rights, nor did it commence an action for declaratory relief in order to resolve the coverage dispute.

35. Due to Utica Mutual's denial, Massamont was forced to retain counsel, at its own cost and expense, to defend itself in the arbitration proceeding.

## F. **Outcome of Westchester/Massamont Arbitration**

36. The arbitration panel held a hearing on the dispute between Westchester and Massamont (as set forth in the Demand) from November 16 through 19, 2004, and on December 13 & 14, 2004.

37. On April 26, 2005, the arbitration panel issued an Award of compensatory damages against Massamont in the amount of Two Million Six Hundred Thousand ($2,600,000) Dollars. Other than determining that "Massamont breached the Agency Agreement," the Award contained

-9-

no specific findings on the merits of Westchester's claims. Nor did the Award make any differentiation in terms of the specific harm Westchester allegedly suffered and for which the arbitrators intended to grant compensation. A true and accurate copy of the Award is attached hereto as Exhibit "C."

38. Massamont thereafter tendered the Award to Utica Mutual for payment, demanding, as well, that Utica Mutual reimburse Massamont for the costs and attorneys' fees Massamont incurred in defending itself against Westchester's Demand. Utica Mutual again declined coverage and refused to indemnify Massamont for the amount of the Award. Utica Mutual also restated its denial of any duty to defend Massamont against the Westchester Demand and thereby refused to reimburse Massamont for its defense costs and attorneys' fees.

## COUNT I
## (Breach of Contract – Duty to Defend)

39. Massamont repeats and incorporates by reference the allegations contained in Paragraphs 1 through 38 above.

40. Westchester's Demand for Arbitration alleged claims that were covered under the terms and provisions of the Policy.

41. During its investigation of Westchester's claims, Utica Mutual learned (or could have readily learned) of facts which showed that the claims set forth in Westchester's Demand were covered under the terms and provisions of the Policy.

42. An objectively reasonable insured, reading the Demand and relevant Policy language, would expect Westchester's claims to be covered under the terms and provisions of the Policy.

-10-

43. At no time before or during the arbitration proceeding did Westchester waive or withdraw any of the claims set forth in its Demand.

44. Massamont has satisfied all conditions precedent to recovery under the terms and provisions of the Policy.

45. Utica Mutual breached the Policy by denying coverage and by refusing to defend Massamont against Westchester's Demand.

46. Massamont has incurred substantial damages as a result of Utica Mutual's breach of contract, including, but not limited to, costs and attorneys' fees spent in defense of the arbitration.

WHEREFORE, Massamont demands judgment against Utica Mutual for all damages caused by the breach of its duty to defend Massamont against Westchester's Demand for Arbitration, plus interest, costs and attorneys' fees.

## COUNT II
### (M.G.L. Chapter 93A – Duty to Defend)

47. Massamont repeats and incorporates by reference the allegations contained in Paragraphs 1 through 46 above.

48. Utica Mutual's denial of coverage to Massamont was based, in part, on an incomplete and/or inadequate investigation.

49. In response to communications from Massamont and its representatives, Utica Mutual provided multiple denials of coverage to Massamont. Throughout such denials, Utica Mutual raised numerous inappropriate, inconsistent and unsustainable grounds for its coverage

-11-

position. While Utica Mutual repeatedly insisted its Policy provided no coverage to Massamont for Westchester's claims, it remained unsure as to the reasons why.

50. By letter dated March 4, 2004, Utica Mutual first denied coverage to Massamont on six grounds, ranging from Massamont's alleged execution of the Agency Agreement prior to the "retroactive date," to Exclusion 6 (for claims by an entity "owned, operated, managed, or controlled by the insured"), to Exclusion 18 (for claims arising out of the insured's activities as a "third-party administrator.")

51. One of the grounds upon which Utica Mutual relied to deny its duty to defend Massamont under the Policy was Exclusion 1 for "dishonest, fraudulent, malicious or criminal conduct . . .." Yet, Exclusion 1 specifically states, in part:

> If a "suit" is brought against the insured alleging both "wrongful acts" within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct, *then we will defend the insured in the trial court*, but we shall not have any liability for any judgment for dishonest, fraudulent, malicious, or criminal conduct nor shall we have any *further obligation* after judgment in the trial court.

(Emphasis added).

52. Massamont subsequently requested Utica Mutual to reconsider its coverage position and to immediately assume Massamont's defense. By letter dated March 31, 2005, Utica Mutual again rejected Massamont's request but, in so doing, "modified" its previous denial. The purported "modification" was, more accurately, a complete revision.

53. In its March 31, 2005 denial letter, Utica Mutual "disavowed" five out of six (83.3%) of its previous grounds for denial set forth in its March 4, 2004 denial, reaffirmed the only remaining ground (Exclusion 1 for "dishonesty," etc.), then raised four *new* grounds. One of the new grounds for denial cited by Utica Mutual concerned the "wrongful act" definition used in the

-12-

Insuring Agreement in Section II(1)(a) of the Policy, and the alleged failure of Westchester's claim to arise out of a "negligent act, error or omission" within the meaning of the Policy. Although Utica Mutual cited numerous out-of-state cases in support of this ground in its March 31, 2005 letter, it failed to mention the one Supreme Judicial Court decision on point (USM Corp. v First State Ins. Co., 420 Mass. 865 (1995)) which directly contradicted its position. Utica Mutual also claimed it was entitled to rescind the Policy, that coverage was eliminated by Exclusion 19 (applicable to claims arising out of the disclosure of "trade secrets or confidential or proprietary information"), and that Massamont had breached the duty of cooperation.

54. When Massamont challenged this second denial as equally unsustainable, Utica Mutual shifted its stance once again. By letter dated May 19, 2005, Utica Mutual restated its denial on the ground that Westchester's claim did not arise of a "negligent act, error or omission," but this time attempted to distinguish the controlling USM decision by fashioning a so-called "professional advice" requirement not found in the Policy. Specifically, Utica Mutual stated in its letter:

> In the present case, unlike *USM*, Westchester's claim did not arise from and was not "inherent in the rendering of professional advice."

The Policy, however, does not condition or limit coverage to the "rendering of professional advice." Rather, in the definition of covered "losses," the Policy states that Massamont is covered for all "wrongful acts" committed in the conduct of its business "in rendering or failing to render professional *services*" in its capacity as an insurance agent or broker, or as a general agent. "Professional services" is not limited to the giving of advice.

-13-

55. Utica Mutual also continued to rely upon Exclusion 1 ("dishonesty," etc.) in its May 19, 2005 letter, but admitted it had "decided not to pursue" its purported right to rescind the Policy (cited in its previous March 31, 2005 denial), and was expressly "withdrawing" its disclaimer based on Massamont's lack of cooperation. Nor did Utica Mutual cite Exclusion 19 (regarding "trade secrets") in its most recent May 19, 2005 letter as one of its grounds for denial. Accordingly, Massamont reasonably understood that this denial (like many of its predecessors) was being withdrawn as well.

56. The final incarnation of Utica Mutual's coverage position was set forth in a letter dated June 15, 2005. There, Utica Mutual stood by its no "negligent act, error or omission" ground for disclaimer, as well as Exclusion 1 ("dishonesty," etc.) It also resurrected the previously-withdrawn Exclusion 19 (regarding "trade secrets.")

57. During the time Utica Mutual was asserting its coverage position in multiple denials, Westchester's claims against Massamont did not change.

58. By declining to defend Massamont against Westchester's Demand, by conducting an incomplete and/or inadequate investigation, by providing Massamont and its representatives with shifting inappropriate, inconsistent and unsustainable grounds for its coverage position, and by various other acts and omissions, Utica Mutual has engaged in unfair or deceptive acts or practices in violation of M.G.L. Chapter 93A.

59. Utica Mutual has also violated the following prohibitions defined as "unfair claim settlement practices" in M.G.L. Chapter 176D, Section 3(9):

(a)     Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

-14-

(b)     Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(c)     Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; [and]

. . .

(n)     Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

60.     The acts, practices, omissions, communications, representations and failures of Utica Mutual, as set forth above, have caused significant damages to Massamont, for which Massamont is entitled to recover under M.G.L. Chapter 93A.

61.     Utica Mutual's use or employment of unfair or deceptive acts or practices constituted wilful or knowing violations of M.G.L. Chapter 93A, Section 2. Further, Utica Mutual's repeated refusal to grant relief to Massamont was done in bad faith with knowledge or reason to know that such refusals violated M.G.L. Chapter 93A, Section 2. Massamont is therefore entitled to recover double or treble the amount of its actual damages from Utica Mutual.

62.     By letter dated August 8, 2005, Massamont sent a "Demand for Relief Under M.G.L. Ch. 93A" to Utica Mutual. A true and accurate copy of the "Demand for Relief" is attached hereto as Exhibit "D." By letter dated August 29, 2005, Utica Mutual responded to Massamont's demand by reasserting its denial of coverage and making no offer in settlement whatsoever.

WHEREFORE, Massamont demands judgment against Utica Mutual for double or treble the amount of actual damages caused by Utica Mutual's Chapter 93A violations arising out of the breach of its duty to defend Massamont against Westchester's Demand for Arbitration, plus interest, costs and attorneys' fees.

-15-

## COUNT III
### (Declaratory Judgment – Duty to Defend)

63. Massamont repeats and incorporates by reference the allegations contained in Paragraphs 1 through 62 above.

64. On or about May 17, 2005, Westchester filed a petition in the United States District Court for the Southern District of New York to confirm the April 26, 2005 Award. Utica Mutual owes Massamont a duty to defend this petition, but has refused and declined to do so.

65. An actual controversy exists between the parties hereto in that Massamont and Utica Mutual dispute the scope of liability coverage afforded to Massamont under the Policy. Specifically, the parties dispute whether Utica Mutual was obligated to defend Massamont (either with or without a reservation of rights) against Westchester's Demand for Arbitration. Massamont maintains that Utica Mutual owed a duty to defend the Demand and, therefore, should have provided Massamont with defense counsel to protect it against Westchester's Demand. Massamont further maintains that Utica Mutual also owes a duty to defend it against the petition to confirm the Award filed in the United States District Court for the Southern District of New York. Utica Mutual, on the other hand, denies it owed or owes any duty or obligation to defend Massamont against Westchester's Demand and/or against the petition to confirm the Award, either under the terms and provisions of the Policy and/or under Massachusetts law.

66. Massamont has legal standing to institute this action for declaratory judgment under Fed. R. Civ. P. 57 and 28 U.S.C. Section 2201. An independent basis exists for the Court's jurisdiction under 28 U.S.C. Section 1332.

-16-

67. This prayer for declaratory judgment is necessary to afford Massamont relief from uncertainty with respect to its rights, duties, status and legal obligations under the Policy and under applicable Massachusetts law.

WHEREFORE, Massamont prays that this Court enter judgment declaring that Utica Mutual:

A. Owed Massamont a duty to defend Westchester's Demand for Arbitration under the terms and provisions of Utica Mutual's Insurance Agents and Brokers Errors and Omissions Liability Policy No. 3445032 EO and/or under Massachusetts law;

B. Owes Massamont a duty to defend the petition filed by Westchester in the United States District Court for the Southern District of New York to confirm the April 26, 2005 Award under the terms and provisions of Utica Mutual's Insurance Agents and Brokers Errors and Omissions Liability Policy No. 3445032 EO and/or under Massachusetts law; and

C. Must provide Massamont with such other compensation and relief as this Court deems just and proper.

## COUNT IV
### (Breach of Contract – Duty to Indemnify)

68. Massamont repeats and incorporates by reference the allegations contained in Paragraphs 1 through 67 above.

69. The Award of Two Million Six Hundred Thousand ($2,600,000) Dollars issued by the arbitration panel against Massamont and in favor of Westchester on April 26, 2005 is covered under the terms and provisions of the Policy. Massamont is legally obligated to pay the Award

-17-

as damages due to a "loss" that arose out of a "wrongful act" or "wrongful acts" to which the Policy applies.

70. Because Utica Mutual breached its duty to defend Massamont against Westchester's Demand, it now bears the burden of proving that *all* of Westchester's claims were outside the scope of Policy coverage.

71. The Award contained no specific findings on the merits of Westchester's claims. Nor did the Award make any differentiation in terms of the specific harm Westchester allegedly suffered and for which the arbitrators intended to grant compensation. As a result, Utica Mutual cannot meet its burden here and is, therefore, liable to pay the full amount of the Award.

72. At no time before or during the arbitration proceeding did Westchester waive or withdraw any of the claims set forth in its Demand.

73. Massamont has satisfied all conditions precedent to recovery under the terms and provisions of the Policy.

74. Utica Mutual breached the Policy by denying coverage and by refusing to indemnify Massamont for the amount of the Award.

75. Massamont has incurred substantial damages as a result of Utica Mutual's breach of contract.

WHEREFORE, Massamont demands judgment against Utica Mutual for all damages caused by the breach of its duty to indemnify Massamont for the amount of the Award, plus interest, costs and attorneys' fees.

-18-

## COUNT V
### (M.G.L. Chapter 93A – Duty to Indemnify)

76. Massamont repeats and incorporates by reference the allegations contained in Paragraphs 1 through 75 above.

77. Utica Mutual's denial of coverage to Massamont was based, in part, on an incomplete and/or inadequate investigation.

78. Utica Mutual's denial of coverage to Massamont was based, in part, on ambiguous Policy language that must be interpreted in favor of Massamont.

79. In response to communications from Massamont and its representatives, Utica Mutual provided multiple denials of coverage to Massamont. Throughout such denials, Utica Mutual raised numerous inappropriate, inconsistent and unsustainable grounds for its coverage position. From time to time, Utica Mutual "withdraw" and "disavowed" certain grounds for its position, but asserted new grounds. Some grounds for denial were stated, then withdrawn, then restated by Utica Mutual in subsequent communications.

80. During the time Utica Mutual was asserting its coverage position in multiple denials, Westchester's claims against Massamont did not change. Nor did Utica Mutual ever request or conduct further investigation in order to determine whether its multiple coverage denials were consistent with known or readily knowable facts.

81. By refusing to indemnify Massamont for the amount of the Award, by conducting an incomplete and/or inadequate investigation, by providing Massamont and its representatives with shifting inappropriate, inconsistent and unsustainable grounds for its coverage position, and by

-19-

various other acts and omissions, Utica Mutual has engaged in unfair or deceptive acts or

practices in violation of M.G.L. Chapter 93A.

82. Utica Mutual has also violated the following prohibitions defined as "unfair claim

settlement practices" in M.G.L. Chapter 176D, Section 3(9):

(a)    Misrepresenting pertinent facts or insurance policy provisions relating to
       coverages at issue;

(b)    Failing to acknowledge and act reasonably promptly upon communications with
       respect to claims arising under insurance policies;

(c)    Failing to adopt and implement reasonable standards for the prompt investigation
       of claims arising under insurance policies; [and]

. . .

(n)    Failing to provide promptly a reasonable explanation of the basis in the insurance
       policy in relation to the facts or applicable law for denial of a claim or for the
       offer of a compromise settlement.

83. The acts, practices, omissions, communications, representations and failures of Utica

Mutual, as set forth above, have caused significant damages to Massamont, for which

Massamont is entitled to recover under M.G.L. Chapter 93A.

84. Utica Mutual's use or employment of unfair or deceptive acts or practices constituted

wilful or knowing violations of M.G.L. Chapter 93A, Section 2. Further, Utica Mutual's

repeated refusal to grant relief to Massamont was done in bad faith with knowledge or reason to

know that such refusals violated M.G.L. Chapter 93A, Section 2. Massamont is therefore

entitled to recover double or treble the amount of its actual damages from Utica Mutual.

85. By letter dated August 8, 2005, Massamont sent a "Demand for Relief Under M.G.L.

Ch. 93A" to Utica Mutual. A true and accurate copy of the "Demand for Relief" is attached

-20-

hereto as Exhibit "D." By letter dated August 29, 2005, Utica Mutual responded to Massamont's demand by reasserting its denial of coverage and making no offer in settlement whatsoever.

WHEREFORE, Massamont demands judgment against Utica Mutual for double or treble the amount of actual damages caused by Utica Mutual's Chapter 93A violations arising out of the breach of its duty to indemnify Massamont for the amount of the Award, plus interest, costs and attorneys' fees.

## COUNT VI
### (Declaratory Judgment – Duty to Indemnify)

86. Massamont repeats and incorporates by reference the allegations contained in Paragraphs 1 through 85 above.

87. On or about May 17, 2005, Westchester filed a petition in the United States District Court for the Southern District of New York to confirm the April 26, 2005 Award. Utica Mutual owes a duty to indemnify Massamont for the amount of any judgment entered against it in said petition, but has refused and declined to do so.

88. An actual controversy exists between the parties hereto in that Massamont and Utica Mutual dispute the scope of liability coverage afforded to Massamont under the Policy. Specifically, the parties dispute whether Utica Mutual is obligated to indemnify Massamont for the amount of the Award issued by the arbitration panel against Massamont and in favor of Westchester on April 26, 2005. Massamont maintains that Utica Mutual owes a duty to indemnify Massamont for the amount of said Award under the terms and provisions of its Policy and/or under Massachusetts law. Massamont further maintains that Utica Mutual owes a duty to indemnify Massamont for the amount of any judgment entered against it in the petition to

-21-

confirm the Award filed in the United States District Court for the Southern District of New York. Utica Mutual, on the other hand, denies it owes Massamont any such duties.

89. Massamont has legal standing to institute this action for declaratory judgment under Fed. R. Civ. P. 57 and 28 U.S.C. Section 2201. An independent basis exists for this Court's jurisdiction under 28 U.S.C. Section 1332.

90. This prayer for declaratory judgment is necessary to afford Massamont relief from uncertainty with respect to its rights, duties, status and legal obligations under the Policy and under applicable Massachusetts law.

WHEREFORE, Massamont prays that this Court enter judgment declaring that Utica Mutual:

A. Owes a duty to indemnify Massamont for the amount of the Award under the terms and provisions of Utica Mutual's Insurance Agents and Brokers Errors and Omissions Liability Policy No. 3445032 EO and/or under Massachusetts law; .

B. Owes a duty to indemnify Massamont for the amount of any judgment entered against it in the petition filed by Westchester in the United States District Court for the Southern District of New York to confirm the April 26, 2005 Award under the terms and provisions of Utica Mutual's Insurance Agents and Brokers Errors and Omissions Liability Policy No. 3445032 EO and/or under Massachusetts law; and

-22-

C. Must provide Massamont with such other compensation and relief as this Court deems

just and proper.

The Plaintiff,
MASSAMONT INSURANCE AGENCY, INC.,

By its attorneys,
**PIERCE, DAVIS & PERRITANO, LLP**

John J. Davis, BBO #115890
10 Winthrop Square
Boston, MA 02110
(617) 350-0950

Dated: September 19, 2005

-23-

**UTICA NATIONAL INSURANCE GROUP**

ISSUED BY
UTICA MUTUAL INSURANCE COMPANY
P.O. BOX 530, UTICA, NEW YORK 13503
TELEPHONE: (315) 734-2000

**DECLARATIONS**

INSURANCE AGENTS AND BROKERS
ERRORS AND OMISSIONS LIABILITY POLICY
**CLAIMS-MADE BASIS**
AMENDMENT

| NAMED INSURED AND MAILING ADDRESS | LOCATION ADDRESS |
|---|---|
| KNAPP SCHENCK & COMPANY<br>INSURANCE AGENCY INC<br>240 LEWIS WHARF<br>BOSTON MA 02110 | |

T, 12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE INSURED AS STATED HEREIN. IN RETURN FOR PAYMENT OF THE PREMIUM, AND UBJECT TO ALL THE TERMS OF THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| POLICY NUMBER | POLICY PERIOD FROM | TO | PRIOR POLICY NO. | CORRECTING RETRO DATE |
|---|---|---|---|---|
| 3445032 EO | 07/30/2003 | 07/30/2004 | 3445032 EO | EFF. 07/30/2003    AMEND. NO. 01 |

**BASIC POLICY COVERAGE**

LEGAL LIABILITY

INSURED'S DEDUCTIBLE AMOUNT

**LIMITS OF LIABILITY**

$ 10,000,000     EACH LOSS
$ 11,000,000     EACH AGGREGATE
$     50,000     EACH LOSS
$    150,000     AGGREGATE

DEDUCTIBLE APPLIES TO:   ☐ LOSS ONLY
                         ☒ LOSS AND LITIGATION EXPENSE

**PREMIUMS**

| | |
|---|---|
| BASIC POLICY PREMIUM | $ 179,905.00 |
| REAL ESTATE AGENTS AND BROKERS PREMIUM | $   N/A   (See attached endorsement for details) |
| MUTUAL FUND AND VARIABLE ANNUITY PREMIUM | $   N/A   (See attached endorsement for details) |
| EMPLOYMENT-RELATED PRACTICES PREMIUM | $ |
| OTHER | |

TOTAL POLICY PREMIUM    $ 179,905.00    NO PREMIUM CHANGE

**RETROACTIVE DATE**

This insurance does not apply to loss, whenever occurring, from "wrongful acts" which took place before the Retroactive Date, if any, shown _____ 07/30/02 _____

Enter Date or "None" if no Retroactive Date applies

**OPTIONAL EXTENDED REPORTING PERIOD PREMIUM**

In Section VII - EXTENDED REPORTING PERIODS, we agree to provide an Optional Extended Reporting Period under certain conditions. The premium for such an Optional Extended Reporting Period is determined as shown in paragraph 5. of Section VII.

**FORMS AND ENDORSEMENTS** APPLYING TO AND MADE PART OF THIS POLICY AT TIME OF ISSUE:

14-E-0001 (01-91)     14-E-0001 (01-91)     14-E-0095 (12-98)     14-P-EOA (01-98)
8-L-1864 (12-02)

| | |
|---|---|
| DATE:    08/19/03    LICENSED RESIDENT AGENT | COMPANY OFFICER |
| COUNTERSIGNED AT: BURLINGTON, MA | CURTIS PEARSALL |

THESE DECLARATIONS AND THE COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A
PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

14-D-EOA ED.12-99    SEE OVER FOR IMPORTANT CLAIMS-MADE COVERAGE NOTICE    Page 1 of 2

> The policy which provides Insurance Agents and Brokers Errors and Omissions Liability Coverage applies on a claims-made basis.

The following provides a general description of this coverage and is subject to the terms and provisions of the actual policy.

A. The policy, subject to its terms and conditions, provides full prior acts coverage if no Retroactive Date is entered in the Declarations. If a Retroactive Date is entered in the Declarations, the policy will not apply to loss from "wrongful acts" which took place before the Retroactive Date. The policy will not apply to loss from "wrongful acts" which take place after the expiration of the policy period.

B. The policy will apply to losses from "wrongful acts" which take place on or after the Retroactive Date, if any, but before the beginning of the policy period only if the insured did not know of the "wrongful acts" before the beginning of the policy period and if any claim is made according to D. below.

C. The policy will not apply to any loss for which claim is first made after the expiration of the policy period or any Automatic or Optional Extended Reporting Period described in the Extended Reporting Period Section of the policy.

D. The policy will apply only to claims which are first made:

   1. During the policy period;

   2. During the sixty day Automatic Extended Reporting Period described in the Extended Reporting Period Section of the policy; or

   3. During the Optional Extended Reporting Periods of 12 months to 120 months duration, described in the Extended Reporting Period Section of the policy. Such Optional Extended Reporting Period must be requested by the insured in writing, within sixty days after the date of termination of coverage or thirty days after the date of mailing by us of notice to the named insured advising of premiums for and provisions of Optional Extended Reporting Periods, in order to allow claims to be made against the policy coverage after the expiration of any Automatic Extended Reporting Period.

E. We will send you a written notice within thirty days after any termination of coverage of costs for and provisions of Extended Reporting Periods.

F. For the first three years of claims-made coverage, premiums will be comparatively lower than for occurrence coverage, and will increase for each renewal of those policies. Claims-made prices will still be somewhat lower than occurrence prices for mature accounts (in their fourth or later years). The purchase of Optional Extended Reporting Periods, as described above, requires additional premium payments.



## Utica National Insurance Group

Insurance that starts with you.

Utica Mutual Insurance Company and its affiliated companies, New Hartford, N.Y. 13413

14-D-EOA  Ed. 12-99

# UTICA NATIONAL INSURANCE GROUP

ISSUED BY
UTICA MUTUAL INSURANCE COMPANY
P.O. BOX 530, UTICA, NEW YORK 13503
TELEPHONE: (315) 734-2000

**DECLARATIONS**

INSURANCE AGENTS AND BROKERS
ERRORS AND OMISSIONS LIABILITY POLICY
**CLAIMS-MADE BASIS**
RENEWAL POLICY

| NAMED INSURED AND MAILING ADDRESS | LOCATION ADDRESS |
|---|---|
| KNAPP SCHENCK & COMPANY<br>INSURANCE AGENCY INC<br>240 LEWIS WHARF<br>BOSTON  MA  02110 | |

T 12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE INSURED AS STATED HEREIN. IN RETURN FOR PAYMENT OF THE PREMIUM, AND
JBJECT TO ALL THE TERMS OF THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| POLICY NUMBER | POLICY PERIOD FROM | TO | PRIOR POLICY NO. | |
|---|---|---|---|---|
| 3445032 EO | 07/30/2003 | 07/30/2004 | 3445032 EO | |

**BASIC POLICY COVERAGE**

LEGAL LIABILITY

INSURED'S DEDUCTIBLE AMOUNT

**LIMITS OF LIABILITY**

$ 10,000,000 ___ EACH LOSS
$ 11,000,000 ___ EACH AGGREGATE
$   50,000 ___ EACH LOSS
$  150,000 ___ AGGREGATE

DEDUCTIBLE APPLIES TO: [ ] LOSS ONLY

[X] LOSS AND LITIGATION EXPENSE

**PREMIUMS**

BASIC POLICY PREMIUM                                        $ 179,905.00
REAL ESTATE AGENTS AND BROKERS PREMIUM       $ ___ N/A ___ (See attached endorsement for details)
MUTUAL FUND AND VARIABLE ANNUITY PREMIUM    $ ___ N/A ___ (See attached endorsement for details)
EMPLOYMENT-RELATED PRACTICES PREMIUM          $
OTHER

TOTAL POLICY PREMIUM       $ 179,905.00

**RETROACTIVE DATE**
This insurance does not apply to loss, whenever occurring, from "wrongful acts" which took place before the
Retroactive Date, if any, shown ___ NONE ___
Enter Date or "None" if no Retroactive Date applies

**OPTIONAL EXTENDED REPORTING PERIOD PREMIUM**
In Section VII - EXTENDED REPORTING PERIODS, we agree to provide an Optional Extended Reporting Period
under certain conditions. The premium for such an Optional Extended Reporting Period is determined as shown in
paragraph 5. of Section VII.

FORMS AND ENDORSEMENTS APPLYING TO AND MADE PART OF THIS POLICY AT TIME OF ISSUE:

14-E-0001 (01-91) *    14-E-0001 (01-91) *    14-E-0095 (12-98) *    14-P-EOA    (01-98) *
8-L-1864 (12-02) *

ATE:   07/29/03       LICENSED RESIDENT AGENT

OUNTERSIGNED AT: BURLINGTON, MA

COMPANY OFFICER

CURTIS PEARSALL

THESE DECLARATIONS AND THE COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A
PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

14-D-EOA ED.12-99   SEE OVER FOR IMPORTANT CLAIMS-MADE COVERAGE NOTICE       Page 1 of 2

FC   UNIBILL #100656909   PREMIUM AMOUNT TO BE REFLECTED ON NEXT BILLING NOTICE

The policy which provides Insurance Agents and Brokers Errors and Omissions Liability Coverage applies on a claims-made basis.

The following provides a general description of this coverage and is subject to the terms and provisions of the actual policy.

A. The policy, subject to its terms and conditions, provides full prior acts coverage if no Retroactive Date is entered in the Declarations. If a Retroactive Date is entered in the Declarations, the policy will not apply to loss from "wrongful acts" which took place before the Retroactive Date. The policy will not apply to loss from "wrongful acts" which take place after the expiration of the policy period.

B. The policy will apply to losses from "wrongful acts" which take place on or after the Retroactive Date, if any, but before the beginning of the policy period only if the insured did not know of the "wrongful acts" before the beginning of the policy period and if any claim is made according to D. below.

C. The policy will not apply to any loss for which claim is first made after the expiration of the policy period or any Automatic or Optional Extended Reporting Period described in the Extended Reporting Period Section of the policy.

D. The policy will apply only to claims which are first made:

1. During the policy period;

2. During the sixty day Automatic Extended Reporting Period described in the Extended Reporting Period Section of the policy; or

3. During the Optional Extended Reporting Periods of 12 months to 120 months duration, described in the Extended Reporting Period Section of the policy. Such Optional Extended Reporting Period must be requested by the insured in writing, within sixty days after the date of termination of coverage or thirty days after the date of mailing by us of notice to the named insured advising of premiums for and provisions of Optional Extended Reporting Periods, in order to allow claims to be made against the policy coverage after the expiration of any Automatic Extended Reporting Period.

E. We will send you a written notice within thirty days after any termination of coverage of costs for and provisions of Extended Reporting Periods.

F. For the first three years of claims-made coverage, premiums will be comparatively lower than for occurrence coverage, and will increase for each renewal of those policies. Claims-made prices will still be somewhat lower than occurrence prices for mature accounts (in their fourth or later years). The purchase of Optional Extended Reporting Periods, as described above, requires additional premium payments.



# Utica National Insurance Group

Insurance that starts with you.

Utica Mutual Insurance Company and its affiliated companies, New Hartford, N.Y. 13413

14-D-EOA, Ed. 12-99

INSURANCE AGENTS AND BROKERS
ERRORS AND OMISSIONS LIABILITY POLICY
CLAIMS-MADE BASIS

**EXTENSION SCHEDULE**   RENEWAL POLICY

| NAMED INSURED AND MAILING ADDRESS | LOCATION ADDRESS |
|---|---|
| KNAPP SCHENCK & COMPANY<br>INSURANCE AGENCY INC<br>240 LEWIS WHARF<br>BOSTON  MA  02110 | |

| POLICY NUMBER | POLICY PERIOD<br>FROM          TO | PRIOR POLICY NO. | |
|---|---|---|---|
| 3445032 EO | 07/30/2003    07/30/2004 | 3445032 EO | |

This schedule will be used for the following:
Additional Insured, Additional Location(s), Named Insured

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE NAMED INSURED IS TO READ AS FOLLOWS:
    KNAPP SCHENCK & COMPANY INSURANCE AGENCY INC
    SOUTH SHORE INSURANCE AGENCY INC    MASSAMONT INSURANCE
    AGENCY INC    SWS LEWIS WHARF LLC    SWS GREENFIELD LLC

ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE FOLLOWING ADDITIONAL LOCATION(S) ARE
COVERED UNDER THE ABOVE MENTIONED POLICY.
    324 MAIN STREET                      850 MAIN STREET
    GREENFIELD, MA                       WEYMOUTH, MA
                            01301                                 02189

ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

FC

POLICY NUMBER: 3445032 EO    RENEWAL POLICY    EFFECTIVE 07/30/2003

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTINGENT CATASTROPHE EXTRA EXPENSE COVERAGE

**(For attachment to Insurance Agents and Brokers Errors and Omissions Liability Policy)**
**(Claims-made Policy)**

## SCHEDULE

I. Effective Date:    07/30/2003
(If no date entered, coverage is effective from policy inception.)
Additional Premium        $_____100.00_____

| COVERAGE | LIMITS OF LIABILITY | |
| --- | --- | --- |
| CATASTROPHE CLAIM | $ 10,000 | EACH CATASTROPHE |
| EXPENSE COVERAGE: | $ 25,000 | AGGREGATE |

**DEDUCTIBLE AMOUNT:**        $500 each catastrophe

With respect to the insurance afforded by this endorsement, the Limits of Liability and Deductible Amount stated herein apply in lieu of, and not in addition to, any Limits of Liability and Deductible Amount stated in the policy Declarations.

II. In consideration of the additional premium shown in the Declarations or Schedule above, it is agreed that the policy includes coverage subject to the policy terms and the additional provisions below for your actual extra expenses necessarily incurred in the providing of professional services covered by this policy but only if such extra expenses:

A. Are a result of an event declared a catastrophe by the Property Claims Services (PCS). As used in this endorsement, catastrophe, regardless of any other cause or event that contributes concurrently or in any sequence to the loss does not include, whether directly or indirectly:

1. Seizure or destruction of property by order of governmental authority, unless the insurance needs of your customers were the result of acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread;

2. Nuclear reaction or radiation, or radioactive contamination, however caused, unless the insurance needs of your customers were the result of ensuing fire; and

3. a. War, including undeclared or civil war;

   b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   c. Insurrection, rebellion, revolution, usurped power, or any action taken by governmental authority in hindering or defending against any of these;

whether or not declared catastrophes by the Property Claim Services.

B. Are incurred between the beginning date of the catastrophe and 45 days after the catastrophe began.

FC

14-E-0095 Ed. 12-98

**C.** Are attributed to the assisting in the processing of insurance claims for your customers who have been affected by the catastrophe. Extra Expense under this endorsement, does not include actual payments, whether in whole or in part, for claims to your customers.

**D.** Are over and above the expenses you would have incurred in the providing of professional services for the same period had no catastrophe occurred.

**E.** Are not to continue your normal business operations due to physical loss or damage to your property.

**F.** Are not paid for by other insurance, except for other insurance that is written subject to the same terms, conditions and provisions of this endorsement.

**III. A.** The Limits of Liability shown in the Schedule above and the rules below determine the most we will pay regardless of the number of:

1. Insureds;
2. Insureds making claims for extra expense;
3. Claims made for extra expense;
4. Claims processed for catastrophes; or
5. Customers serviced in the event of a catastrophe.

**B.** The Aggregate Limit shown in the Schedule above is the most we will pay for the sum of all necessary extra expenses incurred as a result of catastrophes which occur during the "policy period."

**C.** Subject to **B.** above and the deductible amount set forth in the Schedule above for each catastrophe, the Each Catastrophe Limit is the most we will pay under this endorsement for the sum of all necessary extra expenses sustained in any one catastrophe.

**D.** The Limits of Liability of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for the purposes of determining the Limits of Liability.

**E. 1.** The Deductible Amount stated in the Schedule above will be deducted from the sum of all extra expenses for all claims because of any one catastrophe to which this insurance applies.

2. The Limits of Liability, as described above, will apply to any extra expense which remains after the deduction of the Deductible Amount.

**IV.** If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of the loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**A.** Pay its chosen appraiser; and

**B.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**V.** In the event a claim is made for the insurance provided by this endorsement, you must:

**A.** Give us prompt notice of loss.

**B.** As soon as possible, give us details of the extra expense you incurred as a result of providing professional services to your customers due to the PCS declared catastrophe.

**C.** As often as may reasonably be required, permit us to inspect your records proving your extra expense loss.

**D.** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**E.** Cooperate with us in the investigation or settlement of the claim.

**F.** Permit us to examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

Includes copyrighted material of Insurance Services Office, Inc., 14-E-0095 Ed. 12-98 with its permission.
Copyright, Utica Mutual Insurance Company, 1999.

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

# POLICY CHANGES/EXTENSION SCHEDULE

Policy Change

This Endorsement forms a part of the policy numbered below:

Number _____

| | |
|---|---|
| Named Insured and Mailing Address<br>KNAPP SCHENCK & COMPANY INSURANCE AGENCY INC<br>PO BOX 51310<br>BOSTON MA   02205 | Policy Number<br>3445032 AP |
| | Policy Changes Effective<br>07/30/2003 |
| | Company<br>**UTICA MUTUAL INSURANCE COMPANY** |

IT IS AGREED THAT THE POLICY IS AMENDED AS STATED IN PART B.

| P<br>A<br>R<br>T<br><br>A. | □ NAME CHANGE<br>□ ADDRESS CHANGE<br>□ AMENDING PREMIUM<br>□ ADDING ADDITIONAL INSURED<br>□ DELETING ADDITIONAL INSURED<br>□ AMENDING LIMIT OF LIABILITY<br>□ AMENDING DEDUCTIBLE | □ ADDING LOCATION(S)<br>□ DELETING LOCATION<br>□ ADDING MUTUAL FUNDS<br>□ DELETING MUTUAL FUNDS<br>□ MUTUAL FUNDS - ADDING SOLICITOR<br>□ MUTUAL FUNDS - DELETING SOLICITOR<br>□ EXCLUSION OF DUPLICATE COVERAGE | □ CHANGING STAFF<br>□ VOIDING ENDORSEMENT<br>□ ADDING REAL ESTATE<br>□ DELETING REAL ESTATE<br>□ REAL ESTATE - ADDING SOLICITOR<br>□ REAL ESTATE - DELETING SOLICITOR |

| P<br>A<br>R<br>T<br><br>B. | The following exclusion below replaces exclusion #15. as listed in 14-P-EOA, **SECTION III - EXCLUSIONS:**<br><br>15.  The insolvency, receivership, bankruptcy, liquidation or inability to pay of any entity, person, corporation, estate, trust, or other organization including, but not limited to:<br>     a.  Insurnce companies or reinsurance companies;<br>     b.  Health maintenance organizations or preferred provider organizations;<br>     c.  Captive insurers or risk retention groups and/or risk purchasing groups; or<br>     d.  Investment funds or self-insurance programs.<br><br>ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME. |

| PREMIUM ADJUSTMENT |
|---|

| ADDITIONAL PREMIUM | RETURN PREMIUM |
|---|---|

14-E-0001 Ed 1-91

Authorized Representative Signature

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY CHANGES/EXTENSION SCHEDULE

## RENEWAL POLICY

Policy Change
Number_____

This Endorsement forms a part of the policy numbered below:

| Named Insured and Mailing Address | Policy Number |
|---|---|
| | 3445032 EO |
| KNAPP SCHENCK & COMPANY | Policy Changes Effective |
| INSURANCE AGENCY INC | 07/30/2003 |
| 240 LEWIS WHARF | Company |
| BOSTON   MA   02110 | UTICA MUTUAL INSURANCE CO. |

IT IS AGREED THAT ×͓×͓×͓×͓×͓×͓×͓×͓×͓×͓×͓×͓×͓×͓×͓×͓×͓ the policy is amended as stated in Part B.

**P A R T A.**

☐ NAME CHANGE
☐ ADDRESS CHANGE
☐ AMENDING PREMIUM
☐ ADDING ADDITIONAL INSURED
☐ DELETING ADDITIONAL INSURED
☐ AMENDING LIMIT OF LIABILITY
☐ AMENDING DEDUCTIBLE

☐ ADDING LOCATION(S)
☐ DELETING LOCATION
☐ ADDING MUTUAL FUNDS
☐ DELETING MUTUAL FUNDS
☐ MUTUAL FUNDS - ADDING SOLICITOR
☐ MUTUAL FUNDS - DELETING SOLICITOR
☐ EXCLUSION OF DUPLICATE COVERAGE

☐ CHANGING STAFF
☐ VOIDING ENDORSEMENT
☐ ADDING REAL ESTATE
☐ DELETING REAL ESTATE
☐ REAL ESTATE - ADDING SOLICITOR
☐ REAL ESTATE - DELETING SOLICITOR

**P A R T B.**

IN CONSIDERATION OF THE PREMIUM PAID, IT IS HEREBY UNDERSTOOD AND AGREED THAT
NO COVERAGE IS AFFORDED FOR CLAIMS ARISING FROM THE INCIDENT MENTIONED IN
QUESTION(S) 30        OF THE APPLICATION DATED 08/05/02 AND SIGNED
BY DAVID WINSHIP

ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

**PREMIUM ADJUSTMENT**

| ADDITIONAL PREMIUM | RETURN PREMIUM |
|---|---|
| | |

14-E-0001  Ed. 1-91
FC

Authorized Representative Signature

POLICY NUMBER: 3445032 EO    RENEWAL POLICY    EFFECTIVE 07/30/2003

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CONTINGENT CATASTROPHE EXTRA EXPENSE COVERAGE

### (For attachment to Insurance Agents and Brokers Errors and Omissions Liability Policy)
### (Claims-made Policy)

#### SCHEDULE

I.  Effective Date:    07/30/2003
    (If no date entered, coverage is effective from policy inception.)
    Additional Premium          $_____100.00____

| COVERAGE | LIMITS OF LIABILITY | |
|---|---|---|
| CATASTROPHE  CLAIM | $ 10,000 | EACH  CATASTROPHE |
| EXPENSE  COVERAGE: | $ 25,000 | AGGREGATE |

DEDUCTIBLE AMOUNT:          $500 each catastrophe

With respect to the insurance afforded by this endorsement, the Limits of Liability and Deductible Amount stated herein apply in lieu of, and not in addition to, any Limits of Liability and Deductible Amount stated in the policy Declarations.

II. In consideration of the additional premium shown in the Declarations or Schedule above, it is agreed that the policy includes coverage subject to the policy terms and the additional provisions below for your actual extra expenses necessarily incurred in the providing of professional services covered by this policy but only if such extra expenses:

A.  Are a result of an event declared a catastrophe by the Property Claims Services (PCS). As used in this endorsement, catastrophe, regardless of any other cause or event that contributes concurrently or in any sequence to the loss does not include, whether directly or indirectly:

1.  Seizure or destruction of property by order of governmental authority, unless the insurance needs of your customers were the result of acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread;

2.  Nuclear reaction or radiation, or radioactive contamination, however caused, unless the insurance needs of

your customers were the result of ensuing fire; and

3.  a.  War, including undeclared or civil war;

    b.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

    c.  Insurrection, rebellion, revolution, usurped power, or any action taken by governmental authority in hindering or defending against any of these;

whether or not declared catastrophes by the Property Claim Services.

B.  Are incurred between the beginning date of the catastrophe and 45 days after the catastrophe began.

FC
14-E-0095  Ed. 12-98                                                        Page 1 of 2

C. Are attributed to the assisting in the processing of insurance claims for your customers who have been affected by the catastrophe. Extra Expense under this endorsement, does not include actual payments, whether in whole or in part, for claims to your customers.

D. Are over and above the expenses you would have incurred in the providing of professional services for the same period had no catastrophe occurred.

E. Are not to continue your normal business operations due to physical loss or damage to your property.

F. Are not paid for by other insurance, except for other insurance that is written subject to the same terms, conditions and provisions of this endorsement.

III. A. The Limits of Liability shown in the Schedule above and the rules below determine the most we will pay regardless of the number of:

1. Insureds;

2. Insureds making claims for extra expense;

3. Claims made for extra expense;

4. Claims processed for catastrophes; or

5. Customers serviced in the event of a catastrophe.

B. The Aggregate Limit shown in the Schedule above is the most we will pay for the sum of all necessary extra expenses incurred as a result of catastrophes which occur during the "policy period."

C. Subject to B. above and the deductible amount set forth in the Schedule above for each catastrophe, the Each Catastrophe Limit is the most we will pay under this endorsement for the sum of all necessary extra expenses sustained in any one catastrophe.

D. The Limits of Liability of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for the purposes of determining the Limits of Liability.

E. 1. The Deductible Amount stated in the Schedule above will be deducted from the sum of all extra expenses for all claims because of any one catastrophe to which this insurance applies.

2. The Limits of Liability, as described above, will apply to any extra expense which remains after the deduction of the Deductible Amount.

IV. If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of the loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

A. Pay its chosen appraiser; and

B. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

V. In the event a claim is made for the insurance provided by this endorsement, you must:

A. Give us prompt notice of loss.

B. As soon as possible, give us details of the extra expense you incurred as a result of providing professional services to your customers due to the PCS declared catastrophe.

C. As often as may reasonably be required, permit us to inspect your records proving your extra expense loss.

D. Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

E. Cooperate with us in the investigation or settlement of the claim.

F. Permit us to examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

Includes copyrighted material of Insurance Services Office, Inc.,   14-E-0095   Ed. 12-98 with its permission.
Copyright, Utica Mutual Insurance Company, 1999.

## UTICA MUTUAL INSURANCE COMPANY
## UTICA, NEW YORK
## (HEREINAFTER CALLED THE COMPANY)

# INSURANCE AGENTS AND BROKERS
# ERRORS AND OMISSIONS INSURANCE

## THIS IS A CLAIMS-MADE POLICY

THIS POLICY IS LIMITED TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD PROVIDED.

## PLEASE REVIEW THE POLICY CAREFULLY.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine your rights, duties, and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Utica Mutual Insurance Company.

The word "insured" means any person or organization qualifying as such under **SECTION IV- WHO IS AN INSURED**.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION I - DEFINITIONS**.

### SECTION I - DEFINITIONS

1. "Claim" means a written notice, including service of "suit" or demand for arbitration, received by one or more insureds asking for money or services.

2. "Claim expense" means:
   a. Fees charged by an attorney retained by us to defend you;
   b. All other fees, costs, and expenses resulting from the investigation, adjustment, and defense of a "claim" if incurred by us or by the insured with our consent;
   c. Fees charged by any attorney hired by the insured with our written consent; and
   d. Pre and post-judgment interest on that part of the judgment that we pay up to the policy limits.

   However, "claim expense" does not include salaries of regular employees or of officials of the insured.

3. "Dealer organization" means an entity organized for the purpose of selling equity-based products and securities.

4. "Interrelated wrongful acts" means "wrongful acts" which arise out of and have as a common basis:
   a. Related circumstances, situations, events, transactions or facts;
   b. A series of related circumstances, situations, events, transactions or facts; or
   c. A common pattern of conduct in selling or servicing products to which this insurance applies.

5. "Litigation expense" means fees and disbursements charged by any attorney retained by us, or hired by you with our written consent, to defend a suit against you or consult on such defense. "Litigation expense" does not include salaries or other expenses of our regular employees or officials, or the fees, disbursements, or other expenses of any counsel retained by us prior to any actual "suit" filing.

6. "Loss" means any amount which an insured becomes legally obligated to pay as damages for any "claim" to which this insurance applies and shall include judgments and settlements. To the extent allowed by law, "loss" shall include punitive or exemplary damages. "Loss" shall not include:
   a. Fines or penalties imposed by law;
   b. Taxes; and
   c. Matters which may be deemed uninsurable under the law pursuant to which the policy shall be construed.

7. "Personal injury" means injury arising out of one or more of the following offenses:
   a. False arrest, detention, or imprisonment;
   b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord, or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services; or

e. Oral or written publication of material that violates a person's right of privacy.

8. a. "Policy period" means the period from the inception date to the expiration date, stated in the Declarations of this policy, or to its earlier termination date, if any.

b. If there is a "termination of coverage" as described in parts b. or c. of the definition of "termination of coverage," the "policy period" will be understood to end on the date of such change, but only with respect to such changed coverage.

9. "Real Estate Professional" means a:

a. "Real estate property manager";

b. Real estate appraiser, except when appraising real estate with respect to policies written or placed through you (coverage for this is included in the basic policy); or

c. Licensed real estate agent or broker.

10. "Real Estate Property Manager" means a person while performing any one or more of the following services in connection with real property, for others, including functions necessary and incidental to such services:

a. Securing tenants, renting, or leasing;

b. Collecting rents;

c. Arranging for routine cleaning and repairs; or

d. Controlling expenses and reporting such expenses to the real estate owner;

provided such services are rendered pursuant to a written property management agreement for real property held for sale through the Named Insured as listing broker and then only when such services are provided solely for the duration of the period from the listing of such real property for sale until the assumption of such responsibility by a party other than the insured or the closing of the sale of such real property, whichever is earlier, but not to exceed 365 days.

11. "Selling mutual funds or variable annuities" means the sale of shares of a mutual fund (which is a corporation or trust that is an investment company registered under the Investment Company Act of 1940) and the sale of variable annuities. "Selling mutual funds or variable annuities" includes the servicing required by such sales.

12. "Suit" means a civil proceeding in which damages because of "loss" from a "wrongful act" are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

13. "Termination of coverage" means any:

a. Cancellation or nonrenewal of the policy;

b. Decrease in limits, reduction of coverage, increased deductible, new exclusion; or

c. Other change in coverage less favorable to the insured.

14. "Wrongful act" means any negligent act, error, or omission to which this insurance applies.

## SECTION II - COVERAGE

### 1. Insuring Agreement.

a. We will pay on behalf of the insured all "loss" to which this insurance applies.

We will have the right and the duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any "suit" seeking damages for a "wrongful act" to which this insurance does not apply.

We may, at our discretion:

(1) Investigate any allegation of a "wrongful act"; and

(2) Settle, according to the Settlement-Consent of The Insured Condition, any "claim" or "suit" that may result. But:

(a) The amount we will pay for damages is limited as described in **SECTION V - LIMITS OF LIABILITY**; and

(b) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of "loss."

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **2. Supplementary Payments.**

This insurance does not apply to "wrongful acts" which took place before the retroactive date, if any, shown in the Declarations for this policy or which take place after the "policy period."

b. This insurance applies to "wrongful acts" only if:

(1) The "wrongful acts" occurred on or after the retroactive date, if any shown in the Declarations and before the "policy period"; and

(2) A "claim" is first made against any insured, in accordance with paragraph c. below, during the "policy period" or any Extended Reporting Period we provide under **SECTION VII - EXTENDED REPORTING PERIODS.**

c. A "claim" will be considered first made at the earliest of the following times:

(1) When notice of such "claim" is received and recorded by any insured or by us, whichever comes first.

(2) When we make settlement in accordance with paragraph 1.a. above.

(3) On the date during the "policy period" when the first written notice of any facts or circumstances which may subsequently give rise to a "claim" which would be insured hereunder is received by us from an insured. Any "claim" made against an insured arising out of such facts or circumstances after the date of receipt of such notice by us will be considered to have been made as of the date we received the first notice of facts or circumstances and only the policy in force on that date and no other shall apply for all "claims" from such facts or circumstances.

d. All "claims" for damages based on or arising out of a single "wrongful act" or all "interrelated wrongful acts" of one or more insureds shall be deemed to be one "claim" and to have been made at the time the first of those "claims" is made against any insured.

e. The "loss" must arise out of "wrongful acts" committed in the conduct of the insured's business, wherever committed or alleged to have been committed, by the insured or any person for whose "wrongful acts" the insured is legally liable in rendering or failing to render professional services as:

(1) A General Insurance Agent;

(2) An Insurance Broker;

(3) An Insurance Agent;

(4) An Insurance Consultant;

(5) A Managing, Master or Brokerage General Agent;

(6) A Life and Accident and Health Insurance Agent;

(7) A Surplus Lines Broker; or

(8) A Notary Public.

The following services are included providing they are part of the insured's professional services:

(1) Notarizing.

(2) Arranging premium financing through a non-related entity.

(3) Real estate appraising and loss adjustment on or for policies written or placed by you.

(4) Providing insurance advice for employee benefit programs.

(5) Providing insurance program and risk management services and advice.

(6) Providing loss control services for policies written or placed by you.

(7) (a) "Selling mutual funds or variable annuities," as provided for in the Mutual Fund and Variable Annuity Coverage Endorsement; or

(b) Acting as a "real estate professional," as provided for in the Real Estate Agents and Brokers Errors and Omissions Insurance Endorsement;

if a premium has been charged for such coverage. Such insurance is subject to the Limits of Liability and other provisions set forth in the endorsement.

2. **Supplementary Payments.**

We will pay with respect to any "claim" we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur, including fees charged by an attorney retained by us to defend you.

b. The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the applicable limit of liability. We do not have to furnish these bonds.

c. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit," including actual loss of earnings up to $250 a day because of time off from work. Such expenses shall include fees charged by any attorney hired by the insured with our written consent.

d. All costs taxed against the insured in the "suit."

e. Pre and post-judgment interest on that part of the judgment that we pay up to the policy limits.

These payments will not reduce the limits of liability except as stated in part **6., Deductible,** of **SECTION V - LIMITS OF LIABILITY.**

## SECTION III - EXCLUSIONS

This insurance does not apply to:

1. Any dishonest, fraudulent, malicious, or criminal conduct committed or alleged to have been committed by or at the direction of the insured. If a "suit" is brought against the insured alleging both "wrongful acts" within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct, then we will defend the insured in the trial court, but we shall not have any liability for any judgment for dishonest, fraudulent, malicious, or criminal conduct nor shall we have any further obligation to defend after judgment in the trial court.

   This exclusion applies only to insureds who participated in, acted with knowledge of, or acquiesced to such conduct.

2. "Loss" arising out of or in any way involving:

   a. A "wrongful act" or circumstance, situation or fact which has been the subject of notice given prior to the effective date of this policy under other insurance which provided protection for the insureds; or

   b. A "wrongful act" which with any "wrongful act" described in **a.** above would constitute "interrelated wrongful acts."

3. Loss," direct or consequential, arising from:

   a. Bodily injury from whatever cause including emotional distress, sickness, disease, or death, or for care and loss of consortium, support, companionship, or services of any kind resulting from bodily injury; or

   b. Damage to tangible property, including loss of use thereof.

4. Any liability for money received by an insured or credited to an insured for fees, premiums, taxes, commissions, loss payments, or escrow or brokerage monies.

5. The certification or acknowledgment of a signature by an insured acting as a notary without the proper compliance with the applicable laws and regulations of the state having jurisdiction.

6. A "claim" by any entity or individual which:

   a. Is wholly or partially owned, operated, managed, or controlled by the insured;

   b. Did wholly or partially own, operate, manage, or control the insured; or

   c. Is wholly or partially under the same ownership, operation, management, or financial control as the insured.

7. "Personal injury" arising out of:

   a. The oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

   b. The oral or written publication of material whose first publication took place before the Retroactive Date, if any, shown in the Declarations; or

   c. The willful violation of a penal statute or ordinance committed by or with the consent of the insured.

8. Any liability for:

   a. Refusal to employ;

   b. Termination of employment; or

   c. Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, or other employment-related practices, policies, acts, or omissions.

9. Discrimination or unfair competition of any type.

10. Acts, errors, or omissions of an insured which violate the Employee Retirement Income Security Act of 1974 (ERISA), the Pension Benefits Act and the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA) including any amendments, regulations or enabling statutes pursuant thereto, or any similar federal, state, or provincial statute or regulation.

11. The violation of any federal or state security law or the Racketeer Influenced and Corrupt Organizations Act and/or any of their amendments and regulations.

12. a. Any investment advice given or alleged to have been given relating to the performance or lack of performance of any investment or resulting from variations in the value of any investment, including, but not limited to, stocks, bonds, real estate, oil or gas, gold, silver, diamonds, or any non-insurance investment.

    b. "Loss" arising out of an insured's representations or omissions regarding:

       (1) Interest rates; or

       (2) Future premium payments or market value of insurance products.

14-P-EOA Ed. 1-98

13. Services as an attorney, accountant, actuary, tax preparer or tax consultant, real estate broker, security broker, security dealer, mortgage broker, financial planner, or any other professional services unless such professional services are specifically insured hereunder and an additional premium paid.

14. The ownership, formation, creation, administration, or operation of any Health Maintenance Organization or Preferred Provider Organization.

15. The ownership, formation, creation, administration, operation or insolvency of any Self-Insurance Program, Risk Retention Group and/or Risk Purchasing Group formed under the Federal Liability Retention Act of 1981 and 1986 as amended or any amendment thereto, Multiple Employer Trust, Multiple Employer Welfare Arrangement, or any pool, syndicate, association or other combination formed for the purpose of providing insurance or benefits, if not fully funded by an insurance product.

However, this exclusion does not apply to the insolvency of any Self-Insurance Program designed for the purpose of covering exposures of a single individual or entity other than the Named Insured.

16. Any "claim" against an insured based upon or arising out of any pension, profit sharing, health or welfare, or other employee benefit plan or trust sponsored by the insured as an employer.

17. Any "claim" based solely on an insured's status as a fiduciary.

18. "Claims" made against an insured arising out of the insured's activities as third party administrator of any plan, whether insured or self-insured and whether or not the insured performs such activities.

19. "Claims" arising out of or alleging the unauthorized use of trade secrets or confidential or proprietary information.

20. Any "claim" brought against an insured by a "dealer organization."

21. "Loss":

    a. With respect to which an insured under this insurance is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    b. Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    c. Resulting from the "hazardous properties" of "nuclear material," if:

        (a) The "nuclear material" **(i)** is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or **(ii)** has been discharged or dispersed therefrom;

        (b) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported, or disposed of by or on behalf of an insured; or

        (c) The "loss" arises out of the furnishing by an insured of services, materials, parts, or equipment in connection with the planning, construction, maintenance, operation, or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion **(c)** applies only to "loss" to such "nuclear facility" and any property thereat.

As used in this exclusion:

"Hazardous properties" include radioactive, toxic, or explosive properties;

"Nuclear material" means "source material," "special nuclear material," or "by-product material";

"Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"Waste" means any waste material **(i)** containing "by-products material"; other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(ii)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing "spent fuel," or (iii) handling, processing, or packaging "waste";

(c) Any equipment or device used for the processing, fabricating, or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Loss," in this exclusion, includes all forms of radioactive contamination of property.

## SECTION IV - WHO IS AN INSURED

Each of the following is an insured to the extent set forth below:

1. The individual, partnership, corporation or limited liability company designated as the Named Insured in the Declarations;

2. Your executive officers or directors, but only with respect to their duties as your officers and directors;

3. Your partners or members, but only with respect to the conduct of your business;

4. Your employees (regular, leased, or temporary) or managers, but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business; or

5. Your licensed solicitors or office brokers (who is not an employee) but only as respects:

   a. Such persons who are named in the Real Estate Agents and Brokers Errors And Omissions Insurance Endorsement while acting on your behalf; or

   b. Such persons who are named in the Mutual Fund And Variable Annuity Coverage Endorsement while acting on your behalf.

6. Any independent contractor acting on your behalf for "claims" arising out of "wrongful acts" in connection with business placed through or serviced by you.

7. Any person who was formerly an insured under parts 1., 2., 3., 4., 5. and 6. above, but only with respect to "wrongful acts" which took place prior to the termination of such relationship.

8. a. Any merged entity for which coverage was added at any time by our Merged or Consolidated Entity Endorsement, 14-E-0006.

   b. This insurance does not apply to "wrongful acts" which any insured had knowledge of prior to the effective date of the original endorsement which added such coverage.

9. a. You, for legal liability from "wrongful acts" of any merged entity for which coverage was added at any time by our Merged or Consolidated Entity Endorsement, 14-E-0006.

   b. This insurance does not apply to "wrongful acts" which any insured had knowledge of prior to the effective date of the original endorsement which added such coverage.

10. a. You, for legal liability from "wrongful acts" of any purchased entity for which coverage was added at any time by our Purchased Entity Endorsement, 14-E-0005.

    b. This insurance does not apply to "wrongful acts" which any insured had knowledge of prior to the effective date of the original endorsement which added such coverage.

    c. This insurance does not apply to "wrongful acts" which occurred prior to the effective date of the original endorsement which added such coverage.

11. The heirs, executors, administrators, or legal representatives of each insured in the event of death, incapacity, or bankruptcy, but solely with respect to the liability of each insured as otherwise insured herein.

Except as stated in 8., 9. and 10. above, no person or organization is an insured with respect to the conduct of such person or organization, or any current or past partnership or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION V - LIMITS OF LIABILITY

1. The limits of insurance shown in the Declarations and the provisions of this section determine the most we will pay for damages regardless of the number of:

   a. Persons insured;

   b. Persons or entities making "claims" or bringing "suits"; or

c. "Claims" made or "suits" brought.

2. The total limit of our liability for all payments for all "losses" under this policy shall not exceed the aggregate amount stated in the Declarations.

3. a. Subject to **2.** above, the each "loss" limit is the most we will pay for all "loss" from any one "wrongful act" or "interrelated wrongful acts" of one or more insureds; and

   b. Only one deductible amount applies to all such "loss".

4. We will pay all "claim expense" in addition to the applicable Limit of Liability, except as provided in **6. Deductible.**

5. a. Our Limit of Liability for each "loss" applies in excess of the applicable deductible amount set forth in the policy for each "loss."

   b. Subject to the deductible amount for each "loss," the total deductible amount for all "losses" under this policy shall not exceed the aggregate deductible amount stated in the Declarations.

   c. Such aggregate deductible amount applies in conjunction with any and all "loss" deductible amounts, whether set forth in the policy Declarations or in endorsements forming a part of the policy.

6. **Deductible.**

   a. If the block in the Declarations labeled "Deductible Applies To: Loss Only" is checked, the insured shall pay the deductible amount set forth in the Declarations for each "loss." The deductible does not include "claim expense."

   b. If the block in the Declarations labeled "Deductible Applies To: Loss And Litigation Expense" is checked, the insured shall pay the deductible amount set forth in the Declarations for each "loss." The deductible will be applied to payments for both "loss" and "litigation expense" as defined in the policy.

   c. We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

   d. Such deductible amounts shall, upon written demand by the company, be paid by the Named Insured within ten days. The total payments requested from the insured with respect to each "loss" shall not exceed the applicable deductible amount stated in the policy.

The determination of the company as to the reasonableness of the "litigation expense" shall be conclusive for all parties.

## SECTION VI - CONDITIONS

1. **Duties In The Event Of "Wrongful Act," "Claim" Or "Suit."**

   a. You must see to it that we are notified in writing as soon as practicable of any "wrongful act" which may result in a "claim." To the extent possible, notice should include:

      (1) How, when and where the "wrongful act" took place;

      (2) The names and addresses of persons involved in the "wrongful act" and witnesses; and

      (3) The nature of the harm resulting from the "wrongful act."

   b. If a "claim" is received by an insured, you must:

      (1) Immediately record the specifics of the "claim" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the "claim" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses, subpoenas or legal papers received in connection with the "claim" or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation, settlement, or defense of the "claim" or "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to an insured because of "loss" to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

2. **Settlement - Consent Of The Insured.**

   We shall not settle any "claim" without the consent of the insured. If, however, the insured:

   a. Refuses to consent to any settlement recommended by us and elects to contest the "claim" or continue any legal proceeding in connection with such "claim," then our liability for the "claim" will not exceed the lesser of the amount for which the "claim" could have



been settled or the Limits Of Liability plus the incurred "claims expense" up to the time of such refusal.

b. Cannot be located by us after a search using reasonable diligence, then we will use our best efforts to make such settlement as we deem appropriate considering the circumstances and facts.

### 3. Other Insurance.

This insurance is excess over any other applicable insurance whether such insurance is primary, excess, contributory, contingent, or otherwise and whether such insurance is collectible or not; unless such other insurance is written to be specifically excess over the insurance provided by this policy.

### 4. Transfer Of Rights Of Recovery Against Others To Us.

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after a "wrongful act" to prejudice such rights. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. Any amounts recovered will be applied to reduce the amount we paid for "loss" and expense (after application of the deductible) before being applied to reduce your deductible.

### 5. Cancellation.

a. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

b. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1) 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

(2) 60 days before the effective date of cancellation, if we cancel for any other reason.

c. We will mail or deliver our notice of cancellation to the first Named Insured's last mailing address known to us.

d. The notice of cancellation will state the effective date of cancellation. The "policy period" will end on that date.

e. If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, any refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be

effective even if we have not made or offered a refund.

f. If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

### 6. Premium.

The first Named Insured shown in the Declarations:

a. Is responsible for the payment of all premiums and deductibles; and

b. If the premium is not financed, will be the payee for any return premium; but

c. If the premium is financed the Named Insured authorizes us to pay any return premium to the premium finance company.

### 7. Nonrenewal.

If we decide not to renew this policy, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 60 days before the expiration date. If notice is mailed, proof of mailing will be sufficient proof of notice.

### 8. Your Right To "Claim" And "Wrongful Act" Information.

We will provide the first Named Insured shown in the Declarations the following information relating to this and any other Insurance Agents and Brokers Errors and Omissions Liability claims-made policy we have issued to you during the previous three years:

a. A list or other record of each "wrongful act," not previously reported to any other insurer, of which we were notified in accordance with paragraph 1.a. of this Section. We will include the date and a brief description of the "wrongful act" if that information was in the notice we received.

b. A summary by policy year, of payments made and amounts reserved, stated separately under the applicable Aggregate Limit.

Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values. You must not disclose this information to any claimant or any claimant's representative without our consent.

If we cancel or elect not to renew this policy, we will provide such information no later than 30 days before the date of policy termination. In other circumstances, we will provide this information only if we receive a written request from the first Named Insured. In this case, we will provide this information within 45 days of receipt of the request.

We compile "claim" and "wrongful act" information for our own business purposes and exercise reasonable care in doing so. In providing information to the first Named Insured, we make no representations or warranties to insureds, insurers, or others to whom this information is furnished by or on behalf of any insured. Cancellation or nonrenewal will be effective even if we inadvertently provide inaccurate or incomplete information.

## 9. Action Against Company.

No action shall lie against us unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment after actual trial or by written agreement of the insured, the claimant, and us.

Any person or organization or the legal representative thereof, who is signatory to such judgment or written agreement, shall thereafter be able to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join us as a party to any action against an insured to determine the insured's liability, nor shall we be impleaded by an insured or an insured's legal representative.

## 10. Bankruptcy.

Bankruptcy or insolvency of the insured shall not relieve us of any of our obligations hereunder.

## 11. Changes.

This policy embodies all agreements existing between each insured and us or any of our agents relating to this insurance. Only the first Named Insured shown in the Declarations is authorized to request changes in the terms of this policy. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## 12. Agency Of Named Insured.

By acceptance of this policy the first Named Insured agrees to act on behalf of all insureds with respect to the giving and receiving of notices to and from us, the cancellation of this policy, the payment of premiums and deductibles when due, and the receiving of any return premiums that may become due. In addition, all insureds agree that the first Named Insured shall act on their behalf. If the first Named Insured does not comply with the obligations under this policy then each Named Insured agrees that it will be responsible for the payment of premiums and deductibles when due.

## 13. Sale, Transfer, Or Assignment.

The controlling interest of any insured under this policy shall not be assignable to any other person without our written consent. In the event of the death or incompentency of the insured, this policy shall cover the insured's legal representative as an insured as respects any liability of that insured which is covered by this policy.

Coverage under this policy may end on the date ownership of (or stock which comprises a controlling interest in) any Named Insured is sold, transferred, or assigned unless our written consent is obtained before said date.

## 14. Application.

By acceptance of this policy, you affirm as of the effective date of this policy that the statements in the application attached hereto and made a part hereof are each insured's agreements and representations and that we have issued this policy in reliance upon the truth and accuracy of such representations.

## 15. Conformance To Statute.

Any terms of this policy which conflict with the statutes of the state where this policy is issued are hereby amended to conform to such statues.

## 16. Liberalization Clause.

If, after the effective date of this policy or of the latest renewal certificate attached thereto, we adopt revised provisions for this policy form affording broader coverage with no premium increase, then this policy shall be construed in accordance with the revised provisions as of the effective date of such revision.

## SECTION VII - EXTENDED REPORTING PERIODS

1. We will provide an Automatic Extended Reporting Period as described in paragraph **3.**, or if you purchase it, an Optional Extended Reporting Period Endorsement as described in paragraphs **4.** through **7.** below, in the event of any "termination of coverage."

2. a. If we provide an Extended Reporting Period, a "claim" first made during the Extended Reporting Period will be deemed to have been made during the "policy period," provided that the claim is for "loss" from "wrongful acts" which took place before the end of the "policy period" (but not before any applicable Retroactive Date).

   b. **Extended Reporting Periods:**
      (1) Do not extend the "policy period" or change the scope of coverage provided;



**(2)** Do not reinstate or increase the Limits of Liability applicable to any "claim" to which this policy applies, except to the extent described in paragraph **7.** below;

**(3)** Apply only to the coverage terminated or reduced; and

**(4)** Apply only as excess insurance over any other valid and collectible insurance available to the insured, whether primary, excess, contingent, or on any other basis, whose policy period begins or continues after the Extended Reporting Period takes effect.

**3. Automatic 60 Day Extended Reporting Period.**

The Automatic Extended Reporting Period is provided without additional charge. This period starts with the end of the "policy period" and lasts for sixty (60) days. The Automatic Extended Reporting Period may not be cancelled.

**4. Optional Extended Reporting Period.**

If this policy is subject to any "termination of coverage," then you shall have an option to purchase an Optional Extended Reporting Period according to the schedule in **5.** below.

**5. Available Options.**

If you purchase the Optional Extended Reporting Period Endorsement, the Optional Extended Reporting Period will start sixty (60) days after the end of the "policy period" and will last:

a. Twelve (12) months for a premium of 70% of the last full annual premium;

**b.** Twenty-four (24) months for a premium of 100% of the last full annual premium;

**c.** Thirty-six (36) months for a premium of 130% of the last full annual premium;

**d.** Forty-eight (48) months for a premium of 160% of the last full annual premium;

**e.** Sixty (60) months for a premium of 190% of the last full annual premium; or

**f.** One hundred and twenty (120) months for a premium of 200% of the last full annual premium.

**6. Optional Extended Reporting Period Notice and Acceptance.**

**a.** We will notify you in writing within thirty (30) days of the date of "termination of coverage" of the premium for and provisions of the Extended Reporting Period unless we cancel for nonpayment of premium or fraudulent activities of an insured.

If the policy is cancelled for nonpayment of premium or fraudulent activities of an insured, we will only provide a premium quotation for the Optional Extended Reporting Period upon your request.

**b.** You will have until the later of sixty (60) days after the date of "termination of coverage," or thirty (30) days after the date of mailing of the Extended Reporting Period notice provided for above, to request the Optional Extended Reporting Period. Your request must:

**(1)** Be submitted to us in writing;

**(2)** Show the length of the period of extension desired; and

**(3)** Include payment of the premium for the requested extension.

**c.** If such request and premium payment are not received, the Extended Reporting Period options may not be exercised at a later date.

**d.** If, in the event of "termination of coverage" you elect to purchase the Optional Extended Reporting Period Endorsement:

**(1)** Any return premium due you for the "terminated of coverage" will be credited to the premium due for the Optional Extended Reporting Period Endorsement; and

**(2)** Any additional premium or deductible amount due us for the period the policy was in force must be fully paid before any payments will be applied to the premium due for the Optional Extended Reporting Period Endorsement.

**e.** The Optional Extended Reporting Period Endorsement will not take effect unless the additional premium is paid when due. If that premium is paid when due, the Endorsement may not be cancelled.

**f.** The premium for the Optional Extended Reporting Period Endorsement:

**(1)** Is determined as shown above or in any endorsement changing the premium because of any change in the nature or extent of the risk during the "policy period";

**(2)** Will be commensurate with the coverage provided; and

**(3)** Will be fully earned when the Optional Extended Reporting Period Endorsement takes effect.

14-P-EOA Ed. 1-98

g. The Optional Extended Reporting Period Endorsement shall set forth the terms, not inconsistent with this Section, applicable to the Optional Extended Reporting Period including a provision to the effect that the insurance afforded for "claims" made during such period is excess over any other valid and collectible insurance available under policies in force after the Optional Extended Reporting Period starts.

7. **Optional Extended Reporting Period Aggregate Limit.**

   If you purchase the Optional Extended Reporting Period Endorsement, the each "loss" limit shown in the Declarations will continue to apply. Subject to the each "loss" limit, we will provide a single aggregate limit of liability for the entire Optional Extended Reporting Period equal to the Aggregate Limit of Liability entered in the Declarations.

   The Optional Extended Reporting Period aggregate limit of liability described above applies only for "claims" first made during the Optional Extended Reporting Period.

Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.
Copyright, Utica Mutual Insurance Company, 1999.

14-P-EOA Ed. 1-98

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM
# INSURANCE COVERAGE

Coverage for acts of terrorism is already included in your current policy. You should know that, effective November 26, 2002, under your existing coverage, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The portion of your annual premium that is attributable to coverage for acts of terrorism is: _____.

_____
Policy Number

Please consult with your agent or broker if you have any questions.



# Utica National Insurance Group
Insurance that starts with you.

Utica Mutual Insurance Company and its affiliated companies, New Hartford, N.Y.  13413

8-L-1864  Ed. 12-2002



# O'MELVENY & MYERS, LLP

BEIJING
CENTURY CITY
HONG KONG
IRVINE
LONDON
LOS ANGELES

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

TELEPHONE (212) 326-2000
FACSIMILE (212) 326-2061
www.omm.com

NEWPORT BEACH
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

October 23, 2003

OUR FILE NUMBER
004,200-374
1465458

## VIA FACSIMILE AND CERTIFIED MAIL

WRITER'S DIRECT DIAL
(212) 326-2189

Mr. Hilbert Schenck II
Massamont Agency, Inc.
240 Lewis Wharf
Boston, MA 02110

WRITER'S E-MAIL ADDRESS
pkoepff@omm.com

> **Re:** **Westchester Fire Insurance Company v. Massamont**
> **Demand for Arbitration**

Dear Mr. Schenck:

Pursuant to Section XX of the Agency Agreement for the Massamont Metrogard and

Diplomax Program, dated as of January 1, 2001 and as amended October 22, 2001 (the

"Agreement"), we hereby notify you that Westchester Fire Insurance Company, Westchester

Surplus Lines Insurance Company, and Illinois Union Insurance Company (collectively referred

to herein as "Westchester") demand arbitration of their claims against Massamont Agency, Inc.

("Massamont"), as described below. Prior efforts to resolve this matter have failed, and hence

Westchester now pursues its damage claims against Massamont in this arbitration.

Westchester designates Ron Jacks as its arbitrator and encloses a copy of his resume.

Pursuant to Section XX of the Agreement, Massamont is obligated to designate its own arbitrator

within sixty days, after which the two party-designated arbitrators have four weeks to designate

the umpire.

## BACKGROUND

Massamont's Exclusivity Obligation Under
The Agency Agreement

Under the Agreement, Massamont was Westchester's managing general agent for the

Metrogard and Diplomax Program for school and municipal property in New England (the

"Program") and was obligated to perform certain underwriting services. Massamont was

Westchester's exclusive agent for the Program and was not to solicit Program Business from or

place such business with any other insurer, as expressly set forth in Section IX.B. of Exhibit A to

the Agreement:

> During the term of this Agreement <u>AGENT will not solicit for any other
> insurance carrier, except COMPANY, the Program business.</u> If COMPANY
> elects not to write such business, then AGENT is granted the right to submit such
> business to other insurance companies under the same terms and conditions as
> presented to COMPANY.

(emphasis added).

Section VIII.C.2. provides that Westchester could terminate the Agreement immediately

if Massamont:

> assigns, transfers, encumbers or otherwise disposes of this AGREEMENT or any
> interest in this AGREEMENT or sells, exchanges, <u>transfers, assigns, merges or
> consolidates the PROGRAM insurance business without giving COMPANY
> ninety (90) days prior notice thereof.</u>

(emphasis added).

The October 22, 2001 Amendment to the Agreement (the "Amendment") further

provided that the Agreement "is subject to AGENT agreeing not to seek another company to

write the PROGRAM" during the term of the Agreement, which the Amendment extended to

December 31, 2003.

O'MELVENY & MYERS LLP

Mr. Hilbert Schenck II, October 23, 2003 - Page 3

In entering into the Agreement, Westchester relied on Massamont's promise to be the exclusive managing general agent on behalf of Westchester for the Program. To that end, believing that Massamont would continue to act as the exclusive managing general agent in accord with the Agreement, Westchester invested substantial money and effort with respect to the Program. It would not have done so had it known that Massamont would breach Section IX.B. of Exhibit A to the Agreement. Westchester would suffer and did suffer certain damages if the Agreement terminated prematurely.

The Agreement To Increase The Premiums

Prior to February 2003, the premiums on the Program were not sufficient to generate an adequate underwriting profit. As a consequence, Westchester requested that, in the aggregate, the premiums for the Program be raised by 40%. Massamont objected to this 40% increase. Thereafter, on February 24, 2003, Massamont and Westchester agreed that for the coming year, there would be an aggregate 25% increase on new and renewal premiums for the Program, and that for the next year there would be another aggregate premium increase.

There is no dispute that, effective February 24, 2003, under the Program, Massamont was obligated to effectuate an aggregate 25% increase on new and renewal premiums for the Program, including without limitation on any new or renewal policies placed on or after July 1, 2003. Nor is there a dispute that there would be a further aggregate premium increase in the following year.

The April 2003 Audit

In late April, Westchester conducted an audit and found that the deficiencies observed from the previous November audit remained. Among other things, Massamont continued to fail

Mr. Hilbert Schenck II, October 23, 2003 - Page 4

to sufficiently consider individual risk characteristics; instead, risk selection was done on a class

basis, with adjustments made for past losses. Massamont continued to fail to correctly price

windstorm risks and still did not maintain adequate files on particular risks, including

correspondence, email and documentation that supported current valuations, claim development

information, and other information essential to proper underwriting.

Massamont's handling of individual accounts also fell short of the required standards.

Premiums on some risks dropped sharply with no explanation; losses were incurred repeatedly

on accounts with no apparent effort by the agency to properly analyze what had happened or to

determine how deductibles or premiums should be adjusted. Westchester determined that the

agency's overall performance was unsatisfactory.

In response, Massamont agreed to immediately implement the following changes:

- Massamont would utilize Westchester's modeling for windstorm risk. All new business in Massachusetts, Connecticut and Rhode Island was to be referred to Glenn Foster of Westchester for pricing and deductible options. The top 50 renewal accounts, as measured by wind load, were also to be referred for pricing and deductible options.

- All referral accounts previously approved were to be resubmitted as referrals to ensure that they were being underwritten in accordance with Westchester's requirements.

These new requirements made it necessary for Massamont to provide account information to

Westchester as early as possible so that the necessary modeling and evaluation could be carried

out in order to provide quotes before July 1. Massamont failed to submit accounts in a timely

fashion, causing backlogs and delays.

Throughout the process, Massamont made various complaints regarding the procedures it

was required to carry out and requested additional discretion to offer additional coverages and

O'MELVENY & MYERS LLP

Mr. Hilbert Schenck II, October 23, 2003 - Page 5

price particular accounts. On a timely and adequate basis, Westchester responded or otherwise

dealt with the complaints lodged by Massamont.

## MASSAMONT BREACHES THE EXCLUSIVITY
## PROVISION OF THE AGREEMENT

### Massamont's Discussions With Axis

Unbeknownst to Westchester, at some point in time Massamont began having discussions

about transferring or placing new and renewal Program Business with Axis. Westchester

believes that Massamont provided confidential information about the Program Business to Axis,

described new and renewal Program Business to Axis, and began discussing when and how it

would transfer or place new and renewal Program Business to Axis with respect to policies

incepting on July 1, 2003. All of the foregoing constituted a violation or breach of the

exclusivity provision and certain other provisions of the Agreement. Had Westchester known, it

would have objected.

On or about June 27, again unbeknownst to Westchester, Massamont agreed to transfer or

place a large portion of the Massachusetts and Rhode Island new and renewal Program Business

with Axis in violation of the exclusivity provision and certain other provisions of the Agreement.

The business transferred to Axis amounted to approximately $12 million dollars in underwriting

premium. Had Westchester known, it would have objected.

Even though it was obligated under the Agreement to do so, Massamont never offered

any opportunity to Westchester to quote or otherwise obtain the new and renewal Program

Business which it was actually in the process of transferring to or placing with Axis. For

example, not once prior to June 27, did Massamont say in words or in substance that if

Westchester did not agree to certain new or renewal Program Business, Massamont would

O'MELVENY & MYERS LLP

Mr. Hilbert Schenck II, October 23, 2003 - Page 6

transfer or place all or substantially all of new and renewal Program Business with some other

insurer such as Axis.

Massamont's Disclosure About Axis
Getting The Program Business

In a telephone call made on Monday, June 30, Massamont announced to Westchester that

it had transferred a large portion of the Program Business in Massachusetts and Rhode Island to

Axis. This came as a complete surprise to Westchester, which could not believe that Massamont

had secretly transferred to or placed a large portion of the Program Business in Massachusetts

and Rhode Island with Axis, without first giving Westchester an opportunity to obtain such

business.

In a July 1 email to Westchester, Massamont stated that Axis and it had reached such an

agreement on June 27. That also surprised Westchester, because it meant that Massamont had

secretly engaged in discussions and negotiations with Axis long before June 27.

By letter dated July 9, 2003, Westchester advised Massamont that pursuant to Section

VIII.C.2 of the Agreement, Westchester was terminating the Agreement, effective immediately,

because of Massamont's breaches of the Agreement, including:

(1) Section VIII.C.2., which provided that Massamont could be terminated
immediately if it assigned or transferred any portion of the Program's insurance
without giving Westchester 90 days notice;

(2) Section IX.B. of Exhibit A to the Agreement, which provided that the Agent
would not solicit Program Business from any other insurance carrier, unless
Massamont first offered the business to Westchester and Westchester declined to
write it; and

(3) the Amendment, which stated categorically that Massamont "agree[d] not to
seek another company to write the PROGRAM" during the term of the
Agreement.

In its July 9 letter, Westchester also stated that it was preserving any and all claims that it had

against Massamont for breaching the Agreement and reserved the right to pursue such claims.

Massamont's Admissions In Its July 11 Letter

In response to Westchester's July 9 letter of termination, Massamont responded by letter

dated July 11. Massamont admitted in this July 11 letter that it had transferred to or placed with

Axis all renewal and new Program Business for Massachusetts and Rhode Island, in

contravention of the exclusivity provision in the Agreement.

Massamont appears to argue that it previously offered the business to Westchester on the

same terms as it offered to Axis. Westchester disputes that Massamont previously offered the

new and renewal business on the same terms that were provided to Axis. For example, in the

July 11 letter, Massamont contended that it first offered such business to Westchester as follows:

(1) Massamont would have pricing "authority" to obtain the 25% rate
increase;

(2) Massamont would have discretion to offer wind deductibles to "alleviate
price increases;"

(3) Massamont would be entitled to offer flood coverage outside certain
federally designated flood zones; and

(4) Massamont would be entitled to offer $50,000 in mold coverage.

Massamont further contends that Westchester declined to write the requested coverage, thus

purportedly freeing Massamont under Section IX.B. of the Agreement to offer such the Program

business to Axis.

For several separate and independent reasons, the purported excuse offered by

Massamont is without merit. First, the Amendment provides, without any exception, that

Massamont may not seek another company to write the Program. Second, as already noted,

**O'MELVENY & MYERS LLP**

Mr. Hilbert Schenck II, October 23, 2003 - Page 8

Massamont had never "offered" or "proposed" business to Westchester on the terms alleged. Third, it is undisputed that Massamont failed to give <u>any</u> notice – much less the 90 days required by the Agreement – before transferring the \$12 million Massachusetts and Rhode Island premium to Axis. Westchester never knew of these negotiations until they were over and was never given <u>any</u> opportunity to respond to the terms allegedly offered to, and accepted by, Axis.

<u>Damages Suffered By Westchester</u>

In this arbitration, Westchester seeks to recover all damages to Westchester caused by Massamont's breach of the exclusivity provision in the Agreement. Such damages will be specified in Westchester's initial arbitration submission.

Under Section IV.K. of the Agreement, Massamont was required to maintain Errors and Omissions insurance with a limit of liability of not less than \$10 million. We hereby request that you give notice to your insurer of this arbitration demand and the claims asserted herein.

Very truly yours,

Paul R. Koepff
of O'MELVENY & MYERS LLP

cc Bob Gaffney
   Bill Garrigan
   Susan Woodward
   Bill Sharp
   Glen Foster
   Kathleen Morrison

NY1:1475784.1

IN RE ARBITRATION BETWEEN )
)
WESTCHESTER FIRE INSURANCE )
COMPANY ("Westchester") )
   -and- )
)
MASSAMONT AGENCY, INC. ("Massamont") )
)

## ORDER OF THE ARBITRATION PANEL

This Panel, being duly constituted, and having heard the evidence and arguments submitted by counsel, has:

1. Unanimously determined that Massamont breached the Agency Agreement For The Massamont Metrogard and Diplomax Program covering school and municipality properties in New England between The ACE USA Companies designated hereinafter collectively referred to as "Westchester" and Massamont Insurance Agency, Inc. and Knapp Schenck & Company Insurance Agency, Inc. as Guarantor Effective Date 1/1/2001 (collectively referred to as "Massamont");

2. As to the question of whether Westchester breached the Contingent Commission Agreement for The Massamont Metrogard and Diplomax Program between Westchester and Massamont Insurance Agency, Inc. effective January 1, 2001, a majority of the Panel was of the opinion that a technical breach may have occurred, but concluded that a net award covering both questions was appropriate;

3. Awarded $2.6 million ($2,600,000.00) in damages to Westchester.

4. Determined by majority vote that the award of attorneys fees to the prevailing party would not be appropriate in this case.

The Panel would like to congratulate counsel for both sides for the quality of their work and their professionalism in their representation of their clients in the matter.

Ronald A. Jacks        Andrew Ian Douglass        William F. Hofmann

Dated: April 26, 2005

949871v2

# PIERCE, DAVIS & PERRITANO, LLP

COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

James M. Dunn ♦
David C. Hunter †
Danielle T. Jenkins *
Robert S. Ludlum †●
Maureen L. Pomeroy
Daniel G. Skrip ♦
Darlene M. Tonucci ■

* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT
■also admitted in FL

John J. Davis
extension 102
Jdavis@piercedavis.com

August 8, 2005

*Certified Mail, Return Receipt Requested*

Russell F. Conn, Esq.
Conn Kavanaugh Rosenthal Peisch & Ford, LLP
Ten Post Office Square
Boston, MA 02109

Re:    Westchester Fire Insurance Company
       vs. Massamont Insurance Agency, Inc.
       Utica Mutual Claim No.:    732751
       Our File No.:              135-0403246

## DEMAND FOR RELIEF UNDER M.G.L. Ch. 93A

Dear Attorney Conn:

This office has been retained to protect and enforce the rights of Massamont Insurance Agency, Inc. ("Massamont") under an Insurance Agents and Brokers Errors and Omissions Liability Policy issued to Massamont by the Utica Mutual Insurance Company ("Utica Mutual.") As you know, Utica Mutual Policy No. 3445032 EO (the "Policy") carried liability limits of $10,000,000 "each loss"[1] and $11,000,000 "each aggregate," and was effective from July 30, 2003 to July 30, 2004. On October 23, 2003, a liability claimant, Westchester Fire Insurance Company ("Westchester"), sent a Demand for Arbitration to Massamont alleging, among other things, that Massamont breached the terms of an Agency Agreement dated January 1, 2001 and, as a result, caused Westchester to sustain certain unspecified damages. Massamont, in turn, promptly tendered Westchester's claim to Utica Mutual for a defense and indemnification pursuant to the terms and provisions of the Policy.

Utica Mutual, however, failed to fulfill its duties and obligations to Massamont. Despite numerous requests from Massamont and counsel, Utica Mutual refused to offer any defense to

---

[1] Coverage for "each loss" was subject to a $50,000 deductible.

**PIERCE, DAVIS & PERRITANO, LLP**
*August 8, 2005*

*Page 2 of 14*

Massamont whatsoever, either with or without a reservation of rights.[2] Thus, Massamont was forced to retain counsel at its own cost and expense to defend itself against the Westchester claim – a claim for which Massamont had obtained insurance coverage. Further, following the Order of Arbitration entered against Massamont on April 26, 2005, wherein the arbitrators awarded Westchester $2.6 million dollars ($2,600,000) in damages, Utica Mutual breached its duty to indemnify Massamont, with full knowledge that such denial threatened Massamont's future financial viability. In handling Massamont's demand for coverage and in denying all liability to Massamont under its Policy, Utica Mutual not only breached its contract of insurance, but also engaged in unfair or deceptive acts or practices violative of Chapters 93A and 176D of the Massachusetts General Laws. Massamont has suffered (and continues to suffer) significant damages as a result. The purpose of this letter is to demand full relief for such damages from Utica Mutual on Massamont's behalf.

## I.    Background

Effective January 1, 2001, Massamont entered into an Agency Agreement to provide professional services to Westchester as a General Agent. Specifically, Westchester appointed Massamont to handle underwriting duties and responsibilities with respect to the Metrogard and Diplomax Programs covering school and municipal property in New England. By Amendment dated October 22, 2001, the Agency Agreement was to continue to December 31, 2003, unless previously terminated in accordance with other Agreement provisions.

Referenced as Exhibit A to the Agreement were certain underwriting guidelines which Westchester was permitted to revise or change only after giving Massamont 90 days prior written notice. (Section IV(A)). Massamont agreed to follow such guidelines, to maintain a staff of "competent and trained personnel" (Section IV(B)), to keep complete and accurate records of all transactions pertaining to insurance written under the Agreement (Section IV(F)(1)), and to permit Westchester, at its discretion, to perform routine audits of such records in order "to ensure reasonable internal accounting controls." (Section IV(F)(1)(c)).

According to its Demand for Arbitration, Westchester determined, sometime prior to February 2003, that "the premiums on the Program were not sufficient to generate an adequate underwriting profit." (See October 23, 2003 Demand for Arbitration, at p. 3). Westchester blamed the Program's poor performance, at least in part, on various "deficiencies" allegedly discovered during Westchester's November 2002 and April 2003 audits of Massamont's records. As detailed in Westchester's Demand, Massamont underwriters allegedly failed to consider individual risk characteristics, failed to correctly price windstorm risks, maintained inadequate files on particular risks, and failed to submit accounts to Westchester "in a timely fashion, causing backlogs and delays." In Westchester's view, Massamont's performance under the

---

2 Nor did Utica Mutual commence an action for declaratory relief in an effort to resolve the coverage dispute prior to the conclusion of the arbitration, as insurers are expressly encouraged by the Massachusetts courts. See, e.g., Swift v. Fitchburg Mutual Ins. Co., 45 Mass. App. Ct. 617, 624 (1998).

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 3 of 14*

Agency Agreement was "unsatisfactory" and "fell short" of standards required under the Agreement. (Id., at p. 4).

In part as a result of this mounting criticism, the professional relationship between Westchester and Massamont began to sour.[3] In February 2003,[4] Westchester announced a demand for a 40-47% premium rate increase effective July 1, 2003. The timing and size of this increase shocked Massamont. Indeed, Massamont immediately communicated to Westchester that an increase of this magnitude would effectively decimate the Program. As it turns out, this may be precisely what Westchester had in mind. Further, Westchester insisted that, going forward, Massamont employ a risk specific pricing system, rather than the previously-acceptable class-based rating approach. Massamont complained that this new requirement would prove fatal to retaining numerous accounts, particularly those located in southeastern Massachusetts and Rhode Island (one-third of the book of business), as it eliminated all flexibility Massamont needed in order to achieve the overall rate increase desired by Westchester. In short, Westchester made unrealistic and unprecedented demands of Massamont, then took away the precise tools Massamont needed to meet those demands.

For the next several months, Massamont negotiated with Westchester officials in the hopes of softening their stance and, thereby, salvaging the Program. Although Westchester made some concessions to Massamont, it continued to insist upon changes that would ultimately lead to the Program's demise. Around this time, Hilbert Schenck II, President of Massamont, concluded that Massamont could not renew the Agency Agreement with Westchester when it expired on December 31, 2003.

Meanwhile, Massamont did not solicit another carrier for the Program business. Such solicitation by Massamont was prohibited by the Amendment to Agency Agreement dated October 22, 2001, which limited the conditions under which the Agency Agreement could be terminated prior to December 31, 2003 "subject to AGENT agreeing not to seek another company to write the PROGRAM during this period."

In early 2003, however, Axis Specialty Insurance Company ("Axis") approached Massamont to inquire about writing a portion of the Massamont property book.[5] By this time,

---

[3] Massamont disputed (and continues to dispute) that its performance as General Agent under the Agreement was, in any way, deficient. Yet, it acknowledges, as it must, that Westchester's perceptions of the Program (whether genuine or not) led to the underwriting and pricing changes that subsequently compelled Massamont to respond.

[4] The timing of this announcement was calculated by Westchester to effectively "handcuff" Massamont. Massamont submitted a proposed 5% increase to Westchester three months earlier, in November 2002, but received no response. Westchester was aware that the bulk of the Program policies came up for renewal on July 1 and, therefore, the business had to be quoted in April or May, at the latest.

[5] No evidence was introduced at the Arbitration hearing that Massamont approached Axis. Thus, Massamont did not violate its agreement "not to *seek* another company" to write the Program.

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 4 of 14*

Westchester's actions had convinced Mr. Schenck that Westchester in fact had no interest in writing this insurance on terms that, in Mr. Schenck's judgment, were necessary to avoid losing the business to Massamont's competitors. Evidence uncovered during the Arbitration confirmed that Mr. Schenck had good reason to believe this. For example, an internal e-mail dated July 1, 2003, from William Sharp, the Westchester Vice President in charge of the relationship with Massamont, gave this account of Mr. Sharp's discussions with Mr. Schenck about the reasons for Massamont's decision to transfer a portion of the Program business to Axis:

> Axis came back with an indication for wind loads far below what we were asking for. Van [*i.e.,* Hilbert Schenck] also checked around in Bermuda to find out what the market price would be on the cat exposure for his book – and found it to be substantially lower than ours. *The impression that Massamont was getting from us as well was that we would be just as happy not to write any business on the Cape (which I confirmed was correct* – at the completely inadequate premiums that they had been charging).

Claimant's Exhibit 43 (emphasis added).

On the assumption that it would take Axis approximately eight to nine months to conduct its due diligence and complete all necessary filings, Mr. Schenck pursued further discussions with Axis representatives. At the same time, however, Massamont continued to work with Westchester with the expectation and understanding that their relationship would continue through the July 1, 2003 Program renewal date.

To Mr. Schenck's surprise, Axis expressed a ready willingness to assume a portion of the Program business by July 1, 2003, much earlier than previously anticipated. In light of Westchester's obvious displeasure with the Program and diminished appetite for underwriting certain risks, Massamont accordingly placed a number of problem accounts with Axis effective July 1, 2003. It did not cherry-pick accounts by giving Axis only those that were most profitable; on the contrary, Massamont placed with Axis primarily those accounts in which it reasonably assumed Westchester had little or no interest.[6]

Given that even Westchester acknowledged that its actions conveyed the message that it "would be just as happy not to write" the business transferred to Axis, there was no reason for Massamont to suppose that the transfer constituted a breach of the Agency Agreement. Even assuming that the Agency Agreement established an exclusive agency relationship between

---

6 As Westchester later argued, this "assumption" by Massamont was in error; Westchester continued to desire all of the Program business, but only on its terms. This is the type of error for which an Errors and Omissions Policy was intended.

**PIERCE, DAVIS & PERRITANO, LLP**
*August 8, 2005*

*Page 5 of 14*

Massamont and Westchester – an assumption that Massamont disputed during the Arbitration[7] – Massamont was entitled to transfer business that Westchester had elected not to write. Section IX of the Agreement, captioned "EXCLUSIVITY (if applicable)," states in Subparagraph B that:

> During the term of this Agreement [Massamont] will not solicit for any other insurance carrier, except [Westchester], the Program business. *If [Westchester] elects not to write such business, then [Massamont] is granted the right to submit such business to other insurance carriers under the same terms and conditions as presented to [Westchester].*

Agreement Section IX(B) (emphasis added).

Nevertheless, by letter dated July 9, 2003, Westchester advised Massamont that it was terminating the Agency Agreement, effective immediately. Westchester's July 9th letter cited as the basis for its termination, *inter alia*, Massamont's alleged violation of Section IX(B) and the Amendment to the Agency Agreement. Mr. Schenck promptly responded by letter dated July 11, 2003. In that letter, he specifically denied that Massamont had breached Section IX(B) of the Agency Agreement on the ground that Westchester had in fact declined to write the business transferred to Axis on the conditions that Massamont had proposed to Westchester.

The Demand for Arbitration ("Demand") followed shortly thereafter on October 23, 2003. In a remarkable about-face from the position taken by Mr. Sharp, Westchester insisted that it had wanted to write the Program business transferred to Axis and insisted that it would have objected to the transfer had it known. Westchester thus directly challenged Mr. Schenck's belief that Westchester had declined the business. Several other aspects of the Demand are worth noting:

- The final paragraph of the Demand states that "Massamont was required to maintain Errors and Omissions insurance" and requests "that you give notice to your insurer of this arbitration demand and the claims asserted herein." Presumably Westchester requested that Massamont notify its E&O carrier (rather than its D&O carrier) because it understood that the claims asserted in the Demand allege errors and omissions by Massamont.

- The Demand at page 7 draws attention to Westchester's statement in its July 9 letter that Westchester "was preserving any and all claims that it had against Massamont for breaching the Agreement and reserved the right to pursue such claims." Utica Mutual therefore was not entitled to assume, for purposes of determining the extent of its duty to

---

[7] Section I(C) of the Agreement states that Massamont's appointment was "non-exclusive." Thus, Westchester "reserve[d] the right to market, at any time, the class(es) of business and types of coverages written in the Program through other producers." Agreement Section I(C). Westchester nevertheless contended in its Demand for Arbitration and in the Arbitration proceedings that the Agreement established an exclusive agency.

**PIERCE, DAVIS & PERRITANO, LLP**
*August 8, 2005*

*Page 6 of 14*

> defend, that the Demand stated the full extent of the relief Westchester ultimately would seek in the Arbitration.

- The Demand alludes to other alleged breaches of the Agreement. For example, Westchester alleged that Massamont's performance under the Agency Agreement was "unsatisfactory" and "fell short" of required standards and that Massamont had failed to underwrite individual accounts properly such that "losses were incurred repeatedly on accounts" (p. 4).

- The Demand did *not* assert any claim for fraud or seek any tort remedies such as punitive damages from Massamont. The only basis alleged for Westchester claims was breach of the Agency Agreement.

During the Arbitration proceedings, Westchester contended that the Agency Agreement established an *exclusive* agency relationship between Westchester and Massamont that allegedly was breached by Massamont's decision to transfer program business to Axis. Westchester's theory of the case, however, raised the issue whether Westchester had declined to write the business ultimately transferred to Axis. Each side offered testimony and documentary evidence on this issue.

The Arbitration panel issued an Award dated April 26, 2005 against Massamont for $2.6 million. Other than determining that "Massamont breached the Agency Agreement," the Award makes no findings on Westchester's claims. Nevertheless, it appears improbable that the panel would have awarded substantial damages to Westchester unless it had concluded that the Agreement established an exclusive agency *and* that Mr. Schenck had been mistaken in concluding that Westchester had declined to write the business that Massamont offered to Axis.

The Award is covered under the Utica Mutual Policy.

**II.     The Utica Mutual Policy**

In Section II(1)(a) of the Policy, Utica Mutual agreed, in part, as follows:

> We will pay on behalf of the insured all "loss" to which this insurance applies.

> We will have the right and the duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any "suit" seeking damages for a "wrongful act" to which this insurance does not apply.

"Loss" is defined in Section I(6) as:

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 7 of 14*

> [A]ny amount which an insured becomes legally obligated to pay as damages for
> any "claim" to which this insurance applies and shall include judgments and
> settlements.

Section I(1)(e) provides, however, that covered "losses" shall be limited to those which:

> [A]rise out of "wrongful acts" committed in the conduct of the insured's business,
> wherever committed or alleged to have been committed, by the insured or any
> person for whose "wrongful acts" the insured is legally liable in rendering or
> failing to render professional services as:
>
> (1) A General Insurance Agent;
>
> (2) An Insurance Broker;
>
> (3) An Insurance Agent; [or]
>
> . . .
>
> (5) A Managing, Master or Brokerage General Agent . . ..

"Claim" is defined in Section I(1) as:

> [A] written notice, including service of "suit" or demand for arbitration, received
> by one or more insureds asking for money or services.

Finally, "wrongful act" is defined in Section I(14) to mean:

> [A]ny negligent act, error, or omission to which this insurance applies.

Thus, by the terms of its Insuring Agreement, Utica Mutual undertook two duties vis-a-
vis its insured, Massamont. First, it agreed to defend Massamont against any "suit" (including a
demand for arbitration) in which the claimant sought damages (in either money or services)
because of a "wrongful act" – i.e., a negligent act, error or omission not otherwise excluded – in
rendering or failing to render a professional service. Second, Utica Mutual agreed to pay on
behalf of its insured any amount for which Massamont became legally obligated to pay as
damages for any covered "claim," subject only to the Policy deductible and limits of liability.
Utica Mutual failed to fulfill these duties to Massamont in breach of the Policy and in violation
of Massachusetts law.

### III.    Utica Mutual's Breach of the Policy

#### A. The Duty to Defend

As you know, it is well-settled in Massachusetts (as in most jurisdictions) that a liability
insurer's duty to defend its insured against covered claims is very broad. Boston Symphony

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 8 of 14*

Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 710 (1989). The duty to defend is determined by comparing the allegations of the complaint with the language of the policy. If such allegations are "reasonably susceptible" of embracing a covered claim, then the insurer must assume the insured's defense. Liberty Mutual Ins. Co. v. SCA Servs., Inc., 412 Mass. 330, 332 (1992); Continental Cas. Co. v. Gilbane Building Co., 391 Mass. 143, 146-47 (1984). A probability of recovery under the policy need not be shown in order to invoke coverage; a mere "possibility" of coverage is sufficient. Simplex Technologies, Inc. v. Liberty Mutual Ins. Co., 429 Mass. 196, 199 (1999); Doe v. Liberty Mutual Ins. Co., 423 Mass. 366, 368 (1996); Sterilite Corp. v. Continental Cas. Co., 17 Mass. App. Ct. 316, 319 (1983), rev. den., 391 Mass. 1102 (1984). See Bagley v. Monticello Ins. Co., 430 Mass. 454, 458 (1999) (it is the source from which claimant's injury originates, rather than specific theories of liability alleged, that determines insurer's duty to defend); Garnet Constr. Co. v. Acadia Ins. Co., 61 Mass. App. Ct. 705, 706 (2004) (duty to defend extends even to "dubious" claims). Moreover, if a complaint alleges at least one covered claim, then the insurer must assume defense of the entire action even if some or many other claims fall outside the scope of coverage. Simplex, supra, 429 Mass. at 199; Vappi & Co., Inc. v. Aetna Cas. & Sur. Co., 348 Mass. 427 (1965).

Additionally, a simple comparison of the complaint to the policy is not the end of an insurer's inquiry. An insurer's obligation to defend is "based not only on the facts alleged in the complaint but also on the facts that are known or readily knowable by the insurer." Desrosiers v. Royal Ins. Co. of America, 393 Mass. 37, 40 (1984). Thus, if an insurer, in investigating a claim (as required under its policy and under Massachusetts law), either learns (or could have readily learned) of facts which may invoke coverage, then it must provide a defense to its insured even if the allegations of the complaint do not fall within the scope of the policy. Hingham Mutual Fire Ins. Co. v. Niagara Fire Ins. Co., 46 Mass. App. Ct. 500, 503 (1999). Further, it is also appropriate to consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 282 (1997). See Ruggerio Ambulance Service, Inc. v. National Grange Mutual Ins. Co., 430 Mass. 794, 798 (2000). Finally, in construing the policy, any ambiguity must be interpreted most favorably to the insured. Dilbert v. Hanover Ins. Co., 63 Mass. App. Ct. 327, 335 (2005).

Based on the allegations of Westchester's Demand for Arbitration, combined with the facts known or readily knowable by Utica Mutual and Massamont's objectively reasonable expectations, Utica Mutual clearly owed Massamont a defense against Westchester's claim. The Demand for Arbitration, when read (as required) in its entirety, faulted Massamont for a number of errors or omissions, including, but not limited to, Massamont's sloppy underwriting, record-keeping and reporting. According to Westchester, Massamont's performance under the Agency Agreement was "unsatisfactory" and "fell short" of required standards.

The mere fact that Westchester included, within its Demand, allegations that Massamont later engaged in "secret" discussions with Axis and/or "secretly transferred" a portion of the

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 9 of 14*

Program business to Axis without prior notice to Westchester, does not allow Utica Mutual to escape its defense obligations. Utica Mutual asserts that these allegations trigger the exclusion for "dishonest, fraudulent, malicious, or criminal conduct." For several reasons, that exclusion does not excuse Utica Mutual from its duty to defend.

First, allegations that Massamont engaged in "secret" discussions does not amount to a claim that Massamont acted dishonestly or fraudulently for purposes of the exclusion. The Demand does not allege that Massamont made any misrepresentations to Westchester – it merely alleges that Massamont did not give it advance warning that it was going to transfer Program business that Massamont believed Westchester had no interest in writing.

Second, the exclusion by its own terms requires Utica Mutual to defend Massamont "[i]f a 'suit' is brought against the insured alleging both 'wrongful acts' within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct." Even if Utica Mutual were justified in concluding that allegations of "secret" conduct amounted to dishonesty or fraud, it remains the case that the Demand alleges other wrongful acts within the coverage of the policy. Utica Mutual was not free to "pick and choose" from among Westchester's allegations, selecting only those which, in its view, were not covered, while, at the same time, ignoring those which were covered. As stated above, an insurer must defend an entire complaint even if only one claim falls within coverage, and the terms of the exclusion confirm that Utica Mutual was obligated to defend.

Finally, had Utica Mutual properly investigated Westchester's claim, it would have learned facts contradictory to Westchester's allegations which clearly invoked the duty to defend. For example, Massamont did not solicit Axis for Program business. Further, Massamont expected and intended to continue its relationship with Westchester through the July 1, 2003 Program renewal date. Also, effective July 1, 2003, Massamont placed with Axis primarily those "problematic" accounts which, based on Westchester's numerous representations, Massamont reasonably understood and believed Westchester no longer wished to insure.

In view of Massamont's objectively reasonable expectation that any errors or omissions in rendering or failing to render professional services to Westchester as a General Agent under the Agency Agreement would be covered under the Policy, Utica Mutual owed a duty to defend Massamont against the Westchester claim. Utica Mutual breached that duty, thereby causing Massamont to incur approximately $500,000 in defense costs, expenses and attorneys' fees for which Utica Mutual is now legally liable.

B. The Duty to Indemnify

Under Massachusetts law, an insurer that breaches a contractual duty to defend shall be liable "for the natural consequences of [the] breach of contract that places its insured in a worse

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 10 of 14*

position . . .." Liquor Liability Joint Underwriting Ass'n of Massachusetts v. Hermitage Ins. Co., 419 Mass. 316, 323 (1995), quoting Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 764 (1993). This is true even if the denial of coverage was in good faith. Palermo v. Fireman's Fund Ins. Co., 42 Mass. App. Ct. 283, 290 (1997). Moreover, the breaching insurer must also bear the burden of proving that the claim was not within the policy coverage. Id. Utica Mutual cannot meet that burden and, as a result, is liable for the full amount of the Arbitration award entered against Massamont ($2,600,000), plus interest.

Westchester's claim that Massamont breached the Agency Agreement and, as a result, caused damages, is covered under the terms and provisions of the Utica Mutual Policy. Westchester's "loss" arose out a "wrongful act" within the meaning of the Policy. Massamont's interpretation (or misinterpretation) of the Agency Agreement, its understanding (or misunderstanding) of Westchester's interests vis-a-vis the alleged high risk accounts, and its belief (whether mistaken or not) that Westchester had declined to grant Massamont sufficient underwriting authority to salvage the Program and had made a *de facto* election not to write Program business on the terms Massamont had proposed, all qualify as covered "errors" or "omissions." Further, to the extent Westchester complained that Massamont failed to place certain risks with Westchester in breach of the Agency Agreement, such failure likewise qualifies as an "omission" in the "rendering or failing to render professional services" and, therefore, an insured "loss."

The $2.6 million dollar damage award, of course, remains undifferentiated in terms of the specific harm Westchester allegedly suffered and for which the arbitrators meant to grant compensation. In fact, based on a review of the hearing transcript, it is difficult to comprehend on precisely what basis or evidence the damage award was actually calculated. This is a difficulty, however, with which Massamont need not be concerned. Even if some of Westchester's claims were not covered (which Massamont denies), by unjustifiably refusing to defend Massamont in this matter, Utica Mutual has effectively shouldered the burden of apportioning the award between covered and uncovered claims. And, since no such apportionment can now be made, Utica Mutual must pay the entire award. See Liquor Liability Joint Underwriting Ass'n, 419 Mass. at 323-24 (non-defending insurer held liable for entire settlement amount).

Despite numerous (and sometimes conflicting) statements of its coverage position, it appears Utica Mutual's denial now rests principally on two grounds. First, Westchester's "loss" did not arise out of any "negligent act, error, or omission" and, therefore, did not result from a "wrongful act" within the meaning of the Policy. Second, even if Westchester's "loss" arose from a "wrongful act," Massamont's error or omission (in Utica Mutual's view) had nothing to do with the rendering of professional advice.[8] Without restating Massamont's position on these

---

[8] Utica Mutual raised (and sometimes withdrew) numerous other grounds for denial in its four letters to Massamont dated March 4, 2004; March 31, 2005; May 19, 2005; and June 15, 2005. As best as Massamont can currently

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 11 of 14*

grounds in detail, it should be sufficient to point out that they cannot be sustained in light of Massachusetts law, in general, or the decision of USM Corp. v First State Ins. Co., 420 Mass. 865 (1995), in particular. In USM, the SJC expressly rejected the notion that the term "negligent" modifies anything more than the following word "act." Thus, uncertainty regarding the scope of the word "error" rendered the First State policy in USM ambiguous, just as it renders the words "error" and "omission" ambiguous in the context of the Utica Mutual Policy. Like First State, Utica Mutual must now suffer the consequences of that ambiguity. See also Transcontinental Ins. Co. v. Caliber One Indemnity Co., 367 F. Supp. 2d 994, 1002 (E.D. Va. 2005) (citing decisions from other jurisdictions which have consistently held that insurance protection for a "negligent act, error or omission" covers claims for breach of contract).[9]

With respect to Utica Mutual's reliance on the so-called "professional advice" requirement, the Policy contradicts Utica Mutual's assertion. The Policy provides coverage for "wrongful acts" committed "in rendering or failing to render professional services as (1) A General Insurance Agent; (2) An Insurance Broker; (3) An Insurance Agent; [and] . . . (5) A Managing, Master or Brokerage General Agent . . .." It contains no such "professional advice" requirement. Nor are the "professional services" specifically enumerated in the Policy either restricted or, in any way, limited to the giving of advice.

Indeed, it is difficult to conceive of a more fundamental component in the rendering or failure to render professional services than the selection of the insurance carrier that is to underwrite the Program accounts. The fact that the party allegedly harmed by the wrongful act of erroneously choosing the wrong carrier is another carrier rather than an insured is of no consequence to Utica Mutual's duty to indemnify Massamont under the Policy. If Massamont had, for example, erroneously chosen a carrier who went into receivership, surely Utica Mutual would not deny coverage for claims arising out of that error on the ground that they did not involve an error in the rendering of professional services.

Utica Mutual's duty is clear – it must immediately pay to Westchester on behalf of Massamont the $2,600,000 in damages awarded by the Arbitration panel, plus interest. The longer Utica Mutual refuses to meet this obligation, the greater the harm will be suffered by its insured.

---

determine, the two grounds cited above – no "wrongful act" and the lack of professional advice – are Utica Mutual's grounds *du jour*.

[9]     [C]laims-made policies typically afford coverage for claims by reason of any "negligent act, error or omission." What if an insured is held liable for a non-negligent act? Most courts have held that the insured is still entitled to coverage. The strongest argument in favor of that conclusion is that (i) an "error" or "omission" encompasses more than negligent conduct, and (ii) if only negligent errors and negligent omissions were covered, the "error or omission" language would be rendered redundant.

A. Windt, Insurance Claims and Disputes (4th Ed. 2005) (citing USM Corp., supra).

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 12 of 14*

### IV.    Unfair or Deceptive Acts or Practices

Utica Mutual insists its Policy provides no coverage to Massamont in the circumstances of the Westchester case. It's just not sure why.

In response to Massamont's tender of its defense to Utica Mutual, the company responded by letter dated March 4, 2004, denying coverage on six grounds, ranging from Massamont's alleged execution of the Agency Agreement prior to the "retroactive date," to Exclusion 6 (for claims by an entity "owned, operated, managed, or controlled by the insured"), to Exclusion 18 (for claims arising out of the insured's activities as a "third-party administrator.") Amazingly, one of the grounds upon which Utica Mutual relied – Exclusion 1 for "dishonest, fraudulent, malicious or criminal conduct" – expressly states that Utica Mutual "*will defend*" its insured against such claims, but will not indemnify it for any judgment based upon such conduct.[10]

When Massamont, through counsel, subsequently requested Utica Mutual to reconsider its coverage position and immediately assume Massamont's defense, Utica Mutual "modified" its previous denial by letter dated March 31, 2005. In that letter, Utica Mutual reasserted its previous disclaimer of coverage. Yet, in doing so, it "disavowed" five of its previous six grounds for denial, reaffirmed the only remaining ground (Exclusion 1 for "dishonesty," etc.), then raised four *new* grounds. One of the new grounds for denial cited by Utica Mutual concerned the "wrongful act" definition of the Insuring Agreement and the alleged failure of Westchester's claim to arise out of a "negligent act, error or omission" within the meaning of the Policy. Although Utica Mutual cited numerous out-of-state cases in support of this ground, it neglected to mention the one SJC decision on point (USM Corp. v First State Ins. Co., 420 Mass. 865 (1995)) which directly contradicted its position. Utica Mutual also claimed it was entitled to rescind the Policy, that coverage was eliminated by Exclusion 19 (applicable to claims arising out of the disclosure of "trade secrets or confidential or proprietary information"), and that Massamont had breached the duty of cooperation.

When counsel for Massamont likewise challenged this second denial, Utica Mutual shifted its stance once again. By letter dated May 19, 2005, Utica Mutual restated its denial on the ground that Westchester's claim did not arise of a "negligent act, error or omission," but this time attempted (albeit unsuccessfully) to distinguish the controlling USM decision by fashioning the so-called "professional advice" requirement discussed above. Utica Mutual also continued to rely upon Exclusion 1, but admitted it had "decided not to pursue" its rights to rescind the Policy, and was "withdrawing" its disclaimer based on Massamont's lack of cooperation. Curiously, Exclusion 19 (regarding "trade secrets") was now completely ignored.

---

[10] This denial was sent over eight months *before* the Arbitration hearing began, and more than one year *before* the Arbitration award was issued.

The final incarnation of Utica Mutual's coverage position was set forth in a letter dated June 15, 2005. There, Utica Mutual stood by its no "negligent act, error or omission" ground for disclaimer, as well as Exclusion 1. It also resurrected Exclusion 19 (regarding "trade secrets.") At the end of this letter, Utica Mutual invited Massamont to give counsel a call "[i]f Utica's coverage position is unclear in any way . . .." With all due respect, at this point, Massamont has no confidence that such a conversation would prove enlightening.

Chapter 176D, Section 3 of the Massachusetts General Laws identifies certain unfair or deceptive acts or practices in the business of insurance which, in turn, can give rise to liability under Chapter 93A, Sections 9 and 11. Specifically, in the circumstances of Massamont's demand for insurance protection against the Westchester claim, Utica Mutual has violated the following prohibitions defined as "unfair claim settlement practices" in Chapter 176D, Section 3(9):

(a)     Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(b)     Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(c)     Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; [and]

. . .

(n)     Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

Utica Mutual is clearly intent on denying all coverage to Massamont regardless of the language of the Policy, the allegations of Westchester's Demand for Arbitration, the nature of Westchester's claims or Massamont's defenses, the facts known or readily knowable by Utica Mutual, and/or Massachusetts law. In handling and denying Massamont's claim, Utica Mutual has engaged in a series of unfair or deceptive acts or practices prohibited under Massachusetts law. Such acts or practices have caused significant damages to its insured, for which Massamont is entitled to recovery under Chapter 93A. Further, Utica Mutual's use or employment of such unfair or deceptive acts or practices constituted wilful or knowing violations of M.G.L. Chapter 93A, Section 2. Further still, Utica Mutual's repeated refusal to grant relief to Massamont was done in bad faith with knowledge or reason to know that such refusals violated M.G.L. Chapter 93A, Section 2. Massamont is therefore entitled to double or treble the amount of its actual damages from Utica Mutual.

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 14 of 14*

### V.     Demand for Relief

In light of the above, Massamont hereby demands that Utica Mutual immediately:

1. ·    Pay the $2,600,000 Arbitration award to Westchester in full, plus any accrued interest;

2.     Reimburse Massamont in full for all costs, expenses and attorneys' fees incurred in or relating to the defense of the Westchester claim, including any such costs, expenses or fees relating to confirmation of the Arbitration award; and

3.     Reimburse Massamont in full for all costs, expenses and attorneys' fees incurred in or relating to the protection and enforcement of Massamont's rights under the Utica Mutual Policy.

Please note that nothing set forth herein shall be deemed as a waiver or relinquishment of any rights or claims of Massamont Insurance Agency, Inc., under the terms and provisions of the Policy issued by Utica Mutual Insurance Company or under any applicable laws. Nor shall the failure to raise or assert herein any actual or potential right or claim be construed as a waiver or relinquishment of same.

We look forward to receiving Utica Mutual's response. If you wish to discuss this matter further, please do not hesitate to contact us.

Very truly yours,

PIERCE, DAVIS & PERRITANO, LLP

John J. Davis

cc:     Hilbert Schenck II, CPCU
Jarrett A. Williams, Esq.
Lawrence P. Murray, Esq.

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

O F F I C I A L   U S E

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To *Russell F. Conn, Esq.*
Street, Apt. No.; or PO Box No. *10 Post Office Sq.*
City, State, ZIP+4 *Boston, MA 02109*

PS Form 3800, June 2002                    See Reverse for Instructions

7003 1110 0003 2634 1880

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Russell F. Conn, Esq.*
*Conn, Kavanaugh, Rosenthal*
*10 Post Office Sqare*
*Boston, MA 02109*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
x *S Young*                           ☐ Agent
                                      ☐ Addressee
B. Received by ( Printed Name)       C. Date of Delivery
*S. Young*                            *8/9/05*

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)      7003 3110 0003 2634 1880

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)_____MASSAMONT INSURANCE AGENCY, INC. v. UTICA MUTUAL

   INSURANCE COMPANY_____

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local
   rule 40.1(a)(1)).

   ___   I.     160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

   ___   II.    195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,  *Also complete AO 120 or AO 121
                740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.                for patent, trademark or copyright cases

   _X_   III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                380, 385, 450, 891.

   ___   IV.    220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
                690, 810, 861-865, 870, 871, 875, 900.

   ___   V.     150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this
   district please indicate the title and number of the first filed case in this court.

   _____NONE_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                              YES  ☐         NO  ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28
   USC §2403)

                                                              YES  ☐         NO  ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                              YES  ☐         NO  ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                              YES  ☐         NO  ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of
   Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                              YES  ☒         NO  ☐

   A.   If yes, in which division do all of the non-governmental parties reside?

        Eastern Division  ☒          Central Division  ☐          Western Division  ☐

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental
        agencies,  residing in Massachusetts reside?

        Eastern Division  ☐          Central Division  ☐          Western Division  ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes,
   submit a separate sheet identifying the motions)

                                                              YES  ☐         NO  ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME ___JOHN J. DAVIS_____
ADDRESS _____PIERCE, DAVIS & PERRITANO, LLP, 10 WINTHROP SQUARE, BOSTON, MA 02110_____
TELEPHONE NO. _____(617) 350-0950_____

(USDC Category Form.wpd -5/2/05)

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
MASSAMONT INSURANCE AGENCY, INC.

**DEFENDANTS**
UTICA MUTUAL INSURANCE COMPANY

(b) County of Residence of First Listed Plaintiff **Suffolk**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Pierce, Davis & Perritano, LLP
10 Winthrop Sq., Boston, MA 02110 (617) 350-0950

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Diversity jurisdiction under 28 U.S.C. Section 1332
Brief description of cause:
Breach of contract, M.G.L. Ch.93A & DJ against E&O insurer

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ $3.1 million +
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE multiple damages
DOCKET NUMBER

DATE 9/19/05
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____