UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSAMONT INSURANCE AGENCY, INC. | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UTICA MUTUAL INSURANCE COMPANY | ) ) ) |
| Defendant. | ) ) ) |

CIVIL ACTION NO. 05-11897-WGY

**DEFENDANT'S MOTION TO BIFURCATE PLAINTIFF'S CHAPTER 93A AND 176D CLAIMS, AND TO STAY DISCOVERY PENDING DISPOSITION OF PLAINTIFF'S COVERAGE CLAIMS**

Defendant Utica Mutual Insurance Company ("Utica") hereby moves, pursuant to Fed. R. Civ. P. 42(b), to bifurcate Massamont Insurance Agency, Inc.'s ("Massamont's") Chapter 93A and 176D claims from Massamont's declaratory judgment and breach of contract claims. Utica further moves to stay discovery on Massamont's Chapter 93A and 176D claims until this Court has ruled on Utica's anticipated dispositive motion regarding the declaratory judgment and breach of contract claims, as to which claims no discovery will be required. In support of its motion, Utica states as follows.

I.   INTRODUCTION

In this action, Massamont claims that Utica breached its duties to defend and indemnify Massamont with respect to claims brought against it by Westchester Fire Insurance Company ("Westchester"). Massamont further claims that Utica's disclaimer of coverage constituted a violation of Chapters 93A and 176D. This Court should decide whether Utica owed any duty to

defend and/or indemnify Massamont prior to and separately from the issue of whether Utica's

refusal to defend or indemnify Massamont violated Chapters 93A and 176D.  Structuring the

case in this fashion will promote judicial economy, because if the court finds that Utica had no

duty to defend or indemnify Massamont, then the court will not need to reach the Chapter 93A

and 176D claims.  Bifurcation also will conserve the parties' time and resources, because neither

party will need to expend resources on discovery until this Court has ruled on Massamont's

breach of contract and declaratory judgment claims, claims on which no discovery is required.

I.    FACTUAL AND PROCEDURAL BACKGROUND

    A.    Agreement Between Massamont and Westchester

      Massamont is an insurance agency that specializes in the placement and administration of

insurance programs for specific markets in New England.  (Complaint, ¶ 1).  In 2001,

Massamont entered into an Agency Agreement with Westchester with respect to two programs

involving property insurance for New England schools and municipalities – the Metrogard

Program and the Diplomax Program (the "Program").  (Complaint, ¶ 12).  Pursuant to the

Agreement, schools and municipalities were to purchase insurance policies issued by

Westchester through Massamont.  (Id.)  The Agreement was to remain in effect until December

31, 2003, unless terminated prior to that time in accordance with its terms.  (Id.)

      At some time in the spring of 2003, Massamont began placing program business through

another insurance company, Axis Specialty Insurance Company ("Axis").  (Complaint, ¶ 24).

Massamont advised Westchester of the transfer of program business on June 30, 2003.

(Complaint, Exh. B, p. 5).  On July 9, 2003, Westchester notified Massamont that its transfer of

the Program business constituted a breach of the exclusivity provisions of the Agreement, that

Westchester was terminating the Agreement for cause, and that Westchester reserved the right to

pursue Massamont for damages arising out of Massamont's transfer of the program business to Axis. (Complaint, ¶ 26).

On October 23, 2003, Westchester sent an arbitration demand to Massamont. (Complaint, ¶ 27, Exh. B). Massamont forwarded this arbitration demand to Utica on or about October 28, 2003. (Complaint, ¶ 31). A copy of the Arbitration Demand is attached hereto at Tab A.

B. The Policy and Utica's Denial of Coverage

In 2003, Massamont was insured under a claims-made Insurance Agents and Brokers Errors and Omissions Liability Policy issued by Utica, Policy No. 3445032 EO (the "Policy") (Complaint, ¶ 4, Exh. A). The Policy was effective from July 30, 2003, to July 30, 2004, and carried liability limits of $10,000,000 for each loss and $11,000,000 in the aggregate. (Id.) A copy of the Policy is attached hereto at Tab B.

On March 4, 2004, Utica notified Massamont that it had no duty to defend or indemnify Massamont in the arbitration proceedings. (Complaint, ¶ 33). Massamont did not respond to Utica's March 4, 2004 letter, and retained its own counsel (Burns & Levinson) to defend it in the arbitration. (Complaint, ¶ 35).

C. Arbitration and Massamont's Post-Arbitration Demand

The arbitration between Massamont and Westchester began on November 16, 2004. (Complaint, ¶ 36). Westchester's claims against Massamont, as prosecuted in the arbitration, were the same claims as set forth in its arbitration demand. (Complaint, ¶¶ 43, 57, 72, 80). On December 6, 2004, more than two weeks after commencement of the arbitration, Massamont renewed its demand for coverage under the Policy. (Complaint, ¶ 52). Utica then retained coverage counsel (Conn Kavanaugh Rosenthal Peisch & Ford, LLP). After receiving an opinion

from coverage counsel, Utica reaffirmed its disclaimer of coverage by letter dated March 31, 2005. (Id.)

On April 26, 2005, the arbitration panel issued its order unanimously awarding damages to Westchester in the amount of Two Million Six Hundred Thousand ($2,600,000) for breach of the Agreement. (Complaint, ¶ 37). On May 5, 2005, Massamont tendered the arbitration award for payment to Utica. (Complaint, ¶ 38). By letters dated May 19 and 24, 2005, and June 15, 2005, Utica reaffirmed its disclaimer of coverage for the award. (Complaint, ¶¶ 54, 55, 56).

Massamont sent a demand letter to Utica dated August 8, 2005, based on Utica's denial of coverage. (Complaint, ¶ 62). Utica responded to this demand by letter dated August 29, 2005, again denying that it had any duty to defend Massamont in the arbitration proceedings, or any duty to indemnify Massamont against the arbitration award. (Id.)

D. Massamont's Complaint

Massamont filed its Complaint against Utica in this Court on September 19, 2005. The Complaint contains two counts for declaratory judgment, two counts for breach of contract based on Utica's failure to defend and indemnify Massamont, and two counts alleging violations of Chapters 93A and 176D based on Utica's failures to defend and indemnify. The alleged violations of Chapters 93A and 176D are premised on Utica's alleged breach of its duties to defend and indemnify Massamont in the arbitration proceeding. Utica filed its answer to the Complaint on November 2, 2005, denying all of Massamont's claims.

II. ARGUMENT

Utica moves, in accordance with Rule 42(b) of the Federal Rules of Civil Procedure, to bifurcate Counts II and V of the Complaint, setting forth Massamont's claims that Utica's

alleged breaches of its duties to defend and indemnify violated Chapters 93A and 176D. Rule 42(b) provides:

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

This rule gives the trial judge the discretion to separate claims or issues in order to "further the parties' convenience, avoid delay and prejudice, and serve the ends of justice." Wright & A. Miller, Federal Practice and Procedure § 2388 (1971); see also Chapman ex rel. Estate of Chapman v. Bernard's Inc., 167 F. Supp. 2d 406, 417 (D. Mass. 2001) (the issue of whether to bifurcate a civil proceeding is a decision "peculiarly in the discretion of the trial court"). Further, separating issues for trial or summary judgment may save the parties time and expense, especially when resolution of a single issue may dispose of the entire case. Preferred Mut. Ins. Co. v. Meggison, 53 F. Supp. 2d 139, 144-45 (D. Mass. 1999).

A.    Bifurcation of Massamont's Chapter 93A and 176D Claims would Promote Judicial Economy.

In this case, bifurcation of Massamont's Chapter 93A and 176D claims, while staying discovery on those claims, would promote judicial economy and assure the just and speedy resolution of the entire action. See id. The essence of the Complaint is that Utica owed Massamont a duty to defend the claims brought against it by Westchester, and then a duty to indemnify it with respect to the arbitration award. This Court can resolve both of these issues as a matter of law, on the basis of a static record that already is in existence.

"The question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions."

5

<u>Continental Cas. Co. v. Gilbane Bldg. Co.</u>, 391 Mass. 143, 461 N.E.2d 209, 212 (Mass. 1984). In this inquiry, "when the allegations in the underlying complaint lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate or defend the claimant." <u>Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.</u>, 439 Mass. 387, 788 N.E.2d 522, 530 (2003) (<u>quoting Timpson v. Transamerica Ins. Co.</u>, 41 Mass. App. Ct. 344, 669 N.E.2d 1092, 1095 (1996). Here, the question of whether Utica had a duty to defend Massamont can be determined simply by comparing the allegations of Westchester's Arbitration Demand to the language of the Policy. Thus, this Court can decide whether there was a duty to defend as a matter of law.

Massamont's claim that Utica breached its duty to indemnify Massamont also lends itself to summary disposition. Under Massachusetts law, an insurer's duty to defend is broader than its duty to indemnify. <u>B&T Masonry Constr. Co., Inc. v. Public Service Mutual Ins. Co.</u>, 382 F.3d 36, 39 (1st Cir. 2004) (applying Massachusetts law). Massamont has admitted that Westchester's claims against it did not vary from those set forth in the demand for arbitration. (Complaint, ¶¶ 43, 57, 72, 80). It follows logically, therefore, that if Utica had no duty to defend Massamont in the arbitration, it could have no duty to indemnify Massamont against the arbitrators' award. <u>See</u> <u>Bagley v. Monticello Insurance Company</u>, 430 Mass. 454, 720 N.E.2d 813, 817 (1999) ("If an insurer has no duty to defend, based on the allegations in the plaintiff's complaint, it necessarily follows that the insurer does not have a duty to indemnify"); <u>Liberty Mutual Ins. Co. v. Metropolitan Life Ins. Co.</u>, 260 F.3d 54, 62 (1st Cir. 2001) (applying

Massachusetts law). This Court therefore can rule on Massamont's claim that Utica breached its indemnity obligation as a matter of law.[1]

In sum, this Court can resolve Massamont's breach of contract and declaratory judgment claims without any discovery or depositions, simply by comparing the arbitration demand to the language of the Policy. Further, if the court grants summary judgment in Utica's favor on the contract and declaratory judgment counts, Massamont's remaining claims will be moot. Thus, early consideration of those claims will promote judicial economy, and will save both parties the time and expense of discovery on claims that might never be reached.

B.    Bifurcation of Massamont's Chapter 93A and 176D Claims Would Avoid Undue Prejudice to Utica.

If the Court denies Utica's motion, and Massamont proceeds immediately to conduct discovery on its Chapter 93A and 176D claims, Massamont almost certainly will seek to inquire into Utica's representatives' intent and thought-processes. See O'Leary-Alison v. Metropolitan Property & Cas. Ins. Co., 52 Mass. App. Ct. 214, 752 N.E.2d 795, 797 (2001). This is troubling for two reasons. First, as described above, discovery in this case may be entirely unnecessary and therefore a waste of both parties' time and resources. If the Court finds that Utica had no duty to defend or indemnify Massamont, Massamont's Chapter 93A and 176D claims are moot. See LoCicero v. Hartford Ins. Group, 25 Mass. App. Ct. 339, 518 N.E.2d 530, 534 (1988) (where court rejected plaintiff's primary claims, it did not have to consider plaintiff's claim under Chapters 93A and 176D, as those claims were entirely derivative of the primary claims).

---

[1]    Further, even if the Court were required to look beyond the four corners of the arbitration demand to determine whether Utica had a duty of indemnification, the record pertaining to the arbitration proceeding is static and also lends itself to summary disposition, most likely through cross-motions for summary judgment. No discovery is necessary to determine what was before the arbitrators – the Court need only look to the transcript of the proceeding, the exhibits marked by both parties, and the arbitrators' award.

Second, if Utica is forced to engage in discovery on the Chapter 93A and 176D claims, Massamont will undoubtedly demand documents and information protected by the attorney-client privilege and work-product doctrine concerning Utica's decision to disclaim coverage. Massamont also may seek to depose Utica's coverage counsel, the same attorneys representing Utica in this action, and to depose Utica's representatives as to advice received from Utica's coverage counsel. Both parties will incur expense in resolving these privilege issues, and counsel for Utica might be forced to withdraw from its defense of Utica in the current action. This would cause significant prejudice to Utica, as its current counsel obviously is very familiar with the legal arguments on which Utica based its coverage determination and with the record on which Utica will be seeking summary judgment. This prejudice can be avoided by bifurcating and staying discovery on Massamont's Chapter 93A and 176D claims until such time as the Court has ruled on Utica's anticipated dispositive motion.

C.    Bifurcation of Massamont's Chapter 93A and 176D Claims Would Not Cause Undue Prejudice to Massamont.

Massamont would not suffer undue prejudice if the Court bifurcates its Chapter 93A and 176D claims. Utica is prepared to move forward quickly on the disposition of Massamont's declaratory judgment and contract counts, and anticipates that it could have a dispositive motion on those claims filed within sixty days from the date on which this motion is allowed. Further, if the Court were to deny Utica's dispositive motion, Utica would be prepared to move forward quickly with discovery on Massamont's remaining claims.

8

IV.    Conclusion

In the interests of expediency, fairness and judicial economy, this Court should bifurcate Massamont's Chapter 93A and 176D claims, and stay discovery on those claims, pending resolution of Massamont's claims that Utica breached its duties to defend and indemnify Massamont in the underlying arbitration proceedings.

UTICA MUTUAL INSURANCE
COMPANY

By its attorneys,


Russell F. Conn, Esq. (BBO #094440)
Erin K. Higgins, Esq. (BBO #559510)
CONN KAVANAUGH ROSENTHAL
 PEISCH & FORD, LLP
Ten Post Office Square
Boston, MA  02110
(617) 482-8200

Dated:  December __, 2005

## CERTIFICATE OF SERVICE

I certify that a true copy of this document was mailed on December 1, 2005 to:

John J. Davis, Esq.
PIERCE, DAVIS & PERRITANO, LLP
10 Winthrop Square
Boston, MA  02110


Erin K. Higgins, Esq.

239017.1

9

# TAB A

4/13

O'MELVENY & MYERS LLPNY12                    12123262061    P.02/11

O

## O'MELVENY & MYERS LLP

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
TELEPHONE (212) 326-2000
FACSIMILE (212) 326-2061
INTERNET: www.omm.com

LOS ANGELES
CENTURY CITY
IRVINE
NEWPORT BEACH
SAN FRANCISCO
SILICON VALLEY

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
004,300-374
1465456

October 23, 2003

VIA FACSIMILE AND CERTIFIED MAIL

WRITER'S DIRECT DIAL
(212) 326-2189

WRITER'S E-MAIL ADDRESS
pkoepfl@omm.com

Mr. Hilbert Schenck II
Massamont Agency, Inc.
240 Lewis Wharf
Boston, MA 02110

Re:    Westchester Fire Insurance Company v. Massamont
       Demand for Arbitration

Dear Mr. Schenck:

    Pursuant to Section XX of the Agency Agreement for the Massamont Metroguard and Diplomax Program, dated as of January 1, 2001 and as amended October 22, 2001 (the "Agreement"), we hereby notify you that Westchester Fire Insurance Company, Westchester Surplus Lines Insurance Company, and Illinois Union Insurance Company (collectively referred to herein as "Westchester") demand arbitration of their claims against Massamont Agency, Inc. ("Massamont"), as described below. Prior efforts to resolve this matter have failed, and hence Westchester now pursues its damage claims against Massamont in this arbitration.

    Westchester designates Ron Jacks as its arbitrator and encloses a copy of his resume. Pursuant to Section XX of the Agreement, Massamont is obligated to designate its own arbitrator within sixty days, after which the two party-designated arbitrators have four weeks to designate the umpire.

O'MILVENY & MYERS LLP

Mr. Filbert Schenck II, October 23, 2003 - Page 3

In entering into the Agreement, Westchester relied on Massamont's promise to be the exclusive managing general agent on behalf of Westchester for the Program. To that end, believing that Massamont would continue to act as the exclusive managing general agent in accord with the Agreement, Westchester invested substantial money and effort with respect to the Program. It would not have done so had it known that Massamont would breach Section IX.E. of Exhibit A to the Agreement. Westchester would suffer and did suffer certain damages if the Agreement terminated prematurely.

The Agreement To Increase The Premiums

Prior to February 2003, the premiums on the Program were not sufficient to generate an adequate underwriting profit. As a consequence, Westchester requested that, in the aggregate, the premiums for the Program be raised by 40%. Massamont objected to this 40% increase. Thereafter, on February 24, 2003, Massamont and Westchester agreed that for the coming year, there would be an aggregate 25% increase on new and renewal premiums for the Program, and that for the next year there would be another aggregate premium increase.

There is no dispute that, effective February 24, 2003, under the Program, Massamont was obligated to effectuate an aggregate 25% increase on new and renewal premiums for the Program, including without limitation on any new or renewal policies placed on or after July 1, 2003. Nor is there a dispute that there would be a further aggregate premium increase in the following year.

The April 2003 Audit

In late April, Westchester conducted an audit and found that the deficiencies observed from the previous November audit remained. Among other things, Massamont continued to fail

OCT. 28. 2003 (TUE)  16:50                                                  12123262051    P.04/11

OCT. 23-2003  16:11          O'MELVENY & MYERS LLPNY12

O'MILVENY & MYERS LLP

Mr. Gilbert Schenck II, October 23, 2003 - Page 4

to sufficiently consider individual risk characteristics; instead, risk selection was done on a class basis, with adjustments made for past losses. Massamont continued to fail to correctly price windstorm risks and still did not maintain adequate files on particular risks, including correspondence, email and documentation that supported current valuations, claim development information, and other information essential to proper underwriting.

Massamont's handling of individual accounts also fell short of the required standards. Premiums on some risks dropped sharply with no explanation; losses were incurred repeatedly on accounts with no apparent effort by the agency to properly analyze what had happened or to determine how deductibles or premiums should be adjusted. Westchester determined that the agency's overall performance was unsatisfactory.

In response, Massamont agreed to immediately implement the following changes:

- Massamont would utilize Westchester's modeling for windstorm risk. All new business in Massachusetts, Connecticut and Rhode Island was to be referred to Glenn Foster of Westchester for pricing and deductible options. The top 50 renewal accounts, as measured by wind load, were also to be referred for pricing and deductible options.

- All referral accounts previously approved were to be resubmitted as referrals to ensure that they were being underwritten in accordance with Westchester's requirements.

These new requirements made it necessary for Massamont to provide account information to Westchester as early as possible so that the necessary modeling and evaluation could be carried out in order to provide quotes before July 1. Massamont failed to submit accounts in a timely fashion, causing backlogs and delays.

Throughout the process, Massamont made various complaints regarding the procedures it was required to carry out and requested additional discretion to offer additional coverages and

O'MELVENY & MYERS LLP

Mr. Hilbert Schenck II, October 23, 2003 - Page 5

price particular accounts.  On a timely and adequate basis, Westchester responded or otherwise dealt with the complaints lodged by Massamont.

## MASSAMONT BREACHES THE EXCLUSIVITY PROVISION OF THE AGREEMENT

### Massamont's Discussions With Axis

Unbeknownst to Westchester, at some point in time Massamont began having discussions about transferring or placing new and renewal Program Business with Axis.  Westchester believes that Massamont provided confidential information about the Program Business to Axis, described new and renewal Program Business to Axis, and began discussing when and how it would transfer or place new and renewal Program Business to Axis with respect to policies incepting on July 1, 2003.  All of the foregoing constituted a violation or breach of the exclusivity provision and certain other provisions of the Agreement.  Had Westchester known, it would have objected.

On or about June 27, again unbeknownst to Westchester, Massamont agreed to transfer or place a large portion of the Massachusetts and Rhode Island new and renewal Program Business with Axis in violation of the exclusivity provision and certain other provisions of the Agreement. The business transferred to Axis amounted to approximately $12 million dollars in underwriting premium.  Had Westchester known, it would have objected.

Even though it was obligated under the Agreement to do so, Massamont never offered any opportunity to Westchester to quote or otherwise obtain the new and renewal Program Business which it was actually in the process of transferring to or placing with Axis.  For example, not once prior to June 27, did Massamont say in words or in substance that if Westchester did not agree to certain new or renewal Program Business, Massamont would

PAGE. 8/15

OCT. 28. 2003 (TUE) 16:51

OCT. 23-2003  16:12          O'MELVENY & MYERS LLPNY12          12123262861   P.06/11

O'MELVENY & MYERS LLP

Mr. Gilbert Schenck II, October 23, 2003 - Page 6

transfer or place all or substantially all of new and renewal Program Business with some other

insurer such as Axis.

Massamont's Disclosure About Axis
Getting The Program Business

   In a telephone call made on Monday, June 30, Massamont announced to Westchester that

it had transferred a large portion of the Program Business in Massachusetts and Rhode Island to

Axis. This came as a complete surprise to Westchester, which could not believe that Massamont

had secretly transferred to or placed a large portion of the Program Business in Massachusetts

and Rhode Island with Axis, without first giving Westchester an opportunity to obtain such

business.

   In a July 1 email to Westchester, Massamont stated that Axis and it had reached such an

agreement on June 27. That also surprised Westchester, because it meant that Massamont had

secretly engaged in discussions and negotiations with Axis long before June 27.

   By letter dated July 9, 2003, Westchester advised Massamont that pursuant to Section

VIII.C.2 of the Agreement, Westchester was terminating the Agreement, effective immediately,

because of Massamont's breaches of the Agreement, including:

   Section VIII.C.2., which provided that Massamont could be terminated
immediately if it assigned or transferred any portion of the Program's insurance
without giving Westchester 90 days notice;

   Section IX.B. of Exhibit A to the Agreement, which provided that the Agent
would not solicit Program Business from any other insurance carrier, unless
Massamont first offered the business to Westchester and Westchester declined to
take it; and

   the Amendment, which stated categorically that Massamont "agree[d] not to
ask another company to write the PROGRAM" during the term of the
Agreement.

12/08/04  14:48 FAX 318 734 3693    ESC CLAIMS    ☒030

PAGE. 9/13

OCT. 28. 2003 (TUE) 16:31

OCT. 23-2003  18:12        O'MELVENY & MYERS LLPNY12        12123262061    P.07/11

O'MELVENY & MYERS LLP

Mr. Robert Schenck II, October 23, 2003 – Page 7

In its July 9 letter, Westchester also stated that it was preserving any and all claims that it had against Massamont for breaching the Agreement and reserved the right to pursue such claims.

Massamont's Admissions In Its July 11 Letter

In response to Westchester's July 9 letter of termination, Massamont responded by letter dated July 11. Massamont admitted in this July 11 letter that it had transferred to or placed with Axis all renewal and new Program Business for Massachusetts and Rhode Island, in contravention of the exclusivity provision in the Agreement.

Massamont appears to argue that it previously offered the business to Westchester on the same terms as it offered to Axis. Westchester disputes that Massamont previously offered the new and renewal business on the same terms that were provided to Axis. For example, in the July 11 letter, Massamont contended that it first offered such business to Westchester as follows:

(1)    Massamont would have pricing "authority" to obtain the 25% rate increase;

(2)    Massamont would have discretion to offer wind deductibles to "alleviate price increases;"

(3)    Massamont would be entitled to offer flood coverage outside certain federally designated flood zones; and

(4)    Massamont would be entitled to offer $50,000 in mold coverage.

Massamont further contends that Westchester declined to write the requested coverage, thus purportedly freeing Massamont under Section IX.B. of the Agreement to offer such the Program business to Axis.

For several separate and independent reasons, the purported excuse offered by Massamont is without merit. First, the Amendment provides, without any exception, that Massamont may not seek another company to write the Program. Second, as already noted,

O'MELVENY & MYERS LLP

Mr. Filbert Schenck II, October 23, 2003 - Page 8

Massamont had never "offered" or "proposed" business to Westchester on the terms alleged,
Third, it is undisputed that Massamont failed to give any notice – much less the 90 days required
by the Agreement – before transferring the $12 million Massachusetts and Rhode Island
premium to Axis. Westchester never knew of these negotiations until they were over and was
never given any opportunity to respond to the terms allegedly offered to, and accepted by, Axis.

Damages Suffered By Westchester

In this arbitration, Westchester seeks to recover all damages to Westchester caused by
Massamont's breach of the exclusivity provision in the Agreement. Such damages will be
specified in Westchester's initial arbitration submission.

Under Section IV.K. of the Agreement, Massamont was required to maintain Errors and
Omissions insurance with a limit of liability of not less than $10 million. We hereby request that
you give notice to your insurer of this arbitration demand and the claims asserted herein.

Very truly yours,

Paul R. Koepff
of O'MELVENY & MYERS LLP

cc Job Gaffney
   Bill Garrigan
   Susan Woodward
   Bill Sharp
   Glen Foster
   Kathleen Morrison

NY1 1475784.1

# TAB B

**UTICA NATIONAL INSURANCE GROUP**
ISSUED BY
*UTICA MUTUAL INSURANCE COMPANY*
P.O. BOX 530, UTICA, NEW YORK 13503
TELEPHONE: (315) 734-2000

**DECLARATIONS**

INSURANCE AGENTS AND BROKERS
ERRORS AND OMISSIONS LIABILITY POLICY
**CLAIMS-MADE BASIS**
RENEWAL POLICY

**NAMED INSURED AND MAILING ADDRESS**

KNAPP SCHENCK & COMPANY
INSURANCE AGENCY INC
240 LEWIS WHARF
BOSTON MA 02110

**LOCATION ADDRESS**

T 12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE INSURED AS STATED HEREIN. IN RETURN FOR PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| POLICY NUMBER | POLICY PERIOD FROM | TO | PRIOR POLICY NO. |
|---|---|---|---|
| 3445032 EO | 07/30/2003 | 07/30/2004 | 3445032 EO |

**BASIC POLICY COVERAGE**
LEGAL LIABILITY

INSURED'S DEDUCTIBLE AMOUNT

**LIMITS OF LIABILITY**
$ 10,000,000    EACH LOSS
$ 11,000,000    EACH AGGREGATE
$ 50,000    EACH LOSS
$ 150,000    AGGREGATE

DEDUCTIBLE APPLIES TO:
[ ] LOSS ONLY
[X] LOSS AND LITIGATION EXPENSE

**PREMIUMS**

| | | |
|---|---|---|
| BASIC POLICY PREMIUM | $ 179,905.00 | |
| REAL ESTATE AGENTS AND BROKERS PREMIUM | $ N/A | (See attached endorsement for details) |
| MUTUAL FUND AND VARIABLE ANNUITY PREMIUM | $ N/A | (See attached endorsement for details) |
| EMPLOYMENT-RELATED PRACTICES PREMIUM | $ | |
| OTHER | | |
| **TOTAL POLICY PREMIUM** | $ 179,905.00 | |

**RETROACTIVE DATE**
This insurance does not apply to loss, whenever occurring, from "wrongful acts" which took place before the Retroactive Date, if any, shown _____ NONE _____
Enter Date or "None" if no Retroactive Date applies

**OPTIONAL EXTENDED REPORTING PERIOD PREMIUM**
In Section VII - EXTENDED REPORTING PERIODS, we agree to provide an Optional Extended Reporting Period under certain conditions. The premium for such an Optional Extended Reporting Period is determined as shown in paragraph 5. of Section VII.

FORMS AND ENDORSEMENTS APPLYING TO AND MADE PART OF THIS POLICY AT TIME OF ISSUE:

14-E-0001 (01-91) *    14-E-0001 (01-91) *    14-E-0095 (12-98) *    14-P-EOA (01-98) *
8-L-1864 (12-02) *

ATE: 07/29/03
OUNTERSIGNED AT: BURLINGTON, MA

LICENSED RESIDENT AGENT

COMPANY OFFICER
CURTIS PEARSALL

THESE DECLARATIONS AND THE COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.
14-D-EOA ED.12-99   SEE OVER FOR IMPORTANT CLAIMS-MADE COVERAGE NOTICE    Page 1 of 2

The policy which provides Insurance Agents and Brokers Errors and Omissions Liability Coverage applies on a claims-made basis.

The following provides a general description of this coverage and is subject to the terms and provisions of the actual policy.

A. The policy, subject to its terms and conditions, provides full prior acts coverage if no Retroactive Date is entered in the Declarations. If a Retroactive Date is entered in the Declarations, the policy will not apply to loss from "wrongful acts" which took place before the Retroactive Date. The policy will not apply to loss from "wrongful acts" which take place after the expiration of the policy period.

B. The policy will apply to losses from "wrongful acts" which take place on or after the Retroactive Date, if any, but before the beginning of the policy period only if the insured did not know of the "wrongful acts" before the beginning of the policy period and if any claim is made according to D. below.

C. The policy will not apply to any loss for which claim is first made after the expiration of the policy period or any Automatic or Optional Extended Reporting Period described in the Extended Reporting Period Section of the policy.

D. The policy will apply only to claims which are first made:

   1. During the policy period;

   2. During the sixty day Automatic Extended Reporting Period described in the Extended Reporting Period Section of the policy; or

   3. During the Optional Extended Reporting Periods of 12 months to 120 months duration, described in the Extended Reporting Period Section of the policy. Such Optional Extended Reporting Period must be requested by the insured in writing, within sixty days after the date of termination of coverage or thirty days after the date of mailing by us of notice to the named insured advising of premiums for and provisions of Optional Extended Reporting Periods, in order to allow claims to be made against the policy coverage after the expiration of any Automatic Extended Reporting Period.

E. We will send you a written notice within thirty days after any termination of coverage of costs for and provisions of Extended Reporting Periods.

F. For the first three years of claims-made coverage, premiums will be comparatively lower than for occurrence coverage, and will increase for each renewal of those policies. Claims-made prices will still be somewhat lower than occurrence prices for mature accounts (in their fourth or later years). The purchase of Optional Extended Reporting Periods, as described above, requires additional premium payments.



# Utica National Insurance Group

Insurance that starts with you.

Utica Mutual Insurance Company and its affiliated companies, New Hartford, N.Y. 13413

14-D-EOA  Ed. 12-99

**UTICA NATIONAL INSURAN͟ ͟ GROUP**
ISSUED BY
UTICA MUTUAL INSURANCE COMPANY
P.O. BOX 530, UTICA, NEW YORK 13503
TELEPHONE: (315) 734-2000

**DECLARATIONS**

INSURANCE AGENTS AND BROKERS
ERROR͟ ͟ND OMISSIONS LIABILITY POLICY
**CLAIMS-MADE BASIS**
AMENDMENT

**DROP MAIL**

### NAMED INSURED AND MAILING ADDRESS

KNAPP SCHENCK & COMPANY
INSURANCE AGENCY INC
240 LEWIS WHARF
BOSTON  MA  02110

**LOCATION ADDRESS**

73275|

12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE INSURED AS STATED HEREIN. IN RETURN FOR PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| POLICY NUMBER | POLICY PERIOD FROM | TO | PRIOR POLICY NO. | CORRECTING RETRO DATE EFF. 07/30/2003   AMEND. NO. 01 |
|---|---|---|---|---|
| 3445032 E0 | 07/30/2003 | 07/30/2004 | 3445032 E0 | |

### BASIC POLICY COVERAGE
LEGAL LIABILITY

INSURED'S DEDUCTIBLE AMOUNT

**LIMITS OF LIABILITY**

| | | |
|---|---|---|
| $ 10,000,000 | EACH LOSS |
| $ 11,000,000 | EACH AGGREGATE |
| $ 50,000 | EACH LOSS |
| $ 150,000 | AGGREGATE |

DEDUCTIBLE APPLIES TO:  ☐ LOSS ONLY
☒ LOSS AND LITIGATION EXPENSE

### PREMIUMS

BASIC POLICY PREMIUM                                          $ 179,905.00
REAL ESTATE AGENTS AND BROKERS PREMIUM    $   N/A          (See attached endorsement for details)
MUTUAL FUND AND VARIABLE ANNUITY PREMIUM  $   N/A          (See attached endorsement for details)
EMPLOYMENT-RELATED PRACTICES PREMIUM        $
OTHER

**TOTAL POLICY PREMIUM**    $ 179,905.00   NO PREMIUM CHANGE

**RETROACTIVE DATE**
This insurance does not apply to loss, whenever occurring, from "wrongful acts" which took place before the Retroactive Date, if any, shown _____07/30/02_____
Enter Date or "None" if no Retroactive Date applies

**OPTIONAL EXTENDED REPORTING PERIOD PREMIUM**
In Section VII - EXTENDED REPORTING PERIODS, we agree to provide an Optional Extended Reporting Period under certain conditions. The premium for such an Optional Extended Reporting Period is determined as shown in paragraph 5. of Section VII.

**FORMS AND ENDORSEMENTS** APPLYING TO AND MADE PART OF THIS POLICY AT TIME OF ISSUE:
14-E-0001 (01-91)    14-E-0001 (01-91)    14-E-0095 (12-98)    14-P-EOA (01-98)
8-L-1864 (12-02)

LICENSED RESIDENT AGENT

COMPANY OFFICER
CURTIS PEARSALL

DATE:  08/19/03
COUNTERSIGNED AT: BURLINGTON, MA

THESE DECLARATIONS AND THE COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

14-D-EOA ED.12-99  SEE OVER FOR IMPORTANT CLAIMS-MADE COVERAGE NOTICE

Page 1 of 2

The policy which provides Insurance Agents and Brokers Errors and Omissions Liability Coverage applies on a claims-made basis.

The following provides a general description of this coverage and is subject to the terms and provisions of the actual policy.

A. The policy, subject to its terms and conditions, provides full prior acts coverage if no Retroactive Date is entered in the Declarations. If a Retroactive Date is entered in the Declarations, the policy will not apply to loss from "wrongful acts" which took place before the Retroactive Date. The policy will not apply to loss from "wrongful acts" which take place after the expiration of the policy period.

B. The policy will apply to losses from "wrongful acts" which take place on or after the Retroactive Date, if any, but before the beginning of the policy period only if the insured did not know of the "wrongful acts" before the beginning of the policy period and if any claim is made according to D. below.

C. The policy will not apply to any loss for which claim is first made after the expiration of the policy period or any Automatic or Optional Extended Reporting Period described in the Extended Reporting Period Section of the policy.

D. The policy will apply only to claims which are first made:
   1. During the policy period;
   2. During the sixty day Automatic Extended Reporting Period described in the Extended Reporting Period Section of the policy; or

3. During the Optional Extended Reporting Periods of 12 months to 120 months duration, described in the Extended Reporting Period Section of the policy. Such Optional Extended Reporting Period must be requested by the insured in writing, within sixty days after the date of termination of coverage or thirty days after the date of mailing by us of notice to the named insured advising of premiums for and provisions of Optional Extended Reporting Periods, in order to allow claims to be made against the policy coverage after the expiration of any Automatic Extended Reporting Period.

E. We will send you a written notice within thirty days after any termination of coverage of costs for and provisions of Extended Reporting Periods.

F. For the first three years of claims-made coverage, premiums will be comparatively lower than for occurrence coverage, and will increase for each renewal of those policies. Claims-made prices will still be somewhat lower than occurrence prices for mature accounts (in their fourth or later years). The purchase of Optional Extended Reporting Periods, as described above, requires additional premium payments.



# ⊖ Utica National Insurance Group

Insurance that starts with you.

Utica Mutual Insurance Company and its affiliated companies, New Hartford, N.Y. 13413

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY CHANGES/EXTENSION SCHEDULE

## RENEWAL POLICY

Policy Change
Number_____

This Endorsement forms a part of the policy numbered below:

| | |
|---|---|
| Named Insured and Mailing Address<br><br>KNAPP SCHENCK & COMPANY<br>INSURANCE AGENCY INC<br>240 LEWIS WHARF<br>BOSTON  MA  02110 | Policy Number<br>3445032 EO<br><br>Policy Changes Effective<br>07/30/2003<br>Company<br>UTICA MUTUAL INSURANCE CO. |

IT IS AGREED THAT ꭓꭓꭓꭓꭓꭓꭓꭓꭓꭓꭓꭓꭓꭓꭓꭓꭓꭓꭓꭓ the policy is amended as stated in Part B.

**PART A.**

- ☐ NAME CHANGE
- ☐ ADDRESS CHANGE
- ☐ AMENDING PREMIUM
- ☐ ADDING ADDITIONAL INSURED
- ☐ DELETING ADDITIONAL INSURED
- ☐ AMENDING LIMIT OF LIABILITY
- ☐ AMENDING DEDUCTIBLE

- ☐ ADDING LOCATION(S)
- ☐ DELETING LOCATION
- ☐ ADDING MUTUAL FUNDS
- ☐ DELETING MUTUAL FUNDS
- ☐ MUTUAL FUNDS – ADDING SOLICITOR
- ☐ MUTUAL FUNDS – DELETING SOLICITOR
- ☐ EXCLUSION OF DUPLICATE COVERAGE

- ☐ CHANGING STAFF
- ☐ VOIDING ENDORSEMENT
- ☐ ADDING REAL ESTATE
- ☐ DELETING REAL ESTATE
- ☐ REAL ESTATE – ADDING SOLICITOR
- ☐ REAL ESTATE – DELETING SOLICITOR

**PART B.**

IN CONSIDERATION OF THE PREMIUM PAID, IT IS HEREBY UNDERSTOOD AND AGREED THAT
NO COVERAGE IS AFFORDED FOR CLAIMS ARISING FROM THE INCIDENT MENTIONED IN
QUESTION(S) 30      OF THE APPLICATION DATED 08/05/02 AND SIGNED
BY DAVID WINSHIP

ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

**PREMIUM ADJUSTMENT**

| ADDITIONAL PREMIUM | RETURN PREMIUM |
|---|---|
| | |

_____
Authorized Representative Signature

14-E-0001  Ed. 1-91

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

# POLICY CHANGES/EXTENSION SCHEDULE

Policy Change
Number _____

This Endorsement forms a part of the policy numbered below:

| | |
|---|---|
| Named Insured and Mailing Address<br>KNAPP SCHENCK & COMPANY INSURANCE AGENCY INC<br>PO BOX 51310<br>BOSTON MA  02205 | Policy Number<br>3445032 AP |
| | Policy Changes Effective<br>07/30/2003 |
| | Company<br>**UTICA MUTUAL INSURANCE COMPANY** |

IT IS AGREED THAT THE POLICY IS AMENDED AS STATED IN PART B.

| P<br>A<br>R<br>T<br><br>A. | ☐ NAME CHANGE<br>☐ ADDRESS CHANGE<br>☐ AMENDING PREMIUM<br>☐ ADDING ADDITIONAL INSURED<br>☐ DELETING ADDITIONAL INSURED<br>☐ AMENDING LIMIT OF LIABILITY<br>☐ AMENDING DEDUCTIBLE | ☐ ADDING LOCATION(S)<br>☐ DELETING LOCATION<br>☐ ADDING MUTUAL FUNDS<br>☐ DELETING MUTUAL FUNDS<br>☐ MUTUAL FUNDS - ADDING SOLICITOR<br>☐ MUTUAL FUNDS - DELETING SOLICITOR<br>☐ EXCLUSION OF DUPLICATE COVERAGE | ☐ CHANGING STAFF<br>☐ VOIDING ENDORSEMENT<br>☐ ADDING REAL ESTATE<br>☐ DELETING REAL ESTATE<br>☐ REAL ESTATE - ADDING SOLICITOR<br>☐ REAL ESTATE - DELETING SOLICITOR |
|---|---|---|---|

| P<br>A<br>R<br>T<br><br>B. | The following exclusion below replaces exclusion #15. as listed in 14-P-EOA,<br>SECTION III - EXCLUSIONS:<br><br>15.  The insolvency, receivership, bankruptcy, liquidation or inability to pay of any entity,<br>      person, corporation, estate, trust, or other organization including, but not limited to:<br>      a.  Insurnce companies or reinsurance companies;<br>      b.  Health maintenance organizations or preferred provider organizations;<br>      c.  Captive insurers or risk retention groups and/or risk purchasing groups; or<br>      d.  Investment funds or self-insurance programs.<br><br>ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME. |
|---|---|

PREMIUM ADJUSTMENT

| ADDITIONAL PREMIUM | RETURN PREMIUM |
|---|---|
| | |

Authorized Representative Signature

14-E-0001 Ed 1-91

POLICY NUMBER: 3445032 EO    RENEWAL POLICY    EFFECTIVE 07/30/2003

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CONTINGENT CATASTROPHE EXTRA EXPENSE COVERAGE

**(For attachment to Insurance Agents and Brokers Errors and Omissions Liability Policy)**
**(Claims-made Policy)**

### SCHEDULE

I.  Effective Date:    07/30/2003
(If no date entered, coverage is effective from policy inception.)
Additional Premium    $_____100.00_____

| COVERAGE | LIMITS OF LIABILITY | |
|---|---|---|
| CATASTROPHE CLAIM | $ 10,000 | EACH CATASTROPHE |
| EXPENSE COVERAGE: | $ 25,000 | AGGREGATE |

**DEDUCTIBLE AMOUNT:**    $500 each catastrophe

With respect to the insurance afforded by this endorsement, the Limits of Liability and Deductible Amount stated herein apply in lieu of, and not in addition to, any Limits of Liability and Deductible Amount stated in the policy Declarations.

II.  In consideration of the additional premium shown in the Declarations or Schedule above, it is agreed that the policy includes coverage subject to the policy terms and the additional provisions below for your actual extra expenses necessarily incurred in the providing of professional services covered by this policy but only if such extra expenses:

A.  Are a result of an event declared a catastrophe by the Property Claims Services (PCS). As used in this endorsement, catastrophe, regardless of any other cause or event that contributes concurrently or in any sequence to the loss does not include, whether directly or indirectly:

   1.  Seizure or destruction of property by order of governmental authority, unless the insurance needs of your customers were the result of acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread;

   2.  Nuclear reaction or radiation, or radioactive contamination, however caused, unless the insurance needs of

your customers were the result of ensuing fire; and

   3.  a.  War, including undeclared or civil war;

      b.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

      c.  Insurrection, rebellion, revolution, usurped power, or any action taken by governmental authority in hindering or defending against any of these;

   whether or not declared catastrophes by the Property Claim Services.

B.  Are incurred between the beginning date of the catastrophe and 45 days after the catastrophe began.

C. Are attributed to the assisting in the processing of insurance claims for your customers who have been affected by the catastrophe. Extra Expense under this endorsement, does not include actual payments, whether in whole or in part, for claims to your customers.

D. Are over and above the expenses you would have incurred in the providing of professional services for the same period had no catastrophe occurred.

E. Are not to continue your normal business operations due to physical loss or damage to your property.

F. Are not paid for by other insurance, except for other insurance that is written subject to the same terms, conditions and provisions of this endorsement.

III. A. The Limits of Liability shown in the Schedule above and the rules below determine the most we will pay regardless of the number of:

  1. Insureds;
  2. Insureds making claims for extra expense;
  3. Claims made for extra expense;
  4. Claims processed for catastrophes; or
  5. Customers serviced in the event of a catastrophe.

B. The Aggregate Limit shown in the Schedule above is the most we will pay for the sum of all necessary extra expenses incurred as a result of catastrophes which occur during the "policy period."

C. Subject to B. above and the deductible amount set forth in the Schedule above for each catastrophe, the Each Catastrophe Limit is the most we will pay under this endorsement for the sum of all necessary extra expenses sustained in any one catastrophe.

D. The Limits of Liability of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for the purposes of determining the Limits of Liability.

E. 1. The Deductible Amount stated in the Schedule above will be deducted from the sum of all extra expenses for all claims because of any one catastrophe to which this insurance applies.

  2. The Limits of Liability, as described above, will apply to any extra expense which remains after the deduction of the Deductible Amount.

IV. If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of the loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

A. Pay its chosen appraiser; and

B. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

V. In the event a claim is made for the insurance provided by this endorsement, you must:

A. Give us prompt notice of loss.

B. As soon as possible, give us details of the extra expense you incurred as a result of providing professional services to your customers due to the PCS declared catastrophe.

C. As often as may reasonably be required, permit us to inspect your records proving your extra expense loss.

D. Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

E. Cooperate with us in the investigation or settlement of the claim.

F. Permit us to examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

Includes copyrighted material of Insurance Services Office, Inc.,    14-E-0095  Ed. 12-98
with its permission.
Copyright, Utica Mutual Insurance Company, 1999.

INSURANCE AGENTS AND BROKERS
ERRC    AND OMISSIONS LIABILITY POLICY
CLAIMS—MADE BASIS

**EXTENSION SCHEDULE**    RENEWAL POLICY

| NAMED INSURED AND MAILING ADDRESS | LOCATION ADDRESS |
|---|---|
| KNAPP SCHENCK & COMPANY<br>INSURANCE AGENCY INC<br>240 LEWIS WHARF<br>BOSTON  MA  02110 | |

| POLICY NUMBER | POLICY PERIOD FROM | TO | PRIOR POLICY NO. | |
|---|---|---|---|---|
| 3445032 EO | 07/30/2003 | 07/30/2004 | 3445032 EO | |

This schedule will be used for the following:
Additional Insured, Additional Location(s), Named Insured

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE NAMED INSURED IS TO READ AS FOLLOWS:
   KNAPP SCHENCK & COMPANY INSURANCE AGENCY INC
   SOUTH SHORE INSURANCE AGENCY INC    MASSAMONT INSURANCE
   AGENCY INC    SWS LEWIS WHARF LLC    SWS GREENFIELD LLC

   ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE FOLLOWING ADDITIONAL LOCATION(S) ARE
COVERED UNDER THE ABOVE MENTIONED POLICY.
   324 MAIN STREET              850 MAIN STREET
   GREENFIELD, MA               WEYMOUTH, MA
                        01301                        02189

   ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

FC



# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM
# INSURANCE COVERAGE

Coverage for acts of terrorism is already included in your current policy. You should know that, effective November 26, 2002, under your existing coverage, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The portion of your annual premium that is attributable to coverage for acts of terrorism is: _____.

_____
Policy Number

Please consult with your agent or broker if you have any questions.



## Utica National Insurance Group
Insurance that starts with you.
Utica Mutual Insurance Company and its affiliated companies, New Hartford, N.Y.  13413

8-L-1864  Ed. 12-2002

UTICA MUTUAL INSURANCE COMPANY
UTICA, NEW YORK
(HEREINAFTER CALLED THE COMPANY)

# INSURANCE AGENTS AND BROKERS ERRORS AND OMISSIONS INSURANCE

## THIS IS A CLAIMS-MADE POLICY

THIS POLICY IS LIMITED TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD PROVIDED.

## PLEASE REVIEW THE POLICY CAREFULLY.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine your rights, duties, and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Utica Mutual Insurance Company.

The word "insured" means any person or organization qualifying as such under **SECTION IV- WHO IS AN INSURED**.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION I - DEFINITIONS**.

## SECTION I - DEFINITIONS

1. "Claim" means a written notice, including service of "suit" or demand for arbitration, received by one or more insureds asking for money or services.

2. "Claim expense" means:
   a. Fees charged by an attorney retained by us to defend you;
   b. All other fees, costs, and expenses resulting from the investigation, adjustment, and defense of a "claim" if incurred by us or by the insured with our consent;
   c. Fees charged by any attorney hired by the insured with our written consent; and
   d. Pre and post-judgment interest on that part of the judgment that we pay up to the policy limits.

   However, "claim expense" does not include salaries of regular employees or officials of the insured.

3. "Dealer organization" means an entity organized for the purpose of selling equity-based products and securities.

4. "Interrelated wrongful acts" means "wrongful acts" which arise out of and have as a common basis:
   a. Related circumstances, situations, events, transactions or facts;
   b. A series of related circumstances, situations, events, transactions or facts; or
   c. A common pattern of conduct in selling or servicing products to which this insurance applies.

5. "Litigation expense" means fees and disbursements charged by any attorney retained by us, or hired by you with our written consent, to defend a suit against you or consult on such defense. "Litigation expense" does not include salaries or other expenses of our regular employees or officials, or the fees, disbursements, or other expenses of any counsel retained by us prior to any actual "suit" filing.

6. "Loss" means any amount which an insured becomes legally obligated to pay as damages for any "claim" to which this insurance applies and shall include judgments and settlements. To the extent allowed by law, "loss" shall include punitive or exemplary damages. "Loss" shall not include:
   a. Fines or penalties imposed by law;
   b. Taxes; and
   c. Matters which may be deemed uninsurable under the law pursuant to which the policy shall be construed.

7. "Personal injury" means injury arising out of one or more of the following offenses:
   a. False arrest, detention, or imprisonment;
   b. Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord, or lessor;

**d.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services; or

**e.** Oral or written publication of material that violates a person's right of privacy.

**8. a.** "Policy period" means the period from the inception date to the expiration date, stated in the Declarations of this policy, or to its earlier termination date, if any.

**b.** If there is a "termination of coverage" as described in parts **b.** or **c.** of the definition of "termination of coverage," the "policy period" will be understood to end on the date of such change, but only with respect to such changed coverage.

**9.** "Real Estate Professional" means a:

**a.** "Real estate property manager";

**b.** Real estate appraiser, except when appraising real estate with respect to policies written or placed through you (coverage for this is included in the basic policy); or

**c.** Licensed real estate agent or broker.

**10.** "Real Estate Property Manager" means a person while performing any one or more of the following services in connection with real property, for others, including functions necessary and incidental to such services:

**a.** Securing tenants, renting, or leasing;

**b.** Collecting rents;

**c.** Arranging for routine cleaning and repairs; or

**d.** Controlling expenses and reporting such expenses to the real estate owner;

provided such services are rendered pursuant to a written property management agreement for real property held for sale through the Named Insured as listing broker and then only when such services are provided solely for the duration of the period from the listing of such real property for sale until the assumption of such responsibility by a party other than the insured or the closing of the sale of such real property, whichever is earlier, but not to exceed 365 days.

**11.** "Selling mutual funds or variable annuities" means the sale of shares of a mutual fund (which is a corporation or trust that is an investment company registered under the Investment Company Act of 1940) and the sale of variable annuities. "Selling mutual funds or variable annuities" includes the servicing required by such sales.

**12.** "Suit" means a civil proceeding in which damages because of "loss" from a "wrongful act" are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**13.** "Termination of coverage" means any:

**a.** Cancellation or nonrenewal of the policy;

**b.** Decrease in limits, reduction of coverage, increased deductible, new exclusion; or

**c.** Other change in coverage less favorable to the insured.

**14.** "Wrongful act" means any negligent act, error, or omission to which this insurance applies.

## SECTION II - COVERAGE

**1. Insuring Agreement.**

**a.** We will pay on behalf of the insured all "loss" to which this insurance applies.

We will have the right and the duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any "suit" seeking damages for a "wrongful act" to which this insurance does not apply.

We may, at our discretion:

**(1)** Investigate any allegation of a "wrongful act"; and

**(2)** Settle, according to the Settlement-Consent of The Insured Condition, any "claim" or "suit" that may result. But:

**(a)** The amount we will pay for damages is limited as described in **SECTION V - LIMITS OF LIABILITY**; and

**(b)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of "loss."

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **2. Supplementary Payments**.

14-P-EOA  Ed. 1-98

This insurance does not apply to "wrongful acts" which took place before the retroactive date, if any, shown in the Declarations for this policy or which take place after the "policy period."

b. This insurance applies to "wrongful acts" only if:

(1) The "wrongful acts" occurred on or after the retroactive date, if any shown in the Declarations and before the "policy period"; and

(2) A "claim" is first made against any insured, in accordance with paragraph **c.** below, during the "policy period" or any Extended Reporting Period we provide under **SECTION VII - EXTENDED REPORTING PERIODS.**

c. A "claim" will be considered first made at the earliest of the following times:

(1) When notice of such "claim" is received and recorded by any insured or by us, whichever comes first.

(2) When we make settlement in accordance with paragraph **1.a.** above.

(3) On the date during the "policy period" when the first written notice of any facts or circumstances which may subsequently give rise to a "claim" which would be insured hereunder is received by us from an insured. Any "claim" made against an insured arising out of such facts or circumstances after the date of receipt of such notice by us will be considered to have been made as of the date we received the first notice of facts or circumstances and only the policy in force on that date and no other shall apply for all "claims" from such facts or circumstances.

d. All "claims" for damages based on or arising out of a single "wrongful act" or all "interrelated wrongful acts" of one or more insureds shall be deemed to be one "claim" and to have been made at the time the first of those "claims" is made against any insured.

e. The "loss" must arise out of "wrongful acts" committed in the conduct of the insured's business, wherever committed or alleged to have been committed, by the insured or any person for whose "wrongful acts" the insured is legally liable in rendering or failing to render professional services as:

(1) A General Insurance Agent;

(2) An Insurance Broker;

(3) An Insurance Agent;

(4) An Insurance Consultant;

(5) A Managing, Master or Brokerage General Agent;

(6) A Life and Accident and Health Insurance Agent;

(7) A Surplus Lines Broker; or

(8) A Notary Public.

The following services are included providing they are part of the insured's professional services:

(1) Notarizing.

(2) Arranging premium financing through a non-related entity.

(3) Real estate appraising and loss adjustment on or for policies written or placed by you.

(4) Providing insurance advice for employee benefit programs.

(5) Providing insurance program and risk management services and advice.

(6) Providing loss control services for policies written or placed by you.

(7) (a) "Selling mutual funds or variable annuities," as provided for in the Mutual Fund and Variable Annuity Coverage Endorsement; or

(b) Acting as a "real estate professional," as provided for in the Real Estate Agents and Brokers Errors and Omissions Insurance Endorsement;

if a premium has been charged for such coverage. Such insurance is subject to the Limits of Liability and other provisions set forth in the endorsement.

2. **Supplementary Payments.**

We will pay with respect to any "claim" we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur, including fees charged by an attorney retained by us to defend you.

b. The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the applicable limit of liability. We do not have to furnish these bonds.

c. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit," including actual loss of earnings up to $250 a day because of time off from work. Such expenses shall include fees charged by any attorney hired by the insured with our written consent.

d. All costs taxed against the insured in the "suit."

e. Pre and post-judgment interest on that part of the judgment that we pay up to the policy limits.

These payments will not reduce the limits of liability except as stated in part **6.**, **Deductible**, of **SECTION V - LIMITS OF LIABILITY**.

## SECTION III - EXCLUSIONS

This insurance does not apply to:

1. Any dishonest, fraudulent, malicious, or criminal conduct committed or alleged to have been committed by or at the direction of the insured. If a "suit" is brought against the insured alleging both "wrongful acts" within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct, then we will defend the insured in the trial court, but we shall not have any liability for any judgment for dishonest, fraudulent, malicious, or criminal conduct nor shall we have any further obligation to defend after judgment in the trial court.

   This exclusion applies only to insureds who participated in, acted with knowledge of, or acquiesced to such conduct.

2. "Loss" arising out of or in any way involving:

   a. A "wrongful act" or circumstance, situation or fact which has been the subject of notice given prior to the effective date of this policy under other insurance which provided protection for the insureds; or

   b. A "wrongful act" which with any "wrongful act" described in **a.** above would constitute "interrelated wrongful acts."

3. Loss," direct or consequential, arising from:

   a. Bodily injury from whatever cause including emotional distress, sickness, disease, or death, or for care and loss of consortium, support, companionship, or services of any kind resulting from bodily injury; or

   b. Damage to tangible property, including loss of use thereof.

4. Any liability for money received by an insured or credited to an insured for fees, premiums, taxes, commissions, loss payments, or escrow or brokerage monies.

5. The certification or acknowledgment of a signature by an insured acting as a notary without the proper compliance with the applicable laws and regulations of the state having jurisdiction.

6. A "claim" by any entity or individual which:

   a. Is wholly or partially owned, operated, managed, or controlled by the insured;

   b. Did wholly or partially own, operate, manage, or control the insured; or

   c. Is wholly or partially under the same ownership, operation, management, or financial control as the insured.

7. "Personal injury" arising out of:

   a. The oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

   b. The oral or written publication of material whose first publication took place before the Retroactive Date, if any, shown in the Declarations; or

   c. The willful violation of a penal statute or ordinance committed by or with the consent of the insured.

8. Any liability for:

   a. Refusal to employ;

   b. Termination of employment; or

   c. Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, or other employment-related practices, policies, acts, or omissions.

9. Discrimination or unfair competition of any type.

10. Acts, errors, or omissions of an insured which violate the Employee Retirement Income Security Act of 1974 (ERISA), the Pension Benefits Act and the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA) including any amendments, regulations or enabling statutes pursuant thereto, or any similar federal, state, or provincial statute or regulation.

11. The violation of any federal or state security law or the Racketeer Influenced and Corrupt Organizations Act and/or any of their amendments and regulations.

12. a. Any investment advice given or alleged to have been given relating to the performance or lack of performance of any investment or resulting from variations in the value of any investment, including, but not limited to, stocks, bonds, real estate, oil or gas, gold, silver, diamonds, or any non-insurance investment.

    b. "Loss" arising out of an insured's representations or omissions regarding:

       (1) Interest rates; or

       (2) Future premium payments or market value of insurance products.

14-P-EOA  Ed. 1-98

13. Services as an attorney, accountant, actuary, tax preparer or tax consultant, real estate broker, security broker, security dealer, mortgage broker, financial planner, or any other professional services unless such professional services are specifically insured hereunder and an additional premium paid.

14. The ownership, formation, creation, administration, or operation of any Health Maintenance Organization or Preferred Provider Organization.

15. The ownership, formation, creation, administration, operation or insolvency of any Self-Insurance Program, Risk Retention Group and/or Risk Purchasing Group formed under the Federal Liability Retention Act of 1981 and 1986 as amended or any amendment thereto, Multiple Employer Trust, Multiple Employer Welfare Arrangement, or any pool, syndicate, association or other combination formed for the purpose of providing insurance or benefits, if not fully funded by an insurance product.

    However, this exclusion does not apply to the insolvency of any Self-Insurance Program designed for the purpose of covering exposures of a single individual or entity other than the Named Insured.

16. Any "claim" against an insured based upon or arising out of any pension, profit sharing, health or welfare or other employee benefit plan or trust sponsored by the insured as an employer.

17. Any "claim" based solely on an insured's status as a fiduciary.

18. "Claims" made against an insured arising out of the insured's activities as third party administrator of any plan, whether insured or self-insured and whether or not the insured performs such activities.

19. "Claims" arising out of or alleging the unauthorized use of trade secrets or confidential or proprietary information.

20. Any "claim" brought against an insured by a "dealer organization."

21. "Loss":

    a.  With respect to which an insured under this insurance is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    b.  Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    c.  Resulting from the "hazardous properties" of "nuclear material," if:

        (a) The "nuclear material" (i) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or (ii) has been discharged or dispersed therefrom;

        (b) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported, or disposed of by or on behalf of an insured; or

        (c) The "loss" arises out of the furnishing by an insured of services, materials, parts, or equipment in connection with the planning, construction, maintenance, operation, or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (c) applies only to "loss" to such "nuclear facility" and any property thereat.

As used in this exclusion:

"Hazardous properties" include radioactive, toxic, or explosive properties;

"Nuclear material" means "source material," "special nuclear material," or "by-product material";

"Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"Waste" means any waste material (i) containing "by-products material"; other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (ii) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(i)** separating the isotopes of uranium or plutonium, **(ii)** processing or utilizing "spent fuel," or **(iii)** handling, processing, or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating, or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Loss," in this exclusion, includes all forms of radioactive contamination of property.

## SECTION IV - WHO IS AN INSURED

Each of the following is an insured to the extent set forth below:

1. The individual, partnership, corporation or limited liability company designated as the Named Insured in the Declarations;

2. Your executive officers or directors, but only with respect to their duties as your officers and directors;

3. Your partners or members, but only with respect to the conduct of your business;

4. Your employees (regular, leased, or temporary) or managers, but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business; or

5. Your licensed solicitors or office brokers (who is not an employee) but only as respects:

   **a.** Such persons who are named in the Real Estate Agents and Brokers Errors And Omissions Insurance Endorsement while acting on your behalf; or

   **b.** Such persons who are named in the Mutual Fund And Variable Annuity Coverage Endorsement while acting on your behalf.

6. Any independent contractor acting on your behalf for "claims" arising out of "wrongful acts" in connection with business placed through or serviced by you.

7. Any person who was formerly an insured under parts **1.**, **2.**, **3.**, **4.**, **5.** and **6.** above, but only with respect to "wrongful acts" which took place prior to the termination of such relationship.

8. **a.** Any merged entity for which coverage was added at any time by our Merged or Consolidated Entity Endorsement, 14-E-0006.

   **b.** This insurance does not apply to "wrongful acts" which any insured had knowledge of prior to the effective date of the original endorsement which added such coverage.

9. **a.** You, for legal liability from "wrongful acts" of any merged entity for which coverage was added at any time by our Merged or Consolidated Entity Endorsement, 14-E-0006.

   **b.** This insurance does not apply to "wrongful acts" which any insured had knowledge of prior to the effective date of the original endorsement which added such coverage.

10. **a.** You, for legal liability from "wrongful acts" of any purchased entity for which coverage was added at any time by our Purchased Entity Endorsement, 14-E-0005.

    **b.** This insurance does not apply to "wrongful acts" which any insured had knowledge of prior to the effective date of the original endorsement which added such coverage.

    **c.** This insurance does not apply to "wrongful acts" which occurred prior to the effective date of the original endorsement which added such coverage.

11. The heirs, executors, administrators, or legal representatives of each insured in the event of death, incapacity, or bankruptcy; but solely with respect to the liability of each insured as otherwise insured herein.

Except as stated in **8.**, **9.** and **10.** above, no person or organization is an insured with respect to the conduct of such person or organization, or any current or past partnership or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION V - LIMITS OF LIABILITY

1. The limits of insurance shown in the Declarations and the provisions of this section determine the most we will pay for damages regardless of the number of:

   **a.** Persons insured;

   **b.** Persons or entities making "claims" or bringing "suits"; or

c. "Claims" made or "suits" brought.

2. The total limit of our liability for all payments for all "losses" under this policy shall not exceed the aggregate amount stated in the Declarations.

3. a. Subject to 2. above, the each "loss" limit is the most we will pay for all "loss" from any one "wrongful act" or "interrelated wrongful acts" of one or more insureds; and

   b. Only one deductible amount applies to all such "loss."

4. We will pay all "claim expense" in addition to the applicable Limit of Liability, except as provided in 6. Deductible.

5. a. Our Limit of Liability for each "loss" applies in excess of the applicable deductible amount set forth in the policy for each "loss."

   b. Subject to the deductible amount for each "loss," the total deductible amount for all "losses" under this policy shall not exceed the aggregate deductible amount stated in the Declarations.

   c. Such aggregate deductible amount applies in conjunction with any and all "loss" deductible amounts, whether set forth in the policy Declarations or in endorsements forming a part of the policy.

6. **Deductible.**

   a. If the block in the Declarations labeled "Deductible Applies To: Loss Only" is checked, the insured shall pay the deductible amount set forth in the Declarations for each "loss." The deductible does not include "claim expense."

   b. If the block in the Declarations labeled "Deductible Applies To: Loss And Litigation Expense" is checked, the insured shall pay the deductible amount set forth in the Declarations for each "loss." The deductible will be applied to payments for both "loss" and "litigation expense" as defined in the policy.

   c. We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

   d. Such deductible amounts shall, upon written demand by the company, be paid by the Named Insured within ten days. The total payments requested from the insured with respect to each "loss" shall not exceed the applicable deductible amount stated in the policy.

The determination of the company as to the reasonableness of the "litigation expense" shall be conclusive for all parties.

**SECTION VI - CONDITIONS**

1. **Duties In The Event Of "Wrongful Act," "Claim" Or "Suit."**

   a. You must see to it that we are notified in writing as soon as practicable of any "wrongful act" which may result in a "claim." To the extent possible, notice should include:

      (1) How, when and where the "wrongful act" took place;

      (2) The names and addresses of persons involved in the "wrongful act" and witnesses; and

      (3) The nature of the harm resulting from the "wrongful act."

   b. If a "claim" is received by an insured, you must:

      (1) Immediately record the specifics of the "claim" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the "claim" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses, subpoenas or legal papers received in connection with the "claim" or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation, settlement, or defense of the "claim" or "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to an insured because of "loss" to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

2. **Settlement - Consent Of The Insured.**

   We shall not settle any "claim" without the consent of the insured. If, however, the insured:

   a. Refuses to consent to any settlement recommended by us and elects to contest the "claim" or continue any legal proceeding in connection with such "claim," then our liability for the "claim" will not exceed the lesser of the amount for which the "claim" could have

been settled or the Limits Of Liability plus the incurred "claims expense" up to the time of such refusal.

b. Cannot be located by us after a search using reasonable diligence, then we will use our best efforts to make such settlement as we deem appropriate considering the circumstances and facts.

**3. Other Insurance.**

This insurance is excess over any other applicable insurance whether such insurance is primary, excess, contributory, contingent, or otherwise and whether such insurance is collectible or not; unless such other insurance is written to be specifically excess over the insurance provided by this policy.

**4. Transfer Of Rights Of Recovery Against Others To Us.**

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after a "wrongful act" to prejudice such rights. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. Any amounts recovered will be applied to reduce the amount we paid for "loss" and expense (after application of the deductible) before being applied to reduce your deductible.

**5. Cancellation.**

a. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

b. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1) 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

(2) 60 days before the effective date of cancellation, if we cancel for any other reason.

c. We will mail or deliver our notice of cancellation to the first Named Insured's last mailing address known to us.

d. The notice of cancellation will state the effective date of cancellation. The "policy period" will end on that date.

e. If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, any refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be

effective even if we have not made or offered a refund.

f. If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

**6. Premium.**

The first Named Insured shown in the Declarations:

a. Is responsible for the payment of all premiums and deductibles; and

b. If the premium is not financed, will be the payee for any return premium; but

c. If the premium is financed the Named Insured authorizes us to pay any return premium to the premium finance company.

**7. Nonrenewal.**

If we decide not to renew this policy, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 60 days before the expiration date. If notice is mailed, proof of mailing will be sufficient proof of notice.

**8. Your Right To "Claim" And "Wrongful Act" Information.**

We will provide the first Named Insured shown in the Declarations the following information relating to this and any other Insurance Agents and Brokers Errors and Omissions Liability claims-made policy we have issued to you during the previous three years:

a. A list or other record of each "wrongful act," not previously reported to any other insurer, of which we were notified in accordance with paragraph **1.a.** of this Section. We will include the date and a brief description of the "wrongful act" if that information was in the notice we received.

b. A summary by policy year, of payments made and amounts reserved, stated separately under the applicable Aggregate Limit.

Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values. You must not disclose this information to any claimant or any claimant's representative without our consent.

If we cancel or elect not to renew this policy, we will provide such information no later than 30 days before the date of policy termination. In other circumstances, we will provide this information only if we receive a written request from the first Named Insured. In this case, we will provide this information within 45 days of receipt of the request.

14-P-EOA  Ed. 1-98

We compile "claim" and "wrongful act" information for our own business purposes and exercise reasonable care in doing so. In providing information to the first Named Insured, we make no representations or warranties to insureds, insurers, or others to whom this information is furnished by or on behalf of any insured. Cancellation or nonrenewal will be effective even if we inadvertently provide inaccurate or incomplete information.

9. **Action Against Company.**

No action shall lie against us unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment after actual trial or by written agreement of the insured, the claimant, and us.

Any person or organization or the legal representative thereof, who is signatory to such judgment or written agreement, shall thereafter be able to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join us as a party to any action against an insured to determine the insured's liability, nor shall we be impleaded by an insured or an insured's legal representative.

10. **Bankruptcy.**

Bankruptcy or insolvency of the insured shall not relieve us of any of our obligations hereunder.

11. **Changes.**

This policy embodies all agreements existing between each insured and us or any of our agents relating to this insurance. Only the first Named Insured shown in the Declarations is authorized to request changes in the terms of this policy. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

12. **Agency Of Named Insured.**

By acceptance of this policy the first Named Insured agrees to act on behalf of all insureds with respect to the giving and receiving of notices to and from us, the cancellation of this policy, the payment of premiums and deductibles when due, and the receiving of any return premiums that may become due. In addition, all insureds agree that the first Named Insured shall act on their behalf. If the first Named Insured does not comply with the obligations under this policy then each Named Insured agrees that it will be responsible for the payment of premiums and deductibles when due.

13. **Sale, Transfer, Or Assignment.**

The controlling interest of any insured under this policy shall not be assignable to any other person without our written consent. In the event of the death or incompetency of the insured, this policy shall cover the insured's legal representative as an insured as respects any liability of that insured which is covered by this policy.

Coverage under this policy may end on the date ownership of (or stock which comprises a controlling interest in) any Named Insured is sold, transferred, or assigned unless our written consent is obtained before said date.

14. **Application.**

By acceptance of this policy, you affirm as of the effective date of this policy that the statements in the application attached hereto and made a part hereof are each insured's agreements and representations and that we have issued this policy in reliance upon the truth and accuracy of such representations.

15. **Conformance To Statute.**

Any terms of this policy which conflict with the statutes of the state where this policy is issued are hereby amended to conform to such statues.

16. **Liberalization Clause.**

If, after the effective date of this policy or of the latest renewal certificate attached thereto, we adopt revised provisions for this policy form affording broader coverage with no premium increase, then this policy shall be construed in accordance with the revised provisions as of the effective date of such revision.

**SECTION VII - EXTENDED REPORTING PERIODS**

1.  We will provide an Automatic Extended Reporting Period as described in paragraph **3.**, or if you purchase it, an Optional Extended Reporting Period Endorsement as described in paragraphs **4.** through **7.** below, in the event of any "termination of coverage."

2.  a.  If we provide an Extended Reporting Period, a "claim" first made during the Extended Reporting Period will be deemed to have been made during the "policy period," provided that the claim is for "loss" from "wrongful acts" which took place before the end of the "policy period" (but not before any applicable Retroactive Date).

    b.  **Extended Reporting Periods:**

        (1) Do not extend the "policy period" or change the scope of coverage provided;

(2) Do not reinstate or increase the Limits of Liability applicable to any "claim" to which this policy applies, except to the extent described in paragraph **7.** below;

(3) Apply only to the coverage terminated or reduced; and

(4) Apply only as excess insurance over any other valid and collectible insurance available to the insured, whether primary, excess, contingent, or on any other basis, whose policy period begins or continues after the Extended Reporting Period takes effect.

3. **Automatic 60 Day Extended Reporting Period.**

The Automatic Extended Reporting Period is provided without additional charge. This period starts with the end of the "policy period" and lasts for sixty (60) days. The Automatic Extended Reporting Period may not be cancelled.

4. **Optional Extended Reporting Period.**

If this policy is subject to any "termination of coverage," then you shall have an option to purchase an Optional Extended Reporting Period according to the schedule in **5.** below.

5. **Available Options.**

If you purchase the Optional Extended Reporting Period Endorsement, the Optional Extended Reporting Period will start sixty (60) days after the end of the "policy period" and will last:

a. Twelve (12) months for a premium of 70% of the last full annual premium;

b. Twenty-four (24) months for a premium of 100% of the last full annual premium;

c. Thirty-six (36) months for a premium of 130% of the last full annual premium;

d. Forty-eight (48) months for a premium of 160% of the last full annual premium;

e. Sixty (60) months for a premium of 190% of the last full annual premium; or

f. One hundred and twenty (120) months for a premium of 200% of the last full annual premium.

6. **Optional Extended Reporting Period Notice and Acceptance.**

a. We will notify you in writing within thirty (30) days of the date of "termination of coverage" of the premium for and provisions of the Extended Reporting Period unless we cancel for nonpayment of premium or fraudulent activities of an insured.

If the policy is cancelled for nonpayment of premium or fraudulent activities of an insured, we will only provide a premium quotation for the Optional Extended Reporting Period upon your request.

b. You will have until the later of sixty (60) days after the date of "termination of coverage," or thirty (30) days after the date of mailing of the Extended Reporting Period notice provided for above, to request the Optional Extended Reporting Period. Your request must:

(1) Be submitted to us in writing;

(2) Show the length of the period of extension desired; and

(3) Include payment of the premium for the requested extension.

c. If such request and premium payment are not received, the Extended Reporting Period options may not be exercised at a later date.

d. If, in the event of "termination of coverage" you elect to purchase the Optional Extended Reporting Period Endorsement:

(1) Any return premium due you for the "terminated of coverage" will be credited to the premium due for the Optional Extended Reporting Period Endorsement; and

(2) Any additional premium or deductible amount due us for the period the policy was in force must be fully paid before any payments will be applied to the premium due for the Optional Extended Reporting Period Endorsement.

e. The Optional Extended Reporting Period Endorsement will not take effect unless the additional premium is paid when due. If that premium is paid when due, the Endorsement may not be cancelled.

f. The premium for the Optional Extended Reporting Period Endorsement:

(1) Is determined as shown above or in any endorsement changing the premium because of any change in the nature or extent of the risk during the "policy period";

(2) Will be commensurate with the coverage provided; and

(3) Will be fully earned when the Optional Extended Reporting Period Endorsement takes effect.

g. The Optional Extended Reporting Period Endorsement shall set forth the terms, not inconsistent with this Section, applicable to the Optional Extended Reporting Period including a provision to the effect that the insurance afforded for "claims" made during such period is excess over any other valid and collectible insurance available under policies in force after the Optional Extended Reporting Period starts.

7. **Optional Extended Reporting Period Aggregate Limit.**

If you purchase the Optional Extended Reporting Period Endorsement, the each "loss" limit shown in the Declarations will continue to apply. Subject to the each "loss" limit, we will provide a single aggregate limit of liability for the entire Optional Extended Reporting Period equal to the Aggregate Limit of Liability entered in the Declarations.

The Optional Extended Reporting Period aggregate limit of liability described above applies only for "claims" first made during the Optional Extended Reporting Period.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Utica Mutual Insurance Company, 1999.