UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-CV-11897-WGY

_____
                                    )
MASSAMONT INSURANCE                 )
AGENCY, INC.,                       )
                                    )
                Plaintiff,          )
                                    )
UTICA MUTUAL                        )
INSURANCE COMPANY,                  )
                                    )
                Defendant.          )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

INTRODUCTION

This is a diversity action in which the plaintiff, Massamont Insurance Agency, Inc. ("Massamont"), seeks declaratory and other relief from the defendant, Utica Mutual Insurance Company ("Utica.")  From July 30, 2003 to July 30, 2004, Massamont was insured under an Insurance Agents and Brokers Errors and Omissions Liability Policy (the "E&O Policy") issued by Utica.  On October 23, 2003, a third-party claimant submitted a liability claim against Massamont arising from an alleged "wrongful act" by Massamont within the meaning of Utica's E&O Policy. Utica, however, declined and refused to defend Massamont against the third-party claim in breach of its contractual duties.  As a result, Massamont was compelled to retain defense counsel at its own cost and expense.

The third-party claim against Massamont was subsequently arbitrated before a three-member panel in November and December 2004.  On April 26, 2005, the arbitration panel issued an award of damages against Massamont and in favor of the third-party claimant in the amount of two million

six hundred thousand ($2,600,000) dollars. Massamont tendered this damage award for payment to Utica under the E&O Policy. Despite the fact that the claim qualified as a covered "loss" arising out of alleged "wrongful acts," Utica refused to indemnify Massamont for the amount of the award in breach of its contractual duties. As a result, Utica left Massamont exposed to the third-party claimant for the full amount of the damage award. Moreover, Massamont has since been compelled to defend itself against the claimant's subsequent Petition to Confirm the award at its own cost and expense.

On September 19, 2005, Massamont filed its Complaint in this action seeking relief against Utica in six Counts:

**Count I** – Breach of Contract (based on Utica's failure to defend Massamont against the third-party claim);

**Count II** – M.G.L. c. 93A (based on Utica's investigation of and refusal to defend the third-party claim);

**Count III** – Declaratory Judgment (seeking a declaration that Utica owed duties to defend Massamont against the third-party claim and the Petition to Confirm the damage award);

**Count IV** – Breach of Contract (based on Utica's failure to indemnify Massamont for the amount of the damage award);

**Count V** – M.G.L. c. 93A (based on Utica's mishandling of its indemnification obligations under the E&O Policy); and

**Count VI** – Declaratory Judgment (seeking a declaration that Utica owes duties to indemnify Massamont for the amount of the damage award and for the amount of any judgment entered against it in the Petition to Confirm the damage award).

Massamont now moves for the entry of a partial summary judgment against Utica on Counts I, III, IV and VI of its Complaint on the grounds that (1) no material issues of fact remain in dispute concerning the scope of Utica's duties to defend and indemnify Massamont; and (2) Massamont is

entitled to relief under Counts I, III, IV and VI of its Complaint as a matter of law. Massamont submits this Memorandum of Law in support of its Motion for Partial Summary Judgment.

BACKGROUND[1]

Massamont is a licensed insurance agency in Massachusetts that specializes in the placement and administration of insurance programs for specific markets in New England. For several years prior to 2001, Massamont marketed property insurance to New England schools and municipalities under two programs known as the Metrogard and Diplomax Programs. Massamont actively serviced these Programs by, among other things, preparing and filing insurance forms, setting rate structures, underwriting various risks and participating in loss control. Past insurers who issued policies supporting the Metrogard and Diplomax Programs through Massamont were Great American Insurance Company (in the 1980's and 1990's) and Royal & SunAlliance (in 2000).

Sometime in 2000, Westchester Fire Insurance Company ("Westchester") expressed an interest in writing property insurance in the New England area. Following discussions with Westchester, Massamont elected, in 2001, to replace Royal & SunAlliance with Westchester as the property insurer on the Metrogard and Diplomax Programs. Thus, by Agency Agreement dated January 1, 2001, Westchester agreed to support Massamont's Metrogard and Diplomax Programs and to appoint Massamont as its "General Agent." In accordance with the terms of the Agency Agreement, Westchester promulgated (and Massamont agreed to follow) certain underwriting guidelines concerning, among other things, maintaining a staff of competent and trained personnel, keeping complete and accurate records of all transactions pertaining to insurance written, and

---

[1] The facts contained in this Memorandum are set forth and supported in plaintiff's Concise Statement of Material Facts submitted together with plaintiff's Motion for Partial Summary Judgment pursuant to L.R. 56.1

permitting Westchester, at its discretion, to perform routine audits of such records in order to ensure internal auditing controls.[2]

In early 2003 (the third and final year of the Agency Agreement), the relationship between Westchester and Massamont began to sour. Claiming premiums generated on the Metrogard and Diplomax Programs were insufficient, Westchester, on January 29, 2003, announced to Massamont that a 40-47% annual premium rate increase was necessary in order to achieve Westchester's "corporate target profits."[3] Westchester blamed the Programs' past poor performance, in part, on Massamont's alleged underwriting and record-keeping deficiencies. According to Westchester, Massamont had failed to consider individual risk characteristics, to correctly price windstorm risks, to maintain adequate files on certain risks, and to submit accounts to Westchester in a timely fashion, thereby creating backlogs and delays. In addition to the substantial rate increase, Westchester also insisted that Massamont employ a new risk-specific pricing system in the future, rather than the class-based rating approach Westchester had approved in the past.

Westchester's announcements regarding premium increases and new rating approach shocked and concerned Massamont, as they appeared to sound the death knell of Massamont's Metrogard and Diplomax Programs. For the next several months, Massamont's attempts to negotiate pricing and underwriting concessions from Westchester met with only limited success. The message communicated by Westchester, and just as clearly received by Massamont, was that Westchester was no longer interested in writing the Program business on competitive terms. Massamont reasonably

---

[2] Westchester's guidelines for proper risk evaluation, premium pricing, file maintenance and claim development information are attached as Exhibit "C" to the Affidavit of Hilbert Schenck II.

[3] Affidavit of Hilbert Schenck II, Exhibit "D."

interpreted this message to mean that it was free to place the unwanted Program business elsewhere. Accordingly, when another insurer, Axis Specialty Insurance Company ("Axis"), approached Massamont with an interest in underwriting Metrogard and Diplomax Program business, Massamont did not spurn its advances; on the contrary, it pursued further discussions with Axis while simultaneously continuing negotiations with Westchester.

Whereas the preliminary discussions with Axis proved fruitful, the ongoing negotiations with Westchester did not. Hence, effective July 1, 2003, Massamont placed certain former Westchester accounts with the new insurer, Axis, on terms previously rejected by Westchester. In so doing, Massamont believed the transfer of unwanted or undesirable Program business to Axis was consistent with Westchester's wishes and not in violation of the Agency Agreement. Westchester, however, disagreed. By letter dated July 9, 2003, Westchester immediately terminated the Agency Agreement with Massamont.[4] Then, by written Demand for Arbitration dated October 23, 2003, Westchester submitted a claim for damages against Massamont.[5] In its Demand, Westchester insisted that Massamont was in error; Westchester *had* wanted to write the Program business transferred to Axis and indeed *would have* objected to such transfer had it known of the same beforehand. Westchester further alleged that Massamont's performance under the Agency Agreement was "unsatisfactory" and "fell short" of required standards. Specifically, Westchester accused Massamont of sloppy underwriting, record-keeping and reporting. Further, Massamont allegedly failed to underwrite individual accounts properly such that "losses were incurred repeatedly on accounts." Finally, Westchester claimed it suffered damages as a result of Massamont's breach

---

[4] Id., Exhibit "F."

[5] Id., Exhibit "H."

of the Agency Agreement.

In 2003, Massamont was insured for liability under an E&O Policy issued by Utica. Pursuant to the Policy, Utica agreed to defend and indemnify Massamont for all "losses" arising out of "wrongful acts" committed in the conduct of Massamont's business as a "General Insurance Agent."[6] Accordingly, on October 28, 2003, Massamont tendered Westchester's Demand for Arbitration to Utica for a defense. Utica, in turn, retained Robert B. Burkitt of R.M.G. Investigations to investigate Westchester's Demand on Utica's behalf. On December 22, 2003, Mr. Burkitt met with Massamont representatives in Greenfield, Massachusetts, for less than two hours. Thereafter, by letter dated March 4, 2004 (more than four months after Massamont tendered its defense,) Utica denied coverage to Massamont and refused to assume its defense, *even under a reservation of rights.*[7]  In subsequent communications with Massamont and its representatives, Utica "disavowed" or withdrew its initial grounds for denial, yet continuously asserted and raised new and novel grounds in support of its no coverage position.[8]  Throughout such communications, Utica consistently refused to assign counsel to protect Massamont's interests. Nor did it commence an action for declaratory relief in an effort to resolve the coverage dispute. As a result, Massamont was compelled to retain counsel at its own

---

[6] A true and accurate copy of the E&O Policy is attached to the Affidavit of Hilbert Schenck II as Exhibit "A."

[7] Id., Exhibit "I."

[8] The pronounced reasoning for Utica's coverage position was always a moving target. By letter to Massamont dated March 4, 2004, Utica cited six grounds for declining to assume Massamont's defense. See Affidavit of Hilbert Schenck II, Exhibit "I." Yet, when Massamont challenged this disclaimer, Utica "disavowed" – i.e., disclaimed knowledge of, responsibility for, or association with – *five* of the original six grounds, then raised four new ones! Id., Exhibit "L1." Amazingly, the only ground reasserted by Utica rested on Exclusion 1 of the E&O Policy, which excluded coverage for "dishonest, fraudulent, malicious or criminal conduct," *but expressly obligated Utica to defend against such claims.* While subsequent communications with the defendant prompted further refinements in Utica's stated grounds and rationale, Utica never budged from its no coverage stance. Id., Exhibits "K2"-"K6";" L2"-"L5."

-6-

cost and expense to defend itself against Westchester's claim.

The arbitration panel held hearings on the Westchester/Massamont dispute in November and December 2004. On April 26, 2005, much to Massamont's dismay, the panel ruled in Westchester's favor by issuing an Award of compensatory damages against Massamont in the amount of $2,600,000. The one-page Award is silent on the nature of the claims adjudicated by the arbitrators, or the rationale for their damage award.[9]  Other than determining that "Massamont breached the Agency Agreement," the Award contains no specific findings regarding the merits of Westchester's claims, nor does it differentiate in terms of the specific harm Westchester allegedly suffered and for which the arbitrators intended to award compensation. Massamont thereafter tendered the Award for payment to Utica under the E&O Policy. Utica again declined coverage.

On May 17, 2005, Westchester filed a Petition to Confirm Arbitration Award in the United States District Court for the Southern District of New York. Due to Utica's refusal to pay the Award, Massamont was again forced to retain counsel, at its own cost and expense, to defend itself against the Petition.

By refusing to defend Massamont against Westchester's claim, then refusing to indemnify Massamont for the amount of the damage award, Utica breached its duties under the E&O Policy. Because no material facts concerning coverage for Westchester's claim under the E&O Policy remain in dispute – with respect to either the duty to defend or the duty to indemnify – Massamont is entitled to summary judgment on Counts I, III, IV and VI of its Complaint as a matter of law.

---

[9]  Affidavit of Hilbert Schenck II, Exhibit "J."

ARGUMENT

I.    SUMMARY JUDGMENT STANDARD

Fed. R. Civ. P. 56 provides that judgment shall be rendered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004). The moving party must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party does so, the nonmoving party cannot rely on "mere allegations or evidence that is less than significantly probative" to defeat the motion. Maldonado-Denis v. Costillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Rather, it must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citations omitted); Maldonado-Denis, supra, 22 F.3d at 581.

II.    UTICA BREACHED ITS DUTY TO DEFEND MASSAMONT UNDER THE E&O POLICY.

    A.    *Controlling Law*

In Massachusetts, a liability insurer's duty to defend its insured against covered claims is very broad. Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 10 (1989). The duty to defend is determined by comparing the allegations of the complaint with the language of the policy. If such allegations are "reasonably susceptible" of embracing a covered claim, then the insurer must assume the insured's defense. Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 394 (2003); Liberty Mut. Ins. Co. v. SCA Servs., Inc., 412 Mass. 330, 332 (1992); Continental Casualty Co. v. Gilbane Building Co., 391 Mass. 143, 146-47 (1984). A probability of

-8-

recovery under the policy need not be shown in order to invoke coverage; a mere "possibility" of coverage is sufficient. Simplex Technologies, Inc. v. Liberty Mut. Ins. Co., 429 Mass. 196, 199 (1999); Doe v. Liberty Mut. Ins. Co., 423 Mass. 366, 368 (1996); Sterilite Corp. v. Continental Cas. Co., 17 Mass. App. Ct. 316, 319 (1983), rev. den., 391 Mass. 1102 (1984). See Bagley v. Monticello Ins. Co., 430 Mass. 454, 458 (1999) (it is the source from which claimant's injury originates, rather than specific theories of liability alleged, that determines insurer's duty to defend); Garnet Constr. Co. v. Acadia Ins. Co., 61 Mass. App. Ct. 705, 707 (2004) (duty to defend extends even to "dubious" claims). Moreover, if a complaint alleges at least one covered claim, then the insurer must assume defense of the entire action even if some or many other claims fall outside the scope of coverage. Simplex, supra, 429 Mass. at 199; Dilbert v. Hanover Ins. Co., 63 Mass. App. Ct. 327, 331 (2005).

Additionally, a simple comparison of the complaint to the policy is not the end of an insurer's inquiry. An insurer's obligation to defend is "based not only on the facts alleged in the complaint but also on the facts that are known or readily knowable by the insurer." Desrosiers v. Royal Ins. Co. of America, 393 Mass. 37, 40 (1984). Thus, if an insurer, in investigating a claim (as required under its policy and under Massachusetts law), either learns (or could have readily learned) of facts which may invoke coverage, then it must provide a defense to its insured even if the bare allegations of the complaint do not fall within the scope of the policy. Hingham Mut. Fire Ins. Co. v. Niagara Fire Ins. Co., 46 Mass. App. Ct. 500, 503 (1999). Further, it is also appropriate, when interpreting an insurance policy, to consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Hakim v. Mass. Insurers' Insolvency Fund, 424 Mass. 275, 282 (1997); Ruggerio Ambulance Service, Inc. v. National Grange Mut. Ins. Co., 430 Mass. 794, 798

(2000). Finally, in construing an insurance policy, any ambiguity must be interpreted most favorably to the insured. Dilbert v. Hanover Ins. Co., 63 Mass. App. Ct. 327, 335 (2005).

      B.       *The E&O Policy Language*

In Section II(1)(a) of its E&O Policy,[10] Utica agreed:

> We will pay on behalf of the insured [Massamont] all "loss"[11] to which this insurance applies.

> We will have the right and the duty to defend the insured against any "suit"[12] seeking those damages even if the allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any "suit" seeking damages for a "wrongful act" to which this insurance does not apply.

Pursuant to Section II(1)(e) of the Policy, a covered "loss":

> [M]ust arise out of "wrongful acts" committed in the conduct of the insured's business, wherever committed or alleged to have been committed, by the insured or any person for whose "wrongful acts" the insured is legally liable in rendering or failing to render professional services as:

>       (1) A General Insurance Agent;

>       (2) An Insurance Broker;

>       (3) An Insurance Agent; [or]

>       . . .

---

[10] Affidavit of Hilbert Schenck II, Exhibit "A."

[11] "Loss" is defined in Section I(6) of the E&O Policy as:

> [A]ny amount which an insured becomes legally obligated to pay as damages for any "claim" to which this insurance applies and shall include judgments and settlements. . . .

"Claim," in turn, is defined as "a written notice, including service of 'suit' or *demand for arbitration*, received by one or more insureds asking for money or services." Section I(1) (emphasis added).

[12] "Suit" is defined in Section I(12) of the E&O Policy as:

> [A] civil proceeding in which damages because of "loss" from a "wrongful act" are alleged. "Suit" includes:

> a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent . . . .

-10-

(5) A Managing, Master or Brokerage General Agent . . ..

A "wrongful act," in turn, means "any negligent act, error, or omission to which this insurance applies."

###### C. *Westchester's Demand for Arbitration*

The failings of Massamont, as alleged in Westchester's Demand for Arbitration, triggered Utica's duty to defend under Section II(1)(a) of the E&O Policy. Westchester's Demand constituted a "suit" seeking damages for a covered "loss" arising out of "wrongful acts." Moreover, such "wrongful acts" were allegedly committed in the conduct of Massamont's business while rendering or failing to render professional services to Westchester as a "General Insurance Agent." Massamont's interpretation (or misinterpretation) of its Agency Agreement with Westchester, its understanding (or misunderstanding) of Westchester's interests vis-a-vis certain high risk accounts, its belief that the transfer of unwanted Metrogard and Diplomax Program business to another insurer was consistent with Westchester's interests, and its belief that Westchester had refused to grant Massamont sufficient underwriting flexibility to salvage the Programs based on a *de facto* election not to write future business at competitive rates, all qualify as covered "errors" or "omissions" within the meaning of the "wrongful act" definition. This is made even more evident given that the causes of Westchester's disillusionment with the Programs (and, hence, its purported reasons for the substantial premium increase and shift in rating approach) were Massamont's alleged prior underwriting and record-keeping deficiencies.

As alleged in Westchester's "Complaint," Massamont's past performance was subpar and woefully deficient.[13] It failed "to sufficiently consider individual risk characteristics," failed "to

---

[13] Affidavit of Hilbert Schenck II, Exhibit "H."

correctly price windstorm risks," failed to maintain "adequate files" on certain risks, and failed to submit accounts to Westchester in a timely fashion. In other words, Massamont allegedly brought Westchester's proposed changes on itself by mishandling the Metrogard and Diplomax Programs. Overall, Westchester rated Massamont's performance as a General Agent "unsatisfactory."

Westchester concluded in its Demand that Massamont breached the Agency Agreement by failing to place certain risks (i.e., the Program accounts) with Westchester. Such failure alone constitutes an "omission" in the "rendering or failing to render professional services" as a General Agent and, therefore, qualifies as a covered "loss."

     D.     *Westchester's Demand for Arbitration Compared With the E&O Policy Language*

Interpretation of the E&O Policy is a question of fact for the Court. Merchants Ins. Co. of New Hampshire v. United States Fidelity and Guar. Co., 143 F.3d 5, 8 (1st Cir. 1998); Great Northern Ins. Co. v. Paino Assocs., 369 F. Supp. 2d 177, 187 (D. Mass. 2005); Kelleher v. American Mut. Ins. Co. of Boston, 32 Mass. App. Ct. 501, 503, rev. den., 413 Mass. 1102 (1992). In approaching that task, this Court should look for guidance to prior case decisions construing similar policy language. For example, the E&O Policy covers Massamont for "losses" that "*arise out of* 'wrongful acts' . . . ." (Emphasis added). Massachusetts case law holds that the phrase "arising out of" must be read "expansively" in the context of insurance contracts. Rischitelli v. Safety Ins. Co., 423 Mass. 703, 704 (1996); Commerce Ins. Co. v. Theodore, 65 Mass. App. Ct. 471, 472-73 (2006). "'Arising out of' is ordinarily held to mean 'originating from, growing out of, flowing from, incident to or having connection with' . . . ." Metropolitan Prop. & Casualty Ins. Co. v. Fitchburg Mut. Ins. Co., 58 Mass. App. Ct. 818, 821 (2003), quoting Murdock v. Dinsmoor, 892 F.2d 7, 8 (1st Cir. 1989). An "expansive" reading of Utica's E&O Policy demonstrates that Westchester's claim for breach

of the Agency Agreement against Massamont originated from, grew out of, flowed from, was incident to or had connection with the numerous alleged failings – i.e., "wrongful acts" – of Massamont set forth in Westchester's Demand for Arbitration. Certainly, that is precisely what Westchester alleged, for it had no reason to catalog such failings in its Demand if it did not consider Massamont's past performance and subsequent breach "all of a piece," Utica's subjective conclusions to the contrary notwithstanding.

The argument for coverage becomes even more compelling where the definition of "wrongful act," as used by Utica in its E&O Policy, was previously held ambiguous by the Massachusetts Supreme Judicial Court. In USM Corp. v. First State Ins. Co., 420 Mass. 865 (1995), the SJC interpreted a consultants errors and omissions liability policy which defined "wrongful act" as a "negligent act, error or omission committed during the Policy Period." There, the insurer denied coverage for a breach of warranty claim brought against its insured by one of the insured's customers on the grounds that the policy did not apply in the absence of fault by the insured. Id., 420 Mass. at 867. The insurer insisted, in short, that the term "negligent," as used in the "wrongful act" definition, modified all three following terms – "act," "error" *and* "omission" – not merely the word "act." The SJC, however, found the policy definition less than clear.[14] Citing several out-of-state cases where similar language was held to cover breach of contract or other non-negligent claims, the SJC ruled that the insurer "must suffer the consequences of the ambiguity" and found in favor of the

---

[14]    [C]laims-made policies typically afford coverage for claims by reason of any "negligent act, error or omission." What if an insured is held liable for a non-negligent act? Most courts have held that the insured is still entitled to coverage. The strongest argument in favor of that conclusion is that (i) an "error" or "omission" encompasses more than negligent conduct, and (ii) if only negligent errors and negligent omissions were covered, the "error or omission" language would be rendered redundant.

A. Windt, Insurance Claims and Disputes (4th Ed. 2005) (citing USM Corp., supra).

insured. Id., 420 Mass. at 868.[15] See Home Ins. Co. v. St. Paul Fire & Marine Ins. Co., 229 F.3d 56, 65 n.10 (1st Cir. 2000) ("negligent act, error, or omission," as used in "wrongful act" definition of lawyers' professional liability policy, covers loss arising from intentional acts under Maine law); Transcontinental Ins. Co. v. Caliber One Indem. Co., 367 F. Supp. 2d 994, 1002 (E.D. Va. 2005) (collecting decisions from other jurisdictions where courts have consistently held that insurance protection for "negligent acts, errors or omissions" covers claims for breach of contract); Wyman-Gordon Co. v. Liberty Mut. Ins. Co., 2000 WL 34024139 (Mass. Super. Ct., July 14, 2000) (employee benefits liability endorsement in CGL policy providing coverage for liability caused by "improper advice, error or omission" held to include claims for breach of contract arising from deliberate change in insured's benefit policies).

This Court should reach the same result. Coverage under Utica's E&O Policy is not limited to acts of negligence or fault on the part of Massamont, but extends to claims for breach of contract as well, such as Westchester's claim that Massamont breached the Agency Agreement by transferring Metrogard and Diplomax Program business to another insurer. Had Utica intended to protect its insureds against only non-negligent conduct, then "the crucial words of the policy should have been amended to eliminate the ambiguity and to make clear that coverage extended only to negligent errors." USM Corp., 420 Mass. at 868. Utica made no such amendment to the E&O Policy.

In support of its coverage denial, Utica maintains that, even if Westchester's loss arose out of a "wrongful act" within the meaning of the E&O Policy, Massamont's "error" or "omission," in

---

[15] The Appeals Court below interpreted "error" as "a mistaken judgment or incorrect belief as to the existence or effect of matters of fact, or a false or mistaken conception or application of the law." USM Corp. v. First State Ins. Co., 37 Mass. App. Ct. 471, 475 n.5 (1994).

Utica's view, "did not arise from and was not 'inherent in the rendering of professional advice.'"[16] This defense is wholly untenable. Utica's E&O Policy contains no such "professional advice" condition or requirement. Rather, the Policy protects Massamont for "wrongful acts" committed "in rendering or failing to render *professional services* as (1) A General Insurance Agent . . .." (Emphasis added). Although the term "professional services" is nowhere defined in the E&O Policy, it certainly is not restricted or otherwise limited to the rendering of advice only. Indeed, it is difficult to conceive of a more fundamental component in the "rendering or failing to render professional services" as a General Agent than the selection of a particular insurer with whom to place certain accounts. Surely, if a school or municipality insured under the Metrogard or Diplomax Programs were to claim that Massamont erred by placing its coverage with an insurer that subsequently went into receivership, such alleged "error" would arise from the "rendering or failing to render professional services" within the meaning of Utica's E&O Policy. Liability coverage under the Policy does not turn on the identity of the claimant.

In Roe v. Federal Ins. Co., 412 Mass. 43 (1992), the SJC addressed the meaning of "professional services" in the context of a medical malpractice policy. In attempting to craft a workable standard, the Court cited the "widely accepted" notion that a professional act or service typically arises from a calling or vocation involving specialized knowledge or skill that is "predominantly mental or intellectual, rather than physical or manual . . .." Id., 412 Mass. at 48, quoting Marx v. Hartford Accident & Indemnity Co., 183 Neb. 12, 13, 157 N.W.2d 870 (1968). By analogy, Massamont's "professional services" as a "General Insurance Agent" required Massamont to perform the specialized underwriting, record-keeping, reporting, claims-adjustment, pricing and

---

[16] See Affidavit of Hilbert Schenck II, Exhibit "L2."

file management activities set forth in its Agency Agreement with Westchester. Again, Massamont's alleged "wrongful acts" arose from its alleged rendering or failure to render such services. See Jefferson Ins. Co. of NY v. National Union Fire Ins. Co. of Pittsburgh, PA, 42 Mass. App. Ct. 94, 103 (1997) ("professional services" exclusion found ambiguous).

Finally, Utica cannot escape its broad duty to defend by insisting that Westchester's Demand for Arbitration was not based "on any alleged deficiencies by Massamont in performing its underwriting duties under the Agency Agreement" but, rather, "premised *solely* on Massamont's transfer of the program business to Axis."[17] Utica has no right to draw such a unilateral conclusion. Indeed, the SJC rejected this same argument in Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7 (1989).

> Commercial Union argues that Redgrave, even if her reputation was injured within the meaning of the policy, did not state a claim for damages arising out of such injury. The fact that Redgrave's claim was denominated as a contract claim is not controlling. . . .. The process is not one of looking at the legal theory enunciated by the pleader but of "envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy."

Id., 406 Mass. at 12-13, quoting Sterilite Corp., supra, 17 Mass. App. Ct. 316, 318 (1983) (citation omitted). Even if Westchester's breach of contract claim was premised "solely" on Massamont's transfer of Program business to Axis (which Massamont denies), losses due to Massamont's failures and "unsatisfactory" performance may be envisaged as lying "within the range of the allegations" contained in Westchester's Demand for Arbitration.

Given that its duty to defend is broad, that the phrase "arise out of" must be read expansively, and that the term "wrongful act" must be interpreted to include more than mere non-negligent

---

[17] See Defendant's Answer to Complaint, ¶¶ 28-29 (emphasis added).

-16-

conduct on the part of the insured due to the term's ambiguity, this Court must find that Utica breached its duty to Massamont by refusing to defend Massamont against Westchester's Demand for Arbitration. Massamont is, therefore, entitled to summary judgment on Counts I and III of its Complaint.

III. UTICA BREACHED ITS DUTY TO INDEMNIFY MASSAMONT UNDER THE E&O POLICY.

   A.   *Consequences of an Insurer's Breach of the Duty to Defend*

Under Massachusetts law, the consequences of an insurer's breach of its contractual duty to defend its insured can be harsh. The defense-defaulting insurer is liable "for the natural consequences of [the] breach of contract that places its insured in a worse position . . .." Liquor Liab. Joint Underwriting Ass'n of Mass. v. Hermitage Ins. Co., 419 Mass. 316, 323 (1995), quoting Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 764 (1993).

> [T]he general rule under Massachusetts law is that if the insurer fails to defend the lawsuit, it is liable for all defense costs and (assuming policy coverage) the entire resulting judgment or settlement, unless liability can be allocated among covered and noncovered claims.

Liberty Mut. Ins. Co. v. Metropolitan Life Ins. Co., 260 F.3d 54, 63 (1st Cir. 2001); Peterborough Oil Co., Inc. v. Great American Ins. Co., 397 F. Supp. 2d 230, 243 (D. Mass. 2005); Jefferson Ins. Co. of NY, supra, 42 Mass. App. Ct. at 104. This is true even if the denial of coverage was in good faith. Palermo v. Fireman's Fund Ins. Co., 42 Mass. App. Ct. 283, 290 (1997). The burden of making the allocation between covered and noncovered claims rests with the defense-defaulting insurer. Liquor Liab. Joint Underwriting Ass'n, 419 Mass. at 323-24; Swift v. Fitchburg Mut. Ins. Co., 45 Mass. App. Ct. 617, 625 (1998). And, if the defense-defaulting insurer should fail to meet that burden, it

shall be liable for the entire amount of the judgment. <u>Liquor Liab. Joint Underwriting Ass'n</u>, 419 Mass. at 324; <u>Peterborough Oil</u>, 397 F. Supp. 2d at 243-44.

In <u>Liquor Liab. Joint Underwriting Ass'n</u>, the insured tavern was sued by a patron who claimed he was assaulted by another patron. In his complaint, the injured patron alleged the tavern was negligent in serving alcohol to his assailant and in failing to provide adequate security measures on its premises. The tavern tendered the defense of this case to both its commercial general liability insurer, Hermitage Insurance Company, and its liquor liability insurer, the Liquor Liability Joint Underwriting Association of Massachusetts. However, only the liquor liability insurer accepted the tender and agreed to provide the tavern with a defense. The CGL insurer disclaimed all coverage. At the tort trial, the jury returned a verdict in favor of the injured patron and against the tavern in the amount of $80,000. The verdict did not differentiate between the patron's two claims (liquor liability and negligent security.)

The liquor liability insurer subsequently paid the injured patron on the tavern's behalf, took an assignment of the tavern's rights and interests vis-a-vis the CGL insurer, and commenced a separate action for declaratory relief against Hermitage. The Superior Court found the CGL insurer in breach of its duties to defend and indemnify the tavern, and awarded the liquor liability insurer one-half of the defense and indemnity costs incurred in connection with the underlying tort case. On direct appellate review, the SJC affirmed the coverage determinations made below, but ordered the defense-defaulting CGL insurer to pay the *entire* indemnity amount, not just one-half. Hermitage could not, as a matter of law, meet its allocation burden.

> [O]n the burden of proof, Hermitage, in the present circumstances, should have the burden of allocating the judgment in the [underlying] lawsuit between the covered and uncovered claim. . . .. Hermitage cannot satisfy this burden, and any attempt on its part to do so would

be speculative and arbitrary, essentially amounting to an attempt to determine the particular amount that happened to be in the jurors' minds as they returned the verdict.

Id., 419 Mass. at 323-24 (citations and punctuation omitted).  This result is fair, reasoned the SJC, since the CGL insurer could have defended the tort action under a reservation of rights, but refused to do so.  Id., 419 Mass. at 323.  Had it defended the tavern under a reservation of rights, Hermitage could have requested the trial judge to instruct the jury to allocate liability and damages between the two claims.  "[I]t is likely that the judge would have employed other special questions to accomplish that result."  Id.

> B.    *Consequences of Utica's Breach of its Duty to Defend*

Utica is now in the same position Hermitage was in.  As set forth above, Utica owed a duty to defend Massamont against Westchester's action, since the allegations of Westchester's Demand for Arbitration were "reasonably susceptible" of embracing a covered claim.  Yet it failed to do so. As a result, Utica now holds the status of a defense-defaulting insurer with the burden of allocating the arbitration Award entered against Massamont between covered and noncovered claims.  Utica cannot meet that burden as a matter of law.  The one-page Award is silent with respect to the claims adjudicated, and provides no hint of the rationale for the $2,600,000 awarded in damages.[18]  Utica is not now free, not should it be permitted, to wade or sift through the testimony and evidence admitted at the arbitration hearings in a "Monday morning" attempt to divine the thoughts of the individual arbitration panel members.  Such a process, as the SJC cautions, would be "speculative and arbitrary."  Id., 419 Mass. at 324.  Instead, Utica is stuck with the arbitration result.

Utica might have avoided its present predicament had it provided a defense to Massamont under a reservation of rights (as the Liquor Liab. Joint Underwriting Ass'n Court suggested), and/or

---

[18]  Affidavit of Hilbert Schenck II, Exhibit "J."

commenced a timely action for declaratory relief.  Use of the available declaratory relief remedy is "recommended" by Massachusetts courts to those insurers faced with thorny coverage issues.  See Medical Malpractice Joint Underwriting Ass'n of Mass. v. Goldberg, 425 Mass. 46, 56 & n.25 (1997); Hanover Ins. Co .v. Fasching, 52 Mass. App. Ct. 519, 520 (2001).  In the apparent belief that it did not face a thorny coverage issue with respect to the Westchester/Massamont dispute, Utica elected to forego the commencement of a declaratory relief action to determine the scope of its duties and responsibilities to its insured.  It must now live with the consequences of that decision.

Utica breached its duty to indemnify Massamont by refusing to pay the full amount of the arbitration Award rendered against Massamont and in favor of Westchester.  Massamont is, therefore, entitled to summary judgment on Counts IV and VI of its Complaint.

<u>CONCLUSION</u>

For the reasons set forth above, this Court should allow plaintiff's Motion for Partial Summary Judgment by entering summary judgment in favor of the plaintiff, Massamont Insurance Agency, Inc., and against the defendant, Utica Mutual Insurance Company, on Counts I, III, IV and IV of the Complaint.

Respectfully submitted,
The Plaintiff,
MASSAMONT INSURANCE AGENCY, INC.,

By its attorneys,
**PIERCE, DAVIS & PERRITANO, LLP**

John J. Davis, BBO #115890
10 Winthrop Square
Boston, MA 02110
(617) 350-0950

Dated: May 5, 2006