UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-CV-11897-WGY

| | |
|---|---|
| MASSAMONT INSURANCE AGENCY, INC., | ) ) ) |
| Plaintiff, | ) ) |
| UTICA MUTUAL INSURANCE COMPANY, | ) ) ) |
| Defendant. | ) ) |

**PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT[1]**

1.  The plaintiff, Massamont Insurance Agency, Inc. (hereinafter "Massamont"), is a Massachusetts corporation with a principal place of business at 280 Summer Street, Boston, Suffolk County, Massachusetts. Massamont is a licensed insurance agency that specializes in the placement and administration of insurance programs for specific markets in New England. (Affidavit of Hilbert Schenck II (hereinafter "Schenck,") ¶¶ 2 & 3).

2.  The defendant, Utica Mutual Insurance Company (hereinafter "Utica"), is an insurance company domiciled in New York with a principal place of business in New Hartford, New York. Utica is licensed to do business in Massachusetts. (Plaintiff's Complaint (hereinafter "Complaint") and Defendant's Answer to Complaint (hereinafter "Answer,") ¶ 2).

A.  **The Utica E&O Policy**

3.  In 2003, Massamont was insured under a claims-made Insurance Agents and Brokers

---

[1] The plaintiff does not admit that all facts contained within this Concise Statement are necessarily material to the issues in dispute. Some facts are included solely for the purpose of providing the Court with a fuller understanding of the circumstances which gave rise to the pending litigation.

Errors and Omissions Liability Policy issued by Utica. The Utica Policy No. 3445032 EO

(hereinafter "the E&O Policy") carried liability limits of $10,000,000 "each loss" and

$11,000,000 "each aggregate," and was effective from July 30, 2003 to July 30, 2004.

(Complaint and Answer, ¶ 4).

    4. Under Section II(1)(a) of the E&O Policy, Utica agreed, in part, as follows:

> We will pay on behalf of the insured all "loss" to which this insurance applies.

> We will have the right and the duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any "suit" seeking damages for a "wrongful act" to which this insurance does not apply.

(Schenck, Exhibit "A," at Utica 002153).

    5. Under Section II(1)(e) of the E&O Policy, covered "losses" include those which:

> [A]rise out of "wrongful acts" committed in the conduct of the insured's business, wherever committed or alleged to have been committed, by the insured or any person for whose "wrongful acts" the insured is legally liable in rendering or failing to render professional services as:

> (1) A General Insurance Agent;

> (2) An Insurance Broker;

> (3) An Insurance Agent; [or]

> . . .

> (5) A Managing, Master or Brokerage General Agent . . ..

(Schenck, Exhibit "A," at Utica 002154).

    6. "Claim" is defined in Section I(1) of the E&O Policy as:

> [A] written notice, including service of "suit" or demand for arbitration, received by one or more insureds asking for money or services.

(Schenck, Exhibit "A," at Utica 002152).

      7.  "Loss" is defined in Section I(6) of the E&O Policy as:

> [A]ny amount which an insured becomes legally obligated to pay as damages for any "claim" to which this insurance applies and shall include judgments and settlements.

(Schenck, Exhibit "A," at Utica 002152).

      8.  "Suit" is defined in Section I(12) of the E&O Policy as:

> [A] civil proceeding in which damages because of "loss" from a "wrongful act" are alleged.  "Suit" includes:
>
> a.  An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent . . ..

(Schenck, Exhibit "A," at Utica 002153).

      9.  "Wrongful act" is defined in Section I(14) of the E&O Policy as:

> [A]ny negligent act, error, or omission to which this insurance applies.

(Schenck, Exhibit "A," at Utica 002153).

      10.  The E&O Policy was issued by Utica to Massachusetts insureds.  (Complaint and Answer, ¶ 11).

**B.  The Metrogard and Diplomax Programs**

      11.  For several years prior to 2001, Massamont marketed property insurance to New England schools and municipalities under two programs it developed known as the Metrogard and Diplomax Programs.  (Schenck, ¶ 5).

      12.  Massamont actively serviced the Metrogard and Diplomax Programs by, among other things, preparing and filing insurance forms, setting rate structures, underwriting various risks and participating in loss control.  (Schenck, ¶ 6).

-3-

13.  Past insurers who issued policies supporting the Metrogard and Diplomax Programs through Massamont were Great American Insurance Company (in the 1980's and 1990's) and Royal & SunAlliance (in 2000).  (Schenck, ¶ 7).

### C.  The Westchester/Massamont Agency Agreement

14.  Sometime in 2000, Westchester Fire Insurance Company (hereinafter "Westchester") expressed an interest in writing property insurance in the New England area.  Following discussions with Westchester, Massamont elected, in 2001, to replace Royal & SunAlliance with Westchester as the property insurer on the Metrogard and Diplomax Programs.  (Schenck, ¶ 8).

15.  Effective January 1, 2001, Massamont entered into an Agency Agreement to provide professional services to Westchester as a General Agent with respect to the Metrogard and Diplomax Programs.  (Schenck, ¶ 9 & Exhibit B).

16.  By Amendment dated October 22, 2001, the Agency Agreement was to remain in effect until December 31, 2003, unless previously terminated in accordance with other Agreement provisions.  (Schenck, ¶ 10 & Exhibit "B," at WF 003446).

17.  Pursuant to the Agency Agreement, Massamont agreed to follow certain underwriting guidelines which included, but were not limited to, maintaining a staff of competent and trained personnel, keeping complete and accurate records of all transactions pertaining to insurance written under the Agreement, and permitting Westchester, at its discretion, to perform routine audits of such records in order to ensure reasonable internal accounting controls.  (Schenck, Exhibit "B," at WF 003425 - WF 003427).

18.  Pursuant to the Agency Agreement, Westchester and Massamont negotiated a set of mutually-agreeable underwriting guidelines which included, among other things, standards for

proper risk evaluation, premium pricing, file maintenance and claim development information. (Schenck, ¶ 11 & Exhibit "C").

19.  In November 2002, Massamont submitted to Westchester a proposed premium rate increase of 5% for the Metrogard and Diplomax Programs as a whole, to be effective July 1, 2003.  (Schenck, ¶ 12).

20.  Nearly three months later, on January 29, 2003, Westchester responded to Massamont's proposal by announcing instead that a 40 - 47% premium rate increase on the Metrogard and Diplomax Programs was necessary in order to achieve Westchester's "corporate target profits."  (Schenck, ¶ 13 & Exhibit "D").

21.  Sometime prior to responding to Massamont's proposal, Westchester claims it came to the conclusion that premiums generated on the Metrogard and Diplomax Programs were insufficient to generate an adequate underwriting profit.  Westchester blamed the Programs' poor performance, at least in part, on alleged underwriting and record-keeping deficiencies by Massamont.  (Schenck, Exhibit "H").  According to Westchester, Massamont underwriters failed, among other things, to consider individual risk characteristics, to correctly price windstorm risks, to maintain adequate files on certain risks, and to submit accounts to Westchester in a timely fashion, thereby causing backlogs and delays.  (Id.)  In Westchester's view, Massamont's performance as a General Agent under the Agency Agreement was "unsatisfactory" and "fell short" of standards required under the Agreement.  (Id.)

22.  In Massamont's view, the timing of Westchester's announcement was calculated to effectively "handcuff" Massamont.  After receiving Massamont's proposed 5% premium rate increase in early November 2002, Westchester delayed nearly three months before rejecting it,

despite Westchester's awareness that the bulk of the Program policies came up for renewal on July 1st. Due to the large volume of accounts renewable on that date, quotations had to be provided to most of the prospective insureds by April or May, at the latest. (Schenck, ¶ 14).

23. The size and timing of Westchester's proposed premium rate increase shocked Massamont. Indeed, Massamont immediately communicated to Westchester that an increase of such magnitude would effectively decimate the Programs. (Schenck, ¶ 15).

24. In response to Massamont's complaints, Westchester modified its stance, but only slightly. In addition to still requiring a large premium rate increase, Westchester also insisted that, in the future, Massamont employ a new risk specific pricing system on the Metrogard and Diplomax Programs, rather than the previously-acceptable class-based rating approach. (Schenck, ¶ 16).

25. Massamont complained to Westchester that this new requirement would prove fatal to the retention of numerous Metrogard and Diplomax accounts, particularly those located in eastern Massachusetts and Rhode Island (one-third of the Program business), as it eliminated all flexibility Massamont needed in order to achieve the overall rate increase desired by Westchester. In short, Westchester made unrealistic and unprecedented demands of Massamont, then took away the precise tools Massamont needed to meet those demands. (Schenck, ¶ 17).

26. For the next several months, Massamont negotiated with Westchester officials in the hopes of further softening their stance and, thereby, salvaging the Programs. Although Westchester made some concessions to Massamont, it continued to insist upon changes that (if followed) could ultimately lead to the Programs' demise. Around this time, Massamont concluded that it could not renew the Agency Agreement with Westchester when it eventually

expired on December 31, 2003.  (Schenck, ¶ 18).

### D. **The Westchester/Massamont Dispute**

27.  In early 2003, while Massamont was still actively negotiating with Westchester regarding Westchester's demand for a rate increase and other changes, Axis Specialty Insurance Company ("Axis") approached Massamont to inquire about writing a portion of the Massamont property book.  Massamont did not seek or solicit Axis to insure the Metrogard or Diplomax Programs.  (Schenck, ¶¶ 19 & 20).

28.  With the understanding that the Agency Agreement with Westchester was due to expire at the end of 2003, and in the belief that Westchester had no future desire to write such insurance on competitive terms, Massamont agreed to participate in discussions with Axis.  At the same time, Massamont continued to work with Westchester with the expectation that their relationship would continue through the July 1, 2003 Program renewal date.  (Schenck, ¶ 21).

29.  At the time it agreed to participate in discussions with Axis, Massamont reasonably assumed it would take eight to nine months for Axis to conduct its due diligence and complete all necessary filings with respect to the Metrogard and Diplomax Programs.  If so, Massamont anticipated that Axis would be prepared to issue insurance under the Programs beginning in 2004.  To Massamont's surprise, however, Axis expressed a ready willingness to assume a portion of the Program business by July 1, 2003, much earlier than previously anticipated.  (Schenck, ¶ 22).

30.  Around this same time, Westchester's actions convinced Massamont that, despite its representations, Westchester had no interest in writing the Program business on competitive terms.  Westchester was, in effect, saying one thing, but doing another.  (Schenck, ¶ 23).

31.  On or about July 1, 2003, William Sharp, Vice President of Westchester, confirmed Massamont's impressions that Westchester "would be just as happy not to write any business on the Cape . . ." at the competitive rates previously charged.  (Schenck, ¶ 24 & Exhibit "E").

32.  In the face of Westchester's obvious displeasure with the Programs and diminished appetite for underwriting certain risks, Massamont placed a number of problem accounts with Axis effective July 1, 2003, including those in eastern Massachusetts and Rhode Island in which Massamont reasonably assumed Westchester had little or no interest.  (Schenck, ¶ 25).  Moreover, the accounts placed with Axis were written on terms previously rejected by Westchester.  (Id.)

33.  Massamont did not believe the transfer of unwanted and/or undesirable accounts to Axis was in violation of its Agency Agreement with Westchester.  Massamont reasonably understood it was entitled under the terms of the Agreement to transfer to another insurer any Program business that Westchester elected not to write. (Schenck, ¶ 26).

**E.  The Westchester/Massamont Arbitration**

34.  By letter dated July 9, 2003, Westchester advised Massamont that it was terminating the Agency Agreement effective immediately due to Massamont's alleged violation of its terms in transferring certain Program business to Axis.  (Schenck, ¶ 27 & Exhibit "F").

35.  Massamont, in turn, denied it had breached the Agreement.  By letter dated July 11, 2003, Massamont responded to Westchester that it had only offered to Axis those Program policies that Westchester had declined to write.  (Schenck, ¶ 28 & Exhibit "G").

36. On October 23, 2003, Westchester submitted to Massamont a Demand for Arbitration of their dispute. (Schenck, ¶ 29 & Exhibit "H"). Under the Agency Agreement, Massamont was required to submit the dispute to arbitration. (Schenck, Exhibit "B").

37. In its Demand for Arbitration, Westchester alleged, contrary to Massamont's belief and understanding, that it had wanted to write the Program business transferred to Axis and that it (Westchester) would have objected to the transfer of such business had it known of the transfer beforehand. Westchester further alleged that Massamont's performance under the Agency Agreement was "unsatisfactory" and "fell short" of required standards. Specifically, Westchester accused Massamont of sloppy underwriting, record-keeping and reporting. (Schenck, Exhibit "H").

38. In its Demand for Arbitration, Westchester further alleged that Massamont failed to underwrite individual accounts properly such that "losses were incurred repeatedly on accounts." Westchester also stated that it "was preserving any and all claims that it had against Massamont for breaching the Agreement and reserved the right to pursue such claims." Finally, Westchester requested Massamont to tender Westchester's Demand to its (Massamont's) errors and omissions insurer. (Schenck, Exhibit "H").

39. Nowhere in its Demand for Arbitration did Westchester assert any claim for fraud or fraudulent misconduct against Massamont, nor did it allege that Massamont had made any misrepresentations to Westchester, nor did it seek recovery of punitive damages from Massamont. (Schenck, Exhibit "H").

**F.  Utica's Denial of Coverage**

40.  On October 28, 2003, Massamont tendered Westchester's Demand for Arbitration to Utica for coverage under the E&O Policy.  (Complaint and Answer, ¶ 31; Schenck, ¶ 30).

41.  On December 22, 2003, Robert B. Burkitt of R.M.G. Investigations met with representatives of Massamont at Massamont's offices in Greenfield, Massachusetts.  Mr. Burkitt stated that his purpose in meeting with Massamont was to investigate Westchester's Demand for Arbitration against Massamont on behalf of Utica.  (Schenck, ¶ 31).

42.  During the December 22, 2003 meeting, Massamont representatives provided to Mr. Burkitt copies of its files and other documents relating to Westchester's Demand for Arbitration. (Schenck, ¶ 32).

43.  Mr. Burkitt's meeting with Massamont representatives lasted less than two hours. (Schenck, ¶ 33).

44.  Following the December 22, 2003 meeting, neither Mr. Burkitt nor Utica ever requested any further meetings with, or documents or materials from, Massamont representatives regarding Westchester's Demand for Arbitration, prior to April 26, 2003.  (Schenck, ¶ 34).

45.  More than four months after Massamont tendered its defense to the defendants, Utica,  by letter dated March 4, 2004, denied coverage to Massamont for Westchester's Demand for Arbitration under the terms and provisions of the E&O Policy.  (Complaint and Answer, ¶ 33; Schenck, ¶ 35 & Exhibit "I").

46.  Utica refused to defend Massamont against the arbitration proceeding and refused, as well, to indemnify Massamont for any damages that might be awarded against it and in favor of Westchester.  (Complaint and Answer, ¶ 33; Schenck, ¶ 36)

47. Utica did not offer a defense to Massamont under a reservation of rights, nor did it commence an action for declaratory relief in order to resolve the coverage dispute. (Complaint and Answer, ¶ 34; Schenck, ¶ 37).

48. Due to Utica's denial, Massamont was forced to retain counsel, at its own cost and expense, to defend itself in the arbitration proceeding. (Schenck, ¶ 38).

**G. Outcome of Westchester/Massamont Arbitration**

49. The arbitration panel held hearings on the dispute between Westchester and Massamont (as set forth in the Demand for Arbitration) from November 16 through 19, 2004, and on December 13 & 14, 2004. (Complaint and Answer, ¶ 36; Schenck, ¶ 39).

50. At no time prior to or during the arbitration proceeding did Westchester withdraw or dismiss any of the claims set forth in its Demand for Arbitration. (Schenck, ¶ 40).

51. On April 26, 2005, the arbitration panel issued an Award of compensatory damages against Massamont in the amount of Two Million Six Hundred Thousand ($2,600,000) Dollars. (Complaint and Answer, ¶ 36; Schenck, ¶ 41 & Exhibit "J").

52. Other than determining that "Massamont breached the Agency Agreement," the Award contains no specific findings on the merits of Westchester's claims. Nor does the Award make any differentiation in terms of the specific harm Westchester allegedly suffered and for which the arbitrators intended to grant compensation. (Schenck, Exhibit "J").

53. Massamont thereafter tendered the Award to Utica for payment, demanding, as well, that Utica reimburse Massamont for the costs and attorneys' fees Massamont incurred in defending itself against Westchester's Demand. Utica again declined coverage and refused to indemnify Massamont for the amount of the Award. Utica also restated its denial of any duty to

defend Massamont against the Westchester Demand and thereby refused to reimburse Massamont for its defense costs and attorneys' fees. (Complaint and Answer, ¶ 38; Schenck, ¶ 42).

54.  Although Utica repeatedly shifted and modified its grounds for denial, it never accepted Massamont's defense against Westchester's Demand for Arbitration, nor did it ever pay the Award of compensatory damages on Massamont's behalf. (Schenck, ¶¶ 43-45, & Exhibits "K1"-"K6", "L1"-"L5").

55.  On or about May 17, 2005, Westchester filed a Petition to Confirm Arbitration Award in the United States District Court for the Southern District of New York, C.A. No. 05-CV-05059. (Schenck, ¶ 46 & Exhibit "M").

56.  Due to Utica's refusal to pay the Award, Massamont was forced to retain counsel, at its own cost and expense, to defend itself against the Petition to Confirm. (Complaint and Answer, ¶ 64; Schenck, ¶ 47).

57.  Due to Utica's breach of contract and improper claims-handling, Massamont was forced to retain counsel, at its own cost and expense, to establish its rights under the E&O Policy and under applicable law. (Schenck, ¶ 48).

58.  Massamont has suffered damages, including costs and attorneys fees, due to Utica's breach of contract and improper claims-handling.  (Schenck, ¶ 49).

The Plaintiff,
MASSAMONT INSURANCE AGENCY, INC.,

By its attorneys,
**PIERCE, DAVIS & PERRITANO, LLP**

_____
John J. Davis, BBO #115890
10 Winthrop Square
Boston, MA 02110
(617) 350-0950

Dated: May 5, 2006