UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-CV-11897-WGY

| | |
|---|---|
| _____ ) | |
| MASSAMONT INSURANCE ) | |
| AGENCY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| UTICA MUTUAL ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## AFFIDAVIT OF HILBERT SCHENCK II

I, Hilbert Schenck II, hereby depose and aver as follows:

1.  I am the President and General Manager of Massamont Insurance Agency, Inc.

(hereinafter "Massamont.")  I served in such capacities at all times relevant to the subject matters

raised in the plaintiff's Complaint.

2.  Massamont is a Massachusetts corporation with offices located in Boston and

Greenfield, Massachusetts.

3.  Massamont is a licensed insurance agency that specializes in the placement and

administration of insurance programs for specific markets in New England.

4.  In 2003, Massamont purchased a claims-made Insurance Agents and Brokers Errors

and Omissions Liability Policy from the defendant, Utica Mutual Insurance Company

(hereinafter "Utica.")   The Utica Mutual Policy No. 3445032 EO (hereinafter "the Policy")

carried liability limits of $10,000,000 "each loss" and $11,000,000 "each aggregate," and was

effective from July 30, 2003 to July 30, 2004.  A true and accurate copy of the Policy is attached

hereto as Exhibit "A."

5.  For several years prior to 2001, Massamont marketed property insurance to New England schools and municipalities under two programs it developed known as the Metrogard and Diplomax Programs.

6.  Massamont actively serviced the Metrogard and Diplomax Programs by, among other things, preparing and filing insurance forms, setting rate structures, underwriting various risks and participating in loss control.

7.  Past insurers who issued policies supporting the Metrogard and Diplomax Programs through Massamont were Great American Insurance Company (in the 1980's and 1990's) and Royal & SunAlliance (in 2000).

8.  Sometime in 2000, Westchester Fire Insurance Company (hereinafter "Westchester") expressed an interest in writing property insurance in the New England area.  Following discussions with Westchester, Massamont elected, in 2001, to replace Royal & SunAlliance with Westchester as the property insurer on the Metrogard and Diplomax Programs.

9.  Effective January 1, 2001, Massamont entered into an Agency Agreement to provide professional services to Westchester as a General Agent with respect to the Metrogard and Diplomax Programs.  A true and accurate copy of the Agency Agreement is attached hereto as Exhibit "B."

10.  On or about October 22, 2001, Massamont and Westchester amended the Agency Agreement to remain in effect until December 31, 2003.  See Exhibit "B."

11.  Pursuant to the Agency Agreement, Westchester and Massamont negotiated a set of mutually-agreeable underwriting guidelines which included, among other things, standards for

proper risk evaluation, premium pricing, file maintenance and claim development information. A true and accurate copy of the underwriting guidelines is attached hereto as Exhibit "C."

12. In November 2002, Massamont submitted to Westchester a proposed premium rate increase of 5%, for the Metrogard and Diplomax Programs as a whole, to be effective July 1, 2003.

13. Nearly three months later, on January 29, 2003, Westchester responded to Massamont's proposal by announcing instead that a 40 - 47% premium rate increase on the Metrogard and Diplomax Programs was necessary in order to achieve Westchester's "corporate target profits." A true and accurate copy of Westchester's response, dated January 29, 2003, is attached hereto as Exhibit "D."

14. It appeared to Massamont that the timing of Westchester's announcement of a 40-47% premium rate increase was calculated to effectively "handcuff" Massamont. After receiving Massamont's proposed 5% premium rate increase in early November 2002, Westchester delayed nearly three months before rejecting it, despite Westchester's awareness that the bulk of the Program policies came up for renewal on July 1st. Due to the large volume of accounts renewable on that date, quotations had to be provided to most of the prospective insureds by April or May, at the latest.

15. The size and timing of Westchester's proposed premium rate increase shocked Massamont. Indeed, Massamont immediately communicated to Westchester that an increase of such magnitude would effectively decimate the Programs.

16. In response to Massamont's complaints, Westchester modified its stance, but only slightly. In addition to still requiring a large premium rate increase, Westchester also insisted

that, in the future, Massamont employ a new risk specific pricing system on the Metrogard and

Diplomax Programs, rather than the previously-acceptable class-based rating approach.

17.   Massamont complained to Westchester that this new requirement would prove fatal

to the retention of numerous Metrogard and Diplomax accounts, particularly those located in

eastern Massachusetts and Rhode Island (one-third of the Program business), as it eliminated the

flexibility Massamont needed in order to achieve the overall rate increase desired by

Westchester.  In short, Westchester made unrealistic and unprecedented demands of Massamont,

then took away the precise tools Massamont needed to meet those demands.

18.   For the next several months, Massamont negotiated with Westchester officials in the

hopes of further softening their stance and, thereby, salvaging its Metrogard and Diplomax

Programs.  Although Westchester made some concessions to Massamont, it continued to advance

changes that (if followed) could ultimately lead to the Programs' demise.  Around this time,

Massamont concluded that it could not renew the Agency Agreement with Westchester when it

eventually expired on December 31, 2003.

19.   In early 2003, while Massamont was still actively negotiating with Westchester

regarding Westchester's demand for a rate increase and other changes, Axis Specialty Insurance

Company (hereinafter "Axis") approached Massamont to inquire about writing a portion of the

Massamont property insurance business.

20.   Massamont did not seek or solicit Axis to insure the Metrogard or Diplomax

Programs.

21.   With the understanding that the Agency Agreement with Westchester was due to

expire at the end of 2003, and in the belief that Westchester had no future desire to write such

insurance on competitive terms, Massamont agreed to participate in discussions with Axis. At the same time, Massamont continued to work with Westchester with the expectation that their relationship would continue through the July 1, 2003 Program renewal date.

22.    At the time it agreed to participate in discussions with Axis, Massamont reasonably assumed it would take eight to nine months for Axis to conduct its due diligence and complete all necessary filings with respect to the Metrogard and Diplomax Programs. If so, Massamont anticipated that Axis would be prepared to issue insurance under the Programs beginning in 2004. To Massamont's surprise, however, Axis expressed a ready willingness to assume a portion of the Program business by July 1, 2003, much earlier than previously anticipated.

23.    Around this same time, Westchester's actions convinced Massamont that, despite its representations, Westchester had no interest in writing the Program business on competitive terms. Westchester was, in effect, saying one thing, but doing another.

24.    On or about July 1, 2003, William Sharp, Vice President of Westchester, confirmed Massamont's impressions that Westchester "would be just as happy not to write any business on the Cape . . ." at the competitive rates previously charged. A true and accurate copy of Mr. Sharp's e-mail communication, dated July 1, 2003, is attached hereto as Exhibit "E."

25.    In the face of Westchester's obvious displeasure with the Programs and diminished appetite for underwriting certain risks, Massamont accordingly placed a number of problem accounts with Axis effective July 1, 2003, including those in eastern Massachusetts and Rhode Island in which Massamont reasonably assumed Westchester had little or no interest. Moreover, the accounts placed with Axis were written on terms previously rejected by Westchester.

26.  Massamont did not believe the transfer of unwanted and/or undesirable accounts to Axis was in violation of its Agency Agreement with Westchester.  Massamont reasonably understood it was entitled under the terms of the Agreement to transfer to another insurer any Metrogard and Diplomax Program business that Westchester elected not to write.

27.  By letter dated July 9, 2003, Westchester advised Massamont that it was terminating the Agency Agreement effective immediately due to Massamont's alleged violation of its terms in transferring certain Program business to Axis.  A true and accurate copy of Westchester's letter, dated July 9, 2003, is attached hereto as Exhibit "F."

28.  By letter dated July 11, 2003, Massamont responded to Westchester that it had only offered to Axis those Program policies that Westchester had declined to write.  Therefore, in Massamont's view, it was not in breach of the Agency Agreement.  A true and accurate copy of my letter to Westchester, dated July 11, 2003, is attached hereto as Exhibit "G."

29.  On October 23, 2003, Westchester submitted to Massamont a Demand for Arbitration of the dispute.  A true and accurate copy of Westchester's Demand for Arbitration is attached hereto as Exhibit "H."

30.  On October 28, 2003, Massamont tendered Westchester's Demand for Arbitration to Utica for coverage under the terms and provisions of the Policy.

31.  On December 22, 2003, Robert B. Burkitt of R.M.G. Investigations met with me and David Dawson, Sr. Vice President and Massamont's Director of Claims, and several others at Massamont's offices in Greenfield, Massachusetts.  Mr. Burkitt explained that his purpose in meeting with us was to investigate Westchester's Demand for Arbitration against Massamont on behalf of Utica.

32.  During the December 22, 2003 meeting, we provided to Mr. Burkitt copies of Massamont's files and other documents relating to Westchester's Demand for Arbitration

33.  Mr. Burkitt's meeting with Massamont representatives lasted less than two hours.

34.  Following the December 22, 2003 meeting, neither Mr. Burkitt nor Utica ever requested any further meetings with, or documents or materials from, Massamont representatives regarding Westchester's Demand for Arbitration, prior to April 26, 2005.

35.  More than four months after Massamont tendered its defense to the defendant, Utica, by letter dated March 4, 2004, denied coverage to Massamont for Westchester's Demand for Arbitration under the terms and provisions of the E&O Policy.  A true and accurate copy of Utica's denial, dated March 4, 2004, is attached hereto as Exhibit "I."

36.  Utica refused to defend Massamont against the arbitration proceeding or to indemnify Massamont for any damages that might be awarded against it and in favor of Westchester.

37.  Utica did not offer a defense to Massamont under a reservation of rights, nor did it commence an action for declaratory relief in order to resolve the coverage dispute.

38.  Due to Utica's denial, Massamont was forced to retain counsel, at its own cost and expense, to defend itself in the arbitration proceeding.

39.  The arbitration panel held hearings on the dispute between Westchester and Massamont (as set forth in the Demand for Arbitration) from November 16 through 19, 2004, and on December 13 & 14, 2004.

40.  At no time prior to or during the arbitration proceeding did Westchester withdraw or dismiss any of the claims against Massamont set forth in its Demand for Arbitration.

41.  On April 26, 2005, the arbitration panel issued an Award of compensatory damages against Massamont in the amount of Two Million Six Hundred Thousand ($2,600,000) Dollars. A true and accurate copy of the Award is attached hereto as Exhibit "J."

42.  Massamont tendered the Award of compensatory damages to Utica for payment, demanding, as well, that Utica reimburse Massamont for the costs and attorneys' fees Massamont incurred in defending itself against Westchester's Demand.  Utica again declined coverage and refused to indemnify Massamont for the amount of the Award.  Utica also restated its denial of any duty to defend Massamont against the Westchester Demand and thereby refused to reimburse Massamont for its defense costs and attorneys' fees.

43.  True and accurate copies of Massamont's repeated demands for coverage to Utica and its attorneys, dated December 6, 2004; January 4, 2005; May 5, 2005; May 17, 2005; May 23, 2005; and May 27, 2005; are attached hereto as Exhibits "K1" through "K6."

44.  True and accurate copies of Utica's repeated denials of coverage to Massamont and its attorneys dated March 31, 2005; May 19, 2005; May 24, 2005; June 1, 2005; and June 15, 2005; are attached hereto as Exhibits "L1" through "L5."

45.  Although Utica repeatedly shifted and modified its grounds for denial, it never accepted Massamont's defense against Westchester's Demand for Arbitration, nor did it ever pay the Award of compensatory damages on Massamont's behalf.

46.  On or about May 17, 2005, Westchester filed a Petition to Confirm Arbitration Award in the United States District Court for the Southern District of New York, C.A. No. 05-CV-05059.  A true and accurate copy of the Petition to Confirm Arbitration Award is attached hereto as Exhibit "M."

47. Due to Utica's refusal to pay the Award, Massamont was forced to retain counsel, at its own cost and expense, to defend itself against the Petition to Confirm.

48. Due to Utica's breach of contract and improper claims-handling, Massamont was forced to retain counsel, at its own cost and expense, to establish its rights under the Policy and under applicable law.

49. Due to Utica's breach of contract and improper claims-handling, Massamont has suffered damages, including costs, expenses and attorneys fees.

Signed under the pains and penalties of perjury this 4 day of May, 2006

_____
Hilbert Schenck II

**UTICA NATIONAL INSURANCE GROUP**

ISSUED BY
UTICA MUTUAL INSURANCE COMPANY
P.O. BOX 530, UTICA, NEW YORK 13503
TELEPHONE: (315) 734-2000

**DECLARATIONS**

INSURANCE AGENTS AND BROKERS
ERROR AND OMISSIONS LIABILITY POLICY
**CLAIMS-MADE BASIS**
AMENDMENT

| NAMED INSURED AND MAILING ADDRESS | LOCATION ADDRESS |
|---|---|
| KNAPP SCHENCK & COMPANY<br>INSURANCE AGENCY INC<br>240 LEWIS WHARF<br>BOSTON MA 02110 | |

T 12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE INSURED AS STATED HEREIN. IN RETURN FOR PAYMENT OF THE PREMIUM, AN
UBJECT TO ALL THE TERMS OF THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| POLICY NUMBER | POLICY PERIOD FROM | TO | PRIOR POLICY NO. | |
|---|---|---|---|---|
| 3445032 EO | 07/30/2003 | 07/30/2004 | 3445032 EO | CORRECTING RETRO DATE<br>EFF. 07/30/2003   AMEND. NO. 01 |

**BASIC POLICY COVERAGE**
    LEGAL LIABILITY

**LIMITS OF LIABILITY**
$ 10,000,000 ___ EACH LOSS
$ 11,000,000 ___ EACH AGGREGATE

    INSURED'S DEDUCTIBLE AMOUNT
$ 50,000 ___ EACH LOSS
$ 150,000 ___ AGGREGATE

DEDUCTIBLE APPLIES TO:  ☐ LOSS ONLY
                                 ☒ LOSS AND LITIGATION EXPENSE

**PREMIUMS**

BASIC POLICY PREMIUM                 $ 179,905.00
REAL ESTATE AGENTS AND BROKERS PREMIUM   $ N/A       (See attached endorsement for details)
MUTUAL FUND AND VARIABLE ANNUITY PREMIUM   $ N/A       (See attached endorsement for details)
EMPLOYMENT-RELATED PRACTICES PREMIUM   $ _____
OTHER

           TOTAL POLICY PREMIUM     $ 179,905.00 ___ NO PREMIUM CHANGE

**RETROACTIVE DATE**
    This insurance does not apply to loss, whenever occurring, from "wrongful acts" which took place before the
Retroactive Date, if any, shown _____ 07/30/02 _____
                    Enter Date or "None" if no Retroactive Date applies

**OPTIONAL EXTENDED REPORTING PERIOD PREMIUM**
    In Section VII - EXTENDED REPORTING PERIODS, we agree to provide an Optional Extended Reporting Period
under certain conditions. The premium for such an Optional Extended Reporting Period is determined as shown in
paragraph 5. of Section VII.

**FORMS AND ENDORSEMENTS** APPLYING TO AND MADE PART OF THIS POLICY AT TIME OF ISSUE:
    14-E-0001 (01-91)     14-E-0001 (01-91)     14-E-0095 (12-98)     14-P-EOA (01-98)
    8-L-1864 (12-02)

DATE: 08/19/03         LICENSED RESIDENT AGENT             COMPANY OFFICER
COUNTERSIGNED AT: BURLINGTON, MA                 CURTIS PEARSALL

THESE DECLARATIONS AND THE COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A
PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.
14-D-EOA ED.12-99   SEE OVER FOR IMPORTANT CLAIMS-MADE COVERAGE NOTICE     Page 1 of 2

FC UNIBILL #100656909   PREMIUM AMOUNT TO BE REFLECTED ON NEXT BILLING NOTICE   UTICA 002145

**UTICA NATIONAL INSURAN** **GROUP**

ISSUED BY
UTICA MUTUAL INSURANCE COMPANY
P.O. BOX 530, UTICA, NEW YORK 13503
TELEPHONE: (315) 734-2000

**DECLARATIONS**

INSURANCE AGENTS AND BROKERS
ERRORS AND OMISSIONS LIABILITY POLICY

**CLAIMS-MADE BASIS**

RENEWAL POLICY

| NAMED INSURED AND MAILING ADDRESS | LOCATION ADDRESS |
|---|---|
| KNAPP SCHENCK & COMPANY INSURANCE AGENCY INC 240 LEWIS WHARF BOSTON MA 02110 | |

AT 12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE INSURED AS STATED HEREIN. IN RETURN FOR PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| POLICY NUMBER | POLICY PERIOD | | PRIOR POLICY NO. | |
|---|---|---|---|---|
| | FROM | TO | | |
| 3445032 EO | 07/30/2003 | 07/30/2004 | 3445032 EO | |

**BASIC POLICY COVERAGE**

LEGAL LIABILITY

INSURED'S DEDUCTIBLE AMOUNT

**LIMITS OF LIABILITY**

$ 10,000,000    EACH LOSS
$ 11,000,000    EACH AGGREGATE
$      50,000    EACH LOSS
$     150,000    AGGREGATE

DEDUCTIBLE APPLIES TO:   ☐ LOSS ONLY
                        ☒ LOSS AND LITIGATION EXPENSE

**PREMIUMS**

BASIC POLICY PREMIUM                          $ 179,905.00
REAL ESTATE AGENTS AND BROKERS PREMIUM        $     N/A        (See attached endorsement for details)
MUTUAL FUND AND VARIABLE ANNUITY PREMIUM      $     N/A        (See attached endorsement for details)
EMPLOYMENT-RELATED PRACTICES PREMIUM          $
OTHER

**TOTAL POLICY PREMIUM**       $ 179,905.00

**RETROACTIVE DATE**
This insurance does not apply to loss, whenever occurring, from "wrongful acts" which took place before the Retroactive Date, if any, shown _____ NONE _____
Enter Date or "None" if no Retroactive Date applies

**OPTIONAL EXTENDED REPORTING PERIOD PREMIUM**
In Section VII - EXTENDED REPORTING PERIODS, we agree to provide an Optional Extended Reporting Period under certain conditions. The premium for such an Optional Extended Reporting Period is determined as shown in paragraph 5. of Section VII.

**FORMS AND ENDORSEMENTS** APPLYING TO AND MADE PART OF THIS POLICY AT TIME OF ISSUE:

14-E-0001 (01-91) *    14-E-0001 (01-91) *    14-E-0095 (12-98) *    14-P-E0A (01-98) *
8-L-1864 (12-02) *

DATE: 07/29/03
COUNTERSIGNED AT: BURLINGTON, MA

_____
LICENSED RESIDENT AGENT

_____
COMPANY OFFICER

CURTIS PEARSALL

THESE DECLARATIONS AND THE COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

14-D-E0A ED.12-99    SEE OVER FOR IMPORTANT CLAIMS-MADE COVERAGE NOTICE    Page 1 of 2

UTICA 002146

EC. UNIRALL #100656000. PREMIUM AMOUNT TO BE REFLECTED ON NEXT BILLING NOTICE

INSURANCE AGENTS AND BROKERS
ERRORS AND OMISSIONS LIABILITY POLICY
CLAIMS-MADE BASIS

## EXTENSION SCHEDULE

RENEWAL POLICY

| NAMED INSURED AND MAILING ADDRESS | LOCATION ADDRESS |
|---|---|
| KNAPP SCHENCK & COMPANY<br>INSURANCE AGENCY INC<br>240 LEWIS WHARF<br>BOSTON  MA  02110 | |

| POLICY NUMBER | POLICY PERIOD FROM | TO | PRIOR POLICY NO. | |
|---|---|---|---|---|
| 3445032 EO | 07/30/2003 | 07/30/2004 | 3445032 EO | |

This schedule will be used for the following:
Additional Insured, Additional Location(s), Named Insured

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE NAMED INSURED IS TO READ AS FOLLOWS:
KNAPP SCHENCK & COMPANY INSURANCE AGENCY INC
SOUTH SHORE INSURANCE AGENCY INC     MASSAMONT INSURANCE
AGENCY INC     SWS LEWIS WHARF LLC     SWS GREENFIELD LLC

ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE FOLLOWING ADDITIONAL LOCATION(S) ARE
COVERED UNDER THE ABOVE MENTIONED POLICY.
324 MAIN STREET                          850 MAIN STREET
GREENFIELD, MA                           WEYMOUTH, MA
                          01301                                        02189

ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

FC

*THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.*

# POLICY CHANGES/EXTENSION SCHEDULE

This Endorsement forms a part of the policy numbered below:

Policy Change
Number _____

| | |
|---|---|
| Named Insured and Mailing Address<br>KNAPP SCHENCK & COMPANY INSURANCE AGENCY INC<br>PO BOX 51310<br>BOSTON MA   02205 | Policy Number<br>3445032 AP |
| | Policy Changes Effective<br>07/30/2003 |
| | Company<br>**UTICA MUTUAL INSURANCE COMPANY** |

## IT IS AGREED THAT THE POLICY IS AMENDED AS STATED IN PART B.

**PART A.**

☐ NAME CHANGE
☐ ADDRESS CHANGE
☐ AMENDING PREMIUM
☐ ADDING ADDITIONAL INSURED
☐ DELETING ADDITIONAL INSURED
☐ AMENDING LIMIT OF LIABILITY
☐ AMENDING DEDUCTIBLE

☐ ADDING LOCATION(S)
☐ DELETING LOCATION
☐ ADDING MUTUAL FUNDS
☐ DELETING MUTUAL FUNDS
☐ MUTUAL FUNDS - ADDING SOLICITOR
☐ MUTUAL FUNDS - DELETING SOLICITOR
☐ EXCLUSION OF DUPLICATE COVERAGE

☐ CHANGING STAFF
☐ VOIDING ENDORSEMENT
☐ ADDING REAL ESTATE
☐ DELETING REAL ESTATE
☐ REAL ESTATE - ADDING SOLICITOR
☐ REAL ESTATE - DELETING SOLICITOR

**PART B.**

The following exclusion below replaces exclusion #15. as listed in 14-P-EOA,
**SECTION III - EXCLUSIONS:**

**15.  The insolvency, receivership, bankruptcy, liquidation or inability to pay of any entity,
person, corporation, estate, trust, or other organization including, but not limited to:**
   **a.  Insurnce companies or reinsurance companies;**
   **b.  Health maintenance organizations or preferred provider organizations;**
   **c.  Captive insurers or risk retention groups and/or risk purchasing groups; or**
   **d.  Investment funds or self-insurance programs.**

**ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.**

## PREMIUM ADJUSTMENT

ADDITIONAL PREMIUM

RETURN PREMIUM

14-E-0001 Ed 1-91

Authorized Representative Signature

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY CHANGES/EXTENSION SCHEDULE

## RENEWAL POLICY

Policy Change
Number_____

This Endorsement forms a part of the policy numbered below:

| Named Insured and Mailing Address | Policy Number |
|---|---|
| KNAPP SCHENCK & COMPANY INSURANCE AGENCY INC 240 LEWIS WHARF BOSTON MA 02110 | 3445032 EO |
| | Policy Changes Effective 07/30/2003 |
| | Company UTICA MUTUAL INSURANCE CO. |

IT IS AGREED THAT xxx xxx xxxx xxx Rxxx Ax xxxx xxx xXx the policy is amended as stated in Part B.

**PART A.**

- ☐ NAME CHANGE
- ☐ ADDRESS CHANGE
- ☐ AMENDING PREMIUM
- ☐ ADDING ADDITIONAL INSURED
- ☐ DELETING ADDITIONAL INSURED
- ☐ AMENDING LIMIT OF LIABILITY
- ☐ AMENDING DEDUCTIBLE

- ☐ ADDING LOCATION(S)
- ☐ DELETING LOCATION
- ☐ ADDING MUTUAL FUNDS
- ☐ DELETING MUTUAL FUNDS
- ☐ MUTUAL FUNDS – ADDING SOLICITOR
- ☐ MUTUAL FUNDS – DELETING SOLICITOR
- ☐ EXCLUSION OF DUPLICATE COVERAGE

- ☐ CHANGING STAFF
- ☐ VOIDING ENDORSEMENT
- ☐ ADDING REAL ESTATE
- ☐ DELETING REAL ESTATE
- ☐ REAL ESTATE – ADDING SOLICITOR
- ☐ REAL ESTATE – DELETING SOLICITOR

**PART B.**

IN CONSIDERATION OF THE PREMIUM PAID, IT IS HEREBY UNDERSTOOD AND AGREED THAT NO COVERAGE IS AFFORDED FOR CLAIMS ARISING FROM THE INCIDENT MENTIONED IN QUESTION(S) 30        OF THE APPLICATION DATED 08/05/02 AND SIGNED BY DAVID WINSHIP

ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

**PREMIUM ADJUSTMENT**

| ADDITIONAL PREMIUM | RETURN PREMIUM |
|---|---|
| | |

Authorized Representative Signature

14-E-0001  Ed. 1-91

POLICY NUMBER: 3445032 EO    RENEWAL POLICY    EFFECTIVE 07/30/2003

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CONTINGENT CATASTROPHE EXTRA EXPENSE COVERAGE

**(For attachment to Insurance Agents and Brokers Errors and Omissions Liability Policy)**
**(Claims-made Policy)**

### SCHEDULE

I. Effective Date:   07/30/2003
(If no date entered, coverage is effective from policy inception.)
Additional Premium        $ _____100.00_____

| COVERAGE | LIMITS OF LIABILITY | |
|---|---|---|
| CATASTROPHE CLAIM | $ 10,000 | EACH CATASTROPHE |
| EXPENSE COVERAGE: | $ 25,000 | AGGREGATE |

**DEDUCTIBLE AMOUNT:**        $500 each catastrophe

With respect to the insurance afforded by this endorsement, the Limits of Liability and Deductible Amount stated herein apply in lieu of, and not in addition to, any Limits of Liability and Deductible Amount stated in the policy Declarations.

II. In consideration of the additional premium shown in the Declarations or Schedule above, it is agreed that the policy includes coverage subject to the policy terms and the additional provisions below for your actual extra expenses necessarily incurred in the providing of professional services covered by this policy but only if such extra expenses:

A. Are a result of an event declared a catastrophe by the Property Claims Services (PCS). As used in this endorsement, catastrophe, regardless of any other cause or event that contributes concurrently or in any sequence to the loss does not include, whether directly or indirectly:

  1. Seizure or destruction of property by order of governmental authority, unless the insurance needs of your customers were the result of acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread;

  2. Nuclear reaction or radiation, or radioactive contamination, however caused, unless the insurance needs of

your customers were the result of ensuing fire; and

  3. a. War, including undeclared or civil war;

  b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

  c. Insurrection, rebellion, revolution, usurped power, or any action taken by governmental authority in hindering or defending against any of these;

whether or not declared catastrophes by the Property Claim Services.

B. Are incurred between the beginning date of the catastrophe and 45 days after the catastrophe began.

FC

14-E-0095  Ed. 12-98

UTICA 002150

C. Are attributed to the assisting in the processing of insurance claims for your customers who have been affected by the catastrophe. Extra Expense under this endorsement, does not include actual payments, whether in whole or in part, for claims to your customers.

D. Are over and above the expenses you would have incurred in the providing of professional services for the same period had no catastrophe occurred.

E. Are not to continue your normal business operations due to physical loss or damage to your property.

F. Are not paid for by other insurance, except for other insurance that is written subject to the same terms, conditions and provisions of this endorsement.

III. A. The Limits of Liability shown in the Schedule above and the rules below determine the most we will pay regardless of the number of:

1. Insureds;

2. Insureds making claims for extra expense;

3. Claims made for extra expense;

4. Claims processed for catastrophes; or

5. Customers serviced in the event of a catastrophe.

B. The Aggregate Limit shown in the Schedule above is the most we will pay for the sum of all necessary extra expenses incurred as a result of catastrophes which occur during the "policy period."

C. Subject to B. above and the deductible amount set forth in the Schedule above for each catastrophe, the Each Catastrophe Limit is the most we will pay under this endorsement for the sum of all necessary extra expenses sustained in any one catastrophe.

D. The Limits of Liability of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for the purposes of determining the Limits of Liability.

E. 1. The Deductible Amount stated in the Schedule above will be deducted from the sum of all extra expenses for all claims because of any one catastrophe to which this insurance applies.

2. The Limits of Liability, as described above, will apply to any extra expense which remains after the deduction of the Deductible Amount.

IV. If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of the loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

A. Pay its chosen appraiser; and

B. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

V. In the event a claim is made for the insurance provided by this endorsement, you must:

A. Give us prompt notice of loss.

B. As soon as possible, give us details of the extra expense you incurred as a result of providing professional services to your customers due to the PCS declared catastrophe.

C. As often as may reasonably be required, permit us to inspect your records proving your extra expense loss.

D. Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

E. Cooperate with us in the investigation or settlement of the claim.

F. Permit us to examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

Includes copyrighted material of Insurance Services Office, Inc.,  14-E-0095  Ed. 12-98 with its permission.
Copyright, Utica Mutual Insurance Company, 1999.

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM
# INSURANCE COVERAGE

Coverage for acts of terrorism is already included in your current policy. You should know that, effective November 26, 2002, under your existing coverage, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The portion of your annual premium that is attributable to coverage for acts of terrorism is: _____.

_____

Policy Number

Please consult with your agent or broker if you have any questions.



**Utica National Insurance Group**

Insurance that starts with you.

Utica Mutual Insurance Company and its affiliated companies, New Hartford, N.Y. 13413

8-L-1864  Ed. 12-2002

UTICA 002151

**UTICA MUTUAL INSURANCE COMPANY**
**UTICA, NEW YORK**
**(HEREINAFTER CALLED THE COMPANY)**

# INSURANCE AGENTS AND BROKERS
# ERRORS AND OMISSIONS INSURANCE

## THIS IS A CLAIMS-MADE POLICY

THIS POLICY IS LIMITED TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD PROVIDED.

## PLEASE REVIEW THE POLICY CAREFULLY.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine your rights, duties, and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Utica Mutual Insurance Company.

The word "insured" means any person or organization qualifying as such under **SECTION IV- WHO IS AN INSURED**.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION I - DEFINITIONS**.

## SECTION I - DEFINITIONS

1. "Claim" means a written notice, including service of "suit" or demand for arbitration, received by one or more insureds asking for money or services.

2. "Claim expense" means:
   a. Fees charged by an attorney retained by us to defend you;
   b. All other fees, costs, and expenses resulting from the investigation, adjustment, and defense of a "claim" if incurred by us or by the insured with our consent;
   c. Fees charged by any attorney hired by the insured with our written consent; and
   d. Pre and post-judgment interest on that part of the judgment that we pay up to the policy limits.

   However, "claim expense" does not include salaries of regular employees or of officials of the insured.

3. "Dealer organization" means an entity organized for the purpose of selling equity-based products and securities.

4. "Interrelated wrongful acts" means "wrongful acts" which arise out of and have as a common basis:
   a. Related circumstances, situations, events, transactions or facts;
   b. A series of related circumstances, situations, events, transactions or facts; or

   c. A common pattern of conduct in selling or servicing products to which this insurance applies.

5. "Litigation expense" means fees and disbursements charged by any attorney retained by us, or hired by you with our written consent, to defend a suit against you or consult on such defense. "Litigation expense" does not include salaries or other expenses of our regular employees or officials, or the fees, disbursements, or other expenses of any counsel retained by us prior to any actual "suit" filing.

6. "Loss" means any amount which an insured becomes legally obligated to pay as damages for any "claim" to which this insurance applies and shall include judgments and settlements. To the extent allowed by law, "loss" shall include punitive or exemplary damages. "Loss" shall not include:
   a. Fines or penalties imposed by law;
   b. Taxes; and
   c. Matters which may be deemed uninsurable under the law pursuant to which the policy shall be construed.

7. "Personal injury" means injury arising out of one or more of the following offenses:
   a. False arrest, detention, or imprisonment;
   b. Malicious prosecution;

UTICA 002152

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord, or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services; or

e. Oral or written publication of material that violates a person's right of privacy.

8. a. "Policy period" means the period from the inception date to the expiration date, stated in the Declarations of this policy, or to its earlier termination date, if any.

b. If there is a "termination of coverage" as described in parts **b.** or **c.** of the definition of "termination of coverage," the "policy period" will be understood to end on the date of such change, but only with respect to such changed coverage.

9. "Real Estate Professional" means a:

a. "Real estate property manager";

b. Real estate appraiser, except when appraising real estate with respect to policies written or placed through you (coverage for this is included in the basic policy); or

c. Licensed real estate agent or broker.

10. "Real Estate Property Manager" means a person while performing any one or more of the following services in connection with real property, for others, including functions necessary and incidental to such services:

a. Securing tenants, renting, or leasing;

b. Collecting rents;

c. Arranging for routine cleaning and repairs; or

d. Controlling expenses and reporting such expenses to the real estate owner;

provided such services are rendered pursuant to a written property management agreement for real property held for sale through the Named Insured as listing broker and then only when such services are provided solely for the duration of the period from the listing of such real property for sale until the assumption of such responsibility by a party other than the insured or the closing of the sale of such real property, whichever is earlier, but not to exceed 365 days.

11. "Selling mutual funds or variable annuities" means the sale of shares of a mutual fund (which is a corporation or trust that is an investment company registered under the Investment Company Act of 1940) and the sale of variable

annuities. "Selling mutual funds or variable annuities" includes the servicing required by such sales.

12. "Suit" means a civil proceeding in which damages because of "loss" from a "wrongful act" are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

13. "Termination of coverage" means any:

a. Cancellation or nonrenewal of the policy;

b. Decrease in limits, reduction of coverage, increased deductible, new exclusion; or

c. Other change in coverage less favorable to the insured.

14. "Wrongful act" means any negligent act, error, or omission to which this insurance applies.

## SECTION II - COVERAGE

1. **Insuring Agreement.**

a. We will pay on behalf of the insured all "loss" to which this insurance applies.

We will have the right and the duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any "suit" seeking damages for a "wrongful act" to which this insurance does not apply.

We may, at our discretion:

(1) Investigate any allegation of a "wrongful act"; and

(2) Settle, according to the Settlement-Consent of The Insured Condition, any "claim" or "suit" that may result. But:

(a) The amount we will pay for damages is limited as described in **SECTION V - LIMITS OF LIABILITY**; and

(b) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of "loss."

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **2. Supplementary Payments.**

14-P-EOA  Ed. 1-98

UTICA 002153

This insurance does not apply to "wrongful acts" which took place before the retroactive date, if any, shown in the Declarations for this policy or which take place after the "policy period."

**b.** This insurance applies to "wrongful acts" only if:

(1) The "wrongful acts" occurred on or after the retroactive date, if any shown in the Declarations and before the "policy period"; and

(2) A "claim" is first made against any insured, in accordance with paragraph **c.** below, during the "policy period" or any Extended Reporting Period we provide under **SECTION VII - EXTENDED REPORTING PERIODS.**

**c.** A "claim" will be considered first made at the earliest of the following times:

(1) When notice of such "claim" is received and recorded by any insured or by us, whichever comes first.

(2) When we make settlement in accordance with paragraph **1.a.** above.

(3) On the date during the "policy period" when the first written notice of any facts or circumstances which may subsequently give rise to a "claim" which would be insured hereunder is received by us from an insured. Any "claim" made against an insured arising out of such facts or circumstances after the date of receipt of such notice by us will be considered to have been made as of the date we received the first notice of facts or circumstances and only the policy in force on that date and no other shall apply for all "claims" from such facts or circumstances.

**d.** All "claims" for damages based on or arising out of a single "wrongful act" or all "interrelated wrongful acts" of one or more insureds shall be deemed to be one "claim" and to have been made at the time the first of those "claims" is made against any insured.

**e.** The "loss" must arise out of "wrongful acts" committed in the conduct of the insured's business, wherever committed or alleged to have been committed, by the insured or any person for whose "wrongful acts" the insured is legally liable in rendering or failing to render professional services as:

(1) A General Insurance Agent;

(2) An Insurance Broker;

(3) An Insurance Agent;

(4) An Insurance Consultant;

(5) A Managing, Master or Brokerage General Agent;

(6) A Life and Accident and Health Insurance Agent;

(7) A Surplus Lines Broker; or

(8) A Notary Public.

The following services are included providing they are part of the insured's professional services:

(1) Notarizing.

(2) Arranging premium financing through a non-related entity.

(3) Real estate appraising and loss adjustment on or for policies written or placed by you.

(4) Providing insurance advice for employee benefit programs.

(5) Providing insurance program and risk management services and advice.

(6) Providing loss control services for policies written or placed by you.

(7) (a) "Selling mutual funds or variable annuities," as provided for in the Mutual Fund and Variable Annuity Coverage Endorsement; or

(b) Acting as a "real estate professional," as provided for in the Real Estate Agents and Brokers Errors and Omissions Insurance Endorsement;

if a premium has been charged for such coverage. Such insurance is subject to the Limits of Liability and other provisions set forth in the endorsement.

**2. Supplementary Payments.**

We will pay with respect to any "claim" we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur, including fees charged by an attorney retained by us to defend you.

**b.** The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the applicable limit of liability. We do not have to furnish these bonds.

**c.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit," including actual loss of earnings up to $250 a day because of time off from work. Such expenses shall include fees charged by any attorney hired by the insured with our written consent.

d. All costs taxed against the insured in the "suit."

e. Pre and post-judgment interest on that part of the judgment that we pay up to the policy limits.

These payments will not reduce the limits of liability except as stated in part **6.**, **Deductible**, of **SECTION V - LIMITS OF LIABILITY**.

## SECTION III - EXCLUSIONS

This insurance does not apply to:

1.  Any dishonest, fraudulent, malicious, or criminal conduct committed or alleged to have been committed by or at the direction of the insured. If a "suit" is brought against the insured alleging both "wrongful acts" within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct, then we will defend the insured in the trial court, but we shall not have any liability for any judgment for dishonest, fraudulent, malicious, or criminal conduct nor shall we have any further obligation to defend after judgment in the trial court.

    This exclusion applies only to insureds who participated in, acted with knowledge of, or acquiesced to such conduct.

2.  "Loss" arising out of or in any way involving:

    a.  A "wrongful act" or circumstance, situation or fact which has been the subject of notice given prior to the effective date of this policy under other insurance which provided protection for the insureds; or

    b.  A "wrongful act" which with any "wrongful act" described in **a.** above would constitute "interrelated wrongful acts."

3.  Loss," direct or consequential, arising from:

    a.  Bodily injury from whatever cause including emotional distress, sickness, disease, or death, or for care and loss of consortium, support, companionship, or services of any kind resulting from bodily injury; or

    b.  Damage to tangible property, including loss of use thereof.

4.  Any liability for money received by an insured or credited to an insured for fees, premiums, taxes, commissions, loss payments, or escrow or brokerage monies.

5.  The certification or acknowledgment of a signature by an insured acting as a notary without the proper compliance with the applicable laws and regulations of the state having jurisdiction.

6.  A "claim" by any entity or individual which:

    a.  Is wholly or partially owned, operated, managed, or controlled by the insured;

    b.  Did wholly or partially own, operate, manage, or control the insured; or

    c.  Is wholly or partially under the same ownership, operation, management, or financial control as the insured.

7.  "Personal injury" arising out of:

    a.  The oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

    b.  The oral or written publication of material whose first publication took place before the Retroactive Date, if any, shown in the Declarations; or

    c.  The willful violation of a penal statute or ordinance committed by or with the consent of the insured.

8.  Any liability for:

    a.  Refusal to employ;

    b.  Termination of employment; or

    c.  Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, or other employment-related practices, policies, acts, or omissions.

9.  Discrimination or unfair competition of any type.

10. Acts, errors, or omissions of an insured which violate the Employee Retirement Income Security Act of 1974 (ERISA), the Pension Benefits Act and the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA) including any amendments, regulations or enabling statutes pursuant thereto, or any similar federal, state, or provincial statute or regulation.

11. The violation of any federal or state security law or the Racketeer Influenced and Corrupt Organizations Act and/or any of their amendments and regulations.

12. a.  Any investment advice given or alleged to have been given relating to the performance or lack of performance of any investment or resulting from variations in the value of any investment, including, but not limited to, stocks, bonds, real estate, oil or gas, gold, silver, diamonds, or any non-insurance investment.

    b.  "Loss" arising out of an insured's representations or omissions regarding:

        (1)  Interest rates; or

        (2)  Future premium payments or market value of insurance products.

UTICA 002155

13. Services as an attorney, accountant, actuary, tax preparer or tax consultant, real estate broker, security broker, security dealer, mortgage broker, financial planner, or any other professional services unless such professional services are specifically insured hereunder and an additional premium paid.

14. The ownership, formation, creation, administration, or operation of any Health Maintenance Organization or Preferred Provider Organization.

15. The ownership, formation, creation, administration, operation or insolvency of any Self-Insurance Program, Risk Retention Group and/or Risk Purchasing Group formed under the Federal Liability Retention Act of 1981 and 1986 as amended or any amendment thereto, Multiple Employer Trust, Multiple Employer Welfare Arrangement, or any pool, syndicate, association or other combination formed for the purpose of providing insurance or benefits, if not fully funded by an insurance product.

However, this exclusion does not apply to the insolvency of any Self-Insurance Program designed for the purpose of covering exposures of a single individual or entity other than the Named Insured.

16. Any "claim" against an insured based upon or arising out of any pension, profit sharing, health or welfare or other employee benefit plan or trust sponsored by the insured as an employer.

17. Any "claim" based solely on an insured's status as a fiduciary.

18. "Claims" made against an insured arising out of the insured's activities as third party administrator of any plan, whether insured or self-insured and whether or not the insured performs such activities.

19. "Claims" arising out of or alleging the unauthorized use of trade secrets or confidential or proprietary information.

20. Any "claim" brought against an insured by a "dealer organization."

21. "Loss":

    a. With respect to which an insured under this insurance is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    b. Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    c. Resulting from the "hazardous properties" of "nuclear material," if:

        (a) The "nuclear material" (i) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or (ii) has been discharged or dispersed therefrom;

        (b) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported, or disposed of by or on behalf of an insured; or

        (c) The "loss" arises out of the furnishing by an insured of services, materials, parts, or equipment in connection with the planning, construction, maintenance, operation, or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (c) applies only to "loss" to such "nuclear facility" and any property thereat.

As used in this exclusion:

"Hazardous properties" include radioactive, toxic, or explosive properties;

"Nuclear material" means "source material," "special nuclear material," or "by-product material";

"Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"Waste" means any waste material (i) containing "by-products material"; other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (ii) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

UTICA 002156

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing "spent fuel," or (iii) handling, processing, or packaging "waste";

(c) Any equipment or device used for the processing, fabricating, or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Loss," in this exclusion, includes all forms of radioactive contamination of property.

## SECTION IV - WHO IS AN INSURED

Each of the following is an insured to the extent set forth below:

1. The individual, partnership, corporation or limited liability company designated as the Named Insured in the Declarations;

2. Your executive officers or directors, but only with respect to their duties as your officers and directors;

3. Your partners or members, but only with respect to the conduct of your business;

4. Your employees (regular, leased, or temporary) or managers, but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business; or

5. Your licensed solicitors or office brokers (who is not an employee) but only as respects:

   a. Such persons who are named in the Real Estate Agents and Brokers Errors And Omissions Insurance Endorsement while acting on your behalf; or

   b. Such persons who are named in the Mutual Fund And Variable Annuity Coverage Endorsement while acting on your behalf.

6. Any independent contractor acting on your behalf for "claims" arising out of "wrongful acts" in connection with business placed through or serviced by you.

7. Any person who was formerly an insured under parts 1., 2., 3., 4., 5. and 6. above, but only with respect to "wrongful acts" which took place prior to the termination of such relationship.

8. a. Any merged entity for which coverage was added at any time by our Merged or Consolidated Entity Endorsement, 14-E-0006.

   b. This insurance does not apply to "wrongful acts" which any insured had knowledge of prior to the effective date of the original endorsement which added such coverage.

9. a. You, for legal liability from "wrongful acts" of any merged entity for which coverage was added at any time by our Merged or Consolidated Entity Endorsement, 14-E-0006.

   b. This insurance does not apply to "wrongful acts" which any insured had knowledge of prior to the effective date of the original endorsement which added such coverage.

10. a. You, for legal liability from "wrongful acts" of any purchased entity for which coverage was added at any time by our Purchased Entity Endorsement, 14-E-0005.

    b. This insurance does not apply to "wrongful acts" which any insured had knowledge of prior to the effective date of the original endorsement which added such coverage.

    c. This insurance does not apply to "wrongful acts" which occurred prior to the effective date of the original endorsement which added such coverage.

11. The heirs, executors, administrators, or legal representatives of each insured in the event of death, incapacity, or bankruptcy, but solely with respect to the liability of each insured as otherwise insured herein.

Except as stated in 8., 9. and 10. above, no person or organization is an insured with respect to the conduct of such person or organization, or any current or past partnership or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION V - LIMITS OF LIABILITY

1. The limits of insurance shown in the Declarations and the provisions of this section determine the most we will pay for damages regardless of the number of:

   a. Persons insured;

   b. Persons or entities making "claims" or bringing "suits"; or

UTICA 002157

c. "Claims" made or "suits" brought.

2. The total limit of our liability for all payments for all "losses" under this policy shall not exceed the aggregate amount stated in the Declarations.

3. a. Subject to 2. above, the each "loss" limit is the most we will pay for all "loss" from any one "wrongful act" or "interrelated wrongful acts" of one or more insureds; and

   b. Only one deductible amount applies to all such "loss."

4. We will pay all "claim expense" in addition to the applicable Limit of Liability, except as provided in 6. Deductible.

5. a. Our Limit of Liability for each "loss" applies in excess of the applicable deductible amount set forth in the policy for each "loss."

   b. Subject to the deductible amount for each "loss," the total deductible amount for all "losses" under this policy shall not exceed the aggregate deductible amount stated in the Declarations.

   c. Such aggregate deductible amount applies in conjunction with any and all "loss" deductible amounts, whether set forth in the policy Declarations or in endorsements forming a part of the policy.

6. **Deductible.**

   a. If the block in the Declarations labeled "Deductible Applies To: Loss Only" is checked, the insured shall pay the deductible amount set forth in the Declarations for each "loss." The deductible does not include "claim expense."

   b. If the block in the Declarations labeled "Deductible Applies To: Loss And Litigation Expense" is checked, the insured shall pay the deductible amount set forth in the Declarations for each "loss." The deductible will be applied to payments for both "loss" and "litigation expense" as defined in the policy.

   c. We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

   d. Such deductible amounts shall, upon written demand by the company, be paid by the Named Insured within ten days. The total payments requested from the insured with respect to each "loss" shall not exceed the applicable deductible amount stated in the policy.

The determination of the company as to the reasonableness of the "litigation expense" shall be conclusive for all parties.

## SECTION VI - CONDITIONS

1. **Duties In The Event Of "Wrongful Act," "Claim" Or "Suit."**

   a. You must see to it that we are notified in writing as soon as practicable of any "wrongful act" which may result in a "claim." To the extent possible, notice should include:

      (1) How, when and where the "wrongful act" took place;

      (2) The names and addresses of persons involved in the "wrongful act" and witnesses; and

      (3) The nature of the harm resulting from the "wrongful act."

   b. If a "claim" is received by an insured, you must:

      (1) Immediately record the specifics of the "claim" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the "claim" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses, subpoenas or legal papers received in connection with the "claim" or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation, settlement, or defense of the "claim" or "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to an insured because of "loss" to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

2. **Settlement - Consent Of The Insured.**

   We shall not settle any "claim" without the consent of the insured. If, however, the insured:

   a. Refuses to consent to any settlement recommended by us and elects to contest the "claim" or continue any legal proceeding in connection with such "claim," then our liability for the "claim" will not exceed the lesser of the amount for which the "claim" could have

14-P-EOA Ed. 1-98

UTICA 002158

been settled or the Limits Of Liability plus the incurred "claims expense" up to the time of such refusal.

b. Cannot be located by us after a search using reasonable diligence, then we will use our best efforts to make such settlement as we deem appropriate considering the circumstances and facts.

3. **Other Insurance.**

This insurance is excess over any other applicable insurance whether such insurance is primary, excess, contributory, contingent, or otherwise and whether such insurance is collectible or not; unless such other insurance is written to be specifically excess over the insurance provided by this policy.

4. **Transfer Of Rights Of Recovery Against Others To Us.**

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after a "wrongful act" to prejudice such rights. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. Any amounts recovered will be applied to reduce the amount we paid for "loss" and expense (after application of the deductible) before being applied to reduce your deductible.

5. **Cancellation.**

a. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

b. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   (1) 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

   (2) 60 days before the effective date of cancellation, if we cancel for any other reason.

c. We will mail or deliver our notice of cancellation to the first Named Insured's last mailing address known to us.

d. The notice of cancellation will state the effective date of cancellation. The "policy period" will end on that date.

e. If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, any refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be

effective even if we have not made or offered a refund.

f. If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

6. **Premium.**

The first Named Insured shown in the Declarations:

a. Is responsible for the payment of all premiums and deductibles; and

b. If the premium is not financed, will be the payee for any return premium; but

c. If the premium is financed the Named Insured authorizes us to pay any return premium to the premium finance company.

7. **Nonrenewal.**

If we decide not to renew this policy, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 60 days before the expiration date. If notice is mailed, proof of mailing will be sufficient proof of notice.

8. **Your Right To "Claim" And "Wrongful Act" Information.**

We will provide the first Named Insured shown in the Declarations the following information relating to this and any other Insurance Agents and Brokers Errors and Omissions Liability claims-made policy we have issued to you during the previous three years:

a. A list or other record of each "wrongful act," not previously reported to any other insurer, of which we were notified in accordance with paragraph 1.a. of this Section. We will include the date and a brief description of the "wrongful act" if that information was in the notice we received.

b. A summary by policy year, of payments made and amounts reserved, stated separately under the applicable Aggregate Limit.

Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values. You must not disclose this information to any claimant or any claimant's representative without our consent.

If we cancel or elect not to renew this policy, we will provide such information no later than 30 days before the date of policy termination. In other circumstances, we will provide this information only if we receive a written request from the first Named Insured. In this case, we will provide this information within 45 days of receipt of the request.

We compile "claim" and "wrongful act" information for our own business purposes and exercise reasonable care in doing so. In providing information to the first Named Insured, we make no representations or warranties to insureds, insurers, or others to whom this information is furnished by or on behalf of any insured. Cancellation or nonrenewal will be effective even if we inadvertently provide inaccurate or incomplete information.

9. **Action Against Company.**

No action shall lie against us unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment after actual trial or by written agreement of the insured, the claimant, and us.

Any person or organization or the legal representative thereof, who is signatory to such judgment or written agreement, shall thereafter be able to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join us as a party to any action against an insured to determine the insured's liability, nor shall we be impleaded by an insured or an insured's legal representative.

10. **Bankruptcy.**

Bankruptcy or insolvency of the insured shall not relieve us of any of our obligations hereunder.

11. **Changes.**

This policy embodies all agreements existing between each insured and us or any of our agents relating to this insurance. Only the first Named Insured shown in the Declarations is authorized to request changes in the terms of this policy. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

12. **Agency Of Named Insured.**

By acceptance of this policy the first Named Insured agrees to act on behalf of all insureds with respect to the giving and receiving of notices to and from us, the cancellation of this policy, the payment of premiums and deductibles when due, and the receiving of any return premiums that may become due. In addition, all insureds agree that the first Named Insured shall act on their behalf. If the first Named Insured does not comply with the obligations under this policy then each Named Insured agrees that it will be responsible for the payment of premiums and deductibles when due.

13. **Sale, Transfer, Or Assignment.**

The controlling interest of any insured under this policy shall not be assignable to any other person without our written consent. In the event of the death or incompetency of the insured, this policy shall cover the insured's legal representative as an insured as respects any liability of that insured which is covered by this policy.

Coverage under this policy may end on the date ownership of (or stock which comprises a controlling interest in) any Named Insured is sold, transferred, or assigned unless our written consent is obtained before said date.

14. **Application.**

By acceptance of this policy, you affirm as of the effective date of this policy that the statements in the application attached hereto and made a part hereof are each insured's agreements and representations and that we have issued this policy in reliance upon the truth and accuracy of such representations.

15. **Conformance To Statute.**

Any terms of this policy which conflict with the statutes of the state where this policy is issued are hereby amended to conform to such statues.

16. **Liberalization Clause.**

If, after the effective date of this policy or of the latest renewal certificate attached thereto, we adopt revised provisions for this policy form affording broader coverage with no premium increase, then this policy shall be construed in accordance with the revised provisions as of the effective date of such revision.

## SECTION VII - EXTENDED REPORTING PERIODS

1. We will provide an Automatic Extended Reporting Period as described in paragraph **3.**, or if you purchase it, an Optional Extended Reporting Period Endorsement as described in paragraphs **4.** through **7.** below, in the event of any "termination of coverage."

2. **a.** If we provide an Extended Reporting Period, a "claim" first made during the Extended Reporting Period will be deemed to have been made during the "policy period," provided that the claim is for "loss" from "wrongful acts" which took place before the end of the "policy period" (but not before any applicable Retroactive Date).

   **b.** Extended Reporting Periods:

   **(1)** Do not extend the "policy period" or change the scope of coverage provided;

(2) Do not reinstate or increase the Limits of Liability applicable to any "claim" to which this policy applies, except to the extent described in paragraph **7.** below;

(3) Apply only to the coverage terminated or reduced; and

(4) Apply only as excess insurance over any other valid and collectible insurance available to the insured, whether primary, excess, contingent, or on any other basis, whose policy period begins or continues after the Extended Reporting Period takes effect.

**3. Automatic 60 Day Extended Reporting Period.**

The Automatic Extended Reporting Period is provided without additional charge. This period starts with the end of the "policy period" and lasts for sixty (60) days. The Automatic Extended Reporting Period may not be cancelled.

**4. Optional Extended Reporting Period.**

If this policy is subject to any "termination of coverage," then you shall have an option to purchase an Optional Extended Reporting Period according to the schedule in **5.** below.

**5. Available Options.**

If you purchase the Optional Extended Reporting Period Endorsement, the Optional Extended Reporting Period will start sixty (60) days after the end of the "policy period" and will last:

**a.** Twelve (12) months for a premium of 70% of the last full annual premium;

**b.** Twenty-four (24) months for a premium of 100% of the last full annual premium;

**c.** Thirty-six (36) months for a premium of 130% of the last full annual premium;

**d.** Forty-eight (48) months for a premium of 160% of the last full annual premium;

**e.** Sixty (60) months for a premium of 190% of the last full annual premium; or

**f.** One hundred and twenty (120) months for a premium of 200% of the last full annual premium.

**6. Optional Extended Reporting Period Notice and Acceptance.**

**a.** We will notify you in writing within thirty (30) days of the date of "termination of coverage" of the premium for and provisions of the Extended Reporting Period unless we cancel for nonpayment of premium or fraudulent activities of an insured.

If the policy is cancelled for nonpayment of premium or fraudulent activities of an insured, we will only provide a premium quotation for the Optional Extended Reporting Period upon your request.

**b.** You will have until the later of sixty (60) days after the date of "termination of coverage," or thirty (30) days after the date of mailing of the Extended Reporting Period notice provided for above, to request the Optional Extended Reporting Period. Your request must:

(1) Be submitted to us in writing;

(2) Show the length of the period of extension desired; and

(3) Include payment of the premium for the requested extension.

**c.** If such request and premium payment are not received, the Extended Reporting Period options may not be exercised at a later date.

**d.** If, in the event of "termination of coverage" you elect to purchase the Optional Extended Reporting Period Endorsement:

(1) Any return premium due you for the "terminated of coverage" will be credited to the premium due for the Optional Extended Reporting Period Endorsement; and

(2) Any additional premium or deductible amount due us for the period the policy was in force must be fully paid before any payments will be applied to the premium due for the Optional Extended Reporting Period Endorsement.

**e.** The Optional Extended Reporting Period Endorsement will not take effect unless the additional premium is paid when due. If that premium is paid when due, the Endorsement may not be cancelled.

**f.** The premium for the Optional Extended Reporting Period Endorsement:

(1) Is determined as shown above or in any endorsement changing the premium because of any change in the nature or extent of the risk during the "policy period";

(2) Will be commensurate with the coverage provided; and

(3) Will be fully earned when the Optional Extended Reporting Period Endorsement takes effect.

14-P-EOA Ed. 1-98

UTICA 002161

**g.** The Optional Extended Reporting Period Endorsement shall set forth the terms, not inconsistent with this Section, applicable to the Optional Extended Reporting Period including a provision to the effect that the insurance afforded for "claims" made during such period is excess over any other valid and collectible insurance available under policies in force after the Optional Extended Reporting Period starts.

**7.** **Optional     Extended     Reporting     Period Aggregate Limit.**

If you purchase the Optional Extended Reporting Period Endorsement, the each "loss" limit shown in the Declarations will continue to apply. Subject to the each "loss" limit, we will provide a single aggregate limit of liability for the entire Optional Extended Reporting Period equal to the Aggregate Limit of Liability entered in the Declarations.

The Optional Extended Reporting Period aggregate limit of liability described above applies only for "claims" first made during the Optional Extended Reporting Period.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Utica Mutual Insurance Company, 1999.

UTICA 002162



AGENCY AGREEMENT

FOR

The Massamont Metrogard and Diplomax Program
covering school and municipality property in New England

Between

The ACE USA Companies designated herein
Hereafter collectively referred to as "Company"

and

Massamont Insurance Agency, Inc.

and

Knapp Schenck & Company Insurance Agency, Inc

as Guarantor

Effective Date:

1/1/2001

Massamont Insurance Agency, Inc Agency Agreement



WF003424

THIS Agency Agreement (referred to as "AGREEMENT") is between Massamont Insurance Agency, Inc., a corporation with its main office located at 240 Lewis Wharf, Boston, Massachusetts, 02110 (referenced as "AGENT") and the ACE USA companies designated below, with its main offices located at 1601 Chestnut Street, Philadelphia, Pennsylvania 19101-1484 (referenced as "COMPANY.")

In consideration of the reciprocal agreements herein, COMPANY and AGENT mutually agree to the following.

I.      AGENT APPOINTMENT AND PROGRAM DEFINITION

A.      COMPANY hereby appoints AGENT as its General Agent to perform the duties set forth below and vests in AGENT authority to accomplish, effect and execute such duties upon the terms and conditions set forth in this AGREEMENT. The authority granted AGENT by COMPANY shall be limited to the PROGRAM which is defined as:

The Massamont Metrogard and Diplomax Program covering school and municipality property in New England.

B.      AGENT is authorized by this AGREEMENT to write only insurance coverage within the scope of the PROGRAM.

C.      COMPANY appoints AGENT as its non-exclusive General Agent for the PROGRAM. COMPANY reserves the right to market, at any time, the class(es) of business and types of coverages written in the PROGRAM through other producers.

II.     TERM OF AGREEMENT

This AGREEMENT shall be effective commencing January 1, 2001  and continue until terminated pursuant to Section VIII of this AGREEMENT.

III.    AGENT'S RELATION TO COMPANY

This AGREEMENT is not a contract of employment and nothing herein contained shall be construed to create the relationship of employer and employee between COMPANY and AGENT. AGENT is an independent contractor and is intended to exercise its independent judgement and discretion with regard to the performance of its duties and authority hereunder.

IV.     AUTHORITY AND DUTIES OF AGENT

A.      Underwriting

Subject to requirements imposed by law, the terms of this AGREEMENT and the written underwriting authority, guidelines, instructions and limitations that may be provided by COMPANY, in writing from time to time, AGENT assumes the responsibilities and duties for handling underwriting in accordance with Exhibit A. COMPANY shall have the right, with 90 Days prior Written notice to AGENT, to revise and/or change the underwriting guidelines for the PROGRAM, which changes shall apply to PROGRAM business quoted subsequent to notification of such change.

WF003425

B.    Quality of Services

AGENT shall use commercially reasonable efforts to serve COMPANY faithfully and shall perform all acts necessary for the proper conduct of the business on behalf of COMPANY and shall maintain a staff of competent and trained personnel, supplies and equipment for the purpose of performing AGENT's duties under this AGREEMENT.

C.    Representations

AGENT shall not make any representation to any applicant or insured regarding coverage under a policy which is not consistent with the actual terms and conditions of the policy

D.    Legal Compliance

1.    AGENT agrees to carry out its activities in connection with this AGREEMENT in such a way as to comply in all respects with all applicable laws of the jurisdictions involved, including all licensing requirements, as well as all other applicable laws governing the conduct of business and the PROGRAM under this AGREEMENT.

2.    More specifically, AGENT shall not, directly or through agents, brokers or others appointed or employed by AGENT, solicit insurance anywhere in violation of applicable licensing and other laws and regulations. AGENT shall ensure that all the PROGRAM business is written by AGENT or through other properly licensed brokers, agents or producers. AGENT is responsible for providing COMPANY with complete licensing and appointment information on sub-producers located in jurisdictions that require COMPANY to appoint such sub-producers. No assistance, if any, given to AGENT by COMPANY in obtaining or renewing licenses for AGENT shall constitute a waiver of COMPANY's right to indemnification under Section XI for damages, costs, penalties or assessments incurred by COMPANY through the failure of AGENT or other person referred to in the preceding sentence to maintain proper licenses. AGENT shall reimburse COMPANY the amount of any fees, penalties or fines incurred by or assessed against COMPANY as a result of AGENT's non-compliance with or violation of any licensing or other law or regulation

3.    AGENT does not have authority hereunder to appoint agents or other producers for COMPANY or to delegate policy issuance or underwriting authority of any kind or any other duties and authorities contained herein, to any sub-producer or other third party without prior written authorization from COMPANY.

E    Premiums

1.    AGENT shall be responsible for collecting all premiums due from insureds whether written directly by AGENT or through sub-producers through AGENT. AGENT shall pay premiums to COMPANY on insurance written under this AGREEMENT when due without regard to whether AGENT has collected such premiums. Any credit extended by AGENT to the insured or others, beyond that which COMPANY has pre-approved in writing, shall be at the sole risk of AGENT. All premiums will be determined from COMPANY's books and records.

WF003426

2.    AGENT shall also be responsible for collecting and remitting to COMPANY any additional premiums which develop by audit or under reporting from policies. Such items will be included in the monthly statement prepared by COMPANY and sent to AGENT and will be paid by AGENT no later than 50 days after the end of the month in which the additional premium is registered. AGENT is not relieved of responsibility for premium payment, even if such premium is determined to be uncollectible.

3.    The collecting of premium and accounting for business written by or through AGENT will be in accordance with the following COMPANY procedures. Payment of premiums to COMPANY will be made by electronic funds transfer. The balance due on each statement, which will be prepared by COMPANY and sent to AGENT, will be paid by AGENT no later than 50 days after the end of the month in which the business becomes effective. Any changes to these procedures shall be communicated to AGENT in writing. Should AGENT fail to pay COMPANY any premium or monies due, COMPANY shall be entitled to the issuance of an injunction to obtain such premium or monies and the cost and expense thereof, including attorney's fees, shall be the responsibility of AGENT.

4.    All premiums Net of Commissions, including return premiums, received by AGENT, are the property of COMPANY and shall be held by AGENT as trustee until delivered to COMPANY or the insured as applicable." The trust relationship and COMPANY's ownership of unpaid premiums which have not been collected by AGENT shall not be deemed modified, affected or waived by the keeping of an account on COMPANY's books as a creditor and debtor account, the payment of balances and administrative fees by AGENT or the duty to pay commissions to sub-producers when and as appropriate. AGENT will maintain all premium monies in a Premium Trust Account for the benefit of COMPANY and will execute and keep in force a Premium Trust Agreement which is attached as Exhibit B of this AGREEMENT.

5.    AGENT is required to use COMPANY to obtain audit reports on auditable policies. COMPANY at its discretion, may also obtain audit reports of insureds. Collection of any additional premiums which are developed by audit or under reporting form policies is the responsibility of AGENT.

F.   Maintenance of Records; Company's Access to Records

1.    AGENT shall keep complete records of all transactions pertaining to insurance written under this AGREEMENT and shall maintain such records for a period of time in accordance with applicable laws and regulations and COMPANY's record retention requirements. During the term of this AGREEMENT and for such time thereafter as COMPANY shall deem necessary for the protection of COMPANY's property and/or interests, COMPANY shall have the right and AGENT shall permit and authorize COMPANY, through any person(s) designated by COMPANY at such times and as often as COMPANY may reasonably request:

a    To visit, inspect, examine, audit and verify, at any of AGENT's offices or elsewhere, any of the properties, accounts, books, files, records, financial statements or work papers belonging to or in the possession of AGENT pertaining to matters arising under the terms of the AGREEMENT;

WF003427

b.    To make, or to have AGENT make in a timely fashion, copies thereof and extracts of any of the items listed in paragraph a., above;

c.    To perform, at COMPANY's discretion, routine audit tests of AGENT's accounting records in order to ensure reasonable internal accounting controls surrounding AGENT's issuance of COMPANY's policies, including, but not limited to, confirmation of policies, and policy-related information, with insureds; timeliness of premium reporting; compliance with underwriting guidelines; reconciliation of policy number inventory; timeliness of claims reporting.

d.    To discuss program related affairs, finances, and accounts of AGENT with AGENT's directors, officers or any person(s) in any way connected with AGENT, its program related affairs, finances, or accounts, including AGENT's independent accountants, bankers, or parent corporation.

2.    When the PROGRAM transactions are recorded on AGENT's proprietary data processing system(s) and/or AGENT's agency management system(s) AGENT.

a.    Agrees that all changes to AGENT's data processing and/or communication system(s), which are required to make AGENT's system(s) interface with COMPANY's policy registration systems, are completed within 90days of the effective date of the AGREEMENT.

b.    Shall provide COMPANY, in a format, manner and time frame prescribed by COMPANY, complete copies of all policies of insurance written under the PROGRAM.

c.    Agrees that all changes to AGENT's data processing and/or communication systems which affect COMPANY's electronic registration process will be communicated to and discussed with COMPANY prior to implementation of those changes. COMPANY reserves the right to require a new test transmission to revalidate the efficacy of AGENT's system(s) to interface with COMPANY's policy registration systems

d.    Agrees that if AGENT's data processing and/or communication system(s) fail(s) to provide COMPANY with complete electronic registration of policy level detailed information in the format, manner and time frame prescribed by COMPANY that COMPANY reserves the right to reduce AGENT's commission up to 1.5% of the written premium until the system failure is corrected.

3.    At COMPANY's option and expense, and in a time frame prescribed by COMPANY, COMPANY may obtain physical control and possession of all policies, binders, endorsements or other documentation of insurance coverage, in order to satisfy reporting requirements or legal obligations. In said cases, COMPANY shall provide AGENT, at AGENT's expense, the opportunity to make copies of such items, unless such opportunity would result, or cause COMPANY to be, in violation of any reporting requirement imposed by any regulatory authority.

WF003428

4.    COMPANY shall pay all storage and storage related expenses pertaining to expired policies and shall give AGENT access to stored files.

5.    All records of transactions pertaining to insurance written under this AGREEMENT shall be in a form usable by COMPANY and regulatory authorities.

6.    When the PROGRAM transactions are recorded on AGENT's proprietary data processing system(s), AGENT shall, on at least a weekly basis, back-up records of all transactions. AGENT shall maintain said backup records at a location other than the location where original records are maintained.

7.    In the event that policy numbers which have been assigned to AGENT for PROGRAM business cannot be accounted for by AGENT, AGENT agrees to protect, forever defend and hold COMPANY harmless against any and all persons and claims on or relating to said policy numbers.

G.    Reporting

1.    AGENT will report, within ten (10) days after the end of the month, all insurance bound, accepted, cancelled or amended in the preceding month. Monthly reporting, and additional reporting as may be required by COMPANY, shall be in a form acceptable to COMPANY and in accordance with the rules and regulations promulgated from time to time by COMPANY and which COMPANY shall deliver to AGENT.

2.    AGENT shall respond and comply immediately upon receipt to all correspondence or notices relating to the financing of premiums by any insured.

3.    AGENT shall provide, at AGENT's expense and within a reasonable period of time, as necessary, sufficient information to satisfy reporting requirements imposed on COMPANY by boards, bureaus, associations, and regulatory bodies of competent jurisdictions.

4.    AGENT will notify COMPANY immediately if AGENT receives notice of any filed or threatened litigation or arbitration proceedings against AGENT or COMPANY relating to business practices or matters pertaining to the PROGRAM, other than claims.

5.    AGENT will forward all written complaints pertaining to or arising under the PROGRAM (S) to COMPANY upon receipt. AGENT agrees to submit, each month, a report which includes: a copy of the written complaint; complainant's name; insured's name and policy number or claim number; insurance department file number; date received, date closed and disposition. In the event that no written complaints are received during a month, AGENT will positively affirm that fact to COMPANY in writing.

H.    Advertising and Public Relations

1.    AGENT shall at its own expense develop and produce all advertising or promotional materials used to promote the sale of the PROGRAM pursuant to this AGREEMENT.

2.    AGENT shall not, however, use the name or logo of COMPANY or any of its affiliates or products in any advertising and/or promotional materials without COMPANY's pre-

Massamont Insurance Agency, Inc. Agency Agreement 06/19/01          6

WF003429

review and written consent which shall be obtained for each separate promotion, advertisement or use of COMPANY's name, logo or product.

3.    COMPANY shall not use the name of AGENT, its affiliates or its accounts or service marks in any advertising and/or promotional or public materials without the prior review and written consent of AGENT.

## I.    Ownership of Policy Forms, Printed Matter and PROGRAM Data

1.    AGENT will only use policies, endorsements and all other forms approved by COMPANY in connection with its duties hereunder. It is expressly understood that any data processing software or data processing technology or applications, policies, endorsements or forms, or data processing software or data processing technology which produces such applications, policies, endorsement, or forms, or any other supplies furnished to AGENT by COMPANY shall remain the property of COMPANY. Any policy forms, blanks, unused policy numbers, or other forms and documents, including claims or other manuals bearing COMPANY's name shall be the property of COMPANY and shall be surrendered to COMPANY upon its demand, except for Massamont Proprietary forms and rate structures.

2.    The PROGRAM results, loss and pricing data, underwriting criteria and surveys, loss control information, and other related PROGRAM data are the joint property of COMPANY and AGENT. This information shall be shared with AGENT during the term of this AGREEMENT. AGENT's use of this information shall be limited to purposes set forth in this AGREEMENT and its related exhibits and shall be subject to the confidentiality and non-disclosure provisions herein.

3.    During the term of this AGREEMENT and upon termination of this AGREEMENT, AGENT shall treat all PROGRAM information, listed in Sections IV.I.1. and IV.I.2. and which is not publicly available, as confidential information and shall not disclose, communicate or share such items or information with any third party without COMPANY's prior written approval. Such restrictions shall not prevent AGENT from disclosing such information, as mandated by regulatory organizations or courts of law.

4.    Upon termination of this AGREEMENT, AGENT shall promptly return to COMPANY all items and information listed in Sections IV.I.1 and IV.I.2., which are the exclusive property of COMPANY.

5.    If and to the extent that AGENT shall, in connection with this AGREEMENT, come into possession of any information, business or technology of the COMPANY that is not known to the public, AGENT shall treat such information as confidential, and not to disclose such information to any person(s) or entity not a party to this AGREEMENT.

## J.    Expenses

1.    AGENT shall pay all expenses related to the performance of AGENT's duties under this AGREEMENT, including but not limited to rentals, transportation facilities, clerical expense, commissions paid to sub-producers, sub-producers appointment fees incurred by COMPANY, solicitor's fees, postage, advertising, personal local license fees or costs associated with the preparation of any reports required by this AGREEMENT. AGENT

WF003430

shall not charge or commit COMPANY to any expense, agreement, payment, debt, or obligation other than the insurance expressly described herein unless prior written approval is obtained from COMPANY.

2.    AGENT shall pay any applicable surplus lines taxes, stamping office fees and other expenses relating to the filing of all affidavits as required by the appropriate governmental jurisdictions.

3.    AGENT will pay for all motor vehicle reports and Dunn & Bradstreet ("D&B") reports associated with the PROGRAM regardless of whether or not COMPANY accepts or writes the business.

4.    AGENT will bear the cost of all loss control surveys and services mandated by the underwriting criteria of this PROGRAM. Any non-mandated or extraordinary COMPANY loss control services will be negotiated on a case by case basis. Use of AGENT's loss control staff, whose services will be billed to COMPANY, must be pre-approved by COMPANY in writing.

5.    AGENT shall pay for all data processing hardware and shall be responsible for fees for data processing and communication software and technology, including but not limited to, necessary line charges.

6.    AGENT shall reimburse COMPANY for all expenses, fines and assessments resulting directly or indirectly from any action or omission which AGENT is or was responsible for or had authority to perform.

K.    Insurance Maintained by AGENT

1.    AGENT is required to maintain in full force and effect during the term of this AGREEMENT a policy (or policies) of Errors and Omissions Insurance which are issued by an insurer rated no less than B+ VI by A. M. Best Company and which afford(s) coverage in the minimum amount of $10,000,000 with a deductible not to exceed $50,000. AGENT will also maintain Directors & Officers insurance with limits of liability of at least $2,000,000.    When AGENT's gross written premium with COMPANY exceeds $22,000,000, the parties shall negotiate an increase in the amount of Errors and Omissions and D&O Insurance required of AGENT. Such Errors and Omissions and D&O Insurance shall be maintained by AGENT at AGENT's sole cost and expense. AGENT shall notify COMPANY in the event of lapse and shall furnish proof of such insurance prior to executing this AGREEMENT and at each subsequent renewal of the insurance policy.

2.    AGENT is required to maintain in full force and effect during the term of this AGREEMENT a policy (or policies) of Fidelity Insurance for the benefit of COMPANY covering AGENT and its employees which are issued by an insurer rated no less than B+ VI by A. M. Best Company and which afford(s) coverage in the minimum amount of $1,000,000, with a deductible not to exceed $50,000. When AGENT's gross written premium with COMPANY exceeds $10,000,000, the parties shall negotiate an increase in the amount of Fidelity Insurance required of AGENT. Such Fidelity Insurance shall be maintained by AGENT at AGENT's sole cost and expense and shall be primary and provide non-contributing coverage over any valid and collectible insurance available to

WF003431

COMPANY. AGENT shall notify COMPANY in the event of lapse and shall furnish proof of such insurance at inception of this AGREEMENT and at each subsequent renewal of the insurance policy.

3. AGENT shall maintain in full force and effect during the term of this AGREEMENT, a policy (or policies) of Public Liability Insurance and of Automobile Liability Insurance covering AGENT and AGENT's employees which are issued by an insurer rated no less than B+ VI by A. M. Best Company and which afford(s) coverage in the minimum amount of $1,000,000. Combined Single Limit for Bodily Injury and Property Damage Liability. Such insurance shall be primary and provide non-contributing coverage. AGENT shall notify COMPANY in the event of lapse and shall furnish proof of such insurance at COMPANY's request.

L. Financial Statements

1. Prior to executing this AGREEMENT, AGENT shall furnish to COMPANY AGENT's most recent year-end financial statements prepared by a certified public accountant acceptable to COMPANY which fairly present the financial position of AGENT and the results of its operations in accordance with generally accepted accounting principles. The statements shall include, but not be limited to, a statement of profit and loss, a balance sheet and a cash flow statement.

2. Not later than 120 calendar days after the end of its fiscal year, which is December 31st. AGENT shall provide COMPANY its year-end financial statements with accompanying footnote disclosures.    *Financials due May 1*

M. Financial Ratios

AGENT will maintain during each fiscal year covered by this AGREEMENT the following financial ratios:

| | |
|---|---|
| Net Worth: | Not Less Than $ 500,000 |
| Current Ratio: | Not Less Than 1:1 |
| Premium Trust Position: | Not Less Than $ 500,000 |
| Receivable to Payable Ratio: | Not More Than 1:1 |

Net Worth shall be determined in accordance with generally accepted accounting principles

Current Ratio shall mean the ratio of current assets to current liabilities

Premium Trust Position shall mean the excess of cash, marketable securities and collectible accounts receivable from policyholders, less the premium payable to insurance companies.

Receivables to Payables Ratio shall mean the ratio of collectible accounts receivable from policyholders to accounts payable to insurance companies.

WF003432

N.    Written Premium Commitment

AGENT shall place with COMPANY all insurance solicited by AGENT which is within the scope of the PROGRAM. Such written premiums shall, at a minimum, adhere to the following schedule:

| As Of<br>December 31 | Y/E Annual<br>Written<br>Premium |
|---|---|
| 2001 | $15,000,000 |
| 2002 | $17,500,000 |
| 2003 | $20,000,000 |

V.    LIMITATIONS OF AUTHORITY

A.    With respect to the classes of business which AGENT is now or may in the future be authorized to solicit, quote, bind, underwrite, rate, and transact under this AGREEMENT, AGENT will not bind insurance coverage pursuant to this Agreement on the following:

1.    Risks which are unacceptable in accordance with COMPANY's underwriting standards set forth in Exhibit A and the underwriting guidelines, instructions and limitations referred to in Section IV.A.

2.    Policy limits which are in excess of those specified in AGENT's underwriting authority, as set forth in Exhibit A.

3.    Risks which are not in compliance with COMPANY's applicable forms, rules, rates, or filings according to their exact terms and/or with the laws and regulations in effect in the state(s) in which AGENT transacts business

4.    Any risk or class of business other than the PROGRAM.

B.    In the event AGENT solicits, accepts proposals, or binds COMPANY to the risks listed in Section V.A.1., 3 or 4, or binds risks in excess of the policy limits set forth in Exhibit A, or binds risks in excess of specified reinsurance treaty limits without approval from COMPANY (verbal approval to be subsequently confirmed in writing), whether intentional or not, AGENT will do such things and take such actions as necessary to remove or to reduce COMPANY exposure on such risks, or to such excess policy limits, or to such excess reinsurance treaty limits and will defend, indemnify and hold COMPANY harmless pursuant to Section XII. of this AGREEMENT, against any claim, liability or loss which may arise or be incurred by COMPANY as a result of such solicitation, proposal, binder or policy.

C.    AGENT shall have no authority to procure reinsurance in the name of COMPANY.

VI.    COMPENSATION TO AGENT

A.    As full compensation for the business covered by this AGREEMENT and for the faithful performance of AGENT's duties to process, register and report PROGRAM business to

WF003433

COMPANY under this AGREEMENT, COMPANY agrees to pay AGENT a commission on net written premium which AGENT submits to COMPANY and which COMPANY underwrites as set forth below:

| | |
|---|---|
| PROPERTY, INLAND MARINE AND CRIME: | 17.5% |
| BOILER AND MACHINERY: | 22.0% |

Net written premium shall mean gross written premium, less cancellations and returned premiums according to COMPANY's books and records.

In the event AGENT fails to perform, or fails to adequately perform, its duties to process, register and report PROGRAM business to COMPANY in an accurate and timely basis, then COMPANY shall have the right, which may be exercised at its sole discretion, to reduce AGENT's commission by an amount not to exceed twenty five percent (25%) to offset expenses incurred by COMPANY in the processing, registering and reporting of PROGRAM business . If COMPANY elects to reduce AGENT's commission for the failure to perform, or the failure to adequately perform, its duties under this AGREEMENT, COMPANY shall provide AGENT written notice of its intent to reduce commissions before said commission reduction shall become effective.

B.    Commission rates listed above shall be in effect for one year from the effective date of the AGREEMENT. Said commission rates shall automatically renew for ninety (90) day terms unless COMPANY provides AGENT written notification of its intent to revise commission rates no later than ninety (90) days prior to the expiration of the original term or any renewal term for commission rates, except as noted in Section VI.A. above.

C.    AGENT shall refund on a prorated basis to COMPANY, on all insurance issued under this AGREEMENT, commissions on coverage which has been canceled by COMPANY or the insured, and on premiums which have been reduced or refunded, in each case at the same rate at which such commissions were originally payable and within the period of time required by the rules or regulations of COMPANY.

D.    AGENT's fees and commissions and any other monies due AGENT shall be subject to offset by COMPANY, or any of its affiliates for any money due from AGENT to COMPANY or its affiliates. This provision shall not be affected by the insolvency of the AGENT.

E.    AGENT shall be paid contingent commissions, if any, in accordance with the Contingent Commission Agreement which is included as Exhibit E of this AGREEMENT.

F.    Compensation, if any, for claims settlement is provided for in Exhibit D.

G.    Upon breach by the AGENT of any financial obligation to COMPANY, COMPANY shall have the right to collect any outstanding indebtedness directly from any insured, agent, broker or other party owing any sum to AGENT for PROGRAM business. If COMPANY exercises such right by collecting such indebtedness directly, COMPANY shall be accountable to AGENT for any sum received which, net of expenses associated with such collection, exceeds the amount owed to COMPANY by AGENT.

Massamont Insurance Agency, Inc. Agency Agreement 06/19/01        11

WF003434

VII.    COMPENSATION TO OTHERS

AGENT is required to pay out of its remuneration all commissions or fees owing to brokers, surplus lines agents or brokers, sub-producers or countersigning agents on business written through AGENT.

VIII.   TERMINATION

A.     Each party to this AGREEMENT shall have the right to terminate this AGREEMENT for any reason by giving the other party written notice thereof at least one hundred and twenty (120) days prior to the effective date of such termination, except that COMPANY may terminate AGENT's binding authority for new business, not yet quoted, upon at least sixty (60) days notice. After receipt of any such notice of termination, AGENT may begin to place the business within the scope of the PROGRAM with another insurer.

B.     COMPANY may terminate this AGREEMENT upon at least thirty (30) days prior written notice to AGENT, if AGENT shall have violated any provision of this AGREEMENT or any of the exhibits attached hereto (which violation shall be specified in such notice) and AGENT shall not have cured such violation within such grace period (not less than thirty (30) days) as is specified in such notice.

C.     COMPANY may terminate this AGREEMENT immediately by written notice to AGENT if any one or more of the following events occur:

1.     Any substantial part of the assets and business of AGENT, or any equity interest in AGENT, is issued, sold or transferred, or any other substantial change in AGENT's ownership or management, and AGENT shall not have given COMPANY one hundred twenty (120) days prior notice thereof.

2.     AGENT assigns, transfers, encumbers or otherwise disposes of this AGREEMENT or any interest in this AGREEMENT or sells, exchanges, transfers, assigns, merges or consolidates the PROGRAM insurance business without giving COMPANY ninety (90) days prior notice thereof.

3.     AGENT misappropriates any of COMPANY's funds or property including, but not limited to, the violation of AGENT's fiduciary responsibilities regarding COMPANY's premium trust funds or the violation of applicable law or regulations regarding premium trust funds.

4.     AGENT abandons or discontinues business or is determined by COMPANY to have committed fraud, or gross and willful misconduct.

5.     Any broker or agent license of AGENT or any Certificate of Authority issued to AGENT by any regulatory authority in a state where AGENT transacts business is revoked or not renewed by such authority upon expiration.

6.     Any broker or agent license of any employee of AGENT issued by any regulatory authority in a state where AGENT transacts business is revoked or not renewed by such authority.

WF003435

D.   This AGREEMENT will automatically terminate if AGENT, or any of AGENT's affiliated corporations, if any, make(s) an assignment for the benefit of creditors; is (are) dissolved; a receiver or liquidator is appointed for AGENT or such affiliated corporation(s) or a substantial part of its (their) property; or insolvency, bankruptcy, reorganization, arrangement or similar proceedings are instituted by or against AGENT or such affiliated corporations(s).

E.   Upon termination of this AGREEMENT, AGENT shall immediately communicate such termination and its effective date to all agents, brokers, producers and sub-producers who produce PROGRAM business on behalf of AGENT.

F.   Continuing Duties

1.   Upon termination of this AGREEMENT, upon COMPANY's request AGENT shall perform all duties provided for herein necessary to the servicing of all in force policies of insurance written hereunder until all such policies shall have expired or shall have been terminated. The servicing of policies shall consist of, but shall not necessarily be limited to, canceling and nonrenewing policies, issuing amendatory endorsements, collecting and returning premiums and remitting premiums to COMPANY.

2.   If AGENT does not perform this continuing service obligation, then any expense incurred by COMPANY to service or arrange for the servicing of the policies issued by or through AGENT hereunder shall be fully offset against commissions payable to AGENT or reimbursed to COMPANY by AGENT. In addition, should AGENT service the PROGRAM insurance business, but not to the full extent previously provided by AGENT hereunder, then AGENT agrees to continue to provide this lesser service at the reduced commission rate of 15%.

3.   Upon termination of this AGREEMENT, COMPANY may, at its discretion, service the policies of insurance written hereunder and pay to AGENT the reduced commission rate of 15%.

3.   Upon termination of this AGREEMENT, AGENT shall provide COMPANY, at COMPANY's expense and on a timely basis, all files of insurance written under the PROGRAM, and claim files if applicable, which may be required for servicing PROGRAM business or to meet record retention requirements mandated by regulatory organization or required by COMPANY policy. Such files shall include, but shall not be limited to: application for insurance, rating work sheets, loss runs used in rate calculations, loss control reports, copy of the policy declaration page and all correspondence.

G.   Suspension of Authority

During the pendency of any dispute between AGENT and COMPANY, COMPANY may, by written notice, immediately suspend the binding authority of AGENT. Under any other circumstances, COMPANY may, upon written notice, reduce or suspend AGENT's binding authority effective thirty (30) days from mailing of the notice

IX.   OWNERSHIP OF BUSINESS

A.   Except as otherwise provided in this Section, policyholder lists, including expirations and their

Massimont Insurance Agency, Inc. Agency Agreement: 06/19/01         13

WF003436

use and control for solicitation of business written or bound by or through AGENT shall be the sole and exclusive property of AGENT. Records of insurance, coverage bound, insurance policies and other related information as defined in Section IV.I. of this AGREEMENT are the exclusive property of COMPANY.

B.    Upon termination of this AGREEMENT, if AGENT has rendered all accounts and paid all amounts then due to COMPANY and continues to make timely accounts and payments, AGENT's use and control of the records of insureds and policyholder lists shall remain the property of AGENT and be left in AGENT's undisputed possession.

C.    If AGENT has not rendered all accounts and paid all amounts due COMPANY, the use and control of the records of insureds and policyholder lists shall be vested in COMPANY. Failure to pay premium because of good faith routine differences in the accounting records of AGENT and COMPANY will not be considered a failure to pay and will not vest title to the records in COMPANY if AGENT is using accounting procedures acceptable to COMPANY and if AGENT is not willfully withholding funds.

D.    Upon the occurrence of any event which gives rise to the vesting of such records of insureds and policyholder lists in COMPANY, COMPANY may take possession of AGENT's records. AGENT agrees upon request to gather such records together at AGENT's place of business and to allow COMPANY access to such place of business. COMPANY may service such accounts directly or dispose of them in any commercially reasonable manner. COMPANY may collect directly from any policyholder who has not made payment to AGENT. If, in disposing of such accounts at its discretion, COMPANY does not realize sufficient money to discharge in full AGENT's indebtedness to COMPANY, AGENT shall remain liable for the balance of such indebtedness. If there is any money realized by COMPANY, in excess of the amount necessary to discharge in full AGENT's indebtedness to COMPANY, such excess money shall be remitted to AGENT.

E.    In the event this AGREEMENT is terminated, COMPANY retains the right set forth in Section I.C. hereof to market, develop, distribute, advertise and sell PROGRAM business through other agents, brokers, producers and sub-producers.

## X.    CANCELLATION OF INSURANCE

A.    Nothing in this AGREEMENT shall be construed as limiting or restricting the right of COMPANY to reject, cancel or non-renew any binder, policy or other contract of insurance issued under this AGREEMENT in accordance with the cancellation or non-renewal provisions of such binder, policy or contract and any applicable law. COMPANY reserves the right to direct AGENT to cancel any policy of insurance at any time.

B.    In the event of nonpayment of premium, AGENT is authorized and agrees to cancel or non-renew without awaiting direction from COMPANY, but shall promptly notify COMPANY of any such cancellation or non-renewal.

C.    In the case of a flat cancellation, the originals of all canceled policies shall be retained by AGENT, or in lieu thereof, AGENT shall secure a Lost Policy Release, signed by the insured, which shall be retained by AGENT. AGENT shall not be entitled to commission for any flat cancellation unless

WF003437

expressly agreed to by COMPANY.

XI.    INDEMNITY

A.    COMPANY agrees to indemnify, defend and hold AGENT harmless from and against any and all claims, suits, actions, liability, losses, expenses or damages now existing or which hereafter arise caused by or resulting from any of the following, provided AGENT has not contributed to or compounded such error.

1.    COMPANY sponsored or installed loss prevention programs or underwriting surveys.

2.    COMPANY's error or omission in processing business or performing its duties.

3.    COMPANY approved advertising.

4.    COMPANY's written rules, regulations, instructions, or filed rates and forms when fully complied with by AGENT.

5.    Any claims, suits, actions, liability, losses, expenses or damages existing or incurred in which COMPANY caused, compounded or contributed to such error or omission.

B.    In exchange for COMPANY protecting AGENT, AGENT must notify COMPANY immediately of any claim against AGENT.  AGENT must also allow COMPANY to make any investigations, settlement or defense COMPANY feels is appropriate.

C.    AGENT agrees to indemnify, defend and hold COMPANY harmless from and against any and all claims, suits, actions, liability, losses, expenses, or damages now existing or which hereafter arise, which COMPANY, its affiliates, directors, officers, agents, or employees, may sustain, due to or arising out of any act by AGENT, its affiliates, officers, agents, representatives, or employees in violation of this AGREEMENT or in violation of any applicable law or regulation to the extent that COMPANY has not contributed to or compounded such error or omission.

XII.    AGENT STATUS

If AGENT directly or indirectly underwrites an amount of gross direct written premium equal to or more than five percent (5%) of the policyholder surplus as reported in the last annual statement of any individual COMPANY listed below in any one quarter or year and AGENT shall be required thereby to register as a "Managing General Agent" under any Managing General Agent law, each party to this AGREEMENT will take all such action as may be necessary to comply with such law, including without limitation modifying this AGREEMENT to comply with such law, registering and obtaining licenses thereunder.

XIII.    WAIVER OF STATUTORY TERMINATION RIGHTS

Due to the special relationship AGENT has with COMPANY as a result of this AGREEMENT and due to the special duties AGENT performs on behalf of COMPANY, AGENT agrees to waive statutory termination requirements imposed on COMPANY by various jurisdictions and regulatory entities, and shall abide by termination provisions stated herein.

WF003438

**XIV.    NO WAIVER**

The failure of COMPANY or AGENT to insist on strict compliance with this AGREEMENT, or to exercise any right or remedy hereunder shall not constitute a waiver of any rights contained herein nor estop the parties from thereafter demanding full and complete compliance therewith nor prevent the parties from exercising such remedy in the future.

**XV.    FULL AGREEMENT**

A.    This AGREEMENT supersedes and makes null and void any and all previous agreements covering the subject matter herein, whether written or oral, between COMPANY and AGENT or their predecessors with respect to the type of business to be written hereunder and constitutes the full agreement between the parties. No amendment to this AGREEMENT shall be valid unless in writing, and signed by the parties except that the Exhibits attached hereto and the written rules, regulations and instructions of COMPANY communicated to AGENT from time to time, shall be binding on the parties the same as though printed herein.

B.    This AGREEMENT is the only agreement in effect between the parties for the kinds of insurance specified in Exhibit A or any amendment to Exhibit A and referred to as the PROGRAM.

**XVI.    SEVERABILITY**

Wherever possible, each provision of this AGREEMENT will be interpreted in such manner and to such an extent as to be effective and valid under applicable law. If any provision is prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity.

**XVII.    THIRD PARTY BENEFICIARIES**

The provisions of this AGREEMENT are for the sole benefit of the parties. Nothing in this AGREEMENT is intended to create rights enforceable against any party by any so-called third party beneficiary.

**XVIII.    SUCCESSORS AND ASSIGNS**

This AGREEMENT shall insure to the benefit of successors and assigns of the parties hereto, subject to the provisions of Section VIII hereof.

**XIX.    NOTICES**

A.    Any notice required or permitted to be given under this AGREEMENT shall be in writing and shall be deemed duly given if delivered personally, by registered or by certified mail (including delivery by telefax or other electronic transmission) to the party for whom it is intended at the following address or such other address as such party may designate from time to time by notice to the other.

WF003439

To AGENT:    Massamont Insurance Agency, Inc.
             240 Lewis Wharf
             Boston, MA 02110
             ATT: Hilbert Schenck II CPCU


To COMPANY:  ACE USA
             1601 Chestnut Street, TL34K
             Philadelphia, Pennsylvania 19103
             Attn: Parry Gibson, V.P. Administration, Operations and Finance

B.    Such notice shall be deemed to be given when deposited in the United States mail, postage prepaid.

# XX.    ARBITRATION

A.    It is understood that this AGREEMENT is made in good faith and should there arise, a difference of opinion or of interpretation of this AGREEMENT, which cannot be settled amicably between senior representatives of COMPANY who are not involved in the day-to-day management of the PROGRAM and AGENT, or any dispute arising from or relating to the performance or breech of this AGREEMENT, such differences, interpretations or disputes shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire meeting in Philadelphia, PA.

B.    The members of the board of arbitrators shall be active or retired disinterested officials of insurance or reinsurance companies or agencies. AGENT and COMPANY shall each appoint one arbitrator, and the two arbitrators shall choose an umpire before instituting the hearing. If the respondent fails to appoint an arbitrator within sixty (60) days after being requested to do so by the claimant, the latter shall also appoint the second arbitrator. If the two arbitrators fail to agree upon the appointment of an umpire within four (4) weeks after their nominations, each of them shall name three (3), of whom the other shall decline two (2) and the decision shall be made by drawing lots. The claimant shall submit its initial brief in twenty (20) days after appointment of the umpire, the respondent shall submit a brief within twenty (20) days after the submission of the claimant's brief, and the claimant may submit a reply brief within ten (10) days after filing of the respondent's brief.

C.    The board shall make an award with regard to the custom and usage of the insurance and reinsurance business. The board shall issue its award in writing based upon a hearing at which evidence may be introduced without following strict rules of evidence but in which cross-examination and rebuttal shall be allowed. The board shall make its award within sixty (60) days following the termination of the hearing unless the parties consent to an extension. A decision by the majority of the members of the board shall become binding upon all parties to the proceeding.

D.    Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the expense of the umpire. The remaining costs of the arbitration proceeding shall be allocated by the board.

E.    This Section XXI, Arbitration, shall survive the termination of this AGREEMENT.

# XXI.    OTHER COMPANIES

WF003440

AGENT agrees to advise COMPANY of existing and future agency agreements entered into with other insurance companies with respect to business covered by this AGREEMENT.

## XXII.  APPLICABLE LAW

This AGREEMENT shall be governed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania.

## XXIII.  CAPTIONS

The captions of this AGREEMENT are not part of the AGREEMENT, but are merely for reference and shall not affect the construction or the interpretation of the provisions hereof. If any caption is inconsistent with any provision of the AGREEMENT such provision shall govern.

IN WITNESS WHEREOF, the parties intending to be legally bound have caused this Agency Agreement to be signed and to take effect on the above date.

AGENT

DATED: 10/1/01          BY: _Hbt Schr_

NAME: Hilbert Schench
TITLE: President

COMPANY:                FOR THE OPERATING COMPANIES DESIGNATED BELOW:

DATED: 10/22/01          BY: _Michael J. Carr_

NAME: Michael J. Carr
TITLE: Assistant Vice President

Westchester Fire Insurance Company

GUARANTOR:              Knapp Schenck & Company Insurance Agency, Inc

DATED: 10/1/01           BY: _____

Massimimi Insurance Agency, Inc. Agency Agreement 06/19/01;     18

WF003441

Exhibit A

## THE MASSAMONT METROGARD AND DIPLOMAX PROGRAM
## UNDERWRITING AUTHORITY

I.  GENERAL UNDERWRITING AUTHORITY

A.  The terms "COMPANY", "AGENT" and the "Program" shall have the same meanings in this Underwriting Authority as in the Agency Agreement attached hereto.

B.  COMPANY hereby grants AGENT underwriting authority for the Program. Such underwriting authority does not negate AGENT's responsibility to make knowledgeable underwriting decisions. Unique and unusual risks and coverages shall be discussed with COMPANY underwriter, prior to binding, even if the risk is within AGENT's authority.

C.  AGENT does not have the authority to write any class of business, exposure, or coverage which is outside the Program

D.  AGENT's responsibilities and duties for underwriting are subject to all COMPANY policies and procedures as outlined in the Program Underwriting Manual.

E.  AGENT's underwriting authority and Program Underwriting Manual will be reviewed, at a minimum, on an annual basis. Adjustments or revisions to AGENT's underwriting authority and Program Underwriting Criteria will be made as warranted, subject to COMPANY discretion, and will be communicated to AGENT in writing.

II.  GENERAL RESPONSIBILITIES AND DUTIES OF THE AGENT

Subject to requirements imposed by law, the terms of the Agency Agreement, and the specific written program underwriting procedures and policies that may be provided to AGENT by COMPANY from time to time, the AGENT has the responsibility and duty to:

A)  Place such insurance policies as are specified in this Exhibit A, which may be modified by COMPANY;

B)  Bind COMPANY on insurance policies and endorsements as described herein and as outlined in the Program Underwriting Manual and work in conjunction with licensed sub-agents, brokers, and, where necessary, licensed agents appointed by COMPANY;

C)  Underwrite and accept or reject applications for insurance;

D)  Forward to COMPANY such applications as are beyond the AGENT's authority to approve;

E)  Analyze risk and rating information for the purpose of computing premiums.

F)  Assemble, type, prepare and issue policies including endorsements;

G)  Deliver policies, make proper arrangements for the countersigning of policies, where

WF003442

required, and make certain that such requirements are followed;

H)    Calculate, charge, collect, receive and receipt premiums including any additional premiums, and refund return premiums and unearned premiums, if any, on canceled insurance policies;

I)    Transfer and modify policies as appropriate with the prior consent of COMPANY;

J)    Endorse any policy issued by AGENT, except where endorsement results in changes in the ownership, changes in the named insured, or changes in the operations of the insured, in which case, endorsement shall be referred to COMPANY;

K)    Cancel and non-renew policies for non-payment of premiums and underwriting reasons;

L)    Cancel/reinstate any policy issued by AGENT, provided such cancellation/restatement is in accordance with applicable law and COMPANY requirements and cancellation/reinstatement date is not backdated;

M)    Pay fees and/or commissions to brokers and pay countersignature agent's commissions or fees;

N)    Underwrite existing policies prior to renewal;

O)    Send or arrange for the sending of renewal notices, non-renewal notices, rate increase notices, and coverage restriction notices;

P)    Maintain complete records of transactions of insurance, written as part of the Program, in compliance with section IV.F. of the Agency Agreement;

Q)    File affidavits with regulatory authorities and collect from insureds and transmit to the appropriate regulatory authorities the amount required by law to be paid as surplus (or excess) lines tax;

R)    Service all policies of insurance written pursuant to the Agency Agreement;

S)    Provide COMPANY with periodic reports as required under the Agreement as identified in Section IV.G. of the Agency Agreement;

T)    Remit premiums to COMPANY as identified in Section IV.E. of the Agency Agreement;

U)    Furnish COMPANY sufficient information as may be required to satisfy any reporting requirements imposed on COMPANY boards, bureaus, associations, and regulatory bodies of competent jurisdiction as respects the policies issued pursuant to the Agency Agreement;

V)    Engage loss control and risk management activities, as specified in writing, for the Program;

WF003443

W) Designate staff members, acceptable to COMPANY, who will be dedicated to the underwriting for insureds of COMPANY.

## III. DESIGNATED COMPANIES

AGENT is authorized to underwrite and bind risks for only the individual insurance companies that have signed the attached Agency Company agreement, and not for any other ACE USA company.

## IV. RECORD RETENTION

A. In accordance with Section IV.F. of the Agency Agreement between COMPANY and AGENT, the AGENT shall maintain all records of insurance pertaining to business written under the Program. Records of insurance include, but are not limited to:

1. A completed application of insurance.
2. A copy of the insurance policy when the policy is issued by AGENT. If policy is issued by COMPANY a copy of the declaration page for the policy issued.
3. A copy of the rating work sheets used to rate coverages quoted.
4. Copy of the loss experience for the prior three years.
5. A copy of experience rating.
6. Schedule rating work sheets and documentation to support schedule rating.
7. Loss control reports including resolution of recommendations.
8. List of the insured's drivers and related motor vehicle report, if motor vehicle coverages are involved.
9. Verification of values and premium base.
10. Financial data (when required).

B. At such time as AGENT is no longer required by state regulation to retain items listed in Section IV.A. above, COMPANY shall, at its own expense, have items shipped to a storage location designated by COMPANY. COMPANY shall pay all storage cost for these items. AGENT shall be allowed complete access to these items.

## V. REINSURANCE

Agent does not have the authority to place reinsurance on behalf of COMPANY.

## VI. LOSS CONTROL

COMPANY's Loss Control Services (LCS) reports are for COMPANY's and AGENT's use only and AGENT may not release LCS reports to insured or any other entity or individual. AGENT shall retain, in the insurance records maintained by AGENT, the resolution of all LCS recommendations.

## VII. AGENCY AGREEMENT TERMINATION

Cancellation or termination of the Agency Agreement or the Underwriting Authority between AGENT and COMPANY shall not affect any insurance coverage bound by AGENT, written in compliance with said Agency Agreement or Underwriting Authority and executed by AGENT

WF003444

prior to the date of such cancellation or termination.

VIII.    REGULATORY COMPLIANCE (PA Surplus Lines Agents only)

It is understood and agreed that all insurance placed pursuant to this agreement on subjects of insurance resident, located, or to be performed in this Commonwealth, shall be effected and written in accordance with act of January 24, 1966, P.L. 1509 (40 P.S. 1006.1 *et seq*) of the General assembly of the Commonwealth of Pennsylvania.

IX.    EXCLUSIVITY (if applicable)

A.   During the term of this Agreement COMPANY will not grant to any producer, other than AGENT, the authority to solicit on behalf of COMPANY, Program business, as defined in this Underwriting Authority and the related Underwriting Manual.

B.   During the term of this Agreement AGENT will not solicit for any other insurance carrier, except COMPANY, the Program business. If COMPANY elects not to write such business, then AGENT is granted the right to submit such business to other insurance carriers under the same terms and conditions as presented to COMPANY.

C.   The Program business currently written by COMPANY as of the effective date of this Agreement, (Pre-Existing Business) is not subject to the exclusive distributorship arrangement described in Section IX A. of this Exhibit, whether or not such Pre-Existing Business falls within the definition of the Program business. All renewals and endorsements, relating to such Pre-Existing Business, will be processed by COMPANY in the normal manner of transacting such business.

X.    PROPRIETARY INFORMATION

If and to the extent that AGENT shall, in connection with this Underwriting Authority and/or the Agency Agreement to which this Underwriting Authority is attached, come into possession of any information, business or technology of COMPANY which is not known to the public, AGENT shall treat such information as confidential and not to disclose such information to any person, entity or group not a party to this Agreement.

Underwriting Authority - Massamont Insurance Agency, Inc - 6/19/01    6

Exhibit C

## CORPORATE GUARANTEE

Massamont Insurance Agency, Inc., ("AGENT") has been appointed an agent of COMPANY in accordance with the Agency Agreement by and between Massamont Insurance Agency, Inc. and the ACE USA Property & Casualty companies designated therein, effective January 1, 2001 to which this Guarantee is attached. The words "COMPANY" and "AGENT" as used herein shall have the same meaning as in the Agency Agreement.  Furthermore, it is to the advantage of undersigned Guarantor ("GUARANTOR") to have AGENT represent COMPANY pursuant to the terms of the Agency Agreement.

Now therefore, in order to induce COMPANY to enter into the Agency Agreement, GUARANTOR does hereby guarantee to COMPANY prompt and full payment of all indebtedness, which may hereafter accrue, from AGENT to COMPANY under the Agency Agreement, including any amendments thereto.  In the event that AGENT fails at any time or times to pay when due any and all indebtedness which may accrue from AGENT to COMPANY under the Agency Agreement, GUARANTOR promises to pay any and all such indebtedness forthwith, upon demand, with all attorney's fees incurred in enforcing payment under this instrument.

GUARANTOR may terminate this Guarantee as to future indebtedness and acts by giving written notice of such termination to COMPANY by certified or registered mail not less than one hundred eighty (180) days prior to termination.  Such termination shall not affect acts occurring before, or indebtedness already incurred, at the time of COMPANY's receipt of said notice.

Notice of the incurring of debt by AGENT to COMPANY is hereby waived.

GUARANTOR hereby waives notice of non-payment of any items of indebtedness held or hereafter held by COMPANY against AGENT and notice of extension of time for payment.  GUARANTOR further waives all rights that GUARANTOR may have to require COMPANY to exhaust any other rights or remedies that it may have against AGENT prior to exercising its rights under this Guarantee.  GUARANTOR hereunder is bound to the payment of any and all indebtedness of AGENT to COMPANY as fully as if such indebtedness was directly owed to COMPANY by GUARANTOR.

GUARANTOR agrees that the balance due and unpaid at any time from AGENT to COMPANY as shown on COMPANY's books shall be accepted as conclusive evidence of the amount of such indebtedness owed by AGENT to COMPANY and shall not be disputed or questioned by GUARANTOR.  GUARANTOR waives any defense that AGENT may have against COMPANY other than the payment of the indebtedness. GUARANTOR hereby for itself and for its successors and assigns waives all defenses available at law or in equity other than the payment of the indebtedness.

Demand for payment hereunder shall be sufficient if sent by certified or registered mail to GUARANTOR to the following address, or as otherwise designated by GUARANTOR.

Knapp Schenck & Company Insurance Agency, Inc.
240 Lewis Wharf
Boston, MA 02110

This Guarantee shall extend to and bind the successors and assigns of GUARANTOR and shall inure to the benefit of COMPANY and its successors and assigns.

In witness whereof, GUARANTOR has caused this Guarantee to be signed by its authorized representative this day of ___10|1_____, 2001.

GUARANTOR
Knapp, Schenck & Company Insurance Agency, Inc .

Witness: _Hihut Schr_____

By: _____(Seal)
Its: _Presiden_____

UTICA 01899

Exhibit E

CONTINGENT COMMISSION AGREEMENT

FOR

The Massamont Metrogard and Diplomax Program

Between

The ACE USA Companies designated herein
Hereafter collectively referred to as "COMPANY"

and

Massamont Insurance Agency, Inc.
(referred to as "AGENT")

Effective: January 1, 2001

I.      GENERAL

CCA 2000 12-15-99

WF000661

A. The terms "COMPANY" and "AGENT" shall have the same meanings in this Contingent Commission Agreement (AGREEMENT) as in the Agency Agreement to which this AGREEMENT is attached and is incorporated by this reference.

B. This AGREEMENT pertains to Program Business only. AGENT must write a minimum of **$15,000,000** of gross written premium of Program Business in a Plan Year with a minimum annual gross written premium growth rate of 5% to be eligible to earn a contingent commission for that Plan Year.

II.   **DEFINITIONS**

As used in this AGREEMENT, the following terms will have the meanings shown:

A. <u>Bulk Reserve Factors</u>, referred to in Section VI., mean factors COMPANY establishes, by major line of business, which represent or which provide for changes in incurred/reported losses and incurred but not reported losses. These factors will be established for each Evaluation Date occurring fifteen (15), twenty-seven (27), thirty-nine (39), fifty-one (51) and sixty-three (63) months after the beginning of each Plan Year covered by this AGREEMENT.

B. <u>Net Earned Premium</u> means premium earned during a Plan Year on Program Business, net of reinsurance purchased by COMPANY for Program risks, as covered by this AGREEMENT as reported on COMPANY=s books and records.

C. <u>Evaluation Date</u> means the date when COMPANY calculates AGENT=s contingent commission payable for a particular Plan Year, as described in Section VII. of this AGREEMENT.

D. <u>Net Accident Year Losses and Loss Expenses</u> means:

    1)    Losses, with the date of loss occurring in a Plan Year covered by this AGREEMENT, net of reinsurance recoveries, arising from Program Business, including paid losses and reserves for outstanding losses;

    2)    Less salvage and subrogation recoveries;

    3)    Plus allocated loss adjustment expenses incurred or reserved by COMPANY in connection with losses on Program Business written by AGENT;

    4)    Plus bulk reserves attributable or allocated to Program Business written by AGENT and which are listed in Schedule I, attached.

E. <u>Loss Ratio</u> means the ratio calculated by dividing Net Accident Year Losses and Loss Expenses by Net Earned Premium.

F. <u>Open Plan Year</u> means each twelve (12) month period during the course of this AGREEMENT, commencing January 1 and ending on December 31, for which Net Accident Year Losses and Loss Expense, related to that Plan Year, will continue to be evaluated as part of this AGREEMENT.

G. <u>Plan Year</u> means each twelve (12) month period during the course of this AGREEMENT, commencing January 1 and ending on December 31.

CCA 2000 12-15-99

WF000662

H. <u>Program Business</u> means all insurance business written by COMPANY through AGENT as defined in the Agency Agreement for the <u>Massamont Metrogard and Diplomax</u> Program between COMPANY and AGENT and other insurance business written through COMPANY=s Special Programs Department, and as recorded on COMPANY=s books and records.

III. **CONTINGENT COMMISSION CALCULATION**

A. To calculate contingent commission for a Plan Year, COMPANY will:

1. Determine AGENT=s Loss Ratio for Program Business.

2. If the Loss Ratio for Program Business for any Plan Year is below <u>57.9%</u>, then the AGENT will earn contingent commissions equal to the product of 50% of each percentage point the Loss Ratio is below <u>57.9%</u> and Net Earned Premium.

3. If the Loss Ratio for Program Business for any Plan Year is above <u>57.9%</u>, then AGENT will generate a contingent commission deficit equal to the product of 50 % of each percentage point the Loss Ratio is above <u>57.9%</u> and Net Earned Premium.

4. The result of these calculations may be either positive or negative.

5. Notwithstanding the above formula, the maximum contingent commission that can be earned in any Plan Year by AGENT is 5% times Net Earned Premium. The maximum profit share is earned by a Loss Ratio of <u>57.9%</u>.

B. To calculate total contingent commission earned for all Open Plan Years, COMPANY will add AGENT=s contingent commission earned for each Open Plan Year as of the annual Evaluation Date. The result of these calculations may be either positive or negative. The net amount earned will be the aggregate contingent commission earned.

IV. **CONTINGENT COMMISSION PAYMENTS**

A. Contingent commission earned in a Plan Year will be paid to AGENT over a three year period, unless this AGREEMENT is terminated earlier pursuant to Section X. AGENT will be paid thirty three percent (33%) of the contingent commission earned for a Plan Year as of the first Evaluation Date; sixty-seven percent (67%) of the contingent commission earned for that Plan Year as of the second Evaluation Date and one hundred percent (100%) of the contingent commission earned for that Plan Year as of the third, fourth and fifth Evaluation Dates. All contingent commission payments will be reduced by contingent commissions previously paid or offset for that Plan Year.

B. Each Plan Year covered by this AGREEMENT will be calculated separately, but the results of the calculations will be added together to result in one payment which is the aggregate contingent commission payable.

C. COMPANY will pay AGENT the aggregate contingent commission payable for all Open Plan

CCA 2000 12-15-99

3

WF000663

Years by June 30 of the following calendar year.

## V.    CONTINGENT COMMISSION PAYMENT SETOFF

A.    If the calculation of AGENT=s contingent commission payable for a Plan Year results in a negative amount, the negative amount for that Plan Year will be offset against positive amounts, if any, for other Open Plan Years. The result of this calculation will be the aggregate contingent commission payable due AGENT.

B.    If the calculation of AGENT=s aggregate contingent commission payable for Open Plan Years results in a negative amount, then AGENT shall not be paid any contingent commissions as of that Evaluation Date.

C.    The setoff of the negative contingent commission amounts discussed above against positive contingent commission amounts will occur commencing with the earliest Open Plan Years and proceed from the earliest to the most recent Plan Year.

D.    AGENT grants to COMPANY the right to deduct any amounts AGENT owes COMPANY under other agreements, outstanding balances, or other amounts due COMPANY or any other company with whom COMPANY is affiliated, before paying AGENT any contingent commissions.

## VI.    SOURCE OF DATA FOR CALCULATING CONTINGENT COMMISSION PAYMENTS

COMPANY=s books, records, accounting procedures and methods, and other procedures, will be used to determine and calculate gross written premium and Net Earned Premium, Net Accident Year Losses and Loss Expenses and Bulk Reserve Factors, and will be otherwise used to determine and calculate contingent commission. Bulk Reserve Factors for the current Plan Year are listed in Schedule I. The factors contained in Schedule I, and the Loss Ratio, may be changed annually by COMPANY.

## VII.    WHEN DATA IS EVALUATED

A.    The loss data used to calculate contingent commissions will be first evaluated fifteen (15) months after the beginning of each Plan Year and each March 31 thereafter until the Plan Year closes or unless this AGREEMENT terminates in which case loss data used to calculate contingent commissions shall be in accordance with Section X.D. of the AGREEMENT. For example, Plan Year 2000 will be evaluated as of March 31, 2001, March 31, 2002, March 31, 2003, March 31, 2004 and March 31, 2005. In 2005, a final contingent commission calculation will be made for Plan Year 2000.

B.    Each successive calculation of a Plan Year's contingent commission replaces the prior calculation for that Plan Year. Therefore, the total contingent commission earned for a Plan Year may change, upward or downward, as losses develop over time, reserves change, etc. After five (5) years, however, COMPANY will close a Plan Year and any further loss development will have no affect on contingent commissions for that Plan Year. A Plan Year may be closed earlier upon the termination of this AGREEMENT in accordance with Section X.

## VIII.    NOTIFICATION

CCA 2000 12-15-99

4

WF000664

Any notice required under this AGREEMENT will be in writing and will be given personally, or by registered or certified mail, sent or delivered to the following addresses:

To AGENT:

To COMPANY:    ACE USA
1601 Chestnut Street, TL34K
P.O. Box 41484
Philadelphia, PA 19101-1484
Attn: V.P.Operations & Administration, Special Programs

IX.    **FULL AGREEMENT**

This AGREEMENT supersedes and makes null and void any and all previous agreements covering this subject matter, whether written or oral, between AGENT and COMPANY or AGENT=s or COMPANY=s predecessors with respect to contingent commission. This AGREEMENT constitutes full agreement between AGENT and COMPANY on this subject matter. No amendment to this AGREEMENT will be valid unless it is in writing and signed by the parties, except COMPANY may change Schedule I and Loss Ratio of this AGREEMENT without AGENT=s consent. Such changes must be made and communicated to AGENT, in writing, prior to the beginning of a Plan Year. Schedule I attached, forms a binding part of this AGREEMENT.

X.    **TERM AND TERMINATION**

A.    This AGREEMENT shall begin January 1, 2001 and end December 31, 2001 and shall automatically renew for one year terms unless the Agency Agreement between AGENT and COMPANY terminates, or unless either party notifies the other of its intention not to renew this AGREEMENT. Notices by either party not to renew the AGREEMENT must be given by December 1 of a Plan Year.

B.    COMPANY shall provide AGENT written notice of any changes to this AGREEMENT, except for COMPANY=s right to revise Schedule I, and the Loss Ratio, per Section VI., prior to the beginning of the Plan Year in which the changes are to become effective.

C.    This AGREEMENT will automatically terminate as of December 31 following the termination or non-renewal of the Agency Agreement between AGENT and COMPANY or following any other termination of this AGREEMENT pursuant to Section X.A. above. This AGREEMENT shall not apply to any years after such termination, and such years shall not be considered Plan Years for the purposes of this AGREEMENT and AGENT shall not be entitled to any contingent commission for such years.

D.    Upon termination of this AGREEMENT, a final calculation for each Plan Year covered by this AGREEMENT, for which a final calculation has not been previously made, will be made.

1.    If this AGREEMENT or the Agency Agreement to which this AGREEMENT is attached

CCA 2000 12-15-99

5

WF000665

terminates prior to July 1 of any Plan Year then the final calculation for all Open Plan Years will be made in accordance with the Evaluation Dates contained in Section VII.

2.    If this AGREEMENT or the Agency Agreement to which this AGREEMENT is attached terminates subsequent to June 30 of any Plan Year then the final calculation for all Open Plan Years will be made using loss data as of June 30, of the calendar year following the year in which this AGREEMENT terminates. Final contingent commission payment, if any, shall be made to AGENT by September 30 of the calendar year following the year in which this AGREEMENT terminates.

XI.    **ASSIGNMENT**

AGENT may not assign, sell, or otherwise transfer this AGREEMENT or any rights AGENT has to any payments without COMPANY=s prior written approval. If COMPANY does not give AGENT approval, COMPANY will not be bound to make any payments other than to AGENT whether or not COMPANY has received notice of any other claims.

XII.    **SETTLEMENT AND ARBITRATION**

A.    It is understood that this AGREEMENT is made in good faith and should there arise from any unforeseen cause, a difference of opinion or of interpretation of this AGREEMENT which cannot be settled amicably between the parties, such differences or interpretations shall be submitted to the decision of a Board of Arbitration composed of two (2) arbitrators and an umpire meeting in Philadelphia, Pennsylvania.

B.    The members of the board of arbitration shall be active or retired disinterested officials of insurance or reinsurance companies or agencies. COMPANY and AGENT shall each appoint an arbitrator, and the two arbitrators shall choose an umpire before instituting the hearing. If the respondent fails to appoint its arbitrator within sixty (60) days after being requested to do so by the claimant, the latter shall also appoint the arbitrator. If the two arbitrators fail to agree upon the appointment of an umpire within four (4) weeks after their nominations, each of them shall name three (3), of whom the other shall decline two (2) and the decision shall be made by drawing lots. The claimant shall submit its initial brief in twenty (20) days thereafter, and the claimant may submit a reply brief within ten (10) days after filing of the respondent's brief.

C.    The board shall make an award with regard to the custom and usage of the insurance and reinsurance business. The board shall issue its award in writing based upon a hearing at which evidence may be introduced without following strict rules of evidence but in which cross-examination and rebuttal shall be allowed. The board shall make its award within sixty (60) days following the termination of hearings unless the parties consent to an extension. A decision by the majority of the members of the board shall become binding upon all parties to the proceeding.

D.    Each party shall bear the expense of its appointed arbitrator and shall jointly and equally bear with the other party the expense of the umpire. The remaining costs of the arbitration proceeding shall be allocated by the board.

CCA 2000 12-15-99

WF000666

AGENT and COMPANY have signed this AGREEMENT to show that both fully accept the terms of this AGREEMENT and intend to be legally bound by these terms.  AGENT and COMPANY both represent and warrant to the other that AGENT=s and COMPANY=s undersigned officers have the power and authority to enter into and perform this AGREEMENT.  AGENT and COMPANY further represent and warrant to each other that all actions necessary or appropriate for the execution and performance hereof have been taken.

AGENT:                          Massamont Insurance Agency, Inc.

Date: __10|1|01__        By: ____Hibt Schr____ (L.S)

                                Name: Hilbert Schench

                                Title: President


COMPANY:                        FOR THE COMPANIES DESIGNATED BELOW:

Date: __10/22/01__       By: _Michael J. Car_ (L.S)

                                Name: Michael J. Carr

                                Title:  Assistant Vice President

                                Westchester Fire Insurance Company

CCA 2000 12-15-99

**WF000667**

# CONFIDENTIALITY AGREEMENT

CONFIDENTIALITY AGREEMENT made as of 12|1 , 2000 by and between Knapp Schenck Strategic Markets ("Agent"), a Massachusetts corporation with its principal place of business in Boston, Massachusetts and Westchester Fire Insurance Company, a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania (hereinafter "WFIC").

WHEREAS, Agent and WFIC ("the Parties") wish to exchange and review certain confidential information regarding the New England Municipal & School Program ("the Program"); and

WHEREAS, in order to facilitate the Agent in fulfilling the obligations under the Program, WFIC may disclose certain information, including without limitation, underwriting and operational guidelines of WFIC and WFIC's administrative, financial or marketing activities, all of which information disclosed to Agent, in connection with the Program is hereinafter referred to as the "WFIC Information"; and

WHEREAS, Agent may disclose to WFIC certain confidential and proprietary information concerning business affairs, including without limitation, underwriting operations, actuarial projections and financial results, all of which information disclosed to WFIC in connection with the Transaction is herein referred to as "Agent Information";

WHEREAS, such Agent Information or WFIC Information, whether provided before execution, upon execution of this Agreement or subsequently, shall include not only written materials but also information transferred orally, visually, electronically or by other means (and any copies of the foregoing), which information is hereinafter referred to collectively as the "Information";

NOW THEREFORE, effective immediately, in consideration of being provided with the Information, both parties agree with respect to the Information received that:

1. Each will hold the Information received from the other party in strict confidence and will not disclose any Information other than to its respective directors, officers, employees, affiliates and professional advisors and reinsurers (hereinafter, collectively, the "Representatives") who need to know such Information for the purpose of fulfilling the obligations under the Program (it being understood that such Representatives will be informed of the confidential nature of the Information and will be directed by it to treat such Information confidentially and in accordance with the terms of this Agreement, and that each party shall be responsible for the compliance by its Representatives with the terms of this Agreement).

2. Neither the Agent nor WFIC will use any of the Information for any purpose other than to fulfill the obligations under the Program without the prior written authorization of the other party.

3. The Agent and WFIC will maintain the nature of the Information in strict confidence and will not disclose the same other than as set forth herein.

4. If the parties terminate the Program, any party will upon the request of another party return to the other party all of the Information received and all copies, extracts or other reproductions in whole or in part thereof.

5. In the event that the Agent or WFIC become legally compelled (whether by court or regulatory order or otherwise) to disclose any of the Information received from another party, they will provide the other party with prompt notice so that the other party may seek a protective order or other appropriate remedy. In the event that such a protective order or other protective remedy is not obtained, the Agent or WFIC, as the case may be, will furnish only that portion of the Information which, in the opinion of its own counsel, is legally required.

6. This Agreement shall not apply to any Information or materials which were in the Agent or WFIC's possession prior to the date of this Agreement (other than any Information, as defined in this Agreement, previously given by one party to the other party). This Agreement shall not apply to Information received by Agent or WFIC or any of their respective Representatives from a third party who is not a party to this Agreement.

7. This Agreement shall be binding upon the parties hereto and upon their respective successors and assigns.

8. This Agreement shall be governed for all purposes by the laws of the State of Pennsylvania and the parties hereto do irrevocably submit to the non-exclusive jurisdiction of the Courts in the State of Pennsylvania and to the extent permitted by law the parties expressly waive all rights to challenge or otherwise limit such jurisdiction.

9. If any provision of this Agreement is declared void or otherwise unenforceable, such provision shall be deemed to have been severed from this Agreement, which shall otherwise remain in full force and effect.

10. No failure or delay by a party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

11. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute the same agreement.

2

UTICA 01901

12. This Agreement constitutes the entire and complete Agreement between the parties and may not be changed or amended, nor may any of the rights hereunder be waived, except by a writing signed by the party to be changed.

13. Any notice or other communication required to be given hereunder shall be effective only if in writing and shall be deemed sufficiently given only if sent to the respective address shown below unless a change in address is received by the notifying party.

> Westchester Fire Insurance Company
> c/o ACE USA
> Attn: Michael Carr
> Six Concourse Parkway, Suite 2500
> Atlanta, Georgia 30328
>
> Knapp Schenck Strategic Markets
> Attn: Van Schenck
> 240 Lewis Wharf
> Boston, MA 02110

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto by their duly authorized representatives as of the day and year first above written.

WESTCHESTER FIRE INSURANCE COMPANY

By: _____

Name: Michael Carr
Title: Vice President
Date: 12/1/00

KNAPP SCHENCK STRATEGIC MARKETS

By: _____

Name: Van Schenck
Title: Managing Director
Date: 12/1/00

UTICA 01902

## AMENDMENT TO AGENCY AGREEMENT

This Amendment ("Amendment") to the Agency Agreement ("Agreement") which became effective January 1, 2001, by and between the ACE Property and Casualty Companies designated below ("Company") and Massamont Insurance Agency, Inc. ("Agent"), amends the Agreement as follows.

Section II. of the Agreement is amended as follows:

## II.    TERM OF AGREEMENT

This AGREEMENT shall be effective commencing January 1, 2001 and continue until December 31, 2003 or until terminated pursuant to Section VIII B, C and D of this AGREEMENT. COMPANY agrees to offer insurance coverage for PROGRAM subject to the following conditions:

    1.   The PROGRAM meeting a targeted Gross Loss Ratio of 57.9% annually. Gross Loss Ratio will be determined in accordance with Exhibit D.

    2.   COMPANY securing appropriate reinsurance coverage.

The agreement is subject to AGENT agreeing not to seek another company to write the PROGRAM during this period.

All other terms and conditions of the Agreement remain unchanged.

The parties, intending to be bound, have caused this Amendment to be signed by their authorized representatives as of ___10/22/01___.

AGENT:                    Massamont Insurance Agency, Inc.

By: _Hilbert Schenck_
Name: Hilbert Schenck
Title: President

COMPANY:                  FOR THE COMPANIES DESIGNATED BELOW:

By: _Michael Carr_
Name: Michael Carr
Title: Assistant Vice President

Westchester Fire Insurance Company

WF003446

# TABLE OF CONTENTS

*5/4/01*

**1) Binding Authority Philosophy**

**2) Underwriting**
   a.  Underwriting Authority
   b.  Terms & Conditions
   c.  Pricing Guidelines
   d.  Underwriting Guidelines

**3) Operating Procedures**
   a.  Referral Procedures
   b.  Claims Handling Procedures
   c.  Audit Procedures

UTICA 01904

BINDING AUTHORITY OF    ATIONAL AND ADMINISTRATIVE MA    AL

# PHILOSOPHY

A major focus of Affinity Market's strategy is the establishment of binding authority arrangements. We are looking to partner with organizations that value our franchise and share our commitment to achieving an underwriting profit.

There are several factors that have been incorporated into our agreements that, we believe, will assist in the overall success and profitability of our binding authority contracts. These factors include:

- Underwriting authority that is assigned to an individual, who will be accountable for the bottomline results
- Policy and coverage limits of liability that are large enough to encompass the vast majority of our targeted business segment
- Broad underwriting and flexible pricing guidelines that will enable the binding authority underwriter to use their expertise in responding to the individual risk characteristics of each account

**The key to the long-term success to this agreement, is the expertise and sound business judgment of the binding authority underwriter. It is critical, that this individual maintains a strong underwriting discipline in the risk selection and pricing process. While we have provided broad underwriting guidelines to assist the binding authority underwriter, they should be viewed as minimum requirements. Each risk must be analyzed and evaluated based on its unique and distinct risk characteristics. Even if a risk does not violate any specific underwriting guideline, it is imperative that each account written, also meets the high standards set by the binding authority underwriter.**

Affinity Market is committed to working with each of our binding authority partners to build a profitable book of business and enhancing our business relationship. We look forward to a long and prosperous future.

BINDING AUTHORITY OF    ATIONAL AND ADMINISTRATIVE MA    AL

# UNDERWRITING LETTER OF AUTHORITY

This Letter of Underwriting Authority is effective ___1/1/01___ and extended to to HILBERT SCHENCK Van Schenck as a licensed broker who currently is an employee in good standing with Massamont Insurance Agency (MIA).   You are authorized to solicit and accept proposals for, bind and issue insurance on behalf of Westchester Fire Insurance Company (WFIC) for Property, Crime, and Boiler & Machinery coverages for **only** municipalities, and schools AND SIMILAR RISKS CURRENTLY COVERED IN THE PROGRAM subject to all terms, conditions, requirements, procedures, and guidelines, as outlined in this manual.

In passing this authority to you, we encourage and expect you to utilize your underwriting expertise and experience to select and price property accounts, based upon the individual characteristics of each risk.

Your underwriting authority is not transferable, ONLY UPON WRITTEN APPROVAL OF WFIC. WFIC AGREES TO THE ATTACHED UNDERWRITTING AUTHORITY LEVELS OF MASSAMONT EMPLOYEES  UNDERWRITERS Therefore, each file will require THE UNDERWRITERS your signature of approval. You are responsible for insuring that all necessary underwriting information has been obtained, all appropriate documentation is completed, and all parameters of this agreement have been adhered to.

If an account is outside your authority, but has been approved, no additional referral is necessary at subsequent renewals, **unless** there have been MATERIAL   changes to the expiring policy that would in itself require a referral and any change in SOV limits on accounts in excess of $100,000,000. If any changes have occurred, the account must be referred again, as outlined in this manual.  The existing book of business must be referred to the company.

Should you have any questions concerning your underwriting authority, please contact Bill Burkett or Michael Carr in Atlanta.

BINDING AUTHORITY OPE~ ~TIONAL AND ADMINISTRATIVE MAN~`` L

## TERMS & CONDITIONS

| TERRITORY | Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, & Vermont |
|---|---|
| ISSUING COMPANY | • Westchester Fire Insurance Company (Admitted) |
| PROGRAM ELIGIBILITY | Municipalities (County, City, & Towns AND GOVERNMENTAL SUBDIVISIONS) and Educational Services (Primary & Secondary and Colleges & Universities) AND NOT FOR PROFIT ENTITIES -- associated with one of the above |
| LIMITS OF LIABILITY | **PROPERTY:**<br>**FULL or PRIMARY**<br>Total policy limit for all coverages should not exceed $50,000,000 total insured values subject a maximum of $10,000,000 maximum per location.<br>Subject to Sublimits:<br>• $10,000,000 Per Occurrence, A/A FL (Excluding Flood Zone A & V) & EQ<br>• $ 1,000,000 Vacant Building<br>• $ 5,000,000 Increased Cost of Construction<br>• $ 500,000 Underground Property<br><br>**INLAND MARINE:** Subject to the following sublimits that are included within the limits above.<br>• Builder's Risk: $15,000,000<br>• Fire Equipment: $5,000,000<br>• Contractor's Equipment: $250,000 500,000<br>• Band Uniforms: $25,000<br>• Musical Instruments: $25,000 100,000<br>• Account Receivables: $250,000 500,000<br>• Fine Arts: $25,000 50,000 Maximum per item and $250,000 maximum limit<br>• Valuable Papers: $250,000 500,000<br>• Covered Bridges: $250,000<br>• Piers/Wharves: $250,000<br>• Golf Greens: $100,000<br>• EDP: $250,000 500,000<br>• Miscellaneous IM $250,000<br><br>**CRIME**<br>• Blanket Employee Dishonesty: $250,000.<br>   - Loss Inside Money and Securities: $215,000 50,000.<br>   - Loss Outside Money and Securities: $1025,000 50,000<br>• Forgery & Alteration: $250,000<br>• Public Officials Dishonesty: $250,000<br>• Computer Fraud: $250,.000<br><br>**BOILER & MACHINERY**<br>• Policy Limit: Follows Property policy limit for Real & Personal Property up to a maximum of $25,000,000, including:<br>   - Property Damage<br>   - Business Income |

UTICA 01907

BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL

| | |
|---|---|
| | ⁻ Extra Expense: Combined with Business Income<br>⁻ Service Interruption<br>⁻ Perishable Goods<br>⁻ Computer Equipment: $100,000<br>⁻ Demolition and ICC: $200,000<br>⁻ Expediting Expenses<br>⁻ Hazard Substances: $1,000,000<br>⁻ CFC Refrigerant<br>⁻ Newly Acquired Locations |
| **COVERAGE STRUCTURE** | • Full Value ("ground up")<br>• Primary |
| **PROPERTY COVERED** | • Building and Personal Property, Business Interruption, Extra Expense, Inland Marine, CRIME – Subject to Sublimits |
| **PERILS** | • All Risks including Flood and Earthquake, ISO forms<br>**Excluding:** Flood A & V |
| **MINIMUM DEDUCTIBLE** | • $500 AOP – Property, EXCEPT $250 IN ME,NH&VT per expiring<br>• $25,000 Flood<br>• $25,000 Earthquake<br>• $500 Crime<br>• $250 Inland Marine<br>• $1,000 Combined, All Coverages – Boiler & Machinery EXCEPT $500 PER EXPIRING POLICY |
| **VALUATION** | • Replacement Cost<br>• Actual Cash Value<br>• Functional Replacement Cost |
| **MINIMUM PREMIUM** | • Per Policy - $500 |

UTICA 01908

BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL

# UNDERWRITING GUIDELINES

**Procedures:**

1. All accounts must be cleared through the company before quoting.

2. All quotes must be reviewed and signed off by the designated underwriter, as per the Binding Authority Underwriting Letter of Authority.

3. Any risk that is outside the scope of this manual must be referred to the company for additional consideration **before** a quote can be offered.

4. **All policies must have the ACE-Y2K (01-99) endorsement attached.**

**General Requirements:**

1. An application and/or bid specifications must be completed for each **new** risk written and must contain all relevant information necessary to support the underwriter's decision.

2. A Fine Arts schedule is required on schedules that exceed $100,000 with no single item exceeding ~~$25,000~~ $50,000 and the items must be secured. Fine Arts values exceeding $250,000 must be insured outside of the program.

3. Insurance-to-Value analysis should be performed on accounts.

4. Functional replacement cost should be used on historical sites ~~as identified by the Historical Register~~ or replacement cost if the values are validated with an appraisal.

5. No authority is granted for perils other than provided within the approved policy forms.

6. Loss Control inspections should be ordered on key location on all_ bound NEW accounts within 45 days of binding. Loss control visits to all accounts on a three year cycle.

7. Three-year hard copy loss runs, loss history from public bid specifications or a written loss statement from the insured.

8. All accounts with a 3-year loss ratio greater than **60%** is a referral to company.

~~9. If cooking is present, a fully functional and regularly inspected automatic fire extinguishing system must be installed over the entire cooking surface, including hood, duct, and vent.~~

BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL

10.9.   ~~If cooking is present, all filters must be cleaned on a weekly basis, vent and ducts must be cleaned every 3 months, and an automatic fire extinguishing system must be serviced by a licensed contractor, on a semi-annual basis.~~

~~11.~~10.   All electrical wiring must be made of copper.

~~12.~~11. The following classes/exposures are excluded:
- Housing Authorities
- Transmission & Distribution Lines
- Power production facilities
- Stand alone correctional institutions
- Stand alone rolling stocks
- No recycling operations (COLLECTION OPERATIONS WITHOUT PROCESSING ARE INCLUDED IN THE PROGRAM)

UTICA 01910

BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL

# PRICING

## PROPERTY
The Independent Filed Rating must be used to rate accounts and documented in the file.

## CRIME
ISO rating should be utilized.

## BOILER & MACHINERY

| 100% TOTAL INSURABLE VALUE (R&P) | FACTOR PER HUNDRED OF TIV* |
|---|---|
| Up to $5,000,000 | $750 Min. Premium |
| $5,000,001 to $7,500,000 | .018 |
| $7,500,001 to $10,000,000 | .012 |
| $10,000,001 to $15,000,000 | .011 |
| $15,000,001 to $20,000,000 | .010 |
| $20,000,001 to $25,000,000 | .0095 |
| $25,000,001 to $30,000,000 | .0090 |

- *Factors may be deviated by a maximum range of 15% (not applicable to minimum premium)

THESE RATES ARE THE PLUS 6% LEVEL, I THOUGHT IT WAS AGREED THAT THE RATES WOULD BE LEVEL EXCEPT FOR THE ACCOUNT THAT DID NOT RECEIVE A 6% INCREASE IN TIV.

UTICA 01911

BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL

## INLAND MARINE

**Account Receivable★**                                    (Incl. In Plus Form)

$15,000 is included in the Plus endorsement. If a higher limit is desired, rate in excess of $15,000.

Rate            0.20            Minimum Deductible            N/A

**Electronic Data Processing★**                            (Incl. In Plus Form)

A schedule for items with a cost of **$10,000 and over** is required.
Items with a cost **under $10,000** will be included in the blanket limit.
The following is included in the PLUS ENDORSEMENT.

$ 25,000            Hardware
$10,000        Data & Media
$5,000            Extra Expense

1.  Total all excess limits. (Equipment + Data & Media + Extra Expense) = Total Excess limits.
2.  Multiply Total Excess Limits X .40 = EDP Premium

Minimum Deductibles $500 Breakdown; $250 All other Perils

| Optional All Other Perils Deductibles: | $250 | $500 | $1,000 | | $2,500 | $5,000 |
|---|---|---|---|---|---|---|
| Rates: | 0.40 | 0.37 | 0.34 | | 0.32 | 0.30 |

EDP BII IS MISSING  Use same as direct damage

UTICA 01912

BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL

Optional Coverages:    **NO CREDIT APPLIES TO THE FOLLOWING OPTIONAL COVERAGES.**

1. Earthquake - EQ zone 4 or 5
   Standard Rate        .03 X's Total limits
   Zone 4 or 5 Rate     .015 X's Total limits

2. Flood - Rate .05 X's Total limits

3. Off Premises Utility Interruption  **(If we are also providing Flood and EQ,**
   **Then increase the rates below by 10%)**
                        Rate .03

4. State of the Art Replacement Value - Use the desired RC limit, X's the new RC limit.

5. Hard-Copy Info Extension Endorsement - Use Bldg. & Cts. Rate X's the limit for
   each location.

6. Customer Accounts Receivable Endorsement - Use 25% of EDP rate or min. rate of .03 or
   $100 min. premium.

**Computer Fraud★**

| LIMIT | | PREMIUM | |
|---|---|---|---|
| $ | 1,000 | $ | 24. |
| $ | 2,500 | $ | 30. |
| $ | 5,000 | $ | 35. |
| $ | 7,500 | $ | 41. |
| $ | 10,000 | $ | 47. |
| $ | 15,000 | $ | 54. |
| $ | 25,000 | $ | 70. |
| $ | 50,000 | $ | 96. |
| $ | 100,000 | $ | 133. |

DEDUCTIBLE OPTIONS:

| Deductible | | Multiplier |
|---|---|---|
| $ | 0 | 1.00 |
| $ | 100 | .95 |
| $ | 250 | .94 |
| $ | 500 | .93 |
| $ | 1,000 | .90 |

**Fine Arts★**

   $1,000 Per Item / $15,000 Per Occurrence is included in the Plus endorsement.
   If a higher limit is desired, rate the excess limit of $1,000 Per Item / $15,000 Per Occurrence

   Rate        0.45            Minimum Deductible          $250

UTICA 01913

**BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL**

| | | | |
|---|---|---|---|
| Optional Deductibles: | $500 | $1,000 | |
| Rates | 0.42 | 0.38 | |

## Valuable Papers*

$15,000 is included in the Plus endorsement. If a higher limit is desired, rate for the excess limit of $15,000.

| Rate | 0.70 | | Minimum Deductible | | $250 |
|---|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Optional Deductible Rates: | $500 0.65 | $1,000 0.60 | $2,500 0.55 | $5,000 0.50 |

## Contractors Equipment*

| Rate | 0.65 | | Minimum Deductible | $250 |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Optional Deductible Rates: | $500 0.60 | $1,000 0.55 | $2,500 0.52 | $5,000 0.49 |

Optional Coverages:    Use rates above for additional exposure.

| | |
|---|---|
| Valuation Changes | Borrowed Equipment |
| Loss of Income | Contingent Leased & Rented |
| Combination Endt. | Leased or Rented Equipment |
| Territory Extension | Rental Expense |

Employee's Tools
Multiply the following rate per 100 of limit desired.

| | | | |
|---|---|---|---|
| Optional Deductibles: | $100 | $250 | $1,000 |
| Rates: | 4.00 | 2.00 | 1.25 |

## Cameras, Projection Machines, Films, etc.*

| Rate | 0.80 | | Minimum Deductible | $250 |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Optional Deductible Rates: | $500 0.75 | $1,000 0.70 | $2,500 0.67 | $5,000 0.65 |

## Special Floater*

| Rate | 1.50 | | Minimum Deductible | $250 |
|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Optional Deductible Rates: | $500 1.40 | $1,000 1.28 | $2,500 1.20 | $5,000 1.13 | $10,000 1.07 |

## Fire Department Trucks*

UTICA 01914

BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL

**(Use replacement values not agreed values Fire Trucks only.**

| Rate | 0.45 | | | Minimum Deductible | $250 | |

| Optional Deductible Rates: | $500 0.43 | $1,000 0.40 | $2,500 0.37 | $5,000 0.34 | $10,000 0.30 |

## Fire Department Equipment*

| Rate | 0.65 | | | Minimum Deductible | $250 |

| Optional Deductible Rates: | $500 0.63 | $1,000 0.60 | $2,500 0.55 | $5,000 0.45 |

## Police Equipment*

| Rate | 0.45 | | | Minimum Deductible | $250 |

| Optional Deductible Rates: | $500 0.43 | $1,000 0.40 | $2,500 0.35 | $5,000 0.25 |

## Golf Course Greens Coverage*

| Rate | 0.75 | | Minimum Deductible | $1,000 |

.75 X Value of Greens per 100 X # of Greens = Greens Coverage Premium

| Optional Deductible Rates: | $2,500 0.72 | $5,000 0.67 | $10,000 0.60 |

## Boats*

Refer to **SPECIAL FLOATER** Section

## Covered Bridges*

Refer to **SPECIAL FLOATER** Section

Only the structure above the road surface can be covered

UTICA 01915

BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL

| NEED THE DEDUCTIBLE OPTIONS IN THE RULES | $1,000 | 1.00 |
|---|---|---|
| | $2,500 | .93 |
| | $5,000 | .86 |
| | $10,000 | .80 |
| | $25,000 | .75 |

**Builder's Risk\***

**"Annual" Rates for a project**

| Construction | Protection class | | | |
|---|---|---|---|---|
| | 1-4 | 5-6 | 7-8 | 9-10 |
| Fire Resistive | .05 | .065 | .08 | .10 |
| Masonry NC | .075 | .10 | .125 | .15 |
| Masonry | .10 | .125 | .15 | .20 |
| Frame | .15 | .175 | .20 | .25 |

**Optional Coverages\***

| Flood | $25,000 deductible | .015 | | |
|---|---|---|---|---|

| Earthquake | $25,000 deductible | Frame or steel | Reinforced Concrete or steel | Other |
|---|---|---|---|---|
| | | .012 | .018 | .05 |

Transit    $1,000 deductible

| | First | $50,000 | .50 | = | $250 |
|---|---|---|---|---|---|
| | Next | $50,000 | .30 | = | $150 |
| | Next | $150,000 | .15 | = | $225 |

Soft costs - use the applicable building rate

| Monthly Limitation | Factor |
|---|---|
| 1/3 | 1.85 |
| ¼ | 1.50 |

UTICA 01916

BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL

| | |
|---|---|
| 1/6 | 1.15 |
| 1/9 | 0.90 |
| 1/12 | 0.75 |

### Flood & Earthquake (Excluding Flood Zone A & V).

Note: $15,000 (Surface Water) is included in the Plus form. If more than $15,000 requested, Rate for the **entire** amount.

| | | Deductibles | |
|---|---|---|---|
| Limits | | $25,000 | $50,000 |
| $ | 1,000,000 | 0.010 | 0.0075 |
| $ | 2,000,000 | 0.0125 | 0.010 |
| $ | 5,000,000 | 0.015 | 0.0125 |

Multiply rate per 100 of the Building & Contents limit.

Example: 50,000,000 total values with 2 mill Flood & Quake requested (25,000 ded) Take per 100 values of 50,000,000. Or 500,000. X .0125 = $6,250 premium. Flood alone is 1/3 and Earthquake 2/3 of above rates.

### Vacant Properties*

Valuation - ACV

**Coinsurance - 80%**
Deductible minimum should be no less than policy deductible

FIRE & EC RATES (per 100)

| Deductible | Protection class | | |
|---|---|---|---|
| | 1-4 | 5-8 | 9-10 |
| 1% | 1.50 | 2.40 | 3.00 |
| 2.5% | 1.20 | 1.90 | 2.40 |
| 5.0% | 0.90 | 1.40 | 1.80 |
| 10% | 0.50 | 0.80 | 1.00 |

VM&M RATES (per 100)

| | | | |
|---|---|---|---|
| 1% | 0.50 | 0.80 | 1.00 |
| 2.5% | 0.40 | 0.65 | 0.80 |
| 5.0% | 0.30 | 0.45 | 0.60 |
| 10% | 0.15 | 0.25 | 0.30 |

ADJUSTMENTS

| Construction | | Factor |
|---|---|---|
| | Frame | 1.00 |
| | Masonry | .90 |
| | Masonry NC | .75 |
| | Fire Resistive | .60 |
| Sprinklered | | .75 |
| Watchman | | .75 |

UTICA 01917

**BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL**

Schedule Credits                               .50 - 1.25

Maximum combined modification allowed          75%


**Ordinance or Law Coverage**                         (Incl. In Plus Form)
    Note: The coverages can only apply as follows
      -   A only
      -   C only
      -   A & B
      -   A, B and C

    -Coverage A  Loss To The Undamaged Portion Of The Building
        **Included** in the Plus endorsement, up to the building limit.
    -Coverage B  Demolition Cost Coverage
        **Included** in the Plus endorsement, up to the building limit.
    -Coverage C  Increased Cost of Construction
        Multiply the building rate per 100 of the limit requested.


**SBP Legal Liability (Property perils not GL form).**

    Multiply the building rate per 100 of the limit requested.


**Appurtenant Structures**                            (Incl. In Plus Form)

    $5,000 is included in the Plus endorsement.
    **NO HIGHER LIMITS AVAILABLE**  Must be added as another location on the SOV


**Arson Reward**                                      (Incl. In Plus Form)

    $5,000 is included in the Plus endorsement.
    **NO HIGHER LIMITS AVAILABLE**


**Band Uniforms**                                     (Incl. In Plus Form)

    $10,000 is included in the Plus endorsement. If a higher limit is desired,
    Multiply 1.50 per 100 of the limit requested, in excess of $10,000.


**Crime Reward**                                      (incl. In Plus Form)

    $2,500 is included in the Plus endorsement.
    **NO HIGHER LIMITS AVAILABLE**


**Debris Removal**                                    (Incl. In Plus Form)

    $25,000 is included.

UTICA 01918

**BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL**

Use the building rate to increase to a maximum of $250,000.
*(For Debris Removal coverage in connection with Vacant buildings only use the applicable building rate.)
See **VACANT BUILDING** rating


**Emergency Evacuation Expenses**                    (Incl. In Plus Form)

$5,000 is included in the Plus endorsement.
**NO HIGHER LIMITS AVAILABLE**


**Fire Protection Device Recharge**                    (Incl. In Plus Form)

$5,000 is included in the Plus endorsement. If a higher limit is desired,
Multiply .50 per 100 of the limit requested, in excess of $5,000.
**NOT to exceed a total limit of $25,000**


**Food Product Contamination, Spoilage, Change in Temperature or Humidity**
                                                       (Incl. In Plus Form)
$10,000 is included in the Plus endorsement. If a higher limit is desired,
Multiply .70 per 100 of the limit requested, in excess of $10,000.


**Lock Replacement**                                   (Incl. In Plus Form)

$1,000 is included in the Plus endorsement. If a higher limit is desired,
Multiply .50 per 100 of the limit requested, in excess of $1,000.
**NOT to exceed a total limit of $10,000**


**Loss Data Preparation Costs**                        (Incl. In Plus Form)

$10,000 is included in the Plus endorsement.
**NO HIGHER LIMITS AVAILABLE**

**Personal Effects**                                   (Incl. In Plus Form)

$10,000 is included in the Plus endorsement. If a higher limit is desired,
Multiply the Building rate per 100 of the limit requested, in excess of $10,000.


**Personal Property of Others**                        (Incl. In Plus Form)

$10,000 is included in the Plus endorsement. If a higher limit is desired,
Multiply the Building rate per 100 of the limit, in excess of $10,000.


**Pollutant Clean Up & Removal**                       (Incl. In Plus Form)

$10,000 is included in the Plus endorsement. Rating is available up to

UTICA 01919

BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL

10% of the building and contents limit up to a maximum of $250,000 total.
Multiply .20 per 100 of the limit requested, up to $250,000, in excess of $10,000.
(240,000 + 10,000 = 250,000)

**Surface Water**                                         (Incl. In Plus Form)

Note: $15,000 Surface Water is included in the PLUS endorsement. If more than
$15,000 is requested, separate Flood coverage must be purchase and rated for.
Rate for the entire amount under Flood. (See Flood Section)

**Utility Service – Excluding Overhead Transmission Lines Direct Damage**    (Incl. In Plus Form)

$25,000 is included in the Plus endorsement. If a higher limit is desired,
Multiply .15 per 100 of the limit requested, in excess of $25,000.

**Contingent/Dependent Property**                         (Incl. In Plus Form)

$100,000 is included in the Plus endorsement. If a higher limit is desired,
Multiply the building rate by 2. Multiply that rate per 100 of the limit requested,
rate in excess of $100,000.

~~**Unfinished Stock in Transit**~~                          ~~(Incl. In Plus Form)~~

~~$100,000 is included in the Plus endorsement.~~
~~**NO HIGHER LIMITS AVAILABLE**~~

# *Note: Premium may be modified by multiplying by a .50 credit or a .50 debit

UTICA 01920

BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL

## REFERRAL PROCEDURES

It is expected that there will be occasions where an acceptable account may fall outside the scope of this manual. This does not automatically mean that WFIC is not a market for this business. In these situations, the risk should be referred to the WFIC for further discussion, and final approval. Based on this review, Westchester Fire Lines Insurance Company will determine whether the account fits the appetite and underwriting posture of the company.

If there are mid-term changes that would make the account outside your authority, had the changes been included when the account was originally written, the account should be referred to the company for approval on the renewal.

If an account was referred, approved, and written by WFIC, the account does not need to be referred on each renewal, **unless** there have been <u>MATERIAL</u> changes to the expired policy. If there have been changes to the expired policy, the account must be referred and approved.

If a referral account is subsequently quoted and/or written, WFIC, at it's discretion, will make a final determination as to whether the account is processed and handled within the scope of your Binding Authority or General Brokerage Contract.

Any referral should be submitted and discussed with Michael Carr or Bill Burkett in Atlanta.  A final underwriting decision will be sent in writing to <u>MIA. REFERALS WILL BE ACTED UPON</u>

**BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL**

<u>IN TWO BUSINESS DAYS. ACCOUNTS WILL DEAMED APPROVED IF NOT DECLINED IN THAT TIME FRAME.</u>

# CLAIMS HANDLING PROCEDURES

BINDING AUTHORITY OPERATIONAL AND ADMINISTRATIVE MANUAL

# AUDIT PROGRAM

The audit process is a critical element to the Binding Authority process. We want to take every action necessary to insure the long-term profitability of the program, for the benefit of both parties. The following outlines the audit process and procedure that will be utilized to accomplish this objective.

**Audit Philosophy**
The intent of the audit program is to:
- Insure long term profitability
- Provide feedback to MIA regarding the quality of their underwriting practices and procedures

To accomplish the above objectives, we will focus on the following:
- Adherence to underwriting guidelines and procedures
- Quality of underwriting risk selection and pricing decisions

While it is our intention to utilize objective criteria whenever available, it is understood that any evaluation of quality is a subjective process. However, it will be the responsibility of the audit team to specifically describe any deficiency and give clear examples of expected performance.

**Audit Frequency:**

BINDING AUTHORITY OPER    IONAL AND ADMINISTRATIVE MANU

**Weekly Review:**
Policies written will be forwarded to WFIC on a weekly basis. All files will be given to a designated underwriter to conduct a cursory review. Any concerns will be immediately brought to the attention, and addressed with, the binding authority underwriter.

**On-Site Reviews:**
On-site audits, at the broker's location will be conducted on a quarterly basis.

The audit team will review a representative sample of files that have been processed since the previous audit. An audit worksheet will be completed for each file. Any unacceptable area will be noted and explained on the audit worksheet. All files with a "Unsatisfactory" grading will be reviewed and discussed with the binding authority underwriter; and any corrective action will be decided upon at this time. Once the audit is complete, the Audit Coordinator will summarize the findings from the individual worksheets. The final report will be reviewed by the WFIC Executive and a copy forwarded to MIA's management.

UTICA 01924

**ACE**

ACE Commercial Programs
Routing TL34K
1601 Chestnut Street
Philadelphia, PA 19103
USA
www.ace-ina.com

**Fax Transmissi**

| | |
|---|---|
| To: | From: |
| Van Schenck | William R. Sharp, Jr. |
| cc: | Fax: |
| | 215.640.5472 |
| Company/Department: | Tel: |
| Knapp Schenck Insurance | 215.640.2096 |
| Fax: | Date: |
| 617-742-5973 | January 29, 2003 |
| Tel: | E-mail: |
| | William.Sharp@ace-ina.com |
| Re: | Pages including cover: |
| 2003 Rate Indication – Massamont Program | 5 |

*This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.*

One of the ACE Group of Insurance & Reinsurance Companies

Westchester Specialty.

27

WF001452



ACE
ACE Commercial Programs
Routing TL34K
1601 Chestnut Street
Philadelphia, PA 19103
USA

215.640.2096 *tel*
215.640.5472 *fax*
216-219-3386 *cell*

William.Sharp@ace-ina.com
www.ace-ina.com

**William R. Sharp, Jr.**
*Vice President*

January 29, 2003

Van Schenck
Knapp, Schenck & Company Insurance
240 Lewis Wharf
Boston, MA 02110

Re: Massamont Program – 2003 Rate Indication

Dear Van:

This letter represents the official response to the Massamont Program Renewal Proposal that you submitted to ACE on November 4 (updated November 7), 2002.

I apologize for the delay in our response. We had a lot of data to analyze and reconcile from various sources, and this took longer than expected to complete. In summary, I think it is safe to say that our expectations for future potential profit at existing rate levels are not as optimistic as yours.

Attached is a memo and chart which details the increase we believe necessary to achieve ACE's corporate profit targets. The recommendation from our Actuarial staff is for an increase of 47.4%. As I stated to you on the telephone, the increase necessary can range from 40 to 47% (given that there is some leeway in the numbers, and some art to the actuarial science). The indication detailed on the chart comes with a cover memo explaining the methodology and the key assumptions made in the procedure. We believe it to be a reasonable approach.

In completing this analysis, we assumed no material change to the expense structure that exists for the program today. You had proposed increases in commission, additional fees for claims handling, etc. – we took none of this into account in our work.

I suggest you review this and respond. I would expect that your response would include a counter-proposal, as well as a detailed description of what you believe is possible for the program.

I realize that you are not going to view this as the best of news (to put it mildly), and again apologize for the delay in delivering it to you. It does, however, represent our best assessment of the necessary rate action to ensure future, long-term profitability for the Massamont Program.

If you have any questions, please let me know. I look forward to your reply.

Sincerely,

*Bill*

c: Susan Woodward

*One of the ACE Group of Insurance & Reinsurance Companies*          *Westchester Specialty.*

WF001453



Actuarial
Routing TL34K
1601 Chestnut St
Philadelphia, PA 19103
USA

215-640-4320 *tel*
215-640-5471 *fax*
www.ace-ina.com

Internal
Memorand

*copy to V. Schenck*

To:
Bill Sharp

cc:
Susan Woodward

From:
Tim Duffy

Date:
January 24, 2003

Re:
2003 Knapp Schenck Price Increase Needed

Based upon my review of historical program experience (two prior carriers, as well as ACE 2001 and 2002 experience), I am recommending a 47% pricing increase for this program, excluding any additional amounts we may desire for Terrorism/TRIA. This program has substantial Hurricane exposure per our cat model, and does not appear to have priced adequately for it. In addition, this program has enjoyed relatively good large loss experience relative to both our pricing and our reinsurers' pricing assumptions, likely putting further downward pressure on their charged rates.

The attached exhibit summarizes the program experience, actuarial adjustments and the pricing indication.

I would recommend we focus pricing increases on the larger property schedules, where rates are likely thinner. We should also look at substantially increasing Wind pricing. Finally, this increase could be achieved, in part, through further deductible increases. Suspect though it is, the agent's rate logs show the premium-weighted average renewal deductible at $6,100 versus an expiring average of $4,900. Clearly for many of the sizeable risks, we could get an increase.

Following is further explanation of assumptions and methodology supporting the above indications.

- Direct EP comes from prior submission work developed by Alex Greene for the Knapp Schenck pro forma. I included ACE premiums based on actual booked written, developed by effective date.
- Historical loss information also comes from the original pro forma work, updated with Knapp Schenck's recent submission to us, and with program loss runs as of year-end.
- On-level premium incorporates the two most recent years' of estimated rate changes. The 2001 rate change comes from Knapp Schenck. I estimated the 2002 actual rate change at +5%, based on our year-over-year matched renewal premium increase (+7%). Prior years' rate changes per Knapp Schenck appeared small and not very credible; I assumed no prior rate impacts.
- Ultimate loss ratios were selected using a limited loss approach. Losses are first limited to $1mm and then developed to ultimate. A large loss factor is then applied to bring the losses to policy limits. The large loss factor was selected based on program experience, current reinsurance costs, Property

*One of the ACE Group of Insurance & Reinsurance Companies*



2003 Knapp Schenck % Increase Needed
Page 2
1/29/2003

layering algorithms (applied to the current portfolio) and historical Global Property experience. The selected factor is between historical program experience and our reinsurance costs.
- Ultimate losses have been restated to take into account the effect of changes in deductibles, as noted above.
- Annual net loss trend of 1.0% was assumed.
- Using recently supplied exposure data, an annual hurricane loss cost was developed using cat model output from Eric Rabenold, our catastrophe modeling actuary in Atlanta. In addition, I included 2.5% for EQ risk premium.
- Expenses as a percent of gross premium were assumed to be 32.3%, reflecting both 19.3% commission and the 2.5% to Knapp Schenck for claims adjusting.

WF001455

Knapp Schenck Property -- Gross Rate Indication, excluding Terrorism

| CAY | Earned Premium | On-Level Earned Premium | Incurred+ALAE | Incurred+ALAE Limited to $1 mm Detrended | LDF | Selected Large Loss Factor | Credit for Change in Deductible | Net Trend Factor | Trended Adjusted Ultimate Loss + ALAE | Hurricane & EQ Load ($) | Trended On-Level Ult. L+ALAE Ratio Incl. Cat Load |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1995 | 13,746 | 17,609 | 11,700 | 9,049 | 1.000 | 1.60 | -1.0% | 1.088 | 15,599 | | |
| 1996 | 10,339 | 13,244 ✓ | 8,280 ✓ | 6,466 | 1.000 | 1.60 | -1.0% | 1.077 | 11,037 | | |
| 1997 | 12,599 | 16,139 ✓ | 5,521 ✓ | 5,455 | 1.000 | 1.60 | -1.0% | 1.067 | 9,217 | | |
| 1998 | 14,430 | 18,485 ✓ | 9,631 9/03 | 7,188 | 1.000 | 1.60 | -1.0% | 1.056 | 12,026 | | |
| 1999 | 15,221 | 19,498 | 14,612 ✓ | 8,111 | 1.000 | 1.60 | -1.0% | 1.046 | 13,437 | | |
| 2000 | 15,563 | 19,936 | 9,190 | 8,882 | 1.000 | 1.60 | -1.0% | 1.035 | 14,568 | | |
| 2001 | 18,214 | 22,708 | 9,477 source? | 9,042 | 1.000 | 1.60 | -1.0% | 1.025 | 14,683 | | |
| 2002 | 19,037 | 20,320 | 7,316 smelt from Loss runs | 4,551 | 1.335 | 1.60 | 0.0% | 1.015 | 9,865 | 4,004 | |
| Total | 119,149 | 147,939 | 75,727 | 58,745 | | | | | 100,433 | 2.5% | 87.3% |
| | | | | 39.7% | | | | | | | |

| | Target |
|---|---|
| Target Combined | 91.5% |
| Expenses | 32.3% |
| Target L+ALAE | 59.3% |
| L+ALAE Ratio | 87.3% |
| Rate Indication | 47.4% |

Look at Major Differences in underwriting numbers

1995 On L - Works are w/ for Byrne Thing, what diff element

1998 Losses - I would accept Von's (combined w/ 2 yrs) 14/01 + 9/02

2000 - Need to figure out the Byrne Thing

2001 Losses

2002 Losses

## Sharp, William R

| | |
|---|---|
| **From:** | Sharp, William R TL34K |
| **Sent:** | Tuesday, July 01, 2003 10:41 AM |
| **To:** | Woodward, Susan A TL34K |
| **Subject:** | Massamont |

I just spoke at length to Van Schenck about recent events on this program. I told him I wanted something in writing (e-mail at least) by the end of the day, detailing what he has done.

The bottom line is, effective 7/1/03, they have moved all Massachusetts and Rhode Island business to Axis.

Here is the story (according to Van):

In early April, Axis Capital came to them (at the suggestion of Bill Burkett) with interest in their Municipal property book. Let's remember the management team at Axis — Dennis Reding, Marshall Turner, Carlton Manner, et al. Massamont gave them the profitability history on their book, as well as cat exposure info, etc. They thought chances were slim that they could respond in time for 7/1.

Axis came back with an indication for wind loads far below what we were asking for. Van also checked around in Bermuda to find out what the market price would be on the cat exposure for his book – and found it to be substantially lower than ours. The impression that Massamont was getting from us as well was that we would be just as happy not to write any business on the Cape (which I confirmed was correct – at the completely inadequate premiums that they had been charging).

According to Van, they lost 1/3 of their Connecticut business because of the additional wind premium we were asking for – and he could not allow that to happen in Massachusetts.

In mid-June, Axis came back to them with a full-court press telling them they could get it done for 7/1 business. They worked out the terms of the deal yesterday (6/30).

Other info: compensation-wise (commission and profit sharing), it's basically the same as they have with us. Reinsurance-wise, Axis keeps $25 million in house (supported by in-house treaties) and K/S gets $50MM x $25 MM on an auto-fac treaty.

I'm having Mark run some numbers by state. In-force as of 6/30/03 (so we don't know the effect of 7/1/03 renewal pricing (or lost business) yet), we had 330 policies and $7.7 million in CT, ME, NH, and VT.

That's it for now. I'm awaiting his written notice before doing anything else.



EXHIBIT
Schenck 59
8/3/04    KLm

WF001927



Program Services
Routing TL 34K
1601 Chestnut St.
Philadelphia, PA 19103

215-640-4632 tel
215-640-1571 fax

Bob.Gaffney@ace-ina.com
www.ace-ina.com

Robert J. Gaffney
*Executive Vice President*

**VIA FACSIMILE AND CERTIFIED MAIL**
413-774-3916
July 9, 2003
Mr. Hilbert Schenck
Massamont Agency, Inc.
240 Lewis Wharf
Boston, MA 02110

Dear Mr. Schenck,

This correspondence serves as notice that the ACE USA Property and Casualty Insurance Companies designated below ("Company") elect to terminate the Agency Agreement for the Massamont Metrogard and Diplomax Program covering school and municipal property in New England (the "Program") dated January 1, 2001 and amended October 22, 2001 between Massamont Agency, Inc. ("Agent") and Company. The Agreement between Agent and Company (the "Agreement"), is terminated pursuant to Section VIII.C. 2. of the Agreement effective July 9, 2003. Agent's authority to bind renewal business on behalf of the Company is also terminated effective July 9, 2003. Company will accept renewal business from Agent on a referral basis through September 15, 2003.

Additionally, Massamont is in breach of its Agreement with Company for violating Section IX. B., of the Agreement, as well as the Amendment to the Agency Agreement dated October 22, 2001 which amended the Agreement term and specifically provides that the Agreement is subject to Agent's agreement not to seek another company to write the Program during the amended term.

Agent will have limited authority to service policies of Company written under the Agreement and outstanding on the effective date of termination , (the run-off policies) provided Agent remains current in the payment of all amounts due Company. The limited authority granted to Agent on the run off policies is limited to the following activities:

Agent shall have the authority to process non-premium bearing mid term endorsements as well as Newly Acquired Location endorsements that fall specifically within the Newly Acquired Location clause of the policy. Agent's authority for return/additional premium endorsements is subject to a $1000 maximum limit. Premium endorsements in excess of $1,000 must be referred to the Company for underwriting approval.

Agent must also refer the following endorsements to the Company for underwriting approval: Endorsements that reduce rates, deductibles, add coverages or perils, extend any policy term; including builders' risk insurance policies, and endorsements that fall outside the Newly Acquired Location clause of the policy. Endorsements to increase/decrease insured limits by $1,000,000 or more must be referred.

*One of the ACE Group of Insurance & Reinsurance Companies*



135



Endorsements not specifically addressed herein must also be referred to Company for prior-approval. Agent must also provide policy and payment information in a timely manner to enable Company to effectively issue direct notice of cancellation to Insureds.

In order to retain the limited authority granted herein Agent must cooperate with Company and support the transition of the Program business after the termination of the Agreement. If any provision herein is in conflict with applicable law, such provision will be modified to the extent required to comply with the law.

The limited authority granted herein, including any rights that Agent has to service the run-off policies shall automatically terminate upon the expiration, cancellation or non-renewal of the last of the run-off policies, or upon completion of a final audit or any other endorsements needed on such policies, whichever later occurs. At that time, all policies, forms, and other materials furnished to Agent by Company must be returned to Company.

We appreciate your anticipated cooperation and assistance before and during the termination period. If you have any questions, please do not hesitate to contact me directly.

Sincerely,

Robert J. Gaffney
Executive Vice President

For the Companies Designated Below:

Westchester Fire Insurance Company
Illinois Union Insurance Company

C:    Susan Woodward
      Bill Sharp
      Kathy Morrison

Page 2/2

136



ENTERING
METROGARD
A Community Powered by

*Diplomax*
The Insurance Package for Private Education

*The Insurance Package for
Government Subdivisions*

July 11, 2003

Mr. Robert J. Gaffney
Executive Vice President
ACE Insurance – Program Services
Routing TL 34K -1601 Chestnut Street
Philadelphia, PA 19103



Dear Mr. Gaffney,

We are in receipt of you letter dated July 9, 2003. The letter references two sections of
the Agency agreement as the basis of the termination. The facts do not support
termination of the agreement under either of these sections.

The first section sighted, Section VIII.C.2 allows for the immediate termination of the
agreement if the following event occurs:

   "AGENT assigns, transfers, encumbers or otherwise disposes of this
   AGREEMENT or sells, exchanges, transfers, assigns, merges or consolidates the
   PROGRAM insurance business without giving COMPANY ninety (90) days prior
   notice thereof."

Massamont Insurance Agency, Inc. continues to own and operate the Metrogard and
Diplomax programs. The Agency has not assigned, transferred, encumbered, disposed of,
sold, exchanged, transferred, assigned, merged, or consolidated our interest in the
program with any other entity. Since Massamont is not in violation of this section of the
Agency Agreement, your notice of termination is void and of no effect.

The second section sighted, section IX.B. states that:

   "If Company elects not to write such business, then Agent is granted the right to
   submit such business to other insurance carriers under the same terms and
   conditions as presented to Company."

Massamont offered Ace the Massachusetts and Rhode Island Metrogard and Diplomax
property book under the following conditions:

137

1.  Massamont would have Pricing authority to obtain the 25% rate increase on new and renewal policies.
2.  Massamont would have descression to apply wind deductibles on a voluntary basis to alleviate rate increases.
3.  Massamont would offer Flood coverage to customers outside Federal Flood zones A and V.
4.  Massamont would include $50,000 of Mold coverage on the Plus endorsement.

In each case Ace through their representatives declined to write such coverage under the proposed conditions. Massamont, under the terms of section IX.B offered to an alternative carrier the Policies that Ace had declined to write. The alternate carrier did offer to write the business at the terms offered. Massamont therefore is not in violation of Section IX.B. of the Agreement.

It is Massamont's position that your notification of termination is without cause and therefore subject to 120 days notice requirement under section VIII.A. Section VIII.A. further requires Ace to Give 60 days notice for termination of binding authority on new business. Finally, this section allows for Massamont to place business with another insurer once notice has been received.

Massamont proposes the following accommodation to assist Ace in the transition of this business:

1.  Massamont will refrain from binding Ace to any new business.
2.  Massamont will refer renewals to Ace for approval during the transition process.
3.  Massamont will comply with Ace's request on endorsement referrals.
4.  Massamont will continue to meet its obligations under the Agency Agreement during run-off.
5.  Massamont will endeavor to replace Ace on the remaining business prior to the 120 period.

Massamont will continue to cooperate with ACE, as it has over the last 30 months, subject to the provisions of this letter.

Please feel free to contact me should you have any questions.

Sincerely,

Hilbert Schenck II CPCU
President and General Manager

cc:    Christi Guardiola – Massamont Insurance Agency
       Jim McGonigle – Massamont Insurance Agency
       Steve Goodwin – Burns & Levinson

138



# O'MELVENY & MYERS, LLP

BEIJING
CENTURY CITY
HONG KONG
IRVINE
LONDON
LOS ANGELES

**Citigroup Center**
**153 East 53rd Street**
New York, New York 10022-4611

TELEPHONE  (212) 326-2000
FACSIMILE  (212) 326-2061
www.omm.com

NEWPORT BEACH
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

OUR FILE NUMBER
004,200-374
1465458

October 23, 2003

**VIA FACSIMILE AND CERTIFIED MAIL**

WRITER'S DIRECT DIAL
(212) 326-2189

Mr. Hilbert Schenck II
Massamont Agency, Inc.
240 Lewis Wharf
Boston, MA 02110

WRITER'S E-MAIL ADDRESS
pkoepff@omm.com

Re:    **Westchester Fire Insurance Company v. Massamont**
       **Demand for Arbitration**

Dear Mr. Schenck:

Pursuant to Section XX of the Agency Agreement for the Massamont Metrogard and

Diplomax Program, dated as of January 1, 2001 and as amended October 22, 2001 (the

"Agreement"), we hereby notify you that Westchester Fire Insurance Company, Westchester

Surplus Lines Insurance Company, and Illinois Union Insurance Company (collectively referred

to herein as "Westchester") demand arbitration of their claims against Massamont Agency, Inc.

("Massamont"), as described below. Prior efforts to resolve this matter have failed, and hence

Westchester now pursues its damage claims against Massamont in this arbitration.

Westchester designates Ron Jacks as its arbitrator and encloses a copy of his resume.

Pursuant to Section XX of the Agreement, Massamont is obligated to designate its own arbitrator

within sixty days, after which the two party-designated arbitrators have four weeks to designate

the umpire.

O'MELVENY & MYERS LLP

Mr. Hilbert Schenck II, October 23, 2003 - Page 2

## BACKGROUND

Massamont's Exclusivity Obligation Under
The Agency Agreement

Under the Agreement, Massamont was Westchester's managing general agent for the

Metrogard and Diplomax Program for school and municipal property in New England (the

"Program") and was obligated to perform certain underwriting services. Massamont was

Westchester's exclusive agent for the Program and was not to solicit Program Business from or

place such business with any other insurer, as expressly set forth in Section IX.B. of Exhibit A to

the Agreement:

> During the term of this Agreement AGENT will not solicit for any other
> insurance carrier, except COMPANY, the Program business. If COMPANY
> elects not to write such business, then AGENT is granted the right to submit such
> business to other insurance companies under the same terms and conditions as
> presented to COMPANY.

(emphasis added).

Section VIII.C.2. provides that Westchester could terminate the Agreement immediately

if Massamont:

> assigns, transfers, encumbers or otherwise disposes of this AGREEMENT or any
> interest in this AGREEMENT or sells, exchanges, transfers, assigns, merges or
> consolidates the PROGRAM insurance business without giving COMPANY
> ninety (90) days prior notice thereof.

(emphasis added).

The October 22, 2001 Amendment to the Agreement (the "Amendment") further

provided that the Agreement "is subject to AGENT agreeing not to seek another company to

write the PROGRAM" during the term of the Agreement, which the Amendment extended to

December 31, 2003.

O'MELVENY & MYERS LLP

Mr. Hilbert Schenck II, October 23, 2003 - Page 3

In entering into the Agreement, Westchester relied on Massamont's promise to be the exclusive managing general agent on behalf of Westchester for the Program. To that end, believing that Massamont would continue to act as the exclusive managing general agent in accord with the Agreement, Westchester invested substantial money and effort with respect to the Program. It would not have done so had it known that Massamont would breach Section IX.B. of Exhibit A to the Agreement. Westchester would suffer and did suffer certain damages if the Agreement terminated prematurely.

The Agreement To Increase The Premiums

Prior to February 2003, the premiums on the Program were not sufficient to generate an adequate underwriting profit. As a consequence, Westchester requested that, in the aggregate, the premiums for the Program be raised by 40%. Massamont objected to this 40% increase. Thereafter, on February 24, 2003, Massamont and Westchester agreed that for the coming year, there would be an aggregate 25% increase on new and renewal premiums for the Program, and that for the next year there would be another aggregate premium increase.

There is no dispute that, effective February 24, 2003, under the Program, Massamont was obligated to effectuate an aggregate 25% increase on new and renewal premiums for the Program, including without limitation on any new or renewal policies placed on or after July 1, 2003. Nor is there a dispute that there would be a further aggregate premium increase in the following year.

The April 2003 Audit

In late April, Westchester conducted an audit and found that the deficiencies observed from the previous November audit remained. Among other things, Massamont continued to fail

O'MELVENY & MYERS LLP

Mr. Hilbert Schenck II, October 23, 2003 - Page 4

to sufficiently consider individual risk characteristics; instead, risk selection was done on a class

basis, with adjustments made for past losses. Massamont continued to fail to correctly price

windstorm risks and still did not maintain adequate files on particular risks, including

correspondence, email and documentation that supported current valuations, claim development

information, and other information essential to proper underwriting.

Massamont's handling of individual accounts also fell short of the required standards.

Premiums on some risks dropped sharply with no explanation; losses were incurred repeatedly

on accounts with no apparent effort by the agency to properly analyze what had happened or to

determine how deductibles or premiums should be adjusted. Westchester determined that the

agency's overall performance was unsatisfactory.

In response, Massamont agreed to immediately implement the following changes:

- Massamont would utilize Westchester's modeling for windstorm risk. All new
  business in Massachusetts, Connecticut and Rhode Island was to be referred to Glenn
  Foster of Westchester for pricing and deductible options. The top 50 renewal
  accounts, as measured by wind load, were also to be referred for pricing and
  deductible options.

- All referral accounts previously approved were to be resubmitted as referrals to
  ensure that they were being underwritten in accordance with Westchester's
  requirements.

These new requirements made it necessary for Massamont to provide account information to

Westchester as early as possible so that the necessary modeling and evaluation could be carried

out in order to provide quotes before July 1. Massamont failed to submit accounts in a timely

fashion, causing backlogs and delays.

Throughout the process, Massamont made various complaints regarding the procedures it

was required to carry out and requested additional discretion to offer additional coverages and

O'MELVENY & MYERS LLP

Mr. Hilbert Schenck II, October 23, 2003 - Page 5

price particular accounts. On a timely and adequate basis, Westchester responded or otherwise

dealt with the complaints lodged by Massamont.

## MASSAMONT BREACHES THE EXCLUSIVITY
### PROVISION OF THE AGREEMENT

Massamont's Discussions With Axis

Unbeknownst to Westchester, at some point in time Massamont began having discussions

about transferring or placing new and renewal Program Business with Axis. Westchester

believes that Massamont provided confidential information about the Program Business to Axis,

described new and renewal Program Business to Axis, and began discussing when and how it

would transfer or place new and renewal Program Business to Axis with respect to policies

incepting on July 1, 2003. All of the foregoing constituted a violation or breach of the

exclusivity provision and certain other provisions of the Agreement. Had Westchester known, it

would have objected.

On or about June 27, again unbeknownst to Westchester, Massamont agreed to transfer or

place a large portion of the Massachusetts and Rhode Island new and renewal Program Business

with Axis in violation of the exclusivity provision and certain other provisions of the Agreement.

The business transferred to Axis amounted to approximately $12 million dollars in underwriting

premium. Had Westchester known, it would have objected.

Even though it was obligated under the Agreement to do so, Massamont never offered

any opportunity to Westchester to quote or otherwise obtain the new and renewal Program

Business which it was actually in the process of transferring to or placing with Axis. For

example, not once prior to June 27, did Massamont say in words or in substance that if

Westchester did not agree to certain new or renewal Program Business, Massamont would

O'MELVENY & MYERS LLP

Mr. Hilbert Schenck II, October 23, 2003 - Page 6

transfer or place all or substantially all of new and renewal Program Business with some other

insurer such as Axis.

Massamont's Disclosure About Axis
Getting The Program Business

In a telephone call made on Monday, June 30, Massamont announced to Westchester that

it had transferred a large portion of the Program Business in Massachusetts and Rhode Island to

Axis. This came as a complete surprise to Westchester, which could not believe that Massamont

had secretly transferred to or placed a large portion of the Program Business in Massachusetts

and Rhode Island with Axis, without first giving Westchester an opportunity to obtain such

business.

In a July 1 email to Westchester, Massamont stated that Axis and it had reached such an

agreement on June 27. That also surprised Westchester, because it meant that Massamont had

secretly engaged in discussions and negotiations with Axis long before June 27.

By letter dated July 9, 2003, Westchester advised Massamont that pursuant to Section

VIII.C.2 of the Agreement, Westchester was terminating the Agreement, effective immediately,

because of Massamont's breaches of the Agreement, including:

> (1) Section VIII.C.2., which provided that Massamont could be terminated
> immediately if it assigned or transferred any portion of the Program's insurance
> without giving Westchester 90 days notice;
>
> (2) Section IX.B. of Exhibit A to the Agreement, which provided that the Agent
> would not solicit Program Business from any other insurance carrier, unless
> Massamont first offered the business to Westchester and Westchester declined to
> write it; and
>
> (3) the Amendment, which stated categorically that Massamont "agree[d] not to
> seek another company to write the PROGRAM" during the term of the
> Agreement.

O'MELVENY & MYERS LLP

Mr. Hilbert Schenck II, October 23, 2003 - Page 7

In its July 9 letter, Westchester also stated that it was preserving any and all claims that it had

against Massamont for breaching the Agreement and reserved the right to pursue such claims.

Massamont's Admissions In Its July 11 Letter

In response to Westchester's July 9 letter of termination, Massamont responded by letter

dated July 11. Massamont admitted in this July 11 letter that it had transferred to or placed with

Axis all renewal and new Program Business for Massachusetts and Rhode Island, in

contravention of the exclusivity provision in the Agreement.

Massamont appears to argue that it previously offered the business to Westchester on the

same terms as it offered to Axis. Westchester disputes that Massamont previously offered the

new and renewal business on the same terms that were provided to Axis. For example, in the

July 11 letter, Massamont contended that it first offered such business to Westchester as follows:

(1)    Massamont would have pricing "authority" to obtain the 25% rate
increase;

(2)    Massamont would have discretion to offer wind deductibles to "alleviate
price increases;"

(3)    Massamont would be entitled to offer flood coverage outside certain
federally designated flood zones; and

(4)    Massamont would be entitled to offer $50,000 in mold coverage.

Massamont further contends that Westchester declined to write the requested coverage, thus

purportedly freeing Massamont under Section IX.B. of the Agreement to offer such the Program

business to Axis.

For several separate and independent reasons, the purported excuse offered by

Massamont is without merit. First, the Amendment provides, without any exception, that

Massamont may not seek another company to write the Program. Second, as already noted,

O'MELVENY & MYERS LLP

Mr. Hilbert Schenck II, October 23, 2003 - Page 8


Massamont had never "offered" or "proposed" business to Westchester on the terms alleged.

Third, it is undisputed that Massamont failed to give <u>any</u> notice – much less the 90 days required

by the Agreement – before transferring the $12 million Massachusetts and Rhode Island

premium to Axis. Westchester never knew of these negotiations until they were over and was

never given <u>any</u> opportunity to respond to the terms allegedly offered to, and accepted by, Axis.

Damages Suffered By Westchester

In this arbitration, Westchester seeks to recover all damages to Westchester caused by

Massamont's breach of the exclusivity provision in the Agreement. Such damages will be

specified in Westchester's initial arbitration submission.

Under Section IV.K. of the Agreement, Massamont was required to maintain Errors and

Omissions insurance with a limit of liability of not less than $10 million. We hereby request that

you give notice to your insurer of this arbitration demand and the claims asserted herein.


Very truly yours,

Paul R. Koepff
of O'MELVENY & MYERS LLP

cc Bob Gaffney
    Bill Garrigan
    Susan Woodward
    Bill Sharp
    Glen Foster
    Kathleen Morrison

NY1:1475784.1



PAUL WALTERS
Manager
Errors & Omissions Claims Department

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

P.O. Box 530, Utica, NY 13503-0530
Telephone: (315) 734-2522
FAX: (315) 734-2933
e-mail: paul.walters@uticanational.com

<u>DISCLAIMER OF COVERAGE</u>

March 4, 2004





Knapp Schenck & Company
Massamont Insurance Agency, Inc.
240 Lewis Wharf
Boston, MA 02110

RE:     File No.:      732751
        Insured:      Knapp Schenck & Co; Massamont Ins Agcy, Inc.
        Claimant:     Westchester Fire Insurance Company
        Policy No.:   3445032 EO

This letter is written with respect to the captioned matter and more particularly with respect to the demand for arbitration set forth by Westchester Fire Insurance Company. As you are aware, this matter has been under investigation by R.M.G. Investigations under a nonwaiver agreement. The purpose of the nonwaiver agreement was, and is, to preserve the rights of the parties during the investigation. Our investigation appears concluded and Utica's position regarding coverage is discussed below.

By way of the demand for arbitration various acts and damages are alleged that are not afforded coverage under the Utica policy. First, Westchester Fire Insurance Company alleges that Massamont's actions were in violation of an Agency Agreement entered into in and during 2001. While Utica asserts that coverage under its Insurance Agents and Brokers Errors and Omissions Insurance policy does not apply because of the nature of the claim(s) alleged by Westchester Fire Insurance Company, even if coverage was determined as applicable to the allegations, the policy would not apply because the act(s) generating the claim occurred previous to the Retroactive Date of the Utica policy. In this regard the Utica policy, Form 14-P-EOA (1/98), reads:

> **This insurance does not apply to loss, whenever occurring, from "wrongful acts" which took place before the Retroactive Date, if any, shown  07/30/02.**

In its demand for arbitration Westchester Fire Insurance Company alleges it *"...relied on Massamont's promise to be the exclusive managing general agent on behalf of Westchester for the Program."* In this regard the Utica policy contains exclusions as follows.

**SECTION III – EXCLUSIONS**

This insurance does not apply to:

File No.: 732751
Insured: Massamont Insurance Agency Inc
2

6.      A "claim" by any entity or individual which:

      a.  Is wholly or partially owned, operated, managed, or controlled by the insured;
      b.  Did wholly or partially own, operate, manage, or control the insured; or
      c.  Is wholly or partially under the same ownership, operation, management, or financial control as the insured.

**SECTION III – EXCLUSIONS**

This insurance does not apply to:

18.     "Claims" made against an insured arising out of the insured's activities as third party administrator of any plan, whether insured or self-insured and whether or not the insured performs such activities.

In its demand for arbitration Westchester also asserts that there was an issue regarding *"premiums."* The Utica policy reads as follows.

**SECTION III – EXCLUSIONS**

This insurance does not apply to:

4.      Any liability for money received by an insured or credited to an insured for fees, premiums, taxes, commissions, loss payments, or commissions, or escrow or brokerage monies.

Throughout its demand for arbitration Westchester asserts that Massamont was deficient and otherwise failed to perform various and numerous tasks associated with its obligations and duties in accordance with the agreement that existed between the two parties to the contract. All of what is alleged in this regard can be identified and defined as the obligations of a fiduciary. The Utica policy extends errors and omissions coverage to its policyholders for the following:

**SECTION II – COVERAGE**

1.      Insuring Agreement.

      a.      We will pay on behalf of the insured all "loss" to which this insurance applies.

      We will have the right and the duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false, or fraudulent.  However, we will have no duty to defend an insured against any "suit" seeking damages for a "wrongful act" to which this insurance does not apply.

The Utica policy defines "loss" and covered acts as follows:

**SECTION I – DEFINITIONS**

6.      "Loss" means any amount, which an insured becomes legally obligated to pay as damages for any "claim" to which this insurance applies and shall include judgments and settlements.  To the extent allowed by law, "loss" shall include punitive or exemplary damages. "Loss" shall not include:

      a.  Fines or penalties imposed by law;
      b.  Taxes; and

File No.: 732751
Insured: Massamont Insurance Agency Inc
3

      c.   Matters, which may be deemed uninsurable under the law pursuant to which the policy shall be construed.

14.    "Wrongful act" means any negligent act, error, or omission to which this insurance applies.

In addition to the grant and limitations of coverage as discussed above the Utica policy reads as follows:

### SECTION III – EXCLUSIONS

This insurance does not apply to:

17.    Any "claim" based solely on an insured's status as a fiduciary.

Also, based upon the assertions contained throughout Westchester's demand for arbitration it is continually alluded to or asserted that the actions on the part of Massamont were done "secretly." As referenced above under Section II – Coverage, and Section I – Definitions, coverage would not extend to acts other than those defined and referenced and contained in the Insuring Agreement. Section III – Exclusions also reads:

This insurance does not apply to:

1.    Any dishonest, fraudulent, malicious, or criminal conduct committed or alleged to have been committed by or at the direction of the insured. If a "suit" is brought against the insured alleging both "wrongful acts" within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct, then we will defend the insured in the trial court, but we shall not have any liability for any judgment for dishonest, fraudulent, malicious, or criminal conduct nor shall we have any further obligation to defend after judgment in the trial court.

This exclusion applies only to insureds who participated in, acted with knowledge of, or acquiesced to such conduct.

Summarily, Westchester's claim of Massamont's deliberate and secret breach of the agreement that existed between the parties is not a negligent act, error, or omission to which this insurance applies, as explained in the policy excerpts referenced above.

Since Utica will not be extending coverage in this matter any arbitration award, judgment, or settlement, will be the responsibility of the agency and not that of Utica Mutual Insurance Company.

You may wish to retain counsel, at your cost, to best protect your interests with respect to the claim(s) being made against you and in response to the demand for arbitration made against you.

Any action taken by Utica, its agents, its representatives or attorneys, is not to be construed as, nor does it constitute a waiver of any rights and/or defenses available under the terms, conditions, provisions, definitions, exclusions and endorsements of the referenced professional liability policy, nor shall it prevent Utica from asserting at a later date any rights or defenses that may be available now or in the future regarding this matter. Our position with respect to the absence of coverage regarding this matter is based upon the facts presented to Utica and acquired through its investigation conducted by R.M.G. Investigations under the nonwaiver agreement. If you know of, or become aware of facts that may materially change our position in this matter please contact us immediately.

File No.: 732751
Insured:  Massamont Insurance Agency Inc
4

If you have any questions whatsoever regarding this advisement, please contact Senior Errors and Omissions Claims Specialist Mark. M. Ribnikar at 1-800-274-1914 on extension 2628.

Sincerely,

*Paul E. Walters*

Paul E. Walters, Manager
Errors and Omissions Claims

Cc:    Mark M. Ribnikar, AIC
       Senior E & O Claims Specialist
       File No: 732751

| IN RE ARBITRATION BETWEEN | ) |
| | ) |
| WESTCHESTER FIRE INSURANCE | ) |
| COMPANY ("Westchester") | ) |
|    -and- | ) |
| | ) |
| MASSAMONT AGENCY, INC. ("Massamont") | ) |
| | ) |

## ORDER OF THE ARBITRATION PANEL

This Panel, being duly constituted, and having heard the evidence and arguments submitted by counsel, has:

1. Unanimously determined that Massamont breached the Agency Agreement For The Massamont Metrogard and Diplomax Program covering school and municipality properties in New England between The ACE USA Companies designated hereinafter collectively referred to as "Westchester" and Massamont Insurance Agency, Inc. and Knapp Schenck & Company Insurance Agency, Inc. as Guarantor Effective Date 1/1/2001 (collectively referred to as "Massamont");

2. As to the question of whether Westchester breached the Contingent Commission Agreement for The Massamont Metrogard and Diplomax Program between Westchester and Massamont Insurance Agency, Inc. effective January 1, 2001, a majority of the Panel was of the opinion that a technical breach may have occurred, but concluded that a net award covering both questions was appropriate;

3. Awarded $2.6 million ($2,600,000.00) in damages to Westchester.

4. Determined by majority vote that the award of attorneys fees to the prevailing party would not be appropriate in this case.

The Panel would like to congratulate counsel for both sides for the quality of their work and their professionalism in their representation of their clients in the matter.

_____          _____   _____
Ronald A. Jacks                  Andrew Ian Douglass        William F. Hofmann

Dated: April 26, 2005

949871v2

# COVINGTON & BURLING

1201 PENNSYLVANIA AVENUE NW    WASHINGTON, DC
WASHINGTON, DC 20004-2401    NEW YORK
TEL 202.662.6000    LONDON
FAX 202.662.6291    BRUSSELS
WWW.COV.COM    SAN FRANCISCO

ROBERT N. SAYLER
TEL 202.662.6382
FAX 202.778.6382
RSAYLER @ COV.COM

December 6, 2004

**By Federal Express**

Mark M. Ribnikar
Senior Errors and Omissions
 Claims Specialist
Utica Mutual Insurance Company
180 Genesee Street
New Hartford, New York 13413-2299

>     Re:    *Westchester Fire Insurance Company v. Massamont Insurance Agency, Inc.*
>             Your File No. 732751

Dear Mr. Ribnikar:

Massamont Insurance Agency, Inc has asked us to respond to Utica's disclaimer of coverage for the above arbitration as stated in Utica's letter dated March 4, 2004. The disclaimer is without foundation and constitutes a breach of Utica's duty to defend Massamont in the pending arbitration, which is expected to conclude later this month.

I hope that my letter will prompt Utica to reconsider its position without the need for coverage litigation, in which Utica would face liability not only for Massamont's defense costs but also for the costs of the coverage litigation itself (as well as additional liability should Utica be found to have acted in bad faith). *See Hanover Ins. Co. v. Golden*, 766 N.E.2d 838, 840-41 (Mass. 2002).

The arbitration in question was initiated by Westchester Fire Insurance Company on October 23, 2003. Massamont promptly sought coverage for this claim under its Insurance Agents and Brokers Errors and Omissions Liability Policy, Policy No. 3445032 EO, issued by Utica.

There is no dispute that the claim alleges that Massamont committed errors and omissions in its capacity as an insurance agent for Westchester. Utica itself acknowledged on page 2 of its disclaimer letter that Westchester's demand for arbitration "asserts that Massamont was deficient and otherwise failed to perform various and numerous tasks associated with its obligations and duties in accordance with the agreement that existed between the two parties to the contract."

**EXHIBIT**

K-1

COVINGTON & BURLING

Mark M. Ribnikar
December 6, 2004
Page 2


Given the breadth of the duty to defend, such allegations are more than enough to trigger Utica's duty to defend Massamont under the policy. In evaluating the demand for arbitration, Utica was required to "envisag[e] what kinds of losses may be proved as lying within the range of the allegations" and to defend Massamont if "any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy." *Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*, 545 N.E.2d 1156, 1159 (Mass. 1989) (citations omitted).[1]

None of the grounds on which Utica disclaimed coverage has merit. They are addressed in the order they appear in Utica's March 4, 2004 letter:

1.    Retroactive Date.

First, Utica contends that the policy does not apply "because the act(s) generating the claim occurred previous to the Retroactive Date of the Utica policy." However, the only acts that the policy states must occur on or after the Retroactive Date are "wrongful acts," not any act in the chain of causation leading to the claim. *See* Policy § II.1.b.1.

Accordingly, the only specific act that Utica cites in support of this contention – Massamont's execution of the Agency Agreement in 2001 – does not entitle Utica to deny coverage. Westchester is not alleging that Massamont's execution of the Agency Agreement constitutes a "wrongful act" as defined in the policy, *i.e.*, "a negligent act, error, or omission." *See* Policy § I.14.

2.    Entity "managed" by the insured.

Utica contends that Westchester's allegation that Massamont acted as a "managing general agent" implicates an exclusion for claims by an entity "wholly or partially owned, operated, managed, or controlled by the insured" (Policy § III.6). That is, Utica appears to contend that Massamont is not entitled to coverage because it "managed" the Westchester Fire Insurance Company.

---

[1]    Westchester itself appears to have recognized that its claim alleges potentially covered errors and omissions by Massamont. Westchester's demand for arbitration ends with a request that Massamont "give notice to your [Errors and Omissions] insurer of this arbitration demand and the claims asserted herein."

COVINGTON & BURLING

Mark M. Ribnikar
December 6, 2004
Page 3

This contention is absurd and ignores the reality of the relationship between Massamont and Westchester. It was Westchester that managed and controlled Massamont's activities under the Agency Agreement. To take one example, Massamont was required to follow underwriting procedures established by Westchester even while Westchester reserved to itself the right unilaterally to amend those procedures.[2] Massamont was an agent, not the principal.

Moreover, the policy specifically extends coverage to "Managing, Master or Brokerage General Agent[s]" without any suggestion that their coverage is somehow more limited than the coverage afforded to other types of agents and brokers. *See* Policy § II.1.e.5. The evident purpose of the owned-entity exclusion is to prevent coverage for collusive claims (a purpose not implicated here) rather than to impose *sub silentio* a special restriction on one class of insurance agents.

3.    Claims against "third-party administrator of any plan."

The exclusion for claims arising out of an insured's activities as "third-party administrator of any plan" likewise does not apply in this case. A third party administrator is "[a] firm which provides administrative services for employers and other associations having group insurance policies." Merritt Glossary of Insurance Terms at 203 (3rd ed. 1989). Westchester's demand for arbitration does not allege that Massamont was acting in this capacity.

4.    Premiums.

Utica points to Westchester's assertion that there was "an issue" regarding premiums as triggering an exclusion for "liability for money received by an insured ... for ... premiums..." (Policy § III.4). The exclusion does not apply to claims raising any "issue" regarding premiums but only to the insured's liability for premium monies that it received. While Westchester's demand for arbitration describes a dispute about the appropriate target for aggregate premiums that Massamont was expected to produce in 2003, it does not allege that Massamont is liable for wrongfully retaining or disposing of any of the premiums it received.

---

[2]    *See, e.g.*, Agency Agreement Exhibit A, § I.D ("AGENT's responsibilities and duties for underwriting are subject to all COMPANY policies and procedures as outlined in the Program Underwriting Manual."); *id.* at § I.E ("Adjustments or revisions to AGENT's underwriting authority and Program Underwriting Criteria will be made as warranted, subject to COMPANY discretion....").

COVINGTON & BURLING

Mark M. Ribnikar
December 6, 2004
Page 4

    5.    Claims based "solely on ... status as a fiduciary."

    Utica's reliance on the exclusion for claims based "solely on the insured's status as a fiduciary" is bafflingly off-point. The demand for arbitration does not even use the term "fiduciary" and in any event cannot be read as alleging that Massamont's liability rests "solely" on a breach of fiduciary duty.

    6.    "Dishonest, fraudulent, malicious, or criminal conduct."

    Finally, Utica relies on the exclusion for "dishonest, fraudulent, malicious, or criminal conduct" (Policy § III.1). This exclusion, however, requires Utica to defend any suit "alleging both 'wrongful acts' within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct[.]" *See id.* The demand for arbitration alleges that Massamont committed wrongful acts. Utica acknowledges that Westchester's demand for arbitration alleges that "Massamont was deficient and otherwise failed to perform various and numerous tasks" in violation of its obligations under the Agency Agreement. Utica therefore must defend the claim regardless of whether any dishonest, fraudulent, malicious, or criminal acts are also alleged.

    In any event, the demand for arbitration does not allege that any of Massamont's actions were "dishonest, fraudulent, malicious, or criminal." The underlying arbitration describes an ordinary business dispute, not a crime or fraud. The only allegations to which Utica refers to support its position are that some of Massamont's actions were done "secretly." That is a far cry from alleging that they were done dishonestly or fraudulently. For purposes of the duty to defend, Utica must construe these allegations in favor of Massamont rather than assuming the worst.

* * *

COVINGTON & BURLING

Mark M. Ribnikar
December 6, 2004
Page 5

    The final day of the arbitration hearing is scheduled for December 13, 2004, at which time the matter will be ready for decision by the arbitrators. Ideally, Utica will acknowledge its duty to defend before that date. In any event, Massamont expects that Utica will promptly settle its liability for the full amount of the defense costs that Massamont will have incurred while Utica was in breach of its duty to defend. Massamont will forward a statement of those defense costs once the arbitration is complete. Massamont reserves its right to seek coverage from Utica of any award that the arbitration panel may enter against Massamont.

                    Sincerely,

                    Robert N. Sayler

# COVINGTON & BURLING

1201 PENNSYLVANIA AVENUE NW    WASHINGTON, DC
WASHINGTON, DC 20004-2401     NEW YORK
TEL 202.662.6000              LONDON
FAX 202.662.6291             BRUSSELS
WWW.COV.COM                   SAN FRANCISCO

ROBERT N. SAYLER
TEL 202.662.6282
FAX 202.778.5382
RSAYLER @ COV.COM

January 4, 2005

**By Federal Express**

Mark M. Ribnikar
Senior Errors and Omissions
 Claims Specialist
Utica Mutual Insurance Company
180 Genesee Street
New Hartford, New York 13413-2299

   Re:  *Westchester Fire Insurance Company v. Massamont Insurance Agency, Inc.*
      Your File No. 732751

Dear Mr. Ribnikar:

   Since my letter to you dated December 6, 2004, the arbitration hearing in the above matter has been completed. Contrary to our earlier expectation, the panel has ordered the filing of post-hearing briefs by January 24, 2005, before beginning its deliberations in February.

   Meanwhile, Utica remains in breach of its duty to defend Massamont Insurance Agency in this matter. The fees and expenses that Massamont has incurred to date because of Utica's breach already exceed $300,000 and continue to accumulate.

   The panel's request for post-hearing briefs gives Utica one last opportunity to acknowledge its obligation to defend Massamont before the underlying matter is complete. Please consider the points raised in my previous letter and advise us no later than January 14, 2005, whether Utica will agree to defend Massamont.

       Sincerely,

       Robert N. Sayler

**EXHIBIT**

tabbies'

K-2

# COVINGTON & BURLING

1201 PENNSYLVANIA AVENUE NW    WASHINGTON, DC
WASHINGTON, DC 20004-2401    NEW YORK
TEL 202.662.6000    LONDON
FAX 202.662.6291    BRUSSELS
WWW.COV.COM    SAN FRANCISCO

JARRETT A. WILLIAMS
TEL 202.662.5377
JWILLIAMS@COV.COM

May 5, 2005

**BY E-MAIL AND FEDERAL EXPRESS**

Russell F. Conn, Esq.
Conn Kavanaugh Rosenthal Peisch & Ford, LLP
Ten Post Office Square
Boston MA 02109

> Re:    *Westchester Fire Insurance Company v. Massamont Insurance Agency, Inc.*
> Utica Mutual File No. 732751

Dear Mr. Conn:

Massamont learned on Tuesday that the arbitration panel in the above arbitration has entered an award against Massamont in the amount of $2.6 million. A copy of the award is attached. Massamont expects that Utica will keep the terms of this award confidential.

It is in Utica's best interests to indemnify Massamont for the full amount of this award without further delay. Otherwise, Utica may find itself liable for substantial consequential damages that could result from a failure promptly to settle this loss. *The award is due and payable now and Utica should be aware that the award has the immediate effect of exhausting Massamont's working capital upon which Massamont relies to continue in operation.* Even then, the award would not be fully satisfied. Additionally, the award skews Massamont's balance sheets which likely will materially and adversely affect its relationships with its carrier and banks. As a direct consequence of any delay in promptly settling this claim, Massamont could suffer irreparable injury to its viability as a going concern. The bulk of Massamont's insurance program business must be renewed in the coming few months and, thus, any significant disruption in the company's relationships with its insurers and banks could have catastrophic consequences. Massamont will hold Utica responsible for all such consequences should Utica persist in its unjustified disclaimer of coverage for this matter and will seek treble damages (as discussed below) if Utica does not promptly resolve this dispute.

Massamont is sufficiently concerned about this scenario that it is willing to release Utica from any liability for bad faith and accept payment of $3,080,285.22 (representing payment for the $2.6 million award plus Massamont's defense costs of $480,285.22 as of the end of March 2005) in full satisfaction of all of Utica's obligations with respect to this matter, provided that full payment is received within 7 days of the date of this letter

DC: 1779542-1


EXHIBIT
K-3

COVINGTON & BURLING

Russell F. Conn, Esq.
May 5, 2005
Page 2

In evaluating this settlement proposal, Utica should consider the following observations about the merits of the grounds for disclaiming coverage that Utica first asserted in your March 31, 2005 letter. These observations do not exhaust all the problems with Utica's new coverage positions but nevertheless show that these positions lack merit:

1.     "Negligent Act, Error, or Omission"

Your letter asserts that E&O policies such as Massamont's provide coverage only for claims based on negligence (pp. 4-7). That argument is flatly refuted by the Massachusetts Supreme Judicial Court's opinion in *USM Corp. v. First State Ins. Co.*, 652 N.E.2d 613 (Mass. 1995).

The policyholder in *USM* was found liable for breach of a warranty clause in a contract to provide a turnkey computer system. This was not, however, a case of negligence. The policyholder "was not negligent" and "reasonably relied" on advice from a hardware vendor that performance problems could be overcome. *USM*, 652 N.E.2d at 614. The insurer argued that its E&O policy, which like Utica's policy provided coverage for claims resulting from a negligent act, error or omission, "does not cover liability without fault." *Id.*

The Supreme Judicial Court disagreed. After noting that "[c]ases involving the words such as 'negligent act, error or omission' ... have *not* consistently determined that an error must be a negligent one if coverage is to be available," *id.* at 615 (emphasis added), the Court held that the E&O policy in question covered the policyholder's non-negligent breach of the warranty clause. *See id.* at 615.

Accordingly, Utica's position that Massamont's E&O coverage is limited to claims of negligence has no support in Massachusetts law. Indeed, *USM* has been cited by the First Circuit in support of the proposition that acts that "were all intentional in nature" nevertheless fall within the scope of E&O coverage for losses resulting from a "negligent act, error, or omission." *Home Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 229 F.3d 56, 65 n.10 (1st Cir. 2000).

Since Massamont's E&O policy is clearly governed by Massachusetts law – it was issued to a Massachusetts policyholder covering risks in Massachusetts and was countersigned in Massachusetts – Utica's reliance on cases from other jurisdictions cannot justify its interpretation of Massamont's policy. The sole decision from the First Circuit cited in your letter, *Pacific Ins. Co., Ltd. v. Eaton Vance Management*, 369 F.3d 584 (1st Cir. 2004), stands for the proposition that a policyholder's failure to pay an amount due under a contract is not a loss "by reason of" an error or omission, because the policyholder owed the amount even before committing an error or omission. That is simply not the basis on which Massamont was held liable. The $2.6 million award represents contract damages, not an amount that Massamont would have been required to pay to Westchester had Massamont not been found to have breached the Agreement.

COVINGTON & BURLING

Russell F. Conn, Esq.
May 5, 2005
Page 3

2.     "Dishonest Conduct"

Utica reserves its right at page 8 of your letter to deny coverage for any damage award "[t]o the extent that any award against Massamont is premised on a finding that Massamont did in fact engage in 'dishonest, fraudulent, malicious, or criminal conduct' or conduct in violation of the confidentiality clause of the Agency Agreement...." The arbitration award does not contain any findings that Massamont engaged in any of the conduct enumerated in your letter.

Westchester did not even allege in its Demand for Arbitration that Massamont engaged in any dishonest, fraudulent, malicious or criminal conduct. This was a breach of contract case, not a fraud case. The "dishonest conduct" exclusion does not apply to the award.

While Westchester did allege that Massamont had improperly disclosed certain confidential information, Westchester was unable to prove that it suffered any quantifiable damages as a result of the alleged disclosures. For example, the vice president in charge of the ACE Westchester program, William R. Sharp, testified at the arbitration hearing:

> Q.     Can you quantify for me and for this Panel, in a dollar amount, the harm that resulted to Westchester as a result of the disclosure by Massamont to Axis of this information that you consider to be confidential?
>
> A.     I can't quantify that.

Hearing Transcript at 213. Accordingly, there is no reason to assume that any amount of the $2.6 million award represents a recovery for any alleged disclosure of confidential information.

3.     Rescission for Nondisclosures

Utica belatedly has reserved its right to disclaim coverage on the ground that it is entitled to rescind the policy for failure to disclose the transfer of business to Axis and a "demand letter" from Westchester. The circumstances on which Utica relies all appear to have been known to Utica at the time that it disclaimed coverage on March 4, 2004, without electing to rescind the policy. Even if these circumstances gave Utica a right to rescind the policy in March of 2004, Utica failed to do so within a reasonable time and has lost whatever right to rescind the policy it might have had. *See Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.*, 831 F. Supp. 920, 927 (D. Mass. 1993) ("[a]ctions for rescission must be brought with reasonable promptness") (quotation marks omitted); *see also Howland v. Continental Life Ins. Co.*, 121 Mass. 499, 500 (1877) (holding that eleventh month delay in electing to rescind "was not within a reasonable time").

COVINGTON & BURLING

Russell F. Conn, Esq.
May 5, 2005
Page 4

4.    Failure to Cooperate

Finally, your letter asserts that "Massamont refused to provide Utica's investigator with copies of the Massamont-Axis correspondence" and that this correspondence was "material to the claim" (p. 10). Utica asserts that Massamont thereby breached the cooperation clause in the E&O policy and is not entitled to any coverage.

Massamont does not agree that Utica's investigator was refused access to any material information concerning the claim. Personnel at the company who dealt with the investigator have no recollection of such a refusal. Nor did Utica assert in its March 4, 2004 disclaimer letter that any lack of cooperation had hampered its investigation of the claim. To the contrary, that letter states in its opening paragraph: "Our investigation appears concluded ...."

In any event, a breach of the duty to cooperate "must be 'substantial and material' before it permits an insurer to disclaim liability" and the insurer must demonstrate "actual prejudice" to its interests. *Darcy v. Hartford Ins. Co.*, 554 N.E.2d 28, 32-33 (Mass. 1990). Utica cannot make these showings. Utica evidently did not regard any cooperation problems that may have existed as "substantial and material" or Utica would have raised this issue earlier. Utica could not have been prejudiced because it has never shown any inclination to participate in the defense of the Westchester claim. "[C]ooperation clauses are designed primarily to protect the insurer's interest in avoiding payment on claims which it cannot adequately defend." *Id.* at 34. That interest was not prejudiced here.

Should Utica ignore this demand and persist in its unjustified disclaimer of coverage, not only will Massamont sue for breach of contract, but it also intends to bring claims based on M.G.L. c. 176D and c. 93A for unfair claims settlement practices and/or other unfair or deceptive acts or practices. As you, no doubt, are aware, if Massamont were to prove such conduct and show that it was knowing and willful, then Utica would be liable for at least double and up to treble damages, as well as be liable for all of Massamont's costs, expenses and attorneys' fees related to any such litigation. Moreover, if Utica's failure to live up to its obligations under the policy causes Massamont to go out of business, Utica could be liable for tens of millions of dollars.

COVINGTON & BURLING

Russell F. Conn, Esq.
May 5, 2005
Page 5


     Our preference would be to resolve this matter through compromise rather than litigation. In light of the foregoing, I hope that after your client reviews this letter, it will see that Massamont's settlement proposal is quite reasonable and will accept. In any event, I look forward to speaking with you about this matter as soon as possible.


                        Sincerely,

                        Robert N. Sayler
                        Jarrett A. Williams


Enclosure

cc:    Erin K. Higgins, Esq. (via e-mail)

# COVINGTON & BURLING

1201 PENNSYLVANIA AVENUE NW    WASHINGTON, DC
WASHINGTON, DC 20004-2401    NEW YORK
TEL 202.662.6000    LONDON
FAX 202.662.6291    BRUSSELS
WWW.COV.COM    SAN FRANCISCO

JARRETT A. WILLIAMS
TEL 202.662.5377
JWILLIAMS@COV.COM

May 17, 2005

## BY E-MAIL AND FEDERAL EXPRESS

Russell F. Conn, Esq.
Conn Kavanaugh Rosenthal Peisch & Ford, LLP
Ten Post Office Square
Boston MA 02109

Re:    *Westchester Fire Insurance Company v. Massamont Insurance Agency, Inc.*
Utica Mutual File No. 732751

Dear Mr. Conn:

This is in response to your fax dated May 12, 2005. Your letter includes a request to review transcripts of the evidence, exhibits, and submissions to the arbitrators in the above matter. This is Utica's first request to conduct such a review.

Massamont's counsel in the arbitration, Lawrence P. Murray, Esq. of Burns & Levinson, will make these materials available to you to review at his office in Boston. Please contact Mr. Murray at (617) 345-3510 to make arrangements to review these materials.

Separately, Utica should be aware that Westchester's counsel sent Massamont a letter dated May 13, 2005 in which Westchester noted that it intended to commence a proceeding to obtain confirmation of the arbitration award and would seek costs and attorneys fees in the confirmation proceedings if Massamont did not pay the award and/or opposes confirmation. A copy of this letter is attached. Massamont expects that Utica will keep this letter confidential.

Given that Utica has not acknowledged its obligation to defend or indemnify Massamont with respect to this matter, Massamont is free to take whatever actions in response to Westchester's letter that Massamont deems necessary to protect its interests without obtaining Utica's prior consent. At this time, Massamont does not intend to challenge the validity of the award. Nevertheless, Massamont will defer making a substantive response to Westchester's letter until we receive Utica's expected statement of position on May 19.

Sincerely,

Jarrett A. Williams

Enclosure
cc:    Erin K. Higgins, Esq. (via e-mail)

DC: 1801258-1



**EXHIBIT**

K-4

05/13/2005 14:09 FAX 1212 408 2420    O'MELVENY & MYER LLP NY    ☒ 002



# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | Times Square Tower | NEWPORT BEACH |
| CENTURY CITY | 7 Times Square | SAN FRANCISCO |
| HONG KONG | New York, New York 10036 | SHANGHAI |
| IRVINE SPECTRUM | TELEPHONE (212) 326-2000 | SILICON VALLEY |
| LONDON | FACSIMILE (212) 326-2061 | TOKYO |
| LOS ANGELES | www.omm.com | WASHINGTON, D.C. |

May 13, 2005

OUR FILE NUMBER
004,200-374

**VIA FACSIMILE**

WRITER'S DIRECT DIAL
(212) 326-2189

Lawrence P. Murray, Esq.
Burns & Levinson LLP
125 Summer Street
Boston, MA 02110-1624

WRITER'S E-MAIL ADDRESS
pkoepff@omm.com

Re:    *Westchester Fire Insurance Company, et al. v.*
       *Massamont Insurance Agency, Inc.*

Dear Lonnie:

On October 23, 2003, Westchester Fire Insurance Company, Westchester Surplus Lines Insurance Company and Illinois Union Insurance Company (collectively, "Petitioners") notified your client, Massamont Insurance Agency, Inc. ("Massamont") that they were commencing an arbitration against Massamont for its breaches of an Agency Agreement between the parties dated as of January 1, 2001 (the "Agreement").

In accordance with the arbitration provisions set forth in Section XX of the Agreement, the parties appointed an arbitration panel (the "Panel") to hear the case. Petitioners and Massamont conducted extensive discovery and were given ample scope to present their claims and defenses with respect to Massamont's breaches as well as its counterclaim for amounts allegedly owed under the parties' profit-sharing agreement.

As you are aware, the Panel has now rendered its Award in this matter. As set forth in the Award, the Panel:

a.    unanimously determined that Massamont breached the Agreement;

b.    found by a majority that a technical breach of the profit-sharing agreement by Petitioners "may have occurred," but that a net award covering both Massamont's breach of the Agreement and Petitioners' possible breach of the profit-sharing agreement was appropriate;

c.    awarded $2,600,000 in damages to Westchester Fire; and

05/13/2005 14:08 FAX  1212 408 2420        O'MELVENY & MYER LLP NY                    ☑ 005/0

Lawrence P. Murray, May 13, 2005 - Page 2

    d.    determined by majority vote that an award of attorneys' fees to the prevailing party would not be appropriate.

A copy of the Award is enclosed.

    The Agreement provides: "A decision by the majority of the members of the [Panel] shall become binding upon all parties to the proceeding." (Agreement, Section XX.C.) Under the Agreement, therefore, Massamont is obligated to pay its damages without delay.

    Petitioners intend to commence a proceeding to obtain confirmation of the Award. If Massamont does not pay its damages and/or opposes confirmation of the Award, Petitioners will seek to recover their costs and attorneys fees in the confirmation proceeding.

    Very truly yours,

Paul R. Koepff
of O'MELVENY & MYERS LLP

Enclosure

cc:    Kathleen Morrison, Esq.

NY1:1580496.1

# COVINGTON & BURLING

1201 PENNSYLVANIA AVENUE NW    WASHINGTON, DC
WASHINGTON, DC 20004-2401     NEW YORK
TEL 202.662.6000              LONDON
FAX 202.662.6291             BRUSSELS
WWW.COV.COM                  SAN FRANCISCO

JARRETT A. WILLIAMS
TEL 202.662.0377
JWILLIAMS@COV.COM

May 23, 2005

**BY E-MAIL AND FEDERAL EXPRESS**

Russell F. Conn, Esq.
Conn Kavanaugh Rosenthal Peisch & Ford, LLP
Ten Post Office Square
Boston MA 02109

Re:   *Westchester Fire Insurance Company v. Massamont Insurance Agency, Inc.*
      Utica Mutual File No. 732751

Dear Mr. Conn:

Representatives of Massamont and Westchester have scheduled a conference call to discuss the arbitration award in the above matter on the coming Wednesday afternoon, May 25, 2005. Massamont expects that Westchester will ask pointed questions about the status of Massamont's efforts to obtain coverage from Utica. If Westchester is not satisfied with Massamont's answers, Westchester may decide to pursue immediate relief in court, including attachments of Massamont's operational accounts, that could inflict severe damage on Massamont.

Your office had originally scheduled an appointment for today to review the transcripts of the evidence, exhibits, and submissions to the arbitrators in the above matter to which you had requested access. Your office has now postponed that review twice, and it now appears that Utica will not begin its review until Wednesday at the earliest.

Massamont would like to have some encouraging news to report to Westchester by Wednesday afternoon. A monetary counteroffer by Utica would be ideal. An advancement of funds pending resolution of the coverage issues would be helpful. A commitment by Utica to make a final decision on coverage within one week of May 25, 2005, would at least give Massamont something hopeful to say. Any other creative solution you would care to propose would be welcome. Please let us know promptly if there is anything that Utica is willing to do while pursuing its coverage investigation to assist Massamont in avoiding enforcement litigation by Westchester.

On a related issue, Massamont's counsel in the arbitration informs me that two of the exhibits submitted to the arbitration panel were submitted and were the subject of testimony on a "counsel's eyes only" basis. Massamont is willing to allow attorneys from your office to review these exhibits and associated testimony in connection with Utica's coverage

DC: 1806164-1



EXHIBIT

K-5

COVINGTON & BURLING

Russell F. Conn, Esq.
May 23, 2005
Page 2

investigation, provided that you confirm that Utica will make no other use of this information and will not disclose it to any third parties.

Moreover, in connection with Massamont's counterclaim for profit sharing, Westchester also produced information about Westchester's reinsurance treaties, which Westchester considers highly confidential. Given the lack of relevance of this information to Westchester's claims against Massamont, and given its competitive sensitivity, Massamont has not asked Westchester for permission to disclose this information to Utica and does not intend to make it available to Utica on Wednesday.

Sincerely,

Jarrett A. Williams

cc:    Erin K. Higgins, Esq. (via e-mail)

# COVINGTON & BURLING

1201 PENNSYLVANIA AVENUE NW    WASHINGTON, DC
WASHINGTON, DC 20004-2401       NEW YORK
TEL 202.662.6000                LONDON
FAX 202.662.6291                BRUSSELS
WWW.COV.COM                     SAN FRANCISCO

JARRETT A. WILLIAMS
TEL 202.662.5377
JWILLIAMS @ COV.COM

May 27, 2005

## BY E-MAIL AND FEDERAL EXPRESS

Russell F. Conn, Esq.
Conn Kavanaugh Rosenthal Peisch & Ford, LLP
Ten Post Office Square
Boston, MA  02109

    Re:   *Westchester Fire Insurance Company v. Massamont Insurance Agency, Inc.,*
           Utica Mutual File No. 732751

Dear Mr. Conn:

      Westchester has filed a motion to confirm the award in the federal district court for the Southern District of New York. I am sending you a copy of the motion papers by e-mail. Though dated May 17, 2005, the motion was in fact filed yesterday. Massamont has not yet been served with process but expects such service to occur shortly.

      Please take note that the confirmation proceedings may further increase Utica's ultimate liability to Massamont. Westchester's motion seeks, in addition to confirmation of the arbitration award, an award of prejudgement interest and an award of the costs of prosecuting the confirmation proceedings, including attorneys fees. Utica will be obligated to indemnify Massamont should such relief be awarded (and will also be obligated to indemnify Massamont for post-judgment interest). Moreover, defense costs that Massamont incurs to protect its interests in the confirmation proceedings will constitute additional damages attributable to Utica's breach of its duty to defend.

      Utica's prompt payment of the arbitration award therefore is in both of our clients' best interests. Please let me know if there is anything I can do to expedite such payment.

Sincerely,

Jarrett A. Williams

Enclosures (via e-mail)

cc:    Erin K. Higgins, Esq. (via e-mail w/enclosures)

DC: 1809490-1



**EXHIBIT**

K-6

# CONN KAVANAUGH ROSENTHAL PEISCH & FORD, LLP

### COUNSELORS AT LAW

THOMAS E. PEISCH
BOB B. ROSENTHAL
JAMES F. KAVANAUGH,
JR.
RUSSELL F. CONN
GEORGE M. FORD
JAMES B. PELOQUIN
BARRY E. GOLD
THOMAS J. GALLITANO
JAMES GRAY WAGNER
ERIN K. HIGGINS
STEVEN E. GURDIN
MICHAEL T. SULLIVAN
CONSTANCE M. MCGRANE

Ten Post Office Square, Boston, Massachusetts 02109

Tel: (617) 482-8200
Fax: (617) 482-6444

WRITER'S DIRECT DIAL: 617.348.3201
E-MAIL: RCONN@CKRP&F.COM

March 31, 2005

KURT B. FLIEGAUF
RONALD M. JACOBS
CAROL A. STARKEY
JENNIFER M. NORTON
SARA L. GOODMAN
MICHAEL R. BERNARDO
JACOB A. LABOVITZ
CARA A. FAUCI
JOHANNA L. MATLOFF
AMY C. STEWART
BETH NUZZO NEWMARK
SARAH E. WEBER

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
Covington & Burling
1201 Pennsylvania Avenue NW
Washington, D.C. 20004

      RE:    <u>Westchester Fire Insurance Company v. Massamont Insurance Agency</u>
               Utica Claim No. 732751

Dear Messrs. Sayler and Williams:

      We have been retained by Utica Mutual Insurance Company ("Utica") in connection with the above matter. This letter will constitute Utica's response to your December 6, 2004 letter, requesting that Utica reconsider its disclaimer of coverage for the claims made by Westchester Fire Insurance Company ("Westchester") against Massamont Insurance Agency, Inc. ("Massamont") in the above-referenced arbitration. Please be advised that Utica stands by its disclaimer of coverage, for the reasons set forth in its March 4, 2004 letter disclaiming coverage, as modified herein, and as set forth in more detail below.

      Utica's disclaimer of coverage is based upon its review of documents provided to Utica by Massamont or its counsel, including Westchester's October 23, 2003 demand for arbitration and certain correspondence and e-mail messages between Massamont and Westchester. Massamont refused to provide Utica with copies of documents reflecting communications between Massamont and Axis Capital, the company to which Massamont transferred program business in the late spring or early summer of 2003. Utica reserves the right to further amend this disclaimer in the event it receives additional pertinent information.

I.     Factual and Procedural Background

      Massamont is a subsidiary of Knapp, Schenck & Company Insurance Agency, Inc., which is located in Boston, Massachusetts. Massamont acts as Managing General Agent for two specialty programs, the "Metrogard" program, which provides coverage for municipal entities, and the "Diplomax" program, which provides coverage for private educational institutions. From approximately January 1, 2001 through July 9, 2003, Massamont administered these two specialty programs through an agency agreement with Westchester.



**EXHIBIT**

L-1

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 2

In April, 2003, ACE USA, Westchester's parent company, conducted an audit of Massamont's books. On May 7, 2003, Glenn Foster of ACE sent Hilbert "Van" Schenck of Massamont a "report card" with a number of criticisms of Massamont's management of the programs, and an overall grade of "unsatisfactory." Essentially, ACE claimed that Massamont had been accepting and pricing risks within the two programs on a group basis, rather than using a more traditional underwriting approach that focused on specific risk characteristics.

On or before June 27, 2003, according to Westchester's demand for arbitration, Massamont allegedly reached an agreement with Axis Capital to transfer the Massachusetts and Rhode Island program business from Westchester to Axis.

On the same day, Massamont submitted a renewal application to Utica. In that application, Massamont disclaimed any knowledge "of any circumstance, allegation, contention or incident which may result in any claim being made against the agency, its predecessor in business, or any of its present or former owners, partners, officers, or directors."

On June 30, 2003, Massamont notified ACE by telephone that it had placed all of the Massachusetts and Rhode Island business with another carrier.

On July 9, 2003, ACE advised Massamont by telephone that ACE was terminating the Agency Agreement. By letter of the same date, ACE confirmed that it was terminating the Agreement in accord with Paragraph VIII.C.2 of the Agreement, which provided as follows:

COMPANY may terminate this AGREEMENT immediately by written notice to AGENT if any one or more of the following events occur:

....

2.    AGENT assigns, transfers, encumbers or otherwise disposes of this AGREEMENT or any interest in this AGREEMENT or sells, exchanges, transfers, assigns, merges or consolidates the PROGRAM insurance business without giving COMPANY ninety (90) days prior notice thereof.

ACE further claimed that Massamont was in breach of Paragraph IX.B of Exhibit A to the Agency Agreement,[1] which provided as follows:

B.    During the term of this Agreement, AGENT will not solicit for any other insurance carrier, except COMPANY, the Program business. If COMPANY elects not to write such business, then AGENT is granted the right to submit such business to other insurance carriers under the same terms and conditions as presented to COMPANY.

---

[1] In its July 9, 2003 letter, ACE erroneously referred to Paragraph IX.B of the Agreement, which relates to another topic.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 3

ACE's July 9, 2003 letter also referenced the Amendment to the Agency Agreement, which
stated that the Agreement was "subject to AGENT agreeing not to seek another company to
write the PROGRAM during [the term of the Agreement]."

On July 11, 2003, Massamont notified ACE that it disagreed with ACE's reading of the
contract language, and asserted that ACE had terminated the Agreement without cause and
without sufficient notice.

On July 16, 2003, Robert J. Gaffney of ACE wrote to Massamont, reaffirming the
termination of the Agreement. Mr. Gaffney further asserted that Massamont's breaches of the
Agreement had caused substantial damage to ACE, and that ACE intended "to vigorously pursue
its claim for damages." Massamont did not forward this letter, or any of the prior
correspondence, to Utica.

Utica's renewal policy incepted on July 30, 2003.

On or about October 23, 2003, ACE's counsel faxed to Massamont a demand for
arbitration. A copy of the demand for arbitration is attached at Tab A. Knapp, Schenck notified
Utica of the arbitration demand on October 29, 2003.

Utica then assigned Robert Burkitt of R.M.G. Investigations to investigate the claim. Mr.
Burkitt asked Massamont to provide copies of its files. Massamont refused to provide Mr.
Burkitt with copies of Massamont's correspondence with Axis.

On March 4, 2004, Utica disclaimed coverage for the claims made by Westchester on a
number of grounds.

Massamont did not respond to this disclaimer of coverage until your letter of December
6, 2004. In that letter, you requested that Utica reconsider its coverage position in advance of the
final day of the arbitration, which was then scheduled to conclude on December 13, 2004. You
did not provide Utica with any additional documents or information in support of your request
that Utica reconsider its disclaimer of coverage.

We subsequently asked whether Westchester had filed a complaint in the arbitration other
than the October 23, 2003 demand for arbitration. Although Massamont at first refused to
produce any pleadings from the arbitration in the absence of a written confidentiality agreement,
you ultimately provided us with a document filed by Westchester on April 20, 2004, titled
"Petitioner's Statement of Position."

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page **4**

II.    Arbitration Demand

The October 23, 2003 arbitration demand was in the form of a letter from Westchester's counsel, O'Melveny & Myers LLP. Westchester alleged that Massamont breached the exclusivity provisions of the Agreement by seeking another company to write program business, by soliciting program business for Axis without first offering the business to Westchester, and by transferring program business to Axis without giving Westchester ninety days' notice of the proposed transfer. Westchester further alleged that Massamont provided confidential information about the program to Axis in connection with the transfer of business. Westchester alleged that it was entitled to recover the damages caused by Massamont's breach of the cited provisions of the Agency Agreement.

In setting forth the background to the parties' dispute, Westchester's counsel referenced his client's past complaints about deficiencies in Massamont's underwriting program, including a failure "to sufficiently consider individual risk characteristics," a failure "to correctly price windstorm risks," a failure to maintain adequate filing and documentation procedures, and a failure to investigate the causes of loss and to make appropriate recommendations regarding deductibles or premiums. Westchester did not allege, however, that its claims in arbitration were premised on these alleged deficiencies, not did Westchester allege that it was entitled to recover damages arising out of these alleged deficiencies.

III.    Coverage Analysis[2]

Utica issued Policy No. 3445032 (the "Policy") to Knapp Schenck & Company and various additional named insureds, including Massamont, on July 29, 2003. This was a renewal policy, with a policy period from July 30, 2003 to July 30, 2004, and limits of liability in the amount of $10,000,000 for each loss and $11,000,000 in the aggregate. The limits of liability were subject to a deductible in the amount of $50,000 applicable to each loss, and $150,000 in the aggregate. A copy of the Policy is attached at Tab B.

    A.    The Policy Did Not Provide Coverage For Westchester's Claims Against Massamont, Because Westchester's Claims Did Not Arise Out Of A Negligent Act, Error, Or Omission.

In essence, the Policy insures only against "negligent acts, errors, or omissions." The Policy provides, in relevant part, as follows.

---

[2]    We have based our coverage analysis on the allegations made in Westchester's October 23, 2003 demand for arbitration, as that document most closely approximates a civil complaint. We note, however, that the allegations made in Westchester's April 20, 2004 "Statement of Position" are virtually identical to those made in the October 23, 2003 demand.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 5

## SECTION II – COVERAGE

1.  **Insuring Agreement**

a.  We will pay on behalf of the insured all 'loss' to which this insurance applies.

   We will have the right and the duty to defend the insured against any 'suit' seeking those damages even if the allegations of the 'suit' are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any 'suit' seeking damages for a 'wrongful act' to which this insurance does not apply.

   ....

e.  The "loss" must arise out of "wrongful acts" committed in the conduct of the insured's business, wherever committed or alleged to have been committed, by the insured or any person for whose "wrongful acts" the insured is legally liable in rendering or failing to render professional services as:

   (1)   A General Insurance Agent;

   (2)   An Insurance Broker;

   (3)   An Insurance Agent;

   (4)   An Insurance Consultant;

   (5)   A Managing, Master or Brokerage General Agent;

   (6)   A Life and Accident and Health Insurance Agent;

   (7)   A Surplus Lines Broker; or

   (8)   A Notary Public.

The Policy contains the following definitions relevant to these paragraphs of the insuring agreement.

'Loss' means any amount which an insured becomes legally obligated to pay as damages for any 'claim' to which this insurance applies and shall include judgments and settlements. ....

'Claim' means a written notice, including service of 'suit' or demand for arbitration, received by one or more insureds asking for money or services.

'Suit' means a civil proceeding in which damages because of 'loss' from a 'wrongful act' are alleged. 'Suit' includes:

a.   An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b.   Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 6

    ....

       'Wrongful act' means any negligent act, error, or omission to which this insurance applies.

Thus, Utica has a duty to defend an insured against any "suit," which is defined to include arbitration proceedings, but only if the damages alleged arise out of a "loss" from a "wrongful act." Further, the "loss" must arise out of "wrongful acts" committed in the conduct of the insured's business, in rendering or failing to render professional services in one of the enumerated capacities.

Westchester's claims against Massamont, as elucidated in the October 23, 2003 demand for arbitration, did not fall within the insuring agreement of the Policy. Westchester claimed that at some point in time, Massamont began having discussions with Axis about transferring or placing new and renewal program business with Axis. Westchester further alleged that Massamont provided confidential information about the program to Axis, and that Massamont kept secret from Westchester all of its contacts with Axis. Westchester alleged that these actions constituted a breach of the exclusivity and confidentiality provisions of the Agreement, and that Massamont's actions resulted in the transfer of approximately $12,000,000 in premium from Westchester to Axis. In sum, Westchester claimed that Massamont deliberately and secretly transferred program business from Westchester to Axis. Westchester did not allege that Massamont made this transfer negligently or inadvertently, or that Massamont breached the standard of care applicable to Massamont's performance of professional services.

Courts uniformly have held that a policy providing coverage for "negligent acts, errors, or omissions" does not insure against breach of contract claims premised on deliberate conduct. For example, in Town of Orland v. National Fire & Casualty Co., 726 N.E.2d 364 (Ind. App. 2000), an engineer had sued a municipality for breach of a contract for professional services, where the municipality had ordered the engineer to stop work and had hired another engineer to complete the first engineer's duties. The municipality brought a declaratory judgment action against its insurer, asserting that the insurer should have provided a defense to the town under its errors and omissions policy because the engineer's complaint arguably alleged mismanagement by the town. The court rejected this argument, holding:

We acknowledge that "[a] duty of care, the breach of which will support a negligence action, may arise contractually." .... However, this is not such a case. Here, [the town's] conduct cannot be characterized as the negligent performance of a contractual duty such that Jones could have brought a negligence action rather than one for breach of contract. Instead, [the town], whether in good faith or not, deliberately made business decisions which caused [the plaintiff engineer] to question [the town's] commitment to the contract and, thus, bring the federal lawsuit. We hold that such conduct does not result in liability under the Errors or Omissions Clause issued by [the insurer] and decline [the town's] invitation to treat the Errors or Omissions Clause as a performance bond.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 7

Id. at 370-71. In Baylor Heating & Air Conditioning, Inc. v. Federated Mutual Ins. Co., 987
F.2d 415 (7th Cir. 1993), the court held that the insured's decision to stop making payments into
an employee pension fund was not a "negligent act, error, or omission," even though the insured
allegedly acted in good faith and in reliance on erroneous legal advice. The court held:

> Under [the insured's] logic, any default arising from a mistaken assumption regarding
> one's contractual liability could be transformed into an insured event. Indeed, refusing to
> pay a debt in reliance upon erroneous advice of counsel would convert a contractual debt
> into damage arising from a negligent omission. We dare not imagine the creative legal
> theories treading just short of malpractice and frivolity that could seek to transform
> contract obligations into insured events.

Id. at 420-21; see also Cincinnati Ins. Co. v. Metropolitan Properties, Inc., 806 F.2d 1541, 1544-
45 (11th Cir. 1986) (insured developer's failure to acquire low-income properties as required
under contract with city was not a "negligent act, error, or omission," even if developer's breach
resulted from carelessness rather than an intent to defraud, where duty breached was one created
by contract, not by law); Pacific Ins. Co. v. Eaton Vance Management, 369 F.3d 584, 593 (1st
Cir. 2004) (noting that if an insured's mistaken belief regarding a contractual obligation was
sufficient to trigger coverage, insureds would be more likely to adopt "aggressive"
interpretations of contractual obligations).

The reasoning of these cases is applicable here. Regardless of whether Massamont in
good faith believed that its conduct was permissible under its contract with Westchester,
Massamont deliberately made a business decision to transfer part of the program business to
Axis. Put another way, the facts set forth in Westchester's demand for arbitration would not
support a negligence claim against Massamont. Thus, Westchester's claims against Massamont
were not covered under the Policy, and Utica had no duty to defend Massamont in the arbitration
proceedings and has no duty to indemnify Massamont against any judgment awarded to
Westchester as a result of those proceedings.

    B.    Even If Westchester's Arbitration Demand Had Alleged Conduct Falling Within
           The Insuring Agreement Of The Policy, Certain Exclusions In The Policy Would
           Have Barred Or Limited Coverage.

As set forth above, because the conduct alleged in Westchester's demand for arbitration
did not fall within the insuring agreement of the Policy, Utica had no duty to defend or
indemnify Massamont against Westchester's claims. Moreover, even if Westchester had alleged
a "negligent act, error, or omission," certain exclusions in the Policy would have barred or
limited coverage for Westchester's claims. The Policy contained the following pertinent
exclusions:

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 8

**SECTION III - EXCLUSIONS**

This insurance does not apply to:

1.    Any dishonest, fraudulent, malicious, or criminal conduct committed or alleged to have been committed by or at the direction of the insured. If a 'suit' is brought against the insured alleging both 'wrongful acts' within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct, then we will defend the insured in the trial court, but we shall not have any liability for any judgment for dishonest, fraudulent, malicious, or criminal conduct nor shall we have any further obligation to defend after judgment in the trial court.

    This exclusion applies only to insureds who participated in, acted with knowledge of, or acquiesced to such conduct.

    ....

19.    "Claims" arising out of or alleging the unauthorized use of trade secrets or confidential or proprietary information.

    In its October 23, 2003 demand for arbitration, Westchester alleged that Massamont, in breach of its obligations under the Agency Agreement, "secretly transferred or placed" the program business with Axis, and that prior to the actual transfer, Massamont "secretly engaged in discussions and negotiations" with Axis regarding the program business. Westchester further alleged that Massamont "provided confidential information about the Program Business to Axis," where the Agency Agreement required Massamont to refrain from disclosing any such confidential information. To the extent that any award against Massamont is premised on a finding that Massamont did in fact engage in "dishonest, fraudulent, malicious, or criminal conduct," or conduct in violation of the confidentiality clause of the Agency Agreement, these two exclusions would bar or limit coverage for any such damage award.

    C.    Massamont's Failure To Disclose The Transfer Of Program Business And The Subsequent Demand Letter From Westchester Prior To The Inception Date Of The Policy Constituted A Material Misrepresentation Entitling Utica To Rescind the Policy.

    As set forth above, Utica had no duty to defend or indemnify Massamont against any of the claims made by Westchester, as Westchester did not allege a "negligent act, error, or omission" within the Policy's insuring agreement. Should Massamont pursue its claim for coverage under the Policy, however, Utica reserves the right to disclaim coverage on the further ground that Utica is entitled to rescission of the Policy premised on Massamont's failure to disclose the transfer of business of Axis, and the subsequent demand letter from Westchester, prior to the inception date of the Policy.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 9

As set forth above, Westchester alleged in its demand for arbitration that on or about June 27, 2003, Massamont secretly struck a deal with Axis to transfer all or substantially all of the program business from Westchester to Axis. On the same day, Massamont submitted its renewal application to Utica. In that application, Massamont disclaimed any knowledge "of any circumstance, allegation, contention or incident which may result in any claim being made against the agency, its predecessor in business, or any of its present or former owners, partners, officers, or directors." If, as Massamont now claims, its transfer of the program business was a "negligent act, error, or omission" within the meaning of the Policy's insuring agreement, Massamont's failure to disclose to Utica that it had transferred the business and thereby potentially exposed itself to a claim was a material misrepresentation entitling Utica to rescind the Policy.[3]

Even more problematic, the application submitted by Massamont indicated that Massamont had a continuing obligation to report any changes occurring after submission of the application but prior to the inception date. Nevertheless, Massamont never advised Utica prior to the Policy's July 30th inception date that Westchester had sent Massamont a demand letter asserting that Massamont had breached the Agency Agreement and caused substantial damage to Westchester for which Westchester intended to seek a recovery. Massamont's failure to advise Utica of this demand letter prior to the Policy's inception date was a further material misrepresentation entitling Utica to void the Policy.

D.    Massamont's Failure To Cooperate With Utica Bars Coverage

The policy provides in Section VI as a "condition" of coverage the following:

1.    **Duties In The Event of "Wrongful Act," "Claim" Or "Suit"**

c.    You and any other involved insured must:

(1)    Immediately send us copies of any demands, notices, summonses, subpoenas or legal papers received in connection with the "claim" or "suit";

(2)    Authorize us to obtain records and other information;

(3)    Cooperate with us in the investigation, settlement, or defense of the "claim" or "suit"; and

(4)    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to an insured because of "loss" to which this insurance may also apply.

---

[3]    In this regard, we note that the document attached as Exhibit 3 to Westchester's Statement of Position suggests that Massamont in fact struck its deal with Axis on June 18, 2003, nine days before Massamont submitted its application to Utica.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 10


The Policy further provides that "[n]o action shall lie against [Utica] unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of [the Policy]…."

As noted above, Massamont refused to provide Utica's investigator with copies of the Massamont-Axis correspondence. That correspondence is material to the claim. Massamont's refusal to produce documents constitutes a breach of its duty to cooperate pursuant to the Policy provisions cited above, and Utica therefore disclaims coverage as a result of that failure to cooperate.

> E.    Certain Exclusions Cited In Utica's March 4, 2004 Letter Are Not
>        Pertinent To Westchester's Claims.

Utica's March 4, 2004 letter cited to certain exclusions in support of its disclaimer of coverage that, upon further review and in consideration of the arguments set forth in your December 6, 2004 letter, are not pertinent to Westchester's claims against Massamont, and Utica hereby notifies Massamont that it no longer relies on these exclusions in disclaiming coverage for Westchester's claims, and expressly disavows any reliance on these exclusions as a basis for its reaffirmance herein of the denial of coverage. These exclusions are as follows.

**SECTION III - EXCLUSIONS**

This insurance does not apply to:

4.    Any liability for money received by an insured or credited to an insured for fees, premiums, taxes, commissions, loss payments, or escrow or brokerage monies.

….

6.    A "claim" by any entity or individual which:

a.    Is wholly or partially owned, operated, managed, or controlled by the insured; or
b.    Did wholly or partially own, operate, manage, or control the insured; or
c.    Is wholly or partially under the same ownership, operation, management, or financial control of the insured.

….

17.    Any "claim" based solely on an insured's status as a fiduciary.

18.    "Claims" made against an insured arising out of the insured's activities as third party administrator of any plan, whether insured or self-insured and whether or not the insured performs such activities.

Utica also referenced the Policy's Retroactive Date of July 30, 2002 in its March 4, 2004 letter. Utica hereby notifies Massamont that it no longer relies on the Policy's Retroactive Date in disclaiming coverage for Westchester's claims, and expressly disavows any reliance on the Policy's Retroactive Date as a basis for its reaffirmance herein of the denial of coverage.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 11


      If you or the insured have any additional documents or information pertinent to the issues discussed in this letter, please let me know.  I also would be happy to discuss all or any part of this letter with you at your convenience.

                              Very truly yours,



                              Russell F. Conn

RFC:kmg/mah:7663-00
Enclosures
cc:    Erin K. Higgins, Esq.
       Mr. Marc Chilton (Utica Claim No. 732751)


221204.1

### CONN KAVANAUGH ROSENTHAL PEISCH & FORD, LLP

COUNSELORS AT LAW

Ten Post Office Square, Boston, Massachusetts 02109

Tel: (617) 482-8200

Fax: (617) 482-6444

WRITER'S DIRECT DIAL: (617) 348-3201
E-MAIL: RCONN@CKRPF.COM

May 19, 2005

THOMAS E. PEISCH
BOB B. ROSENTHAL
JAMES F. KAVANAUGH, JR.
RUSSELL F. CONN
GEORGE M. FORD
JAMES B. PELOQUIN
BARRY E. GOLD
THOMAS J. GALLITANO
JAMES GRAY WAGNER
ERIN K. HIGGINS
STEVEN E. GURDIN
MICHAEL T. SULLIVAN
CONSTANCE M. MCGRANE

KURT B. FLIEGAUF
RONALD M. JACOBS
CAROL A. STARKEY
JENNIFER M. NORTON
SARA L. GOODMAN
MICHAEL R. BERNARDO
JACOB A. LABOVITZ
CARA A. FAUCI
JOHANNA L. MATLOFF
AMY C. STEWART
BETH NUZZO NEWMARK
SARAH E. WEBER

<u>Via Facsimile (202) 662-6291</u>
<u>and Regular Mail</u>

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
Covington & Burling
1201 Pennsylvania Avenue NW
Washington, DC 20004-2401

  RE: <u>Westchester Fire Insurance Company v. Massamont Insurance Agency</u>
     Utica Claim No. 732751

Dear Messrs. Sayler & Williams:

  We now have had an opportunity to review in detail the matters set forth in your letter of May 5, 2005. Consistent with its previous decision, Utica disclaims any obligation to indemnify Massamont for the arbitrators' award, as that award results from a claim that is not covered under Utica's policy with Massamont. In addition, Utica reiterates the position set forth in our letter to you of March 31, 2005 declining to pay Massamont's defense costs in the arbitration.

  The basis for Utica's position is as set forth in our letter to you of March 31, 2005, supplemented with specific attention to your letter of May 5, 2005 as follows.

1. <u>"Negligent Act, Error or Omission"</u>

  We addressed this coverage issue at some length in our letter of March 31, 2005, *see* pp. 5-7, and will not reiterate those views here.

  In your latest letter, you dismiss most of our analysis on the basis that the law we cited was not decided by a Massachusetts appellate court. You further argue that the case of *USM Corp. v. First State Insurance Co.*, 420 Mass. 865 (1995) ("*USM*") is dispositive.

  *USM* involved the interpretation of an errors and omissions policy in which the insured had been found liable in an underlying action for having breached an express warranty that a



EXHIBIT

L-2

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
Covington & Burling
May 19, 2005
Page 2

computer system, which the insured agreed to develop and deliver to its customer, would
perform certain functions. In fact, that computer system did not function in accordance with its

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
Covington & Burling
May 19, 2005
Page 3

specifications. In the underlying action, the insured specifically was determined not to have been negligent because the insured had reasonably relied upon information from the computer manufacturer in making its representations and warranties to the insured's customer.

Like the Utica policy, the First State policy at issue in *USM* provided coverage for claims against the insured by reason of any "negligent act, error, or omission." In parsing the language of the policy, the Court determined that the word "negligent" modified only the word act, so that even though the court in the underlying action had determined that there was no negligence, there still could be coverage if the claim for which the insured was found liable involved either an "error" or "omission." In the key language of the decision, the Court concluded (with emphasis added) as follows.

> "Although the policy does not cover liability because of each and
> every error resulting from a breach of contract, the error in this
> case was inherent in the rendering of professional advice. [The
> consultant] assured [its customer] that it may rely on its
> professional advice as a consultant that a particular system would
> meet a particular standard of performance. [Consultant] was not
> negligent in giving that assurance, or, put another way, it was
> reasonable [sic] within its professional responsibilities for
> [consultant] to make such a promise. The policies covered losses
> of the character that [consultant] incurred."

Id. at 868-69.

In the present case, unlike *USM*, Westchester's claim did not arise from and was not "inherent in the rendering of professional advice." To the contrary, Westchester's claim against Massamont arose from Massamont's breach of its agency agreement with Westchester. That breach had nothing to do with the rendering of professional advice – as was the case in *USM* – but arose from and was related to Massamont's deliberate solicitation of a different carrier, and then the placement with that carrier of an extensive book of business that, by contract, Massamont had agreed to place with Westchester. Further, the arbitration panel order specifically based the award upon Massamont's breach of the agency agreement. There was no finding that Massamont was "negligent," or that it had committed any "error" or "omission."

Simply put, the Utica policy was never intended by the parties to make Utica a guarantor of Massamont's deliberate and calculated business decisions. There simply is no coverage for this claim under the Utica policy.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
Covington & Burling
May 19, 2005
Page **4**

2.    Dishonest Conduct

It is not clear from the face of the arbitrators' award whether that award in any way was based upon so-called "dishonest conduct" or claims "arising out of or alleging the unauthorized of trade secrets or confidential proprietary information."

While you have cited trial testimony that you believe is dispositive of the issue, we have not been given an opportunity to review the trial transcripts, any exhibits, or submissions by the parties to the arbitration panel. You will recall that I requested this information in my letter to you of May 12th, and your letter of May 17th indicates we will be given access to these materials.

Accordingly, Utica will continue to reserve its rights on this issue until we have reviewed the materials from the arbitration. We then will notify you of Utica's position accordingly.

3.    Rescission for Non-Disclosure

We have reviewed the issue of rescission with Utica and Utica has decided not to pursue this issue.

4.    Failure to Cooperate

We interviewed Utica's investigator, Robert Burkitt, and Mr. Burkitt confirmed that Massamont refused to produce to him copies of any of its communications with Axis. Moreover, the pertinent clause in Utica's policy requires cooperation with respect to the "investigation" of a claim or suit. Such a clause requires an insured to cooperate not only with respect to the defense of a claim or suit, but with respect to an insurer's determination of coverage. *See Metlife Auto & Home v. Cunningham*, 59 Mass. App. Ct. 583, 589-90 (2003).

We continue to believe the Axis – Massamont communications are germane to the issue of coverage. We further note that your letter of December 6, 2004 asked Utica to revisit the issue of Utica's duty to defend while your letter of May 5th asks Utica, for the first time, to indemnify Massamont with respect to the arbitration award. In view of the ongoing nature of Utica's coverage determination, with respect to both defense and indemnity, the request for this documentation remains germane.

Because your letter indicates that Massamont has no recollection of Mr. Burkitt's request, and because the coverage determination has been ongoing, Utica will withdraw its formal disclaimer on this issue, provided the materials in question are produced promptly. At the same time, Utica fully reserves its rights to modify or clarify its position, as may be appropriate, once it has reviewed the requested materials.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
Covington & Burling
May 19, 2005
Page 5

5.    Your letter of May 17th

    As you suggest, we will contact Mr. Murray and make arrangements to review the arbitration transcripts, exhibits, and filings. Please note we may wish to designate certain materials for copying. We will then let you know if Utica's position changes as a result of our review of these materials.

    In view of its continued denial of coverage, Utica agrees Massamont may take whatever actions it deems appropriate with respect to the arbitration award or Westchester's demands therein.

    Please do not hesitate to contact me if you have any questions or if Utica's position is unclear.

Very truly yours,

Russell F. Conn

RFC:kmg:7663-059

cc:    Erin K. Higgins, Esq.
      Mr. Marc Chilton (Utica Claim No. 732751)

226718.1

# CONN KAVANAUGH ROSENTHAL PEISCH & FORD, LLP

## COUNSELORS AT LAW

THOMAS E. PEISCH
BOB B. ROSENTHAL
JAMES F. KAVANAUGH, JR.
RUSSELL F. CONN
GEORGE M. FORD
JAMES B. PELOQUIN
BARRY E. GOLD
THOMAS J. GALLITANO
JAMES GRAY WAGNER
ERIN K. HIGGINS
STEVEN E. GURDIN
MICHAEL T. SULLIVAN
CONSTANCE M. MCGRANE

Ten Post Office Square, Boston, Massachusetts 02109

Tel: (617) 482-8200

Fax: (617) 482-6444

WRITER'S DIRECT DIAL: (617) 348-3201
E-MAIL: RCONN@CKRPF.COM

May 24, 2005

KURT B. FLIECAUF
RONALD M. JACOBS
CAROL A. STARKEY
JENNIFER M. NORTON
SARA L. GOODMAN
MICHAEL R. BERNARDO
JACOB A. LABOVITZ
CARA A. FAUCI
JOHANNA L. MATLOFF
AMY C. STEWART
BETH NUZZO NEWMARK
SARAH E. WEBER

<u>Via E-Mail and</u>
<u>Regular Mail</u>

Jarrett A. Williams, Esq.
Covington & Burling
1201 Pennsylvania Avenue NW
Washington, DC 20004-2401

RE:  <u>Westchester Fire Insurance Company v. Massamont Insurance Agency</u>
Utica Claim No. 732751

Dear Mr. Williams:

In response to your May 23, 2005 letter, I repeat what I said in my May 19, 2005 letter – i.e., that in light of Utica's disclaimer of any obligation to defend or indemnify Massamont with respect to the claims made by Westchester, Massamont should take whatever actions it deems appropriate with respect to the arbitration award or Westchester's demands in connection with the award.

I note your comment that this office "twice rescheduled" our review of the documents generated during the arbitration, which originally was scheduled to take place yesterday and now is scheduled to take place tomorrow. Please let me remind you that it was open to Massamont to submit any and all materials regarding the arbitration to Utica in connection with your demand for coverage dated December 6, 2004, or in connection with your further demand for coverage dated May 5, 2005. Further, although we specifically requested access to these documents in our letter dated May 11, 2005, you first notified us that the documents would be made available for review on May 17, 2005, and you have never taken steps to deliver these materials to our office. Thus, I hardly think it fair to imply that we have delayed in reviewing these materials.

I cannot commit at this time to having a further report to you by June 1, 2005 regarding our review of the arbitration materials and the impact, if any, of such review on Utica's coverage position, as we simply do not know how much material we will have to review. I should have a better sense of when our review will be completed after my associate, Jake Labovitz, has had an opportunity to inspect the documents at Burns & Levinson.



EXHIBIT

tabbies

L – 3

Jarrett A. Williams, Esq.
Covington & Burling
May 24, 2005
Page 2

As to the final points in your letter, Utica does not intend to disclose to any third parties any information that was designated as "attorneys' eyes only" in the arbitration. We do reserve the right to use any information as pertinent to any coverage litigation between our clients. In that event, we would agree to a confidentiality order. Further, Utica does not object to your decision to withhold from the production those materials that were designated by Westchester as "highly confidential," based on your representation that these documents were relevant only to Massamont's counterclaims against Westchester for certain profit sharing payments.

Please do not hesitate to contact me if you have any questions or if Utica's position is unclear.

Very truly yours,

Russell F. Conn

RFC:kmg:7663-059

cc:    Erin K. Higgins, Esq.
       Mr. Marc Chilton (Utica Claim No. 732751)

227276.1

## CONN KAVANAUGH ROSENTHAL PEISCH & FORD, LLP

### COUNSELORS AT LAW

THOMAS E. PEISCH
BOB B. ROSENTHAL
JAMES F. KAVANAUGH,
JR.
RUSSELL F. CONN
GEORGE M. FORD
JAMES B. PELOQUIN
BARRY E. GOLD
THOMAS J. GALLITANO
JAMES GRAY WAGNER
ERIN K. HIGGINS
STEVEN E. GURDIN
MICHAEL T. SULLIVAN
CONSTANCE M. MCGRANE

Ten Post Office Square, Boston, Massachusetts 02109

Tel: (617) 482-8200
Fax: (617) 482-6444

WRITER'S DIRECT DIAL: (617) 348-8210
E-MAIL: RCONN@CKRPF.COM

June 1, 2005

KURT B. FLIEGAUF
RONALD M. JACOBS
CAROL A. STARKEY
JENNIFER M. NORTON
SARA I. GOODMAN
MICHAEL R. BERNARDO
JACOB A. LABOVITZ
CARA A. FAUCI
JOHANNA L. MATLOFF
AMY C. STEWART
BETH NUZZO NEWMARK
SARAH E. WEBER

<u>Via E-Mail and
Regular Mail</u>

Jarrett A. Williams, Esq.
Covington & Burling
1201 Pennsylvania Avenue NW
Washington, DC 20004-2401

      RE:   <u>Westchester Fire Insurance Company v. Massamont Insurance Agency</u>
              Utica Claim No. 732751

Dear Mr. Williams:

     I have reviewed your May 27, 2005 letter and the voluminous attachments to same. I trust that you have advised Massamont of Utica's disclaimer of any obligation to defend or indemnify Massamont with respect to the claims made by Westchester, and that Massamont therefore is prepared to take whatever action it deems appropriate in responding to Westchester's petition to confirm the arbitration award.

     Please do not hesitate to contact me if you have any questions or if Utica's position is unclear.

                Very truly yours,

                Russell F. Conn

RFC:kmg:7663-059

cc:   Erin K. Higgins, Esq.
      Mr. Marc Chilton (Utica Claim No. 732751)

227728.1



EXHIBIT

L-4

-----Original Message-----
**From:** Palino, Gayle V. [mailto:gpalino@ckrpf.com]
**Sent:** Wednesday, June 15, 2005 3:44 PM
**To:** Williams, Jarrett
**Subject:** 227938_1.DOC

Attached please find a letter sent to you on behalf of Russell F. Conn.

Via E-Mail and
Regular Mail

Jarrett A. Williams, Esq.
Covington & Burling
1201 Pennsylvania Avenue NW
Washington, DC 20004-2401

      RE:    Westchester Fire Insurance Company v. Massamont Insurance
            Agency

7/5/2005



**EXHIBIT**

L-5

_____ Utica Claim No. 732751

Dear Mr. Williams:

We have reviewed the arbitration documents that were made available to us at Burns & Levinson. There has been no change in Utica's position disclaiming any obligation to defend or indemnify Massamont against Westchester's claims on the grounds that there is no coverage available under Utica's policy because the claims did not arise out of a "negligent act, error or omission."

In your letter of May 5, 2005, you also questioned Utica's reservation of its right to disclaim coverage for any dishonest or fraudulent conduct, claiming that Westchester had not even alleged that such conduct occurred. Having now had the opportunity to review the transcript of the proceedings and the parties' post-hearing briefs, however, it appears to us that Westchester's case against Massamont was centered on its claim that Massamont's actions were deceitful and fraudulent. This point is clearly made in the concluding paragraph of Westchester's 59-page post-hearing memorandum, which sums up the evidence offered by Westchester as demonstrating that "Massamont engaged in deceit and double-dealing on a breathtaking scale." Thus, even if Utica's policy otherwise provided coverage for Westchester's claims, which it does not, Utica would be entitled to disclaim coverage on the grounds that the policy excludes coverage for "dishonest, fraudulent, malicious, or criminal conduct."

Finally, with respect to the exclusion for claims arising out of the disclosure of confidential information, we have now reviewed the entire transcript of the arbitration proceedings, including the brief excerpt referenced in your May 5, 2005 letter. From our review of the transcript, it appears clear that Westchester alleged and offered evidence demonstrating that Massamont, in connection with and in furtherance of its breach of the Agency Agreement, improperly disclosed confidential information to Axis. Utica's policy excludes coverage for claims "arising out of or alleging the unauthorized use of . . . confidential or proprietary information." Thus, even if Utica's policy otherwise provided coverage for Westchester's claims, which it does not, Utica would be entitled to disclaim coverage on the grounds that the policy excludes coverage for claims arising out of the unauthorized use of confidential or proprietary information.

In sum, having now reviewed the arbitration materials only recently made available at the offices of Burns & Levinson, Utica restates and reaffirms the coverage positions set forth in our March 31, 2005 and May 19, 2005 letters, as supplemented herein. If Utica's coverage position is unclear in any way, please give me a call.

Very truly yours,

Russell F. Conn

RFC:kmg/mah:7663-059
Enclosure
cc:     Erin K. Higgins, Esq.
        Mr. Marc Chilton (Utica Claim No. 732751)

227938.1

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the original and any copy of this e-mail message and any printout thereof.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

IN THE MATTER OF THE ARBITRATION
BETWEEN

WESTCHESTER FIRE INSURANCE
COMPANY, WESTCHESTER SURPLUS LINES
INSURANCE COMPANY AND ILLINOIS
UNION INSURANCE COMPANY,

                                Petitioners,

                   -against-

MASSAMONT INSURANCE AGENCY, INC.,

                                Respondent.

------------------------------------------------------------- x

                                            Case No. 05 Civ. \_\_\_

## PETITION TO CONFIRM
## ARBITRATION AWARD

         Petitioners Westchester Fire Insurance Company, Westchester Surplus Lines

Insurance Company and Illinois Union Insurance Company (collectively, "Petitioners"), by their

attorneys O'Melveny & Myers LLP, allege as follows:

<u>Nature Of The Proceeding And Relief Sought</u>

         1.       Petitioners commence this proceeding to confirm an arbitration award

(the "Award") and to have judgment entered thereon pursuant to Section 9 of the Federal

Arbitration Act ("FAA"), 9 U.S.C. § 9. (A copy of the Award is attached as Exhibit A to the

accompanying Declaration of Paul R. Koepff, dated May 17, 2005 (the "Koepff Declaration").)

         2.       The Award was issued pursuant to the arbitration provisions of the

Agency Agreement (the "Agreement") between Westchester Fire and Massamont entered into as

of January 1, 2001. (A copy of the Agreement is attached as Exhibit B to the Koepff
Declaration.)

3.      Additionally, Petitioners seek pre-judgment interest on the Award and fees
incurred in this proceeding to confirm the Award.

### Parties

4.      Petitioner Westchester Fire Insurance Company ("Westchester Fire") is a
corporation formed under the laws of New York with offices at 1133 Avenue of the Americas,
New York, New York 10036.

5.      Petitioner Westchester Surplus Lines Insurance Company ("Westchester
Surplus") is a corporation formed under the laws of Georgia with offices at 1601 Chestnut Street,
Philadelphia, Pennsylvania 19103.

6.      Petitioner Illinois Union Insurance Company ("Illinois Union") is a
corporation formed under the laws of Illinois with offices at 525 West Monroe Street, Chicago,
Illinois 60661.

7.      Respondent Massamont Insurance Agency, Inc. ("Respondent" or
"Massamont") is a corporation formed under the laws of Massachusetts with offices at
240 Lewis Wharf, Boston, Massachusetts 02110.

### Jurisdiction And Venue

8.      Chapter 1 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16,
governs this proceeding because the performance and breach of the Agreement involved
interstate commerce. The Agreement concerned the purchase and sale of insurance in the New
England states and governed the relationship between Petitioners, which are New York, Georgia,
and Illinois corporations, respectively, and Respondent, a Massachusetts corporation.
(See Agreement at WF003425.) Consequently, federal law governs enforcement of the Award.

9.      This court has subject-matter jurisdiction over Respondent pursuant to 28 U.S.C. § 1332(a)(1), because this action is between citizens of different states and the amount in controversy exceeds $75,000.

10.     This court has personal jurisdiction over Respondent because Respondent agreed to participate in arbitral proceedings that included four days of hearings in this district.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a), because "a substantial part of the events or omissions giving rise to the claim" occurred in this district. Venue is also proper in this district pursuant to 9 U.S.C. § 9, because, since arbitration hearings were held here, the Award is deemed to be made here.

Facts

The Parties' Agreement

12.     Massamont serves as managing general agent ("MGA") for a program of property and casualty insurance in New England.  Pursuant to the Agreement, as of January 1, 2001, Westchester Fire agreed to serve as property carrier for the Program.[1]  (See Agreement at WF003425.)[2]

13.     Under the Agreement, Massamont was appointed Westchester Fire's exclusive agent for the Program.  The Agreement provided:

> COMPANY [Westchester Fire] may terminate this AGREEMENT immediately by written notice to AGENT [Massamont] if any one or more of the following events occur:
>
> . . . .
>
> AGENT assigns, transfers, encumbers or otherwise disposes of this AGREEMENT or any interest in this AGREEMENT or sells,

---

[1]     Petitioners Westchester Surplus and Illinois Union were later added in order to issue surplus lines policies.

[2]     Documents with the pagination prefix WF are taken from Petitioners' document production in the arbitration.

exchanges, transfers, assigns, merges or consolidates the
PROGRAM insurance business without giving COMPANY ninety
(90) days prior notice thereof.

(Agreement, Section VIII.C.2 at WF003435.)

14.    The Agreement further provided:

During the term of this Agreement AGENT will not solicit for any
other insurance carrier, except COMPANY, the Program business.
If COMPANY elects not to write such business, then AGENT is
granted the right to submit such business to other insurance
companies under the same terms and conditions as presented to
COMPANY.

(Id., Section IX.B. of Exhibit A to the Agency Agreement at WF003445.)

15.    In October 2001 the parties amended the Agreement to extend its term to

December 31, 2003, and to flatly prohibit Massamont from "shopping" the Program during that

term: "[t]he Agreement is subject to AGENT agreeing not to seek another company to write the

PROGRAM during this period." (Id., Amendment to Agency Agreement at WF003446.)

16.    Section IV.I. of the Agreement also provided that Program information,

including "results, loss and pricing data, underwriting criteria and surveys, loss control

information, and other related PROGRAM data" would be kept confidential and not disclosed to

any third party without Petitioners' prior written approval. (Agreement, Section IV.I. at

WF003430.)

The Parties Agreed To Arbitrate All Disputes

17.    The Agreement contains an arbitration clause pursuant to which the parties

agreed to arbitrate all disputes:

It is understood that this AGREEMENT is made in good faith and
should there arise a difference of opinion or of interpretation of
this AGREEMENT, which cannot be settled amicably between
senior representatives of the COMPANY who are not involved in
the day-to-day management of the PROGRAM and AGENT, or
any dispute arising from or relating to the performance or breach

4

20.    The Letter of Intent provided that "[e]ffective June 19, 2003, Massamont will be authorized to negotiate, underwrite and accept property insurance coverages for municipalities and schools" in the six New England states.  (Letter of Intent at 557.)[3]  The Letter of Intent also provided that:

> All new and renewal accounts for business covered by this Letter and located in the states of Massachusetts and Rhode Island that will have a policy effective date on or after 7/1/03 and where a quote has yet to be released will be quoted with and underwritten by Sheffield Insurance Company [an Axis affiliate].

(Id. at 558.)  Where Massamont had already quoted on behalf of Westchester Fire, the Letter of Intent further required Massamont to make a good faith effort to quote on behalf of Sheffield "as a replacement to the existing quote."  (Id.)  Massamont immediately began placing accounts with Axis, even before Massamont revealed its agreement with Axis to Petitioners.

21.    On June 30, 2003, Massamont finally informed Petitioners of the Axis deal.  Petitioners promptly demanded an explanation.  The parties had several calls, including a conference call that included Schenck and a senior Westchester Fire executive, Robert Gaffney.  These discussions proved fruitless.  By letter dated July 9, 2003, Westchester Fire advised Massamont that Westchester Fire was terminating the Agreement, effective immediately.  (A copy of the letter is attached to the Koepff Declaration as Exhibit D.)

### The Arbitration Proceeding

On October 23, 2003, Petitioners notified Massamont that they were commencing arbitration in accordance with Section XX of the Agreement in order to seek damages for Massamont's breaches, including:

- transferring Program business to a rival carrier, in violation of the Agreement's exclusivity provisions, and

---

[3]    Documents with no pagination prefix are taken from Massamont's document production in the arbitration.

6

- sharing confidential Program information with a third party—indeed, a carrier in direct competition with Petitioners—without Petitioners' consent.

(A copy of the arbitration demand is attached to the Koepff Declaration as Exhibit E.)

22.    As of March 22, 2004, the parties had constituted a panel of two arbitrators and an umpire (the "Panel"). In accordance with the Agreement, all members of the Panel had extensive experience with insurance. (See Agreement, Section XX.B.) The two party-appointed arbitrators were Ronald Jacks, Esq., former General Counsel of the CNA Insurance Companies and retired Senior Partner at Mayer, Brown, Rowe & Maw LLP, and William F. Hofmann, III, Executive Vice President and Treasurer of the Provider Insurance Group and former president of the Independent Insurance Agents of America. The party-appointed arbitrators agreed to appoint Andrew I. Douglass, Esq., a partner with Morrison Mahoney LLP and formerly Executive Vice President and General Counsel for the St. Paul Companies, Inc., as umpire.

Thereafter, the Panel approved a timetable for the arbitration. Pursuant to that timetable, as modified from time to time, the parties agreed to a schedule that included the following:

- exchange of documents;
- depositions of fact witnesses and experts on each side; and
- submission of pre-hearing memoranda with supporting documentary evidence and expert reports.

23.    The parties then presented four days of fact and expert testimony on November 16–19, 2004 in New York.[4] In order to permit each party to complete the

---

[4]    While the Agreement's arbitration clause provides that the situs of the arbitration is Philadelphia, Pennsylvania, the parties and the Panel agreed to hold hearings in New York (where Petitioners' counsel's offices were located) and Boston (where Respondent's and respondent's counsel's principal offices were located).

7

presentation of its case, the Panel agreed to hear an additional two days of rebuttal testimony on

December 13–14, 2004 in Boston. At the Panel's request, the parties submitted post-hearing

briefs on January 24, 2005 and reply briefs on February 8, 2005.

### The Final Arbitration Award

24.    The Arbitral Tribunal issued its final Award dated April 26, 2005.

25.    In the Award, the Panel:

    a.    unanimously determined that Massamont breached the Agreement;

    b.    found by a majority that a technical breach of the profit-sharing
agreement by Petitioners "may have occurred," but that a net
award covering both Massamont's breach of the Agreement and
Petitioners' possible breach of the profit-sharing agreement was
appropriate;

    c.    awarded $2,600,000 in damages to Westchester Fire; and

    d.    determined by majority vote that an award of attorneys' fees to the
prevailing party would not be appropriate.

(See Award.)

26.    On May 13, 2005, having received no communication from Respondent,

Petitioners sent a demand letter. (A copy of the demand letter is attached to the Koepff

Declaration as Exhibit F.)

### Claims For Relief

27.    Chapter 1 of the FAA governs the Award because the performance and

breach of the Agreement concern interstate commerce. 9 U.S.C. § 9.

28.    The Parties agreed that the decision of the arbitrators would be binding on

all parties. (See Agreement, Section XX.C. at WF003435.)

8

29.    This Court has jurisdiction to confirm the Award because the parties are citizens of different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a)(1).

30.    This petition is being filed within one year after the Award was rendered, in accordance with 9 U.S.C. § 9.

### First Claim for Relief
### (Confirmation of the Award)

31.    Petitioners repeat and reallege each and every allegation contained in paragraphs 1 through 30 above, inclusive, and incorporate them herein by reference.

32.    The FAA provides that a judgment of the court shall be entered upon an arbitration award "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9.

33.    None of the grounds available for vacation, modification or correction of the Award specified in 9 U.S.C. §§ 10–11 apply to the Award.

34.    Therefore, the Award should be confirmed pursuant to 9 U.S.C. § 9.

### Second Claim for Relief
### (Interest on Amounts Due Under the Award)

35.    Petitioners repeat and reallege each and every allegation contained in paragraphs 1 through 34, above, inclusive, and incorporate them herein by reference.

36.    The Agreement provides that it shall be governed by Pennsylvania law. (Agreement, Section XXII at WF003441.)  Under Pennsylvania law, prejudgment interest is awarded from the date of the award until the date of entry of judgment at the statutory rate of six percent.  41 Pa. Stat. Ann. § 202.

Dated: New York, New York
      May 17, 2005

Respectfully submitted,

O'MELVENY & MYERS LLP

By: _____
    Paul R. Koepff (PK 8452)
    Claudia Ray (CR 4132)
    Scott D. Thomson (ST 6136)

Times Square Tower
7 Times Square
New York, New York 10036

| Telephone: | 212-326-2000 |
| Facsimile: | 212-326-2061 |
| E-mail: | pkoepff@omm.com |
| | cray@omm.com |
| | sthomson@omm.com |

*Attorneys for Petitioners Westchester Fire
Insurance Company, Westchester Surplus
Lines Insurance Company, and Illinois
Union Insurance Company*

11