UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
MASSAMONT INSURANCE                       )
AGENCY, INC.                              )
                                          )
           Plaintiff,                     )
                                          )     CIVIL ACTION NO. 05-11897-WGY
v.                                        )
                                          )
UTICA MUTUAL INSURANCE                    )
COMPANY                                   )
                                          )
           Defendant.                     )
_____)

## STATEMENT OF UNDISPUTED FACTS

1.     Massamont Insurance Agency, Inc. ("Massamont") is a Massachusetts

Corporation with a principal place of business at 280 Summer Street, Boston, Massachusetts.

(Complaint, ¶ 1).  Massamont is a licensed insurance agency that specializes in the placement and

administration of insurance  programs for specific markets in New England.  (Id.)

2.     Utica Mutual Insurance Company ("Utica") is an insurance company domiciled in

New York with a principal place of business in New Hartford, New York.  (Id. at ¶ 2).  Utica is

licensed to do business in Massachusetts.  (Id.)

3.     In 2003, Massamont was insured under a Utica claims-made Insurance Agents and

Brokers Errors and Omissions Liability Policy No. 3445032 EO (the "Policy").  (Affidavit of

Jacob A. Labovitz, Exhibit A, ¶ 1).  The Policy carried liability limits of $10 million "each loss"

and $11 million "each aggregate," and was effective from July 30, 2003, to July 30, 2004.  (Id.)

4.    The Policy provides the following in Section II(1)(a):

We will pay on behalf of the insured all 'loss' to which this insurance applies.

We will have the right and the duty to defend the insured against any 'suit' seeking those damages even if the allegations of the 'suit' are groundless, false, or fraudulent.  However, we will have no duty to defend an insured against any 'suit' seeking damages for a 'wrongful act' to which this insurance does not apply.

5.    The Policy provides the following in Section II(1)(e):

The 'loss' must arise out of 'wrongful acts' committed in the conduct of the insured's business, wherever committed or alleged to have been committed, by the insured or any person for whose 'wrongful acts' the insured is legally liable in rendering or failing to render professional services as:

(1)    A General Insurance Agent;

(2)    An Insurance Broker;

(3)    An Insurance Agent;

(4)    An Insurance Consultant;

(5)    A Managing, Master or Brokerage General Agent;

(6)    A Life and Accident and Health Insurance Agent;

(7)    A Surplus Lines Broker; or

(8)    A Notary Public.

6.    The Policy contains the following definitions relevant to these paragraphs of the

insuring agreement.

'Loss' means any amount which an insured becomes legally obligated to pay as damages for any 'claim' to which this insurance applies and shall include judgments and settlements. ...

2

'Claim' means a written notice, including service of 'suit' or demand for arbitration, received by one or more insureds asking for money or services.

'Suit' means a civil proceeding in which damages because of 'loss' from a 'wrongful act' are alleged.

   a.    An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b.    Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.
                 ...

'Wrongful act' means any negligent act, error, or omission to which this insurance applies.

7.    The Policy provides the following in Section III – Exclusions:

This insurance does not apply to:

   1.    Any dishonest, fraudulent, malicious, or criminal conduct committed or alleged to have been committed by or at the direction of the insured.  If a 'suit' is brought against the insured alleging both 'wrongful acts' within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct, then we will defend the insured in the trial court, but we shall not have any liability for any judgment for dishonest, fraudulent, malicious, or criminal conduct nor shall we have any further obligation to defend after judgment in the trial court.

         This exclusion applies only to insureds who participated in, acted with knowledge of, or acquiesced to such conduct.
         ...

   19.   "Claims" arising out of or alleging the unauthorized use of trade secrets or confidential or proprietary information.

8.    Effective January 1, 2001, Massamont entered into an Agency Agreement (the "Agreement") with Westchester Fire Insurance Company ("Westchester").  (Complaint, ¶ 12, Labovitz Aff., ¶ 2, Exhibit A).

9.      Pursuant to the Agreement, Westchester appointed Massamont to handle various duties and responsibilities with respect to two programs involving property insurance for New England schools and municipalities – the Metrogard Program and the Diplomax Program (the "programs"). (Id.) Under these Programs, schools and municipalities were to purchase insurance policies issued exclusively by Westchester through Massamont. (Id.) The Agreement was to remain in effect until December 31, 2003, unless previously terminated in accordance with other provisions of the Agreement. (Id.)

10.     The Agreement provided that Westchester may terminate the Agreement immediately by written notice to Massamont if:

       ...

2.      [Massamont] assigns, transfers, encumbers or otherwise disposes of this AGREEMENT or any interest in this AGREEMENT or sells, exchanges, transfers, assigns, merges or consolidates the PROGRAM insurance business without giving [Westchester] ninety (90) days notice thereof.

The Agreement also provided, in pertinent part:
       ...

B.      During the term of this Agreement, Massamont will not solicit for any other insurance carrier, except [Westchester], the Program business. If [Westchester] elects not to write such business, then [Massamont] is granted the right to submit such business to other insurance carriers under the same terms and conditions as presented to [Westchester].

(Labovitz Aff., ¶ 2, Exhibit A).

11.     An amendment to the Agreement, effective on January 1, 2001, provided:

       The Agreement is subject to [Massamont] agreeing not to seek another company to write the PROGRAM business during this period.

(Labovitz Aff., ¶ 2, Exhibit A).

4

12.    On or before July 1, 2003, Massamont transferred certain program accounts to a competing insurance carrier of Westchester, Axis Capital Group ("Axis").  (Complaint, ¶ 24).

13.    By letter dated July 9, 2003, Westchester advised Massamont that it was terminating the Agreement effective immediately due to Massamont's alleged violation of the Agreement in transferring certain program business to Axis.  (Complaint, ¶ 26).  Massamont denied that it breached the Agreement.  (Id.)

14.    On or about October 23, 2003, Westchester served Massamont with a demand for arbitration ("Arbitration Demand"), seeking damages for Massamont's breach of the exclusivity provisions of the Agreement by: (1) seeking another company to write program business; (2) soliciting program business for Axis without first offering the business to Westchester; and (3) transferring program business to Axis without giving Westchester ninety days' notice of the proposed transfer.  (Labovitz Aff., ¶ 3, Exhibit A).  Westchester also alleged that Massamont had breached the confidentiality provisions of the Agreement.  (Id.)

15.    On October 28, 2003, Massamont tendered the Arbitration Demand to Utica.  (Complaint, ¶ 31).

16.    On March 4, 2004, Utica sent a letter to Massamont disclaiming coverage for the claims made by Westchester.  (Labovitz Aff., ¶ 4, Exhibit A).  Utica denied coverage on the grounds that "Westchester's claims of Massamont's deliberate and secret breach of the agreement that existed between the parties is not a negligent act, error, or omission to which this insurance applies . . . ."  (Id.)  Utica also noted that the Policy contained a number of exclusions, including the exclusion for dishonest, fraudulent, malicious, or criminal conduct.  (Id.)

5

17.     Massamont did not respond to this disclaimer of coverage, and had no further communications with Utica during the discovery phase of the arbitration proceedings.

18.     The arbitration between Massamont and Westchester (the "Arbitration") was held from November 16-19, 2004, and from December 13-14, 2004.  (Complaint, ¶ 36).

19.     On December 6, 2004, after four days of testimony, Massamont again wrote to Utica, challenging the coverage disclaimer and asserting that none of the policy provisions cited in Utica's March 4, 2004 letter supported the denial of coverage.  (Labovitz Aff., ¶ 5, Exhibit A). Massamont did not address Utica's assertion that the Policy provided coverage only for "negligent acts, errors, or omissions."  (Id.)

20.     By letter dated March 31, 2005, Utica responded to Massamont's December 6, 2004 letter, reiterating its disclaimer of coverage.  (Labovitz Aff., ¶ 6, Exhibit A; Complaint, ¶¶ 52, 53).

21.     On April 26, 2005, the arbitration panel issued an award of damages against Massamont in the amount of Two Million Six Hundred Thousand ($2,600,000) Dollars. (Labovitz Aff., ¶ 7, Exhibit A; Complaint, ¶ 37).

22.     Westchester's only claim at the arbitration was that Massamont had breached the Agreement with Westchester by transferring program business to Axis and by sharing confidential information with Axis.  (Complaint, ¶¶ 57, 72, 80; Arbitration Transcript, pages 42-88, 96-155, 322, 1215-1220-244, Westchester Fire Insurance Company's Post-Hearing Memorandum, pages 1-8, Westchester Fire Insurance Company's Reply Post-Hearing Memorandum, pages 1-15, Labovitz Aff., ¶ 13, Exhibit A).  Westchester submitted exhibits and testimony at the arbitration consistent with this claim.  (Id.)

23.     On May 5, 2005, Massamont made a demand on Utica for indemnification against the arbitration award.  (Labovitz Aff., ¶ 8, Exhibit A).  By letter dated May 19, 2005, Utica confirmed to Massamont its denial of indemnification.  (Labovitz Aff., ¶ 9, Exhibit A; Complaint, ¶¶ 54, 55).

24.     By letter dated August 8, 2005, Massamont sent a "Demand for Relief Under M.G.L. Ch. 93A" to Utica.  (Labovitz Aff., ¶ 10, Exhibit A; Complaint, ¶ 62).  Utica responded to this demand by letter dated August 29, 2005, reasserting its denial of coverage.  (Labovitz Aff., ¶ 11, Exhibit A; Complaint, ¶ 62).

25.     On September 19, 2005, Massamont filed a complaint in this Court against Utica, seeking a declaratory judgment that Massamont was entitled to coverage and indemnification, and alleging that Utica's breach of its duties to defend and indemnify was in violation of Chapters 93/176D.

UTICA MUTUAL INSURANCE
COMPANY

By its attorneys,

/s/ Jacob A. Labovitz
_____
Russell F. Conn, Esq. (BBO#94440)
Erin K. Higgins, Esq. (BBO#559510)
Jacob A. Labovitz, Esq. (BBO#646967)
CONN KAVANAUGH ROSENTHAL
 PEISCH & FORD, LLP
Ten Post Office Square
Boston, MA  02110
(617) 482-8200

Dated:  May 8, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system on May 8, 2006, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Jacob A. Labovitz
_____

Jacob A. Labovitz

244840.1

8

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                 )
MASSAMONT INSURANCE              )
AGENCY, INC.                     )
                                 )
            Plaintiff,           )
                                 )        CIVIL ACTION NO. 05-11897-WGY
v.                               )
                                 )
UTICA MUTUAL INSURANCE           )
COMPANY                          )
                                 )
            Defendant.           )
_____)
```

## AFFIDAVIT OF JACOB A. LABOVITZ IN SUPPORT
## OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, JACOB A. LABOVITZ, DO HEREBY DEPOSE AND STATE:

(1)     My name is Jacob A. Labovitz.  Along with Russell F. Conn and Erin K.
Higgins, I represent Utica Mutual Insurance Company ("Utica") in this action brought by
Massamont Insurance Agency, Inc. ("Massamont").  I have personal knowledge of the
facts set forth in this affidavit.

(2)     Attached as Exhibit 1 is a true and correct copy of the Utica claims-made
Insurance Agents and Brokers Errors and Omissions Liability Policy No. 3445032 EO
(the "Policy").

(3)     Attached as Exhibit 2 is a true and correct copy of the Agency Agreement
between Massamont and Westchester Fire Insurance Company ("Westchester"), effective
January 1, 2001.

(4)     Attached as <u>Exhibit 3</u> is a true and correct copy of Westchester's arbitration demand ("Arbitration Demand") served on Massamont dated October 23, 2003.

(5)     Attached as <u>Exhibit 4</u> is a true and correct copy of a letter dated March 4, 2004, from Utica to Massamont disclaiming coverage for the claims made by Westchester.

(6)     Attached as <u>Exhibit 5</u> is a true and correct copy of a letter dated December 6, 2004, from Massamont to Utica responding to Utica's disclaimer of coverage.

(7)     Attached as <u>Exhibit 6</u> is a true and correct copy of a letter dated March 31, 2005, from Utica to Massamont reiterating Utica's disclaimer of coverage to Massamont.

(8)     Attached as <u>Exhibit 7</u> is a true and correct copy of the arbitration panel's award against Massamont in the amount of Two Million Six Hundred Thousand Dollars ($2,600,000) dated April 26, 2005.

(9)     Attached as <u>Exhibit 8</u> is a true and correct copy of a letter dated May 5, 2005, from Massamont to Utica demanding indemnification from Utica against the arbitration award.

(10)     Attached as <u>Exhibit 9</u> is a true and correct copy of a letter dated May 19, 2005, from Utica to Massamont confirming Utica's denial of indemnification.

(11)     Attached as <u>Exhibit 10</u> is a true and correct copy of a letter dated August 8, 2005, from Massamont to Utica demanding relief under M.G.L. c. 93A for Utica's alleged breach of its duties to defend and indemnify Massamont.

(12)    Attached as <u>Exhibit 11</u> is a true and correct copy of a letter dated August 29, 2005, from Utica to Massamont responding to Massamont's demand and reasserting Utica's denial of coverage.

(13)    Attached as <u>Exhibit 12</u> (in separate volume to be delivered to the Court in hard copy) is a true and correct copy of the following documents from the arbitration between Massamont and Westchester:

> A.    the entire Arbitration Transcript (pages 1-1312);
>
> B.    Westchester's Arbitration Exhibits (1-86);
>
> C.    Massamont's Arbitration Exhibits (1-77);
>
> D.    Massamont's Post-Hearing Brief and Reply Brief; and
>
> E.    Westchester's Post-Hearing Brief and Reply Brief.

SUBSCRIBED TO AND SWORN UNDER THE PENALTIES OF PERJURY THIS 8th DAY OF MAY 2006.

/s/ Jacob A. Labovitz
_____
Jacob A. Labovitz

246433.1

3

# EXHIBIT 1

UTICA NATIONAL INSURANCE GROUP
ISSUED BY
*UTICA MUTUAL INSURANCE COMPANY*
P.O. BOX 530, UTICA, NEW YORK 13503
TELEPHONE: (315) 734-2000

**DECLARATIONS**

INSURANCE AGENTS AND BROKERS
ERRORS AND OMISSIONS LIABILITY POLICY
**CLAIMS-MADE BASIS**
RENEWAL POLICY

| NAMED INSURED AND MAILING ADDRESS | LOCATION ADDRESS |
|---|---|
| KNAPP SCHENCK & COMPANY<br>INSURANCE AGENCY INC<br>240 LEWIS WHARF<br>BOSTON MA 02110 | |

THE ADDRESS OF THE INSURED AS STATED HEREIN. IN RETURN FOR PAYMENT OF THE PREMIUM, AND
T 12:01 A.M. STANDARD TIME AT THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.
JBJECT TO ALL THE TERMS OF

| POLICY NUMBER | POLICY PERIOD | | PRIOR POLICY NO. | |
|---|---|---|---|---|
| | FROM | TO | | |
| 3445032 EO | 07/30/2003 | 07/30/2004 | 3445032 EO | |

**BASIC POLICY COVERAGE**
  LEGAL LIABILITY

  INSURED'S DEDUCTIBLE AMOUNT

**LIMITS OF LIABILITY**
$ 10,000,000 ___ EACH LOSS
$ 11,000,000 ___ EACH AGGREGATE
$ ___ 50,000 ___ EACH LOSS
$ ___ 150,000 ___ AGGREGATE

DEDUCTIBLE APPLIES TO: ☐ LOSS ONLY
☒ LOSS AND LITIGATION EXPENSE

**PREMIUMS**

BASIC POLICY PREMIUM                                   $ 179,905.00
REAL ESTATE AGENTS AND BROKERS PREMIUM                 $ N/A        (See attached endorsement for details)
MUTUAL FUND AND VARIABLE ANNUITY PREMIUM               $ N/A        (See attached endorsement for details)
EMPLOYMENT-RELATED PRACTICES PREMIUM                   $
OTHER

            TOTAL POLICY PREMIUM                       $ 179,905.00

**RETROACTIVE DATE**
  This insurance does not apply to loss, whenever occurring, from "wrongful acts" which took place before the
  Retroactive Date, if any, shown ___ NONE ___
                                   Enter Date or "None" if no Retroactive Date applies

**OPTIONAL EXTENDED REPORTING PERIOD PREMIUM**
  In Section VII - EXTENDED REPORTING PERIODS, we agree to provide an Optional Extended Reporting Period
  under certain conditions. The premium for such an Optional Extended Reporting Period is determined as shown in
  paragraph 5. of Section VII.

**FORMS AND ENDORSEMENTS** APPLYING TO AND MADE PART OF THIS POLICY AT TIME OF ISSUE:

  14-E-0001 (01-91) *   14-E-0001 (01-91) *   14-E-0095 (12-98) *   14-P-EOA (01-98) *
  8-L-1864 (12-02) *

ATE:  07/29/03
OUNTERSIGNED AT: BURLINGTON, MA
_____
LICENSED RESIDENT AGENT

_____
COMPANY OFFICER
CURTIS PEARSALL

  THESE DECLARATIONS AND THE COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A
  PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

14-D-EOA ED.12-99   SEE OVER FOR IMPORTANT CLAIMS-MADE COVERAGE NOTICE

> The policy which provides Insurance Agents and Brokers Errors and Omissions
> Liability Coverage applies on a claims-made basis.

The following provides a general description of this coverage and is subject to the terms and provisions of the actual policy.

A. The policy, subject to its terms and conditions, provides full prior acts coverage if no Retroactive Date is entered in the Declarations. If a Retroactive Date is entered in the Declarations, the policy will not apply to loss from "wrongful acts" which took place before the Retroactive Date. The policy will not apply to loss from "wrongful acts" which take place after the expiration of the policy period.

B. The policy will apply to losses from "wrongful acts" which take place on or after the Retroactive Date, if any, but before the beginning of the policy period only if the Insured did not know of the "wrongful acts" before the beginning of the policy period and if any claim is made according to D. below.

C. The policy will not apply to any loss for which claim is first made after the expiration of the policy period or any Automatic or Optional Extended Reporting Period described in the Extended Reporting Period Section of the policy.

D. The policy will apply only to claims which are first made:

  1. During the policy period;
  2. *During the sixty day Automatic Extended Reporting Period described in the Extended Reporting Period Section of the policy; or*

  3. During the Optional Extended Reporting Periods of 12 months to 120 months duration, described in the Extended Reporting Period Section of the policy. Such Optional Extended Reporting Period must be requested by the Insured in writing, within sixty days after the date of termination of coverage or thirty days after the date of mailing by us of notice to the named insured advising of premiums for and provisions of Optional Extended Reporting Periods, in order to allow claims to be made against the policy coverage after the expiration of any Automatic Extended Reporting Period.

E. We will send you a written notice within thirty days after any termination of coverage of costs for and provisions of Extended Reporting Periods.

F. For the first three years of claims-made coverage, premiums will be comparatively lower than for occurrence coverage, and will increase for each renewal of those policies. Claims-made prices will still be somewhat lower than occurrence prices for mature accounts (in their fourth or later years). The purchase of Optional Extended Reporting Periods, as described above, requires additional premium payments.



**Utica National Insurance Group**

Insurance that starts with you.

Utica Mutual Insurance Company and its affiliated companies, New Hartford, N.Y. 13413

14-D-EOA Ed. 12-99

**UTICA NATIONAL INSURAN: GROUP**

ISSUED BY
*UTICA MUTUAL INSURANCE COMPANY*
P.O. BOX 530, UTICA, NEW YORK 13503
TELEPHONE: (315) 734-2000

**DECLARATIONS**

INSURANCE AGENTS AND BROKERS
ERROR: AND OMISSIONS LIABILITY POLICY
**CLAIMS-MADE BASIS**
AMENDMENT

DROP MAIL

NAMED INSURED AND MAILING ADDRESS

KNAPP SCHENCK & COMPANY
INSURANCE AGENCY INC
240 LEWIS WHARF
BOSTON MA 02110

LOCATION ADDRESS

7327S1

T 12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE INSURED AS STATED HEREIN. IN RETURN FOR PAYMENT OF THE PREMIUM, AND
UBJECT TO ALL THE TERMS OF THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| POLICY NUMBER | POLICY PERIOD FROM | TO | PRIOR POLICY NO. | CORRECTING RETRO DATE |
|---|---|---|---|---|
| 3445032 EO | 07/30/2003 | 07/30/2004 | 3445032 EO | EFF. 07/30/2003    AMEND. NO. 01 |

**BASIC POLICY COVERAGE**
    LEGAL LIABILITY

    INSURED'S DEDUCTIBLE AMOUNT

**LIMITS OF LIABILITY**
$ 10,000,000 __ EACH LOSS
$ 11,000,000 __ EACH AGGREGATE
$ 50,000 __ EACH LOSS
$ 150,000 __ AGGREGATE

DEDUCTIBLE APPLIES TO: ☐ LOSS ONLY
☒ LOSS AND LITIGATION EXPENSE

**PREMIUMS**

    BASIC POLICY PREMIUM                                $ 179,905.00
    REAL ESTATE AGENTS AND BROKERS PREMIUM              $ N/A ___ (See attached endorsement for details)
    MUTUAL FUND AND VARIABLE ANNUITY PREMIUM            $ N/A ___ (See attached endorsement for details)
    EMPLOYMENT-RELATED PRACTICES PREMIUM                $ ___
    OTHER

        TOTAL POLICY PREMIUM        $ 179,905.00 ___ NO PREMIUM CHANGE

**RETROACTIVE DATE**
    This Insurance does not apply to loss, whenever occurring, from "wrongful acts" which took place before the
    Retroactive Date, if any, shown ___ 07/30/02
                                    Enter Date or "None" if no Retroactive Date applies

**OPTIONAL EXTENDED REPORTING PERIOD PREMIUM**
    In Section VII - EXTENDED REPORTING PERIODS, we agree to provide an Optional Extended Reporting Period
    under certain conditions. The premium for such an Optional Extended Reporting Period is determined as shown in
    paragraph 5. of Section VII.
**FORMS AND ENDORSEMENTS** APPLYING TO AND MADE PART OF THIS POLICY AT TIME OF ISSUE:

    14-E-0001 (01-91)    14-E-0001 (01-91)    14-E-0095 (12-98)    14-P-EOA (01-98)
    8-L-1864 (12-02)

_____
LICENSED RESIDENT AGENT

ATE: 08/19/03
COUNTERSIGNED AT: BURLINGTON, MA

_____
COMPANY OFFICER
CURTIS PEARSALL

THESE DECLARATIONS AND THE COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A
PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

14-D-EOA ED.12-99  SEE OVER FOR IMPORTANT CLAIMS-MADE COVERAGE NOTICE        Page 1 of 2

The policy which provides Insurance Agents and Brokers Errors and Omissions Liability Coverage applies on a claims-made basis.

The following provides a general description of this coverage and is subject to the terms and provisions of the actual policy.

A. The policy, subject to its terms and conditions, provides full prior acts coverage if no Retroactive Date is entered in the Declarations. If a Retroactive Date is entered in the Declarations, the policy will not apply to loss from "wrongful acts" which took place before the Retroactive Date. The policy will not apply to loss from "wrongful acts" which take place after the expiration of the policy period.

B. The policy will apply to losses from "wrongful acts" which take place on or after the Retroactive Date, if any, but before the beginning of the policy period only if the insured did not know of the "wrongful acts" before the beginning of the policy period and if any claim is made according to D. below.

C. The policy will not apply to any loss for which claim is first made after the expiration of the policy period or any Automatic or Optional Extended Reporting Period described in the Extended Reporting Period Section of the policy.

D. The policy will apply only to claims which are first made:
   1. During the policy period;
   2. During the sixty day Automatic Extended Reporting Period described in the Extended Reporting Period Section of the policy; or

3. During the Optional Extended Reporting Periods of 12 months to 120 months duration, described in the Extended Reporting Period Section of the policy. Such Optional Extended Reporting Period must be requested by the insured in writing, within sixty days after the date of termination of coverage or thirty days after the date of mailing by us of notice to the named insured advising of premiums for and provisions of Optional Extended Reporting Periods, in order to allow claims to be made against the policy coverage after the expiration of any Automatic Extended Reporting Period.

E. We will send you a written notice within thirty days after any termination of coverage of costs for and provisions of Extended Reporting Periods.

F. For the first three years of claims-made coverage, premiums will be comparatively lower than for occurrence coverage, and will increase for each renewal of those policies. Claims-made prices will still be somewhat lower than occurrence prices for mature accounts (in their fourth or later years). The purchase of Optional Extended Reporting Periods, as described above, requires additional premium payments.



## Utica National Insurance Group

Insurance that starts with you.

Utica Mutual Insurance Company and its affiliated companies, New Hartford, N.Y. 13413

14-D-EOA Ed. 12-99

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY CHANGES/EXTENSION SCHEDULE

## RENEWAL POLICY

Policy Change
Number_____

This Endorsement forms a part of the policy numbered below:

| Named Insured and Mailing Address | Policy Number |
|---|---|
| KNAPP SCHENCK & COMPANY INSURANCE AGENCY INC 240 LEWIS WHARF BOSTON MA 02110 | 3445032 EO |
| | Policy Changes Effective |
| | 07/30/2003 |
| | Company |
| | UTICA MUTUAL INSURANCE CO. |

IT IS AGREED THAT x̶x̶x̶x̶x̶x̶x̶b̶x̶x̶x̶x̶x̶R̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶x̶ the policy is amended as stated in Part B.

**PART A.**

- ☐ NAME CHANGE
- ☐ ADDRESS CHANGE
- ☐ AMENDING PREMIUM
- ☐ ADDING ADDITIONAL INSURED
- ☐ DELETING ADDITIONAL INSURED
- ☐ AMENDING LIMIT OF LIABILITY
- ☐ AMENDING DEDUCTIBLE

- ☐ ADDING LOCATION(S)
- ☐ DELETING LOCATION
- ☐ ADDING MUTUAL FUNDS
- ☐ DELETING MUTUAL FUNDS
- ☐ MUTUAL FUNDS – ADDING SOLICITOR
- ☐ MUTUAL FUNDS – DELETING SOLICITOR
- ☐ EXCLUSION OF DUPLICATE COVERAGE

- ☐ CHANGING STAFF
- ☐ VOIDING ENDORSEMENT
- ☐ ADDING REAL ESTATE
- ☐ DELETING REAL ESTATE
- ☐ REAL ESTATE – ADDING SOLICITOR
- ☐ REAL ESTATE – DELETING SOLICITOR

**PART B.**

IN CONSIDERATION OF THE PREMIUM PAID, IT IS HEREBY UNDERSTOOD AND AGREED THAT NO COVERAGE IS AFFORDED FOR CLAIMS ARISING FROM THE INCIDENT MENTIONED IN QUESTION(S) 30        OF THE APPLICATION DATED 08/05/02 AND SIGNED BY DAVID WINSHIP

ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

---

PREMIUM ADJUSTMENT

| ADDITIONAL PREMIUM | RETURN PREMIUM |
|---|---|
| | |

Authorized Representative Signature
_____

14-E-0001  Ed. 1-91

*THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.*

# POLICY CHANGES/EXTENSION SCHEDULE

Policy Change

Number _____

This Endorsement forms a part of the policy numbered below:

| | |
|---|---|
| Named Insured and Mailing Address<br>KNAPP SCHENCK & COMPANY INSURANCE AGENCY INC<br>PO BOX 51310<br>BOSTON MA   02205 | Policy Number<br>3445032 AP |
| | Policy Changes Effective<br>07/30/2003 |
| | Company<br>**UTICA MUTUAL INSURANCE COMPANY** |

IT IS AGREED THAT THE POLICY IS AMENDED AS STATED IN PART B.

| | | | |
|---|---|---|---|
| **P<br>A<br>R<br>T<br><br>A.** | ☐ NAME CHANGE<br>☐ ADDRESS CHANGE<br>☐ AMENDING PREMIUM<br>☐ ADDING ADDITIONAL INSURED<br>☐ DELETING ADDITIONAL INSURED<br>☐ AMENDING LIMIT OF LIABILITY<br>☐ AMENDING DEDUCTIBLE | ☐ ADDING LOCATION(S)<br>☐ DELETING LOCATION<br>☐ ADDING MUTUAL FUNDS<br>☐ DELETING MUTUAL FUNDS<br>☐ MUTUAL FUNDS - ADDING SOLICITOR<br>☐ MUTUAL FUNDS - DELETING SOLICITOR<br>☐ EXCLUSION OF DUPLICATE COVERAGE | ☐ CHANGING STAFF<br>☐ VOIDING ENDORSEMENT<br>☐ ADDING REAL ESTATE<br>☐ DELETING REAL ESTATE<br>☐ REAL ESTATE - ADDING SOLICITOR<br>☐ REAL ESTATE - DELETING SOLICITOR |

| | |
|---|---|
| **P<br>A<br>R<br>T<br><br>B.** | The following exclusion below replaces exclusion #15. as listed in 14-P-EOA,<br>**SECTION III - EXCLUSIONS:**<br><br>15.   The insolvency, receivership, bankruptcy, liquidation or inability to pay of any entity,<br>        person, corporation, estate, trust, or other organization including, but not limited to:<br>        a.  Insurnce companies or reinsurance companies;<br>        b.  Health maintenance organizations or preferred provider organizations;<br>        c.  Captive insurers or risk retention groups and/or risk purchasing groups; or<br>        d.  Investment funds or self-insurance programs.<br><br>**ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.** |

PREMIUM ADJUSTMENT

| ADDITIONAL PREMIUM | RETURN PREMIUM |
|---|---|
| | |

Authorized Representative Signature

14-E-0001 Ed 1-91

POLICY NUMBER: 3445032 EO     RENEWAL POLICY     EFFECTIVE 07/30/2003

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CONTINGENT CATASTROPHE EXTRA EXPENSE COVERAGE

**(For attachment to Insurance Agents and Brokers Errors and Omissions Liability Policy)**
**(Claims-made Policy)**

### SCHEDULE

I.  Effective Date:     07/30/2003
    (If no date entered, coverage is effective from policy inception.)
    Additional Premium          $          100.00

| COVERAGE | LIMITS OF LIABILITY | |
|---|---|---|
| CATASTROPHE CLAIM | $ 10,000 | EACH CATASTROPHE |
| EXPENSE COVERAGE: | $ 25,000 | AGGREGATE |

DEDUCTIBLE AMOUNT:     $500 each catastrophe

With respect to the insurance afforded by this endorsement, the Limits of Liability and Deductible Amount stated herein apply in lieu of, and not in addition to, any Limits of Liability and Deductible Amount stated in the policy Declarations.

II. In consideration of the additional premium shown in the Declarations or Schedule above, it is agreed that the policy includes coverage subject to the policy terms and the additional provisions below for your actual extra expenses necessarily incurred in the providing of professional services covered by this policy but only if such extra expenses:

A.  Are a result of an event declared a catastrophe by the Property Claims Services (PCS). As used in this endorsement, catastrophe, regardless of any other cause or event that contributes concurrently or in any sequence to the loss does not include, whether directly or indirectly:

1.  Seizure or destruction of property by order of governmental authority, unless the insurance needs of your customers were the result of acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread;

2.  Nuclear reaction or radiation, or radioactive contamination, however caused, unless the insurance needs of

your customers were the result of ensuing fire; and

3.  a. War, including undeclared or civil war;

    b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

    c. Insurrection, rebellion, revolution, usurped power, or any action taken by governmental authority in hindering or defending against any of these;

whether or not declared catastrophes by the Property Claim Services.

B.  Are incurred between the beginning date of the catastrophe and 45 days after the catastrophe began.

FC
14-E-0095  Ed. 12-98

C. Are attributed to the assisting in the processing of insurance claims for your customers who have been affected by the catastrophe. Extra Expense under this endorsement, does not include actual payments, whether in whole or in part, for claims to your customers.

D. Are over and above the expenses you would have incurred in the providing of professional services for the same period had no catastrophe occurred.

E. Are not to continue your normal business operations due to physical loss or damage to your property.

F. Are not paid for by other insurance, except for other insurance that is written subject to the same terms, conditions and provisions of this endorsement.

III. A. The Limits of Liability shown in the Schedule above and the rules below determine the most we will pay regardless of the number of:

1. Insureds;
2. Insureds making claims for extra expense;
3. Claims made for extra expense;
4. Claims processed for catastrophes; or
5. Customers serviced in the event of a catastrophe.

B. The Aggregate Limit shown in the Schedule above is the most we will pay for the sum of all necessary extra expenses incurred as a result of catastrophes which occur during the "policy period."

C. Subject to B. above and the deductible amount set forth in the Schedule above for each catastrophe, the Each Catastrophe Limit is the most we will pay under this endorsement for the sum of all necessary extra expenses sustained in any one catastrophe.

D. The Limits of Liability of this endorsement apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for the purposes of determining the Limits of Liability.

E. 1. The Deductible Amount stated in the Schedule above will be deducted from the sum of all extra expenses for all claims because of any one catastrophe to which this insurance applies.

2. The Limits of Liability, as described above, will apply to any extra expense which remains after the deduction of the Deductible Amount.

IV. If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of the loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

A. Pay its chosen appraiser; and
B. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

V. In the event a claim is made for the insurance provided by this endorsement, you must:

A. Give us prompt notice of loss.
B. As soon as possible, give us details of the extra expense you incurred as a result of providing professional services to your customers due to the PCS declared catastrophe.
C. As often as may reasonably be required, permit us to inspect your records proving your extra expense loss.
D. Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.
E. Cooperate with us in the investigation or settlement of the claim.
F. Permit us to examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

Includes copyrighted material of Insurance Services Office, Inc.,    14-E-0095   Ed. 12-98
with its permission.
Copyright, Utica Mutual Insurance Company, 1999.

INSURANCE AGENTS AND BROKERS
ERRO    AND OMISSIONS LIABILITY POLICY

**CLAIMS-MADE BASIS**

## EXTENSION SCHEDULE

**RENEWAL POLICY**

| NAMED INSURED AND MAILING ADDRESS | LOCATION ADDRESS |
|---|---|
| KNAPP SCHENCK & COMPANY<br>INSURANCE AGENCY INC<br>240 LEWIS WHARF<br>BOSTON  MA  02110 | |

| POLICY NUMBER | POLICY PERIOD FROM | TO | PRIOR POLICY NO. | |
|---|---|---|---|---|
| 3445032 EO | 07/30/2003 | 07/30/2004 | 3445032 EO | |

This schedule will be used for the following:
Additional Insured, Additional Location(s), Named Insured

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE NAMED INSURED IS TO READ AS FOLLOWS:
KNAPP SCHENCK & COMPANY INSURANCE AGENCY INC
SOUTH SHORE INSURANCE AGENCY INC     MASSAMONT INSURANCE
AGENCY INC     SWS LEWIS WHARF LLC     SWS GREENFIELD LLC

ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE FOLLOWING ADDITIONAL LOCATION(S) ARE
COVERED UNDER THE ABOVE MENTIONED POLICY.
324 MAIN STREET                              850 MAIN STREET
GREENFIELD, MA                               WEYMOUTH, MA
                                    01301                                    02189

ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

FC

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM
## INSURANCE COVERAGE

Coverage for acts of terrorism is already included in your current policy. You should know that, effective November 26, 2002, under your existing coverage, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The portion of your annual premium that is attributable to coverage for acts of terrorism is: _____.

_____
Policy Number

Please consult with your agent or broker if you have any questions.

## Utica National Insurance Group
Insurance that starts with you.
Utica Mutual Insurance Company and its affiliated companies, New Hartford, N.Y.  13413

8-L-1864  Ed. 12-2002

# **EXHIBIT 2**

# AGENCY AGREEMENT

## FOR

The Massamont Metrogard and Diplomax Program
covering school and municipality property in New England

### Between

The ACE USA Companies designated herein
Hereafter collectively referred to as "Company"

and

Massamont Insurance Agency, Inc.

and

Knapp Schenck & Company Insurance Agency, Inc

as Guarantor

Effective Date:

1/1/2001

THIS Agency Agreement (referred to as "AGREEMENT") is between  Massamont Insurance Agency, I corporation with its main office located at  240 Lewis Wharf, Boston, Massachusetts, 02110 (reference "AGENT") and the ACE USA companies designated below, with its main offices located at 1601 Chestnut S Philadelphia, Pennsylvania 19101-1484 (referenced as "COMPANY.")

In consideration of the reciprocal agreements herein, COMPANY and AGENT mutually agree to the follow

## I.    AGENT APPOINTMENT AND PROGRAM DEFINITION

A.    COMPANY hereby appoints AGENT as its General Agent to perform the duties set forth be and vests in AGENT authority to accomplish, effect and execute such duties upon the terms conditions set forth in this AGREEMENT.  The authority granted AGENT by COMPANY sl be limited to the PROGRAM which is defined as:

The Massamont Metrogard and Diplomax Program covering school and municipality property New England.

B.    AGENT is authorized by this AGREEMENT to write only insurance coverage within the scope the PROGRAM.

C.    COMPANY appoints. AGENT as its non-exclusive General Agent for the PROGRAM COMPANY reserves the right to market, at any time, the class(es) of business and types coverages written in the PROGRAM through other producers.

## II.    TERM OF AGREEMENT

This AGREEMENT shall be effective commencing January 1, 2001  and continue until terminate pursuant to Section VIII of this AGREEMENT.

## III.    AGENT'S RELATION TO COMPANY

This AGREEMENT is not a contract of employment and nothing herein contained shall be construed to create the relationship of employer and employee between COMPANY and AGENT.  AGENT is an independent contractor and is intended to exercise its independent judgement and discretion with regard to the performance of its duties and authority hereunder.

## IV.    AUTHORITY AND DUTIES OF AGENT

A.    Underwriting

Subject to requirements imposed by law, the terms of this AGREEMENT and the written underwriting authority, guidelines, instructions and limitations that may be provided by COMPANY, in writing, from time to time, AGENT assumes the responsibilities and duties for handling underwriting in accordance with Exhibit A. COMPANY shall have the right, with 90 Days prior Written notice to AGENT, to revise and/or change the underwriting guidelines for the PROGRAM, which changes shall apply to PROGRAM business quoted subsequent to notification of such change.

B.    Quality of Services

AGENT shall use commercially reasonable efforts to serve COMPANY faithfully and perform all acts necessary for the proper conduct of the business on behalf of COMPANY shall maintain a staff of competent and trained personnel, supplies and equipment for the pur of performing AGENT's duties under this AGREEMENT.

C.    Representations

AGENT shall not make any representation to any applicant or insured regarding coverage und policy which is not consistent with the actual terms and conditions of the policy.

D.    Legal Compliance

1.    AGENT agrees to carry out its activities in connection with this AGREEMENT in suc way as to comply in all respects with all applicable laws of the jurisdictions involv including all licensing requirements, as well as all other applicable laws governing t conduct of business and the PROGRAM under this AGREEMENT.

2.    More specifically, AGENT shall not, directly or through agents, brokers or othe appointed or employed by AGENT, solicit insurance anywhere in violation of applicab licensing and other laws and regulations. AGENT shall ensure that all the PROGRAI business is written by AGENT or through other properly licensed brokers, agents o producers. AGENT is responsible for providing COMPANY with complete licensing an appointment information on sub-producers located in jurisdictions that requir COMPANY to appoint such sub-producers. No assistance, if any, given to AGENT b COMPANY in obtaining or renewing licenses for AGENT shall constitute a waiver o COMPANY's right to indemnification under Section XI for damages, costs, penalties o assessments incurred by COMPANY through the failure of AGENT or other person referred to in the preceding sentence to maintain proper licenses. AGENT shall reimburse COMPANY the amount of any fees, penalties or fines incurred by or assessed against COMPANY as a result of AGENT's non-compliance with or violation of any licensing or other law or regulation.

3.    AGENT does not have authority hereunder to appoint agents or other producers for COMPANY or to delegate policy issuance or underwriting authority of any kind or any other duties and authorities contained herein, to any sub-producer or other third party without prior written authorization from COMPANY.

E.    Premiums

1.    AGENT shall be responsible for collecting all premiums due from insureds whether written directly by AGENT or through sub-producers through AGENT. AGENT shall pay premiums to COMPANY on insurance written under this AGREEMENT when due without regard to whether AGENT has collected such premiums. Any credit extended by AGENT to the insured or others, beyond that which COMPANY has pre-approved in writing, shall be at the sole risk of AGENT.  All premiums will be determined from COMPANY's books and records.

2. AGENT shall also be responsible for collecting and remitting to COMPANY additional premiums which develop by audit or under reporting from policies. Such will be included in the monthly statement prepared by COMPANY and sent to AG and will be paid by AGENT no later than 50 days after the end of the month in whic additional premium is registered. AGENT is not relieved of responsibility for pren payment, even if such premium is determined to be uncollectible.

3. The collecting of premium and accounting for business written by or through AGENT be in accordance with the following COMPANY procedures. Payment of premium COMPANY will be made by electronic funds transfer. The balance due on e statement, which will be prepared by COMPANY and sent to AGENT, will be paid AGENT no later than 50 days after the end of the month in which the business becon effective. Any changes to these procedures shall be communicated to AGENT in writi Should AGENT fail to pay COMPANY any premium or monies due, COMPANY sl be entitled to the issuance of an injunction to obtain such premium or monies and the c and expense thereof, including attorney's fees, shall be the responsibility of AGENT

4. All premiums Net of Commissions, including return premiums, received by AGENT, a the property of COMPANY and shall be held by AGENT as trustee until delivered COMPANY or the insured as applicable. The trust relationship and COMPANY ownership of unpaid premiums which have not been collected by AGENT shall not I deemed modified, affected or waived by the keeping of an account on COMPANY books as a creditor and debtor account, the payment of balances and administrative fees t AGENT or the duty to pay commissions to sub-producers when and as appropriate AGENT will maintain all premium monies in a Premium Trust Account for the benefit o COMPANY and will execute and keep in force a Premium Trust Agreement which i attached as Exhibit B of this AGREEMENT.

5. AGENT is required to use COMPANY to obtain audit reports on auditable policies COMPANY at its discretion, may also obtain audit reports of insureds. Collection of any additional premiums which are developed by audit or under reporting form policies is the responsibility of AGENT.

F. <u>Maintenance of Records; Company's Access to Records</u>

1. AGENT shall keep complete records of all transactions pertaining to insurance written under this AGREEMENT and shall maintain such records for a period of time in accordance with applicable laws and regulations and COMPANY's record retention requirements. During the term of this AGREEMENT and for such time thereafter as COMPANY shall deem necessary for the protection of COMPANY's property and/or interests, COMPANY shall have the right and AGENT shall permit and authorize COMPANY, through any person(s) designated by COMPANY at such times and as often as COMPANY may reasonably request:

a. To visit, inspect, examine, audit and verify, at any of AGENT's offices or elsewhere, any of the properties, accounts, books, files, records, financial statements or work papers belonging to or in the possession of AGENT pertaining to matters arising under the terms of the AGREEMENT;

b.    To make, or to have AGENT make in a timely fashion, copies thereof and e>
any of the items listed in paragraph a., above;

c.    To perform, at COMPANY's discretion, routine audit tests of AGENT's acc
records in order to ensure: reasonable internal accounting controls surr
AGENT's issuance of COMPANY's policies, including, but not lim
confirmation of policies, and policy-related information, with insureds; timel
premium reporting; compliance with underwriting guidelines; reconciliation o
number inventory; timeliness of claims reporting.

d.    To discuss program related affairs, finances, and accounts of AGENT with AG
directors, officers or any person(s) in any way connected with AGENT, its pr
related affairs, finances, or accounts, including AGENT's independent accoun
bankers, or parent corporation.

2.    When the PROGRAM transactions are recorded on AGENT's proprietary data proce
system(s) and/or AGENT's agency management system(s) AGENT:

a.    Agrees that all changes to AGENT's data processing and/or communic
system(s), which are required to make AGENT's system(s) interface
COMPANY's policy registration systems, are completed within 90 days o
effective date of the AGREEMENT.

b.    Shall provide COMPANY, in a format, manner and time frame prescribed
COMPANY, complete copies of all policies of insurance written under
PROGRAM.

c.    Agrees that all changes to AGENT's data processing and/or communication syste
which affect COMPANY's electronic registration process will be communicated
and discussed with COMPANY prior to implementation of those chang
COMPANY reserves the right to require a new test transmission to revalidate
efficacy of AGENT's system(s) to interface with COMPANY's policy registrati
systems.

d.    Agrees that if AGENT's data processing and/or communication system(s) fail(s)
provide COMPANY with complete electronic registration of policy level detaile
information in the format, manner and time frame prescribed by COMPANY th
COMPANY reserves the right to reduce AGENT's commission up to 1.5% of th
written premium until the system failure is corrected.

3.    At COMPANY's option and expense, and in a time frame prescribed by COMPANY,
COMPANY may obtain physical control and possession of all policies, binders,
endorsements or other documentation of insurance coverage, in order to satisfy reporting
requirements or legal obligations. In said cases, COMPANY shall provide AGENT, at
AGENT's expense, the opportunity to make copies of such items, unless such opportunity
would result, or cause COMPANY to be, in violation of any reporting requirement imposed
by any regulatory authority.

4.  COMPANY shall pay all storage and storage related expenses pertaining to e policies and shall give AGENT access to stored files.

5.  All records of transactions pertaining to insurance written under this AGREEMEN be in a form usable by COMPANY and regulatory authorities.

6.  When the PROGRAM transactions are recorded on AGENT's proprietary data proce system(s), AGENT shall, on at least a weekly basis, back-up records of all transac AGENT shall maintain said backup records at a location other than the location v original records are maintained.

7.  In the event that policy numbers which have been assigned to AGENT for PROGF business cannot be accounted for by AGENT, AGENT agrees to protect, forever de and hold COMPANY harmless against any and all persons and claims on or relating to policy numbers.

G.  <u>Reporting</u>

1.  AGENT will report, within ten (10) days after the end of the month, all insurance accepted, cancelled or amended in the preceding month. Monthly reporting, and add reporting as may be required by COMPANY, shall be in a form acceptable to COMPAN in accordance with the rules and regulations promulgated from time to time by COMI and which COMPANY shall deliver to AGENT.

2.  AGENT shall respond and comply immediately upon receipt to all correspondence notices relating to the financing of premiums by any insured.

3.  AGENT shall provide, at AGENT's expense and within a reasonable period of time, necessary, sufficient information to satisfy reporting requirements imposed on COMPAN by boards, bureaus, associations, and regulatory bodies of competent jurisdictions.

4.  AGENT will notify COMPANY immediately if AGENT receives notice of any filed o threatened litigation or arbitration proceedings against AGENT or COMPANY relating tc business practices or matters pertaining to the PROGRAM, other than claims.

5.  AGENT will forward all written complaints pertaining to or arising under the PROGRAM (S) to COMPANY upon receipt. AGENT agrees to submit, each month, a report which includes: a copy of the written complaint; complainant's name; insured's name and policy number or claim number; insurance department file number; date received; date closed and disposition. In the event that no written complaints are received during a month, AGENT will positively affirm that fact to COMPANY in writing.

H.  <u>Advertising and Public Relations</u>

1.  AGENT shall at its own expense develop and produce all advertising or promotional materials used to promote the sale of the PROGRAM pursuant to this AGREEMENT.

2.  AGENT shall not, however, use the name or logo of COMPANY or any of its affiliates or products in any advertising and/or promotional materials without COMPANY's prior

review and written consent which shall be obtained for each separate  prom
advertisement or use of COMPANY's name, logo or product.

3.    COMPANY shall not use the name of AGENT, its affiliates or its accounts or s
marks in any advertising and/or promotional or public materials without the prior r
and written consent of AGENT.

I.    Ownership of Policy Forms, Printed Matter and PROGRAM Data

1.    AGENT will only use policies, endorsements and all other forms approved by COMP
in connection with its duties hereunder. It is expressly understood that any data proce
software or data processing technology or applications, policies, endorsements or form
data processing software or data processing technology which produces such applicat
policies, endorsement, or forms, or any other supplies furnished to AGENT by COMP/
shall remain the property of COMPANY.  Any policy forms, blanks, unused p
numbers, or other forms and documents, including claims or other manuals bea
COMPANY's name shall be the property of COMPANY and shall be surrendere
COMPANY upon its demand, except for Massamont Proprietary forms and rate struct

2.    The PROGRAM results, loss and pricing data, underwriting criteria and surveys,
control information, and other related PROGRAM data are the joint  property
COMPANY and AGENT. This information shall be shared with AGENT during the t
of this AGREEMENT. AGENT's use of this information shall be limited to purposes
forth in this AGREEMENT and its related exhibits and shall be subject to
confidentiality and non-disclosure provisions herein.

3.    During the term of this AGREEMENT and upon termination of this AGREEMEI
AGENT shall treat all PROGRAM information, listed in Sections IV.I.1. and IV.I.2. a
which is not publicly available, as confidential information and shall not disclc
communicate or share such items or information with any third party with
COMPANY's prior written approval. Such restrictions shall not prevent AGENT fr
disclosing such information, as mandated by regulatory organizations or courts of law

4.    Upon termination of this AGREEMENT, AGENT shall promptly return to COMPANY
items and information listed in Sections IV.I.1 and IV.I.2., which are the exclusive prope
of COMPANY.

5.    If and to the extent that AGENT shall, in connection with this AGREEMENT, come in
possession of any information, business or technology of the COMPANY that is not knov
to the public, AGENT shall treat such information as confidential, and not to disclose suc
information to any person(s) or entity not a party to this AGREEMENT.

J.    Expenses

1.    AGENT shall pay all expenses related to the performance of AGENT's duties under thi
AGREEMENT, including but not limited to rentals, transportation facilities, clerica
expense, commissions paid to sub-producers, sub-producers appointment fees incurred b
COMPANY, solicitor's fees, postage, advertising, personal local license fees or cost
associated with the preparation of any reports required by this AGREEMENT. AGENT

shall not charge or commit COMPANY to any expense, agreement, payment, d
obligation other than the insurance expressly described herein unless prior written ap
is obtained from COMPANY.

2.    AGENT shall pay any applicable surplus lines taxes, stamping office fees and
expenses relating to the filing of all affidavits as required by the appropriate governn
jurisdictions.

3.    AGENT will pay for all motor vehicle reports and Dunn & Bradstreet ("D&B") re
associated with the PROGRAM regardless of whether or not COMPANY accepts or v
the business.

4.    AGENT will bear the cost of all loss control surveys and services mandated by
underwriting criteria of this PROGRAM. Any non-mandated or extraordinary COMP/
loss control services will be negotiated on a case by case basis.  Use of AGENT's
control staff, whose services will be billed to COMPANY, must be pre-approvec
COMPANY in writing.

5.    AGENT shall pay for all data processing hardware and shall be responsible for fees for
processing and communication software and technology, including but not limited
necessary line charges.

6.    AGENT shall reimburse COMPANY for all expenses, fines and assessments result
directly or indirectly from any action or omission which AGENT is or was responsible
or had authority to perform.

K.    Insurance Maintained by AGENT

1.    AGENT is required to maintain in full force and effect during the term of tl
AGREEMENT a policy (or policies) of Errors and Omissions Insurance which are issu
by an insurer rated no less than B+ VI by A. M. Best Company and which afford
coverage in the minimum amount of $10,000,000 with a deductible not to exceed $50,00
AGENT will also maintain Directors & Officers insurance with limits of liability of at lea
$2,000,000.   When AGENT's gross written premium with COMPANY excee
$22,000,000, the parties shall negotiate an increase in the amount of Errors and Omission
and D&O Insurance required of AGENT.  Such Errors and Omissions and D&O Insuranc
shall be maintained by AGENT at AGENT's sole cost and expense.  AGENT shall notif
COMPANY in the event of lapse and shall furnish proof of such insurance prior t
executing this AGREEMENT and at each subsequent renewal of the insurance policy.

2.    AGENT is required to maintain in full force and effect during the term of thi
AGREEMENT a policy (or policies) of Fidelity Insurance for the benefit of COMPANY
covering AGENT and its employees which are issued by an insurer rated no less than B+
VI by A. M. Best Company and which afford(s) coverage in the minimum amount o
$1,000,000, with a deductible not to exceed $50,000.  When AGENT's gross writter
premium with COMPANY exceeds $10,000,000, the parties shall negotiate an increase in
the amount of Fidelity Insurance required of AGENT.  Such Fidelity Insurance shall be
maintained by AGENT at AGENT's sole cost and expense and shall be primary and
provide non-contributing coverage over any valid and collectible insurance available to

COMPANY. AGENT shall notify COMPANY in the event of lapse and shall f proof of such insurance at inception of this AGREEMENT and at each subsequent re of the insurance policy.

3.       AGENT shall maintain in full force and effect during the term of this AGREEME policy (or policies) of Public Liability Insurance and of Automobile Liability Insu covering AGENT and AGENT's employees which are issued by an insurer rated n than B+ VI by A. M. Best Company and which afford(s) coverage in the minimum an of $1,000,000. Combined Single Limit for Bodily Injury and Property Damage Liab Such insurance shall be primary and provide non-contributing coverage. AGENT notify COMPANY in the event of lapse and shall furnish proof of such insuranc COMPANY's request.

L.     Financial Statements

1.       Prior to executing this AGREEMENT, AGENT shall furnish to COMPANY AGEN most recent year-end financial statements prepared by a certified public account acceptable to COMPANY which fairly present the financial position of AGENT and results of its operations in accordance with generally accepted accounting principles. 1 statements shall include, but not be limited to, a statement of profit and loss, a balar sheet and a cash flow statement.

2.       Not later than 120 calendar days after the end of its fiscal year, which is December 31 AGENT shall provide COMPANY its year-end financial statements with accompanyi footnote disclosures.

M.     Financial Ratios

AGENT will maintain during each fiscal year covered by this AGREEMENT the followir financial ratios:

| | |
|---|---|
| Net Worth: | Not Less Than $ 500,000 |
| Current Ratio: | Not Less Than 1:1 |
| Premium Trust Position: | Not Less Than $ 500,000 |
| Receivable to Payable Ratio: | Not More Than 1:1 |

Net Worth shall be determined in accordance with generally accepted accounting principles.

Current Ratio shall mean the ratio of current assets to current liabilities.

Premium Trust Position shall mean the excess of cash, marketable securities and collectible accounts receivable from policyholders, less the premium payable to insurance companies.

Receivables to Payables Ratio shall mean the ratio of collectible accounts receivable from policyholders to accounts payable to insurance companies.

N.    Written Premium Commitment

AGENT shall place with COMPANY all insurance solicited by AGENT which is within the
of the PROGRAM.  Such written premiums shall, at a minimum, adhere to the following sch

| As Of December 31 | Y/E Annual Written Premium |
|---|---|
| 2001 | $15,000,000 |
| 2002 | $17,500,000 |
| 2003 | $20,000,000 |

V.    LIMITATIONS OF AUTHORITY

A.    With respect to the classes of business which AGENT is now or may in the future be authoriz
solicit, quote, bind, underwrite, rate, and transact under this AGREEMENT, AGENT will not
insurance coverage pursuant to this Agreement on the following:

1.    Risks which are unacceptable in accordance with COMPANY's underwriting standard
forth in Exhibit A and the underwriting guidelines, instructions and limitations referred
Section IV.A.

2.    Policy limits which are in excess of those specified in AGENT's underwriting authority a
forth in Exhibit A.

3.    Risks which are not in compliance with COMPANY's applicable forms, rules, rates, or fili
according to their exact terms and/or with the laws and regulations in effect in the state(s
which AGENT transacts business.

4.    Any risk or class of business other than the PROGRAM.

B.    In the event AGENT solicits, accepts proposals, or binds COMPANY to the risks listed in Secti
V.A.1., 3 or 4, or binds risks in excess of the policy limits set forth in Exhibit A, or binds risks
excess of specified reinsurance treaty limits without approval from COMPANY (verbal approval
be subsequently confirmed in writing), whether intentional or not, AGENT will do such things a
take such actions as necessary to remove or to reduce COMPANY exposure on such risks, or
such excess policy limits, or to such excess reinsurance treaty limits and will defend, indemnify ar
hold COMPANY harmless pursuant to Section XII. of this AGREEMENT, against any clair
liability or loss which may arise or be incurred by COMPANY as a result of such solicitatio
proposal, binder or policy.

C.    AGENT shall have no authority to procure reinsurance in the name of COMPANY.

VI.    COMPENSATION TO AGENT

A.    As full compensation for the business covered by this AGREEMENT and for the faithfu
performance of AGENT's duties to process, register and report PROGRAM business to

COMPANY under this AGREEMENT, COMPANY agrees to pay AGENT a commission written premium which AGENT submits to COMPANY and which COMPANY underwrites forth below:

| | |
|---|---|
| PROPERTY, INLAND MARINE AND CRIME: | 17.5% |
| BOILER AND MACHINERY: | 22.0% |

Net written premium shall mean gross written premium, less cancellations and returned prem according to COMPANY's books and records.

In the event AGENT fails to perform, or fails to adequately perform, its duties to process, reg and report PROGRAM business to COMPANY in an accurate and timely basis, then COMPA shall have the right, which may be exercised at its sole discretion, to reduce AGENT's commis by an amount not to exceed twenty five percent (25%) to offset expenses incurred by COMPA in the processing, registering and reporting of PROGRAM business . If COMPANY elect reduce AGENT's commission for the failure to perform, or the failure to adequately perform duties under this AGREEMENT, COMPANY shall provide AGENT written notice of its inter reduce commissions before said commission reduction shall become effective.

B.   Commission rates listed above shall be in effect for one year from the effective date of AGREEMENT. Said commission rates shall automatically renew for ninety (90) day terms unCOMPANY provides AGENT written notification of its intent to revise commission rates no la than ninety (90) days prior to the expiration of the original term or any renewal term for commiss rates, except as noted in Section VI.A. above.

C.   AGENT shall refund on a prorated basis to COMPANY, on all insurance issued under t AGREEMENT, commissions on coverage which has been canceled by COMPANY or the insur and on premiums which have been reduced or refunded, in each case at the same rate at which su commissions were originally payable and within the period of time required by the rules regulations of COMPANY.

D.   AGENT's fees and commissions and any other monies due AGENT shall be subject to offset COMPANY, or any of its affiliates for any money due from AGENT to COMPANY or its affiliate This provision shall not be affected by the insolvency of the AGENT.

E.   AGENT shall be paid contingent commissions, if any, in accordance with the Continge Commission Agreement which is included as Exhibit E of this AGREEMENT.

F.   Compensation, if any, for claims settlement is provided for in Exhibit D.

G.   Upon breach by the AGENT of any financial obligation to COMPANY, COMPANY shall have th right to collect any outstanding indebtedness directly from any insured, agent, broker or other part owing any sum to AGENT for PROGRAM business. If COMPANY exercises such right b collecting such indebtedness directly, COMPANY shall be accountable to AGENT for any sur received which, net of expenses associated with such collection, exceeds the amount owed t COMPANY by AGENT.

## VII.    COMPENSATION TO OTHERS

AGENT is required to pay out of its remuneration all commissions or fees owing to brokers, surplus agents or brokers, sub-producers or countersigning agents on business written through AGENT.

## VIII.    TERMINATION

A.    Each party to this AGREEMENT shall have the right to terminate this AGREEMENT for reason by giving the other party written notice thereof at least one hundred and twenty (120) prior to the effective date of such termination, except that COMPANY may terminate AGE binding authority for new business, not yet quoted, upon at least sixty (60) days notice. receipt of any such notice of termination, AGENT may begin to place the business within the s of the PROGRAM with another insurer.

B.    COMPANY may terminate this AGREEMENT upon at least thirty(30) days prior written notic AGENT, if AGENT shall have violated any provision of this AGREEMENT or any of the exhi attached hereto (which violation shall be specified in such notice) and AGENT shall not have cu such violation within such grace period (not less than thirty (30) days) as is specified in such not

C.    COMPANY may terminate this AGREEMENT immediately by written notice to AGENT if one or more of the following events occur:

1.    Any substantial part of the assets and business of AGENT, or any equity interest in AGENT, is issued, sold or transferred, or any other substantial change in AGENT's ownership or management, and AGENT shall not have given COMPANY one hundred twenty (120) days prior notice thereof.

2.    AGENT assigns, transfers, encumbers or otherwise disposes of this AGREEMENT or any interest in this AGREEMENT or sells, exchanges, transfers, assigns, merges or consolidates the PROGRAM insurance business without giving COMPANY ninety (90) days prior notice thereof.

3.    AGENT misappropriates any of COMPANY's funds or property including, but not limited to, the violation of AGENT's fiduciary responsibilities regarding COMPANY's premium trust funds or the violation of applicable law or regulations regarding premium trust funds.

4.    AGENT abandons or discontinues business or is determined by COMPANY to have committed fraud, or gross and willful misconduct.

5.    Any broker or agent license of AGENT or any Certificate of Authority issued to AGENT by any regulatory authority in a state where AGENT transacts business is revoked or not renewed by such authority upon expiration.

6.    Any broker or agent license of any employee of AGENT issued by any regulatory authority in a state where AGENT transacts business is revoked or not renewed by such authority.

D.    This AGREEMENT will automatically terminate if AGENT, or any of AGENT's affi
corporations, if any, make(s) an assignment for the benefit of creditors; is (are) dissolv
receiver or liquidator is appointed for AGENT or such affiliated corporation(s) or a substantia
of its (their) property; or insolvency, bankruptcy, reorganization, arrangement or si
proceedings are instituted by or against AGENT or such affiliated corporations(s).

E.    Upon termination of this AGREEMENT, AGENT shall immediately communicate
termination and its effective date to all agents, brokers, producers and sub-producers who pro
PROGRAM business on behalf of AGENT.

F.    Continuing Duties

1.    Upon termination of this AGREEMENT, upon COMPANY's request AGENT shall perf
all duties provided for herein necessary to the servicing of all in force policies of insura
written hereunder until all such policies shall have expired or shall have been terminated.
servicing of policies shall consist of, but shall not necessarily be limited to, canceling :
nonrenewing policies, issuing amendatory endorsements, collecting and returning premiu
and remitting premiums to COMPANY.

2.    If AGENT does not perform this continuing service obligation, then any expense incurred
COMPANY to service or arrange for the servicing of the policies issued by or throu
AGENT hereunder shall be fully offset against commissions payable to AGENT
reimbursed to COMPANY by AGENT. In addition, should AGENT service the PROGRA
insurance business, but not to the full extent previously provided by AGENT hereunder, th
AGENT agrees to continue to provide this lesser service at the reduced commission rate
15% .

3.    Upon termination of this AGREEMENT, COMPANY may, at its discretion, service th
policies of insurance written hereunder and pay to AGENT the reduced commission rate (
15%.

3.    Upon termination of this AGREEMENT, AGENT shall provide COMPANY, :
COMPANY's expense and on a timely basis, all files of insurance written under th
PROGRAM, and claim files if applicable, which may be required for servicing PROGRAM
business or to meet record retention requirements mandated by regulatory organization o
required by COMPANY policy. Such files shall include, but shall not be limited to
application for insurance, rating work sheets, loss runs used in rate calculations, loss contro
reports, copy of the policy declaration page and all correspondence.

G.    <u>Suspension of Authority</u>

During the pendency of any dispute between AGENT and COMPANY, COMPANY may, by
written notice, immediately suspend the binding authority of AGENT. Under any other
circumstances, COMPANY may, upon written notice, reduce or suspend AGENT's binding
authority effective thirty (30) days from mailing of the notice.

IX.    OWNERSHIP OF BUSINESS

A.    Except as otherwise provided in this Section, policyholder lists, including expirations and their

use and control for solicitation of business written or bound by or through AGENT shall b
sole and exclusive property of AGENT. Records of insurance, coverage bound, insurance po
and other related information as defined in Section IV.I. of this AGREEMENT are the exclu
property of COMPANY.

B.      Upon termination of this AGREEMENT, if AGENT has rendered all accounts and paic
amounts then due to COMPANY and continues to make timely accounts and payments, AGEN
use and control of the records of insureds and policyholder lists shall remain the propert
AGENT and be left in AGENT's undisputed possession.

C.      If AGENT has not rendered all accounts and paid all amounts due COMPANY, the use a
control of the records of insureds and policyholder lists shall be vested in COMPANY. Failure
pay premium because of good faith routine differences in the accounting records of AGENT a
COMPANY will not be considered a failure to pay and will not vest title to the records
COMPANY if AGENT is using accounting procedures acceptable to COMPANY and if AGEN
is not willfully withholding funds.

D.      Upon the occurrence of any event which gives rise to the vesting of such records of insureds an
policyholder lists in COMPANY, COMPANY may take possession of AGENT's record
AGENT agrees upon request to gather such records together at AGENT's place of business and
allow COMPANY access to such place of business. COMPANY may service such accoun
directly or dispose of them in any commercially reasonable manner. COMPANY may colle
directly from any policyholder who has not made payment to AGENT. If, in disposing of suc
accounts at its discretion, COMPANY does not realize sufficient money to discharge in fu
AGENT's indebtedness to COMPANY, AGENT shall remain liable for the balance of suc
indebtedness. If there is any money realized by COMPANY, in excess of the amount necessary t
discharge in full AGENT's indebtedness to COMPANY, such excess money shall be remitted t
AGENT.

E.      In the event this AGREEMENT is terminated, COMPANY retains the right set forth in Section
I.C. hereof to market, develop, distribute, advertise and sell PROGRAM business through other
agents, brokers, producers and sub-producers.

## X.    CANCELLATION OF INSURANCE

A.      Nothing in this AGREEMENT shall be construed as limiting or restricting the right of COMPANY
to reject, cancel or non-renew any binder, policy or other contract of insurance issued under this
AGREEMENT in accordance with the cancellation or non-renewal provisions of such binder,
policy or contract and any applicable law. COMPANY reserves the right to direct AGENT to
cancel any policy of insurance at any time.

B.      In the event of nonpayment of premium, AGENT is authorized and agrees to cancel or non-renew
without awaiting direction from COMPANY, but shall promptly notify COMPANY of any such
cancellation or non-renewal.

C.      In the case of a flat cancellation, the originals of all canceled policies shall be retained by AGENT,
or in lieu thereof, AGENT shall secure a Lost Policy Release, signed by the insured, which shall be
retained by AGENT. AGENT shall not be entitled to commission for any flat cancellation unless

expressly agreed to by COMPANY.

**XI.    INDEMNITY**

A.    COMPANY agrees to indemnify, defend and hold AGENT harmless from and against any an
claims, suits, actions, liability, losses, expenses or damages now existing or which hereafter a
caused by or resulting from any of the following, provided AGENT has not contributed t
compounded such error:

1.    COMPANY sponsored or installed loss prevention programs or underwriting surveys.

2.    COMPANY's error or omission in processing business or performing its duties.

3.    COMPANY approved advertising.

4.    COMPANY's written rules, regulations, instructions, or filed rates and forms when fu
complied with by AGENT.

5.    Any claims, suits, actions, liability, losses, expenses or damages existing or incurred in whi
COMPANY caused, compounded or contributed to such error or omission.

B.    In exchange for COMPANY protecting AGENT, AGENT must notify COMPANY immediately
any claim against AGENT. AGENT must also allow COMPANY to make any investigation
settlement or defense COMPANY feels is appropriate.

C.    AGENT agrees to indemnify, defend and hold COMPANY harmless from and against any and a
claims, suits, actions, liability, losses, expenses, or damages now existing or which hereafter aris
which COMPANY, its affiliates, directors, officers, agents, or employees, may sustain, due to o
arising out of any act by AGENT, its affiliates, officers, agents, representatives, or employees i
violation of this AGREEMENT or in violation of any applicable law or regulation to the extent tha
COMPANY has not contributed to or compounded such error or omission.

**XII.    AGENT STATUS**

If AGENT directly or indirectly underwrites an amount of gross direct written premium equal to or mor
than five percent (5%) of the policyholder surplus as reported in the last annual statement of any individua
COMPANY listed below in any one quarter or year and AGENT shall be required thereby to register as a
"Managing General Agent" under any Managing General Agent law, each party to this AGREEMENT wil
take all such action as may be necessary to comply with such law, including without limitation modifying
this AGREEMENT to comply with such law, registering and obtaining licenses thereunder.

**XIII.    WAIVER OF STATUTORY TERMINATION RIGHTS**

Due to the special relationship AGENT has with COMPANY as a result of this AGREEMENT and due to
the special duties AGENT performs on behalf of COMPANY, AGENT agrees to waive statutory
termination requirements imposed on COMPANY by various jurisdictions and regulatory entities, and shall
abide by termination provisions stated herein.

## XIV.   NO WAIVER

The failure of COMPANY or AGENT to insist on strict compliance with this AGREEMENT, exercise any right or remedy hereunder shall not constitute a waiver of any rights contained herein nor the parties from thereafter demanding full and complete compliance therewith nor prevent the parties exercising such remedy in the future.

## XV.   FULL AGREEMENT

A.   This AGREEMENT supersedes and makes null and void any and all previous agreements cove the subject matter herein, whether written or oral, between COMPANY and AGENT or t predecessors with respect to the type of business to be written hereunder and constitutes the agreement between the parties. No amendment to this AGREEMENT shall be valid unles writing, and signed by the parties except that the Exhibits attached hereto and the written ru regulations and instructions of COMPANY communicated to AGENT from time to time, shal binding on the parties the same as though printed herein.

B.   This AGREEMENT is the only agreement in effect between the parties for the kinds of insurar specified in Exhibit A or any amendment to Exhibit A and referred to as the PROGRAM.

## XVI.   SEVERABILITY

Wherever possible, each provision of this AGREEMENT will be interpreted in such manner and to such extent as to be effective and valid under applicable law. If any provision is prohibited by or invalid und applicable law, such provision will be ineffective only to the extent of such prohibition of invalidity.

## XVII.   THIRD PARTY BENEFICIARIES

The provisions of this AGREEMENT are for the sole benefit of the parties. Nothing in this AGREEMEN is intended to create rights enforceable against any party by any so-called third party beneficiary.

## XVIII.   SUCCESSORS AND ASSIGNS

This AGREEMENT shall insure to the benefit of successors and assigns of the parties hereto, subject to the provisions of Section VIII hereof.

## XIX.   NOTICES

A.   Any notice required or permitted to be given under this AGREEMENT shall be in writing and shall be deemed duly given if delivered personally, by registered or by certified mail (including delivery by telefax or other electronic transmission) to the party for whom it is intended at the following address or such other address as such party may designate from time to time by notice to the other.

To AGENT:       Massamont Insurance Agency, Inc.
240 Lewis Wharf
Boston, MA 02110
ATT: Hilbert Schenck II CPCU

To COMPANY:    ACE USA
1601 Chestnut Street, TL34K
Philadelphia, Pennsylvania 19103
Attn: Patty Gibson, V.P. Administration, Operations and Finance

B.     Such notice shall be deemed to be given when deposited in the United States mail, postage prepai

## XX.    ARBITRATION

A.     It is understood that this AGREEMENT is made in good faith and should there arise, a differenc
of opinion or of interpretation of this AGREEMENT, which cannot be settled amicably betwee
senior representatives of COMPANY who are not involved in the day-to-day management of th
PROGRAM and AGENT, or any dispute arising from or relating to the performance or breech o
this AGREEMENT, such differences, interpretations or disputes shall be submitted to the decisior
of a board of arbitration composed of two arbitrators and an umpire meeting in Philadelphia, PA.

B.     The members of the board of arbitrators shall be active or retired disinterested officials of insurance
or reinsurance companies or agencies. AGENT and COMPANY shall each appoint one arbitrator,
and the two arbitrators shall choose an umpire before instituting the hearing. If the respondent fails
to appoint an arbitrator within sixty (60) days after being requested to do so by the claimant, the
latter shall also appoint the second arbitrator. If the two arbitrators fail to agree upon the
appointment of an umpire within four (4) weeks after their nominations, each of them shall name
three (3), of whom the other shall decline two (2) and the decision shall be made by drawing lots.
The claimant shall submit its initial brief in twenty (20) days after appointment of the umpire, the
respondent shall submit a brief within twenty (20) days after the submission of the claimant's brief,
and the claimant may submit a reply brief within ten (10) days after filing of the respondent's brief.

C.     The board shall make an award with regard to the custom and usage of the insurance and
reinsurance business. The board shall issue its award in writing based upon a hearing at which
evidence may be introduced without following strict rules of evidence but in which cross-
examination and rebuttal shall be allowed. The board shall make its award within sixty (60) days
following the termination of the hearing unless the parties consent to an extension. A decision by
the majority of the members of the board shall become binding upon all parties to the proceeding.

D.     Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the
other party the expense of the umpire. The remaining costs of the arbitration proceeding shall be
allocated by the board.

E.     This Section XXI, Arbitration, shall survive the termination of this AGREEMENT.

## XXI.    OTHER COMPANIES


AGENT agrees to advise COMPANY of existing and future agency agreements entered into with insurance companies with respect to business covered by this AGREEMENT.

## XXII.   APPLICABLE LAW

This AGREEMENT shall be governed and interpreted in accordance with the laws of the Commonwe of Pennsylvania.

## XXIII.  CAPTIONS

The captions of this AGREEMENT are not part of the AGREEMENT, but are merely for reference ; shall not affect the construction or the interpretation of the provisions hereof. If any caption is inconsist with any provision of the AGREEMENT such provision shall govern.

IN WITNESS WHEREOF, the parties intending to be legally bound have caused this Agency Agreement to signed and to take effect on the above date.

**AGENT**

DATED: 10|1|01                     BY: Hilbert Schnk

NAME: Hilbert Schench
TITLE: President

**COMPANY:**                    FOR THE OPERATING COMPANIES DESIGNATED BELOW:

DATED: _____                 BY:

NAME: Michael J. Carr
TITLE:  Assistant Vice President

Westchester Fire Insurance Company

**GUARANTOR:**                  Knapp Schenck & Company Insurance Agency, Inc

DATED: 10|1|01                  BY:

Exhibit A

## THE MASSAMONT METROGARD AND DIPLOMAX PROGRAM
## UNDERWRITING AUTHORITY

**I.    GENERAL UNDERWRITING AUTHORITY**

A.    The terms "COMPANY", "AGENT" and the "Program" shall have the same meanings in this Underwriting Authority as in the Agency Agreement attached hereto.

B.    COMPANY hereby grants AGENT underwriting authority for the Program. Such underwriting authority does not negate AGENT's responsibility to make knowledgeable underwriting decisions. Unique and unusual risks and coverages shall be discussed with COMPANY underwriter, prior to binding, even if the risk is within AGENT's authority.

C.    AGENT does not have the authority to write any class of business, exposure, or coverage which is outside the Program.

D.    AGENT's responsibilities and duties for underwriting are subject to all COMPANY policies and procedures as outlined in the Program Underwriting Manual.

E.    AGENT's underwriting authority and Program Underwriting Manual will be reviewed, at a minimum, on an annual basis. Adjustments or revisions to AGENT's underwriting authority Program Underwriting Criteria will be made as warranted, subject to COMPANY discretion, will be communicated to AGENT in writing.

**II.    GENERAL RESPONSIBILITIES AND DUTIES OF THE AGENT**

Subject to requirements imposed by law, the terms of the Agency Agreement, and the specific written program underwriting procedures and policies that may be provided to AGENT by COMPANY from time to time, the AGENT has the responsibility and duty to:

A)    Place such insurance policies as are specified in this Exhibit A, which may be modified by COMPANY;

B)    Bind COMPANY on insurance policies and endorsements as described herein and as outlined in the Program Underwriting Manual and work in conjunction with licensed sub-agents, brokers, and, where necessary, licensed agents appointed by COMPANY;

C)    Underwrite and accept or reject applications for insurance;

D)    Forward to COMPANY such applications as are beyond the AGENT's authority to approve;

E)    Analyze risk and rating information for the purpose of computing premiums;

F)    Assemble, type, prepare and issue policies including endorsements;

G)    Deliver policies, make proper arrangements for the countersigning of policies, where

required, and make certain that such requirements are followed;

H)    Calculate, charge, collect, receive and receipt premiums including any additional premiums, and refund return premiums and unearned premiums, if any, on canceled insurance policies;

I)    Transfer and modify policies as appropriate with the prior consent of COMPANY;

J)    Endorse any policy issued by AGENT, except where endorsement results in change in the ownership, changes in the named insured, or changes in the operations of the insured, in which case, endorsement shall be referred to COMPANY;

K)    Cancel and non-renew policies for non-payment of premiums and underwriting reasons;

L)    Cancel/reinstate any policy issued by AGENT, provided such cancellation/restatement is in accordance with applicable law and COMPANY requirements and cancellation/reinstatement date is not backdated;

M)    Pay fees and/or commissions to brokers and pay countersignature agent's commissions or fees;

N)    Underwrite existing policies prior to renewal;

O)    Send or arrange for the sending of renewal notices, non-renewal notices, rate increase notices, and coverage restriction notices;

P)    Maintain complete records of transactions of insurance, written as part of the Program, in compliance with section IV.F. of the Agency Agreement;

Q)    File affidavits with regulatory authorities and collect from insureds and transmit to the appropriate regulatory authorities the amount required by law to be paid as surplus (or excess) lines tax;

R)    Service all policies of insurance written pursuant to the Agency Agreement;

S)    Provide COMPANY with periodic reports as required under the Agreement as identified in Section IV.G. of the Agency Agreement;

T)    Remit premiums to COMPANY as identified in Section IV.E. of the Agency Agreement

U)    Furnish COMPANY sufficient information as may be required to satisfy any reporting requirements imposed on COMPANY boards, bureaus, associations, and regulatory bodies of competent jurisdiction as respects the policies issued pursuant to the Agency Agreement;

V)    Engage loss control and risk management activities, as specified in writing, for the Program;

W) Designate staff members, acceptable to COMPANY, who will be dedicated to the underwriting for insureds of COMPANY.

### III. DESIGNATED COMPANIES

AGENT is authorized to underwrite and bind risks for only the individual insurance companies : have signed the attached Agency Company agreement, and not for any other ACE USA compan

### IV. RECORD RETENTION

A. In accordance with Section IV.F. of the Agency Agreement between COMPANY and AGENT, the AGENT shall maintain all records of insurance pertaining to business written under the Program. Records of insurance include, but are not limited to:

1. A completed application of insurance.
2. A copy of the insurance policy when the policy is issued by AGENT. If policy is iss by COMPANY a copy of the declaration page for the policy issued.
3. A copy of the rating work sheets used to rate coverages quoted.
4. Copy of the loss experience for the prior three years.
5. A copy of experience rating.
6. Schedule rating work sheets and documentation to support schedule rating.
7. Loss control reports including resolution of recommendations.
8. List of the insured's drivers and related motor vehicle report, if motor vehicle coverages are involved.
9. Verification of values and premium base.
10. Financial data (when required).

B. At such time as AGENT is no longer required by state regulation to retain items listed in Section IV.A. above, COMPANY shall, at its own expense, have items shipped to a storage location designated by COMPANY. COMPANY shall pay all storage cost for these items. AGENT shall be allowed complete access to these items.

### V. REINSURANCE

Agent does not have the authority to place reinsurance on behalf of COMPANY.

### VI. LOSS CONTROL

COMPANY's Loss Control Services (LCS) reports are for COMPANY's and AGENT's use only and AGENT may not release LCS reports to insured or any other entity or individual. AGENT shall retain, in the insurance records maintained by AGENT, the resolution of all LCS recommendations.

### VII. AGENCY AGREEMENT TERMINATION

Cancellation or termination of the Agency Agreement or the Underwriting Authority between AGENT and COMPANY shall not affect any insurance coverage bound by AGENT, written in compliance with said Agency Agreement or Underwriting Authority and executed by AGENT

prior to the date of such cancellation or termination.

VIII.    **REGULATORY COMPLIANCE (PA Surplus Lines Agents only)**

It is understood and agreed that all insurance placed pursuant to this agreement on subjects of insurance resident, located, or to be performed in this Commonwealth, shall be effected and written in accordance with act of January 24, 1966, P.L. 1509 (40 P.S. 1006.1 *et seq*) of the General assembly of the Commonwealth of Pennsylvania.

IX.    **EXCLUSIVITY (if applicable)**

A.    During the term of this Agreement COMPANY will not grant to any producer, other than AGENT, the authority to solicit on behalf of COMPANY, Program business, as defined in this Underwriting Authority and the related Underwriting Manual.

B.    During the term of this Agreement AGENT will not solicit for any other insurance carrier, except COMPANY, the Program business. If COMPANY elects not to write such business, then AGENT is granted the right to submit such business to other insurance carriers under the same terms and conditions as presented to COMPANY.

C.    The Program business currently written by COMPANY as of the effective date of this Agreement, (Pre-Existing Business) is not subject to the exclusive distributorship arrangement described in Section IX.A. of this Exhibit, whether or not such Pre-Existing Business falls within the definition of the Program business. All renewals and endorsements, relating to such Pre-Existing Business, will be processed by COMPANY in the normal manner of transacting such business.

X.    **PROPRIETARY INFORMATION**

If and to the extent that AGENT shall, in connection with this Underwriting Authority and/or the Agency Agreement to which this Underwriting Authority is attached, come into possession of any information, business or technology of COMPANY which is not known to the public, AGENT shall treat such information as confidential and not to disclose such information to any person, entity or group not a party to this Agreement.

## AMENDMENT TO AGENCY AGREEMENT

This Amendment ("Amendment") to the Agency Agreement ("Agreement") which became effective January 1, 2001, by and between the ACE Property and Casualty Companies designated below ("Company") and Massamont Insurance Agency, Inc. ("Agent"), amends the Agreement as follows.

Section II. of the Agreement is amended as follows:

## II.    TERM OF AGREEMENT

This AGREEMENT shall be effective commencing January 1, 2001 and continue until December 31, 2003 or until terminated pursuant to Section VIII B, C and D of this AGREEMENT.  COMPANY agrees to offer insurance coverage for PROGRAM subject to the following conditions:

     1.   The PROGRAM meeting a targeted Gross Loss Ratio of **57.9%** annually. Gross Loss Ratio will be determined in accordance with Exhibit D.

     2.   COMPANY securing appropriate reinsurance coverage.

The agreement is subject to AGENT agreeing not to seek another company to write the PROGRAM during this period.

All other terms and conditions of the Agreement remain unchanged.

The parties, intending to be bound, have caused this Amendment to be signed by their authorized representatives as of _____.

AGENT:           Massamont Insurance Agency, Inc.

By: _Hhut Schn_____

Name:  _Hlbert Schench_

Title:   _President_

COMPANY:       FOR THE COMPANIES DESIGNATED BELOW:

By: _____

Name:  Michael Carr

Title:   Assistant Vice President

Westchester Fire Insurance Company

# EXHIBIT 3

OCT. 26. 2005 (TUE) 16:30    *9. unfair competition*    Knopp, Schenck PAGE. 4/13

OCT-23-2003  18:11    O'MELVENY & MYERS LLPNY12    12123262061    P.02/11

*19. confidential info*

*Do we insure Massamont?*    Peter ?  7/30/04 ?

# O'MELVENY & MYERS LLP

| LOS ANGELES | Citigroup Center | TYSONS CORNER |
| CENTURY CITY | 153 East 53rd Street | WASHINGTON, D.C. |
| IRVINE | New York, New York 10022-4611 | HONG KONG |
| NEWPORT BEACH | TELEPHONE (212) 326-2000 | LONDON |
| SAN FRANCISCO | FACSIMILE (212) 326-2061 | SHANGHAI |
| SILICON VALLEY | INTERNET: www.omm.com | TOKYO |

OUR FILE NUMBER
004.200-374
1465458

October 23, 2003

WRITER'S DIRECT DIAL
(212) 326-2189

## VIA FACSIMILE AND CERTIFIED MAIL

WRITER'S E-MAIL ADDRESS
pkoepff@omm.com

Mr. Hilbert Schenck II
Massamont Agency, Inc.
240 Lewis Wharf
Boston, MA 02110

Re:     Westchester Fire Insurance Company v. Massamont
        Demand for Arbitration

Dear Mr. Schenck:

Pursuant to Section XX of the Agency Agreement for the Massamont Metrogard and Diplomax Program, dated as of January 1, 2001 and as amended October 22, 2001 (the "Agreement"), we hereby notify you that Westchester Fire Insurance Company, Westchester Surplus Lines Insurance Company, and Illinois Union Insurance Company (collectively referred to herein as "Westchester") demand arbitration of their claims against Massamont Agency, Inc. ("Massamont"), as described below. Prior efforts to resolve this matter have failed, and hence Westchester now pursues its damage claims against Massamont in this arbitration.

Westchester designates Ron Jacks as its arbitrator and encloses a copy of his resume. Pursuant to Section XX of the Agreement, Massamont is obligated to designate its own arbitrator within sixty days, after which the two party-designated arbitrators have four weeks to designate the umpire.

O'MELVENY & MYERS LLP

Mr. Filbert Schenck II, October 23, 2003 - Page 3

In entering into the Agreement, Westchester relied on Massamont's promise to be the exclusive managing general agent on behalf of Westchester for the Program. To that end, believing that Massamont would continue to act as the exclusive managing general agent in accord with the Agreement, Westchester invested substantial money and effort with respect to the Program. It would not have done so had it known that Massamont would breach Section IX.E. of Exhibit A to the Agreement. Westchester would suffer and did suffer certain damages if the Agreement terminated prematurely.

The Agreement To Increase The Premiums

Prior to February 2003, the premiums on the Program were not sufficient to generate an adequate underwriting profit. As a consequence, Westchester requested that, in the aggregate, the premiums for the Program be raised by 40%. Massamont objected to this 40% increase. Thereafter, on February 24, 2003, Massamont and Westchester agreed that for the coming year, there would be an aggregate 25% increase on new and renewal premiums for the Program, and that for the next year there would be another aggregate premium increase.

There is no dispute that, effective February 24, 2003, under the Program, Massamont was obligated to effectuate an aggregate 25% increase on new and renewal premiums for the Program, including without limitation on any new or renewal policies placed on or after July 1, 2003. Nor is there a dispute that there would be a further aggregate premium increase in the following year.

The April 2003 Audit

In late April, Westchester conducted an audit and found that the deficiencies observed from the previous November audit remained. Among other things, Massamont continued to fail

*11/02 - uncovered initial problems*

O'MELVENY & MYERS LLP

Mr. Hibert Schenck II, October 23, 2003 - Page 4

to sufficiently consider individual risk characteristics; instead, risk selection was done on a class basis, with adjustments made for past losses. Massamont continued to fail to correctly price windstorm risks and still did not maintain adequate files on particular risks, including correspondence, email and documentation that supported current valuations, claim development information, and other information essential to proper underwriting.

Massamont's handling of individual accounts also fell short of the required standards. Premiums on some risks dropped sharply with no explanation; losses were incurred repeatedly on accounts with no apparent effort by the agency to properly analyze what had happened or to determine how deductibles or premiums should be adjusted. Westchester determined that the agency's overall performance was unsatisfactory.

In response, Massamont agreed to immediately implement the following changes:

- Massamont would utilize Westchester's modeling for windstorm risk. All new business in Massachusetts, Connecticut and Rhode Island was to be referred to Glenn Foster of Westchester for pricing and deductible options. The top 50 renewal accounts, as measured by wind load, were also to be referred for pricing and deductible options.

- All referral accounts previously approved were to be resubmitted as referrals to ensure that they were being underwritten in accordance with Westchester's requirements.

These new requirements made it necessary for Massamont to provide account information to Westchester as early as possible so that the necessary modeling and evaluation could be carried out in order to provide quotes before July 1. Massamont failed to submit accounts in a timely fashion, causing backlogs and delays.

Throughout the process, Massamont made various complaints regarding the procedures it was required to carry out and requested additional discretion to offer additional coverages and

O'MELVENY & MYERS LLP

Mr. Hilbert Schenck II, October 23, 2003 - Page 5

price particular accounts. On a timely and adequate basis, Westchester responded or otherwise to dealt with the complaints lodged by Massamont.

MASSAMONT BREACHES THE EXCLUSIVITY<br/>PROVISION OF THE AGREEMENT

Massimont's Discussions With Axis

Unbeknownst to Westchester, at some point in time Massamont began having discussions about transferring or placing new and renewal Program Business with Axis. Westchester believes that Massamont provided confidential information about the Program Business to Axis, described new and renewal Program Business to Axis, and began discussing when and how it would transfer or place new and renewal Program Business to Axis with respect to policies incepting on July 1, 2003. All of the foregoing constituted a violation or breach of the exclusivity provision and certain other provisions of the Agreement. Had Westchester known, it would have objected.

On or about June 27, again unbeknownst to Westchester, Massamont agreed to transfer or place a large portion of the Massachusetts and Rhode Island new and renewal Program Business with Axis in violation of the exclusivity provision and certain other provisions of the Agreement. The Business transferred to Axis amounted to approximately $12 million dollars in underwriting premium. Had Westchester known, it would have objected.

Even though it was obligated under the Agreement to do so, Massamont never offered any opportunity to Westchester to quote or otherwise obtain the new and renewal Program Business which it was actually in the process of transferring to or placing with Axis. For example, not once prior to June 27, did Massamont say in words or in substance that if Westchester did not agree to certain new or renewal Program Business, Massamont would

OCT·23-2003  16:12          O'MELVENY & MYERS LLPNY12                12123262061   P.06/11

O'MELVENY & MYERS LLP

Mr. Hubert Schenck II, October 23, 2003 - Page 6

transfer or place all or substantially all of new and renewal Program Business with some other

insurer such as Axis.

**Massamont's Disclosure About Axis**
**Getting The Program Business**

    In a telephone call made on Monday, June 30, Massamont announced to Westchester that

it had transferred a large portion of the Program Business in Massachusetts and Rhode Island to

Axis. This came as a complete surprise to Westchester, which could not believe that Massamont

had secretly transferred to or placed a large portion of the Program Business in Massachusetts

and Rhode Island with Axis, without first giving Westchester an opportunity to obtain such

business.

    In a July 1 email to Westchester, Massamont stated that Axis and it had reached such an

agreement on June 27. That also surprised Westchester, because it meant that Massamont had

secretly engaged in discussions and negotiations with Axis long before June 27.

    By letter dated July 9, 2003, Westchester advised Massamont that pursuant to Section

VIII.C.2 of the Agreement, Westchester was terminating the Agreement, effective immediately,

because of Massamont's breaches of the Agreement, including:

    Section VIII.C.2., which provided that Massamont could be terminated
immediately if it assigned or transferred any portion of the Program's insurance
without giving Westchester 90 days notice;

    Section IX.B. of Exhibit A to the Agreement, which provided that the Agent
could not solicit Program Business from any other insurance carrier, unless
Massamont first offered the business to Westchester and Westchester declined to
write it; and

    the Amendment, which stated categorically that Massamont "agree[d] not to
ask another company to write the PROGRAM" during the term of the
Agreement.

OCT. 28, 2003 (TUE) 16:31

OCT-23-2003 18:12          O'MELVENY & MYERS LLPNY12          12123262061  P.07/11

O'MELVENY & MYERS LLP

Mr. Hubert Schenck II, October 23, 2003 – Page 7

In its July 9 letter, Westchester also stated that it was preserving any and all claims that it had against Massamont for breaching the Agreement and reserved the right to pursue such claims.

Massamont's Admissions In Its July 11 Letter

In response to Westchester's July 9 letter of termination, Massamont responded by letter dated July 11. Massamont admitted in this July 11 letter that it had transferred to or placed with Axis all renewal and new Program Business for Massachusetts and Rhode Island, in contravention of the exclusivity provision in the Agreement.

Massamont appears to argue that it previously offered the business to Westchester on the same terms as it offered to Axis. Westchester disputes that Massamont previously offered the new and renewal business on the same terms that were provided to Axis. For example, in the July 11 letter, Massamont contended that it first offered such business to Westchester as follows:

(1)    Massamont would have pricing "authority" to obtain the 25% rate increase;

(2)    Massamont would have discretion to offer wind deductibles to "alleviate price increases;"

(3)    Massamont would be entitled to offer flood coverage outside certain federally designated flood zones; and

(4)    Massamont would be entitled to offer $50,000 in mold coverage.

Massamont further contends that Westchester declined to write the requested coverage, thus purportedly freeing Massamont under Section IX.B. of the Agreement to offer such the Program business to Axis.

For several separate and independent reasons, the purported excuse offered by Massamont is without merit. First, the Amendment provides, without any exception, that Massamont may not seek another company to write the Program. Second, as already noted,

**O'MELVENY & MYERS LLP**
Mr. Filbert Schenck II, October 23, 2003 - Page 8

Massamont had never "offered" or "proposed" business to Westchester on the terms alleged. Third, it is undisputed that Massamont failed to give any notice – much less the 90 days required by the Agreement – before transferring the $12 million Massachusetts and Rhode Island premium to Axis. Westchester never knew of these negotiations until they were over and was never given any opportunity to respond to the terms allegedly offered to, and accepted by, Axis.

<u>Damages Suffered By Westchester</u>

In this arbitration, Westchester seeks to recover all damages to Westchester caused by Massamont's breach of the exclusivity provision in the Agreement. Such damages will be specified in Westchester's initial arbitration submission.

Under Section IV.K. of the Agreement, Massamont was required to maintain Errors and Omissions insurance with a limit of liability of not less than $10 million. We hereby request that you give notice to your insurer of this arbitration demand and the claims asserted herein.

Very truly yours,

Paul R. Koepff
of O'MELVENY & MYERS LLP

cc Bob Gaffney
   Bill Garrigan
   Susan Woodward
   Bill Sharp
   Glen Foster
   Kathleen Morrison

NY1:1475784.1

# EXHIBIT 4



PAUL WALTERS
Manager
Errors & Omissions Claims Department

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

P.O. Box 530, Utica, NY 13503-0530
Telephone: (315) 734-2522
FAX: (315) 734-2933
e-mail: paul.walters@uticanational.com

DISCLAIMER OF COVERAGE

*#732 751*

*DROP MAIL*

*TYPE: outgoing letter*

*Descr: DISCL of COVERAGE*

March 4, 2004

Knapp Schenck & Company
Massamont Insurance Agency Inc
240 Lewis Wharf
Boston, MA 02110

RE:     File No.:     732751
        Insured:      Knapp Schenck & Co; Massamont Ins Agcy, Inc.
        Claimant:     Westchester Fire Insurance Company
        Policy No.:   3445032 EO

This letter is written with respect to the captioned matter and more particularly with respect to the demand for arbitration set forth by Westchester Fire Insurance Company. As you are aware, this matter has been under investigation by R.M.G. Investigations under a nonwaiver agreement. The purpose of the nonwaiver agreement was, and is, to preserve the rights of the parties during the investigation. Our investigation appears concluded and Utica's position regarding coverage is discussed below.

By way of the demand for arbitration various acts and damages are alleged that are not afforded coverage under the Utica policy. First, Westchester Fire Insurance Company alleges that Massamont's actions were in violation of an Agency Agreement entered into in and during 2001. While Utica asserts that coverage under its Insurance Agents and Brokers Errors and Omissions Insurance policy does not apply because of the nature of the claim(s) alleged by Westchester Fire Insurance Company, even if coverage was determined as applicable to the allegations, the policy would not apply because the act(s) generating the claim occurred previous to the Retroactive Date of the Utica policy. In this regard the Utica policy, Form 14-P-EOA (1/98), reads:

> **This insurance does not apply to loss, whenever occurring, from "wrongful acts" which took place before the Retroactive Date, if any, shown** 07/30/02.

In its demand for arbitration Westchester Fire Insurance Company alleges it "...relied on Massamont's promise to be the exclusive managing general agent on behalf of Westchester for the Program." In this regard the Utica policy contains exclusions as follows.

**SECTION III – EXCLUSIONS**

This insurance does not apply to:

Utica National Insurance Group

Utica Mutual Insurance Company
and its affiliated companies.

Insurance that starts with you.

File No.: 732751
Insured: Massamont Insurance Agency Inc
2

6.    A "claim" by any entity or individual which:

    a.  Is wholly or partially owned, operated, managed, or controlled by the insured;

    b.  Did wholly or partially own, operate, manage, or control the insured; or

    c.  Is wholly or partially under the same ownership, operation, management, or financial control as the insured.

### SECTION III – EXCLUSIONS

This insurance does not apply to:

18.   "Claims" made against an insured arising out of the insured's activities as third party administrator of any plan, whether insured or self-insured and whether or not the insured performs such activities.

In its demand for arbitration Westchester also asserts that there was an issue regarding "premiums." The Utica policy reads as follows.

### SECTION III – EXCLUSIONS

This insurance does not apply to:

4.    Any liability for money received by an insured or credited to an insured for fees, premiums, taxes, commissions, loss payments, or escrow or brokerage monies.

Throughout its demand for arbitration Westchester asserts that Massamont was deficient and otherwise failed to perform various and numerous tasks associated with its obligations and duties in accordance with the agreement that existed between the two parties to the contract. All of what is alleged in this regard can be identified and defined as the obligations of a fiduciary. The Utica policy extends errors and omissions coverage to its policyholders for the following:

### SECTION II – COVERAGE

1.    Insuring Agreement.

    a.    We will pay on behalf of the insured all "loss" to which this insurance applies.

        We will have the right and the duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any "suit" seeking damages for a "wrongful act" to which this insurance does not apply.

The Utica policy defines "loss" and covered acts as follows:

### SECTION I – DEFINITIONS

6.    "Loss" means any amount, which an insured becomes legally obligated to pay as damages for any "claim" to which this insurance applies and shall include judgments and settlements. To the extent allowed by law, "loss" shall include punitive or exemplary damages. "Loss" shall not include:

    a.  Fines or penalties imposed by law;

    b.  Taxes; and

File No.: 732751
Insured: Massamont Insurance Agency Inc
3

c. Matters, which may be deemed uninsurable under the law pursuant to which the policy shall be construed.

14. "Wrongful act" means any negligent act, error, or omission to which this insurance applies.

In addition to the grant and limitations of coverage as discussed above the Utica policy reads as follows:

### SECTION III -- EXCLUSIONS

This insurance does not apply to:

17. Any "claim" based solely on an insured's status as a fiduciary.

Also, based upon the assertions contained throughout Westchester's demand for arbitration it is continually alluded to or asserted that the actions on the part of Massamont were done "secretly." As referenced above under Section II – Coverage, and Section I – Definitions, coverage would not extend to acts other than those defined and referenced and contained in the Insuring Agreement. Section III – Exclusions also reads:

This insurance does not apply to:

1. Any dishonest, fraudulent, malicious, or criminal conduct committed or alleged to have been committed by or at the direction of the insured. If a "suit" is brought against the insured alleging both "wrongful acts" within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct, then we will defend the insured in the trial court, but we shall not have any liability for any judgment for dishonest, fraudulent, malicious, or criminal conduct nor shall we have any further obligation to defend after judgment in the trial court.

This exclusion applies only to insureds who participated in, acted with knowledge of, or acquiesced to such conduct.

Summarily, Westchester's claim of Massamont's deliberate and secret breach of the agreement that existed between the parties is not a negligent act, error, or omission to which this insurance applies, as explained in the policy excerpts referenced above.

Since Utica will not be extending coverage in this matter any arbitration award, judgment, or settlement, will be the responsibility of the agency and not that of Utica Mutual Insurance Company.

You may wish to retain counsel, at your cost, to best protect your interests with respect to the claim(s) being made against you and in response to the demand for arbitration made against you.

Any action taken by Utica, its agents, its representatives or attorneys, is not to be construed as, nor does it constitute a waiver of any rights and/or defenses available under the terms, conditions, provisions, definitions, exclusions and endorsements of the referenced professional liability policy, nor shall it prevent Utica from asserting at a later date any rights or defenses that may be available now or in the future regarding this matter. Our position with respect to the absence of coverage regarding this matter is based upon the facts presented to Utica and acquired through its investigation conducted by R.M.G. Investigations under the nonwaiver agreement. If you know of, or become aware of facts that may materially change our position in this matter please contact us immediately.

File No.: 732751
Insured:  Massamont Insurance Agency Inc
4

If you have any questions whatsoever regarding this advisement, please contact Senior Errors and Omissions Claims Specialist Mark. M. Ribnikar at 1-800-274-1914 on extension 2628.

Sincerely,

Paul E. Walters, Manager
Errors and Omissions Claims

Cc:    Mark M. Ribnikar, AIC
       Senior E & O Claims Specialist
       File No: 732751

P.W.

H.O.

Al —
Coverage discl
for your and
Paul's approval.
Thank You
Mar E

# **<u>EXHIBIT 5</u>**

# COVINGTON & BURLING

1201 PENNSYLVANIA AVENUE NW    WASHINGTON DC
WASHINGTON DC 20004-2401       NEW YORK
TEL 202 662 6000              LONDON
FAX 202 662 6291             BRUSSELS
WWW COV COM                   SAN FRANCISCO

ROBERT N SAYLER
TEL 202 662 5393
FAX 202 778 5392
RSAYLER@COV COM

December 6, 2004

**By Federal Express**

Mark M Ribnikar
Senior Errors and Omissions
 Claims Specialist
Utica Mutual Insurance Company
180 Genesee Street
New Hartford, New York 13413-2299

Re     *Westchester Fire Insurance Company v Massamont Insurance Agency, Inc*
       Your File No 732751

Dear Mr Ribnikar

Massamont Insurance Agency, Inc has asked us to respond to Utica's disclaimer of coverage for the above arbitration as stated in Utica's letter dated March 4, 2004  The disclaimer is without foundation and constitutes a breach of Utica's duty to defend Massamont in the pending arbitration, which is expected to conclude later this month

I hope that my letter will prompt Utica to reconsider its position without the need for coverage litigation, in which Utica would face liability not only for Massamont's defense costs but also for the costs of the coverage litigation itself (as well as additional liability should Utica be found to have acted in bad faith)  *See Hanover Ins Co v Golden*, 766 N E 2d 838, 840-41 (Mass 2002)

The arbitration in question was initiated by Westchester Fire Insurance Company on October 23, 2003  Massamont promptly sought coverage for this claim under its Insurance Agents and Brokers Errors and Omissions Liability Policy, Policy No 3445032 EO, issued by Utica

There is no dispute that the claim alleges that Massamont committed errors and omissions in its capacity as an insurance agent for Westchester  Utica itself acknowledged on page 2 of its disclaimer letter that Westchester's demand for arbitration "asserts that Massamont was deficient and otherwise failed to perform various and numerous tasks associated with its obligations and duties in accordance with the agreement that existed between the two parties to the contract "

COVINGTON & BURLING

Mark M Ribnikar
December 6, 2004
Page 2

Given the breadth of the duty to defend, such allegations are more than enough to trigger Utica's duty to defend Massamont under the policy  In evaluating the demand for arbitration, Utica was required to "envisag[e] what kinds of losses may be proved as lying within the range of the allegations" and to defend Massamont if "any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy " *Boston Symphony Orchestra, Inc v Commercial Union Ins Co* , 545 N E 2d 1156, 1159 (Mass 1989) (citations omitted) [1]

None of the grounds on which Utica disclaimed coverage has merit  They are addressed in the order they appear in Utica's March 4, 2004 letter

1    Retroactive Date

First, Utica contends that the policy does not apply "because the act(s) generating the claim occurred previous to the Retroactive Date of the Utica policy " However, the only acts that the policy states must occur on or after the Retroactive Date are "wrongful acts," not any act in the chain of causation leading to the claim  *See* Policy § II 1 b 1

Accordingly, the only specific act that Utica cites in support of this contention – Massamont's execution of the Agency Agreement in 2001 – does not entitle Utica to deny coverage  Westchester is not alleging that Massamont's execution of the Agency Agreement constitutes a "wrongful act" as defined in the policy, i e , "a negligent act, error, or omission " *See* Policy § I 14

2    Entity "managed" by the insured

Utica contends that Westchester's allegation that Massamont acted as a "managing general agent" implicates an exclusion for claims by an entity "wholly or partially owned, operated, managed, or controlled by the insured" (Policy § III 6)  That is, Utica appears to contend that Massamont is not entitled to coverage because it "managed" the Westchester Fire Insurance Company

---

[1]    Westchester itself appears to have recognized that its claim alleges potentially covered errors and omissions by Massamont  Westchester's demand for arbitration ends with a request that Massamont "give notice to your [Errors and Omissions] insurer of this arbitration demand and the claims asserted herein "

COVINGTON & BURLING

Mark M Ribnikar
December 6, 2004
Page 3

This contention is absurd and ignores the reality of the relationship between Massamont and Westchester  It was Westchester that managed and controlled Massamont's activities under the Agency Agreement  To take one example, Massamont was required to follow underwriting procedures established by Westchester even while Westchester reserved to itself the right unilaterally to amend those procedures [2]  Massamont was an agent, not the principal

Moreover, the policy specifically extends coverage to "Managing, Master or Brokerage General Agent[s]" without any suggestion that their coverage is somehow more limited than the coverage afforded to other types of agents and brokers  See Policy § II 1 c 5  The evident purpose of the owned-entity exclusion is to prevent coverage for collusive claims (a purpose not implicated here) rather than to impose *sub silentio* a special restriction on one class of insurance agents

3     Claims against "third-party administrator of any plan "

The exclusion for claims arising out of an insured's activities as "third-party administrator of any plan" likewise does not apply in this case  A third party administrator is "[a] firm which provides administrative services for employers and other associations having group insurance policies "  Merritt Glossary of Insurance Terms at 203 (3rd ed 1989)  Westchester's demand for arbitration does not allege that Massamont was acting in this capacity

4     Premiums

Utica points to Westchester's assertion that there was "an issue" regarding premiums as triggering an exclusion for "liability for money received by an insured    for    premiums  " (Policy § III 4)  The exclusion does not apply to claims raising any "issue" regarding premiums but only to the insured's liability for premium monies that it received  While Westchester's demand for arbitration describes a dispute about the appropriate target for aggregate premiums that Massamont was expected to produce in 2003, it does not allege that Massamont is liable for wrongfully retaining or disposing of any of the premiums it received

---

[2]    *See, e g ,* Agency Agreement Exhibit A, § I D ("AGENT's responsibilities and duties for underwriting are subject to all COMPANY policies and procedures as outlined in the Program Underwriting Manual "), *id* at § I E ("Adjustments or revisions to AGENT's underwriting authority and Program Underwriting Criteria will be made as warranted, subject to COMPANY discretion   ")

COVINGTON & BURLING

Mark M Ribnikar
December 6, 2004
Page 4

5    Claims based "solely on    status as a fiduciary"

Utica's reliance on the exclusion for claims based "solely on the insured's status as a fiduciary" is bafflingly off-point  The demand for arbitration does not even use the term "fiduciary" and in any event cannot be read as alleging that Massamont's liability rests "solely" on a breach of fiduciary duty

6    "Dishonest, fraudulent, malicious, or criminal conduct"

Finally, Utica relies on the exclusion for "dishonest, fraudulent, malicious, or criminal conduct" (Policy § III 1)  This exclusion, however, requires Utica to defend any suit "alleging both 'wrongful acts' within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct[ ]"  See id  The demand for arbitration alleges that Massamont committed wrongful acts  Utica acknowledges that Westchester's demand for arbitration alleges that "Massamont was deficient and otherwise failed to perform various and numerous tasks" in violation of its obligations under the Agency Agreement  Utica therefore must defend the claim regardless of whether any dishonest, fraudulent, malicious, or criminal acts are also alleged

In any event, the demand for arbitration does not allege that any of Massamont's actions were "dishonest, fraudulent, malicious, or criminal"  The underlying arbitration describes an ordinary business dispute, not a crime or fraud  The only allegations to which Utica refers to support its position are that some of Massamont's actions were done "secretly"  That is a far cry from alleging that they were done dishonestly or fraudulently  For purposes of the duty to defend, Utica must construe these allegations in favor of Massamont rather than assuming the worst

* * *

COVINGTON & BURLING

Mark M Ribnikar
December 6, 2004
Page 5

The final day of the arbitration hearing is scheduled for December 13, 2004, at which time the matter will be ready for decision by the arbitrators   Ideally, Utica will acknowledge its duty to defend before that date   In any event, Massamont expects that Utica will promptly settle its liability for the full amount of the defense costs that Massamont will have incurred while Utica was in breach of its duty to defend   Massamont will forward a statement of those defense costs once the arbitration is complete   Massamont reserves its right to seek coverage from Utica of any award that the arbitration panel may enter against Massamont

Sincerely,

Robert N  Sayler

# **EXHIBIT 6**

# CONN KAVANAUGH ROSENTHAL PEISCH & FORD, LLP

### COUNSELORS AT LAW

Ten Post Office Square, Boston, Massachusetts 02109

Tel: (617) 482-8200
Fax: (617) 482-6444

THOMAS E. PEISCH
BOB B. ROSENTHAL
JAMES F. KAVANAUGH, JR.
RUSSELL F. CONN
GEORGE M. FORD
JAMES B. PELOQUIN
BARRY E. GOLD
THOMAS J. GALLITANO
JAMES GRAY WAGNER
ERIN K. HIGGINS
STEVEN E. GURDIN
MICHAEL T. SULLIVAN
CONSTANCE M. MCGRANE

KURT B. FLIEGAUF
RONALD M. JACOBS
CAROL A. STARKEY
JENNIFER M. NORTON
SARA L. GOODMAN
MICHAEL R. BERNARDO
JACOB A. LABOVITZ
CARA A. FAUCI
JOHANNA L. MATLOFF
AMY C. STEWART
BETH NUZZO NEWMARK
SARAH E. WEBER

WRITER'S DIRECT DIAL: 617.348.3201
E-MAIL: RCONN@CKRP&F.COM

March 31, 2005

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
Covington & Burling
1201 Pennsylvania Avenue NW
Washington, D.C. 20004

RE:   Westchester Fire Insurance Company v. Massamont Insurance Agency
      Utica Claim No. 732751

Dear Messrs. Sayler and Williams:

We have been retained by Utica Mutual Insurance Company ("Utica") in connection with the above matter. This letter will constitute Utica's response to your December 6, 2004 letter, requesting that Utica reconsider its disclaimer of coverage for the claims made by Westchester Fire Insurance Company ("Westchester") against Massamont Insurance Agency, Inc. ("Massamont") in the above-referenced arbitration. Please be advised that Utica stands by its disclaimer of coverage, for the reasons set forth in its March 4, 2004 letter disclaiming coverage, as modified herein, and as set forth in more detail below.

Utica's disclaimer of coverage is based upon its review of documents provided to Utica by Massamont or its counsel, including Westchester's October 23, 2003 demand for arbitration and certain correspondence and e-mail messages between Massamont and Westchester. Massamont refused to provide Utica with copies of documents reflecting communications between Massamont and Axis Capital, the company to which Massamont transferred program business in the late spring or early summer of 2003. Utica reserves the right to further amend this disclaimer in the event it receives additional pertinent information.

I.    Factual and Procedural Background

Massamont is a subsidiary of Knapp, Schenck & Company Insurance Agency, Inc., which is located in Boston, Massachusetts. Massamont acts as Managing General Agent for two specialty programs, the "Metrogard" program, which provides coverage for municipal entities, and the "Diplomax" program, which provides coverage for private educational institutions. From approximately January 1, 2001 through July 9, 2003, Massamont administered these two specialty programs through an agency agreement with Westchester.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 2

In April, 2003, ACE USA, Westchester's parent company, conducted an audit of Massamont's books. On May 7, 2003, Glenn Foster of ACE sent Hilbert "Van" Schenck of Massamont a "report card" with a number of criticisms of Massamont's management of the programs, and an overall grade of "unsatisfactory." Essentially, ACE claimed that Massamont had been accepting and pricing risks within the two programs on a group basis, rather than using a more traditional underwriting approach that focused on specific risk characteristics.

On or before June 27, 2003, according to Westchester's demand for arbitration, Massamont allegedly reached an agreement with Axis Capital to transfer the Massachusetts and Rhode Island program business from Westchester to Axis.

On the same day, Massamont submitted a renewal application to Utica. In that application, Massamont disclaimed any knowledge "of any circumstance, allegation, contention or incident which may result in any claim being made against the agency, its predecessor in business, or any of its present or former owners, partners, officers, or directors."

On June 30, 2003, Massamont notified ACE by telephone that it had placed all of the Massachusetts and Rhode Island business with another carrier.

On July 9, 2003, ACE advised Massamont by telephone that ACE was terminating the Agency Agreement. By letter of the same date, ACE confirmed that it was terminating the Agreement in accord with Paragraph VIII.C.2 of the Agreement, which provided as follows:

> COMPANY may terminate this AGREEMENT immediately by written notice to AGENT if any one or more of the following events occur:
>
> ....
>
> 2.    AGENT assigns, transfers, encumbers or otherwise disposes of this AGREEMENT or any interest in this AGREEMENT or sells, exchanges, transfers, assigns, merges or consolidates the PROGRAM insurance business without giving COMPANY ninety (90) days prior notice thereof.

ACE further claimed that Massamont was in breach of Paragraph IX.B of Exhibit A to the Agency Agreement,[1] which provided as follows:

> B.    During the term of this Agreement, AGENT will not solicit for any other insurance carrier, except COMPANY, the Program business. If COMPANY elects not to write such business, then AGENT is granted the right to submit such business to other insurance carriers under the same terms and conditions as presented to COMPANY.

---

[1] In its July 9, 2003 letter, ACE erroneously referred to Paragraph IX.B of the Agreement, which relates to another topic.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 3

ACE's July 9, 2003 letter also referenced the Amendment to the Agency Agreement, which stated that the Agreement was "subject to AGENT agreeing not to seek another company to write the PROGRAM during [the term of the Agreement]."

On July 11, 2003, Massamont notified ACE that it disagreed with ACE's reading of the contract language, and asserted that ACE had terminated the Agreement without cause and without sufficient notice.

On July 16, 2003, Robert J. Gaffney of ACE wrote to Massamont, reaffirming the termination of the Agreement. Mr. Gaffney further asserted that Massamont's breaches of the Agreement had caused substantial damage to ACE, and that ACE intended "to vigorously pursue its claim for damages." Massamont did not forward this letter, or any of the prior correspondence, to Utica.

Utica's renewal policy incepted on July 30, 2003.

On or about October 23, 2003, ACE's counsel faxed to Massamont a demand for arbitration. A copy of the demand for arbitration is attached at Tab A. Knapp, Schenck notified Utica of the arbitration demand on October 29, 2003.

Utica then assigned Robert Burkitt of R.M.G. Investigations to investigate the claim. Mr. Burkitt asked Massamont to provide copies of its files. Massamont refused to provide Mr. Burkitt with copies of Massamont's correspondence with Axis.

On March 4, 2004, Utica disclaimed coverage for the claims made by Westchester on a number of grounds.

Massamont did not respond to this disclaimer of coverage until your letter of December 6, 2004. In that letter, you requested that Utica reconsider its coverage position in advance of the final day of the arbitration, which was then scheduled to conclude on December 13, 2004. You did not provide Utica with any additional documents or information in support of your request that Utica reconsider its disclaimer of coverage.

We subsequently asked whether Westchester had filed a complaint in the arbitration other than the October 23, 2003 demand for arbitration. Although Massamont at first refused to produce any pleadings from the arbitration in the absence of a written confidentiality agreement, you ultimately provided us with a document filed by Westchester on April 20, 2004, titled "Petitioner's Statement of Position."

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 4

## II.    Arbitration Demand

The October 23, 2003 arbitration demand was in the form of a letter from Westchester's counsel, O'Melveny & Myers LLP. Westchester alleged that Massamont breached the exclusivity provisions of the Agreement by seeking another company to write program business, by soliciting program business for Axis without first offering the business to Westchester, and by transferring program business to Axis without giving Westchester ninety days' notice of the proposed transfer. Westchester further alleged that Massamont provided confidential information about the program to Axis in connection with the transfer of business. Westchester alleged that it was entitled to recover the damages caused by Massamont's breach of the cited provisions of the Agency Agreement.

In setting forth the background to the parties' dispute, Westchester's counsel referenced his client's past complaints about deficiencies in Massamont's underwriting program, including a failure "to sufficiently consider individual risk characteristics," a failure "to correctly price windstorm risks," a failure to maintain adequate filing and documentation procedures, and a failure to investigate the causes of loss and to make appropriate recommendations regarding deductibles or premiums. Westchester did not allege, however, that its claims in arbitration were premised on these alleged deficiencies, not did Westchester allege that it was entitled to recover damages arising out of these alleged deficiencies.

## III.    Coverage Analysis[2]

Utica issued Policy No. 3445032 (the "Policy") to Knapp Schenck & Company and various additional named insureds, including Massamont, on July 29, 2003. This was a renewal policy, with a policy period from July 30, 2003 to July 30, 2004, and limits of liability in the amount of $10,000,000 for each loss and $11,000,000 in the aggregate. The limits of liability were subject to a deductible in the amount of $50,000 applicable to each loss, and $150,000 in the aggregate. A copy of the Policy is attached at Tab B.

A.    The Policy Did Not Provide Coverage For Westchester's Claims Against Massamont, Because Westchester's Claims Did Not Arise Out Of A Negligent Act, Error, Or Omission.

In essence, the Policy insures only against "negligent acts, errors, or omissions." The Policy provides, in relevant part, as follows:

---

[2]    We have based our coverage analysis on the allegations made in Westchester's October 23, 2003 demand for arbitration, as that document most closely approximates a civil complaint. We note, however, that the allegations made in Westchester's April 20, 2004 "Statement of Position" are virtually identical to those made in the October 23, 2003 demand.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 5

## SECTION II – COVERAGE

1. **Insuring Agreement**

   a.   We will pay on behalf of the insured all 'loss' to which this insurance applies.

        We will have the right and the duty to defend the insured against any 'suit' seeking those damages even if the allegations of the 'suit' are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any 'suit' seeking damages for a 'wrongful act' to which this insurance does not apply.

        ....

   e.   The "loss" must arise out of "wrongful acts" committed in the conduct of the insured's business, wherever committed or alleged to have been committed, by the insured or any person for whose "wrongful acts" the insured is legally liable in rendering or failing to render professional services as:

        (1)   A General Insurance Agent;

        (2)   An Insurance Broker;

        (3)   An Insurance Agent;

        (4)   An Insurance Consultant;

        (5)   A Managing, Master or Brokerage General Agent;

        (6)   A Life and Accident and Health Insurance Agent;

        (7)   A Surplus Lines Broker; or

        (8)   A Notary Public.

The Policy contains the following definitions relevant to these paragraphs of the insuring agreement:

'Loss' means any amount which an insured becomes legally obligated to pay as damages for any 'claim' to which this insurance applies and shall include judgments and settlements. ....

'Claim' means a written notice, including service of 'suit' or demand for arbitration, received by one or more insureds asking for money or services.

'Suit' means a civil proceeding in which damages because of 'loss' from a 'wrongful act' are alleged. 'Suit' includes:

   a.   An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b.   Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 6

....

'Wrongful act' means any negligent act, error, or omission to which this insurance applies.

Thus, Utica has a duty to defend an insured against any "suit," which is defined to include arbitration proceedings, but only if the damages alleged arise out of a "loss" from a "wrongful act." Further, the "loss" must arise out of "wrongful acts" committed in the conduct of the insured's business, in rendering or failing to render professional services in one of the enumerated capacities.

Westchester's claims against Massamont, as elucidated in the October 23, 2003 demand for arbitration, did not fall within the insuring agreement of the Policy. Westchester claimed that at some point in time, Massamont began having discussions with Axis about transferring or placing new and renewal program business with Axis. Westchester further alleged that Massamont provided confidential information about the program to Axis, and that Massamont kept secret from Westchester all of its contacts with Axis. Westchester alleged that these actions constituted a breach of the exclusivity and confidentiality provisions of the Agreement, and that Massamont's actions resulted in the transfer of approximately $12,000,000 in premium from Westchester to Axis. In sum, Westchester claimed that Massamont deliberately and secretly transferred program business from Westchester to Axis. Westchester did not allege that Massamont made this transfer negligently or inadvertently, or that Massamont breached the standard of care applicable to Massamont's performance of professional services.

Courts uniformly have held that a policy providing coverage for "negligent acts, errors, or omissions" does not insure against breach of contract claims premised on deliberate conduct. For example, in Town of Orland v. National Fire & Casualty Co., 726 N.E.2d 364 (Ind. App. 2000), an engineer had sued a municipality for breach of a contract for professional services, where the municipality had ordered the engineer to stop work and had hired another engineer to complete the first engineer's duties. The municipality brought a declaratory judgment action against its insurer, asserting that the insurer should have provided a defense to the town under its errors and omissions policy because the engineer's complaint arguably alleged mismanagement by the town. The court rejected this argument, holding:

We acknowledge that "[a] duty of care, the breach of which will support a negligence action, may arise contractually." .... However, this is not such a case. Here, [the town's] conduct cannot be characterized as the negligent performance of a contractual duty such that Jones could have brought a negligence action rather than one for breach of contract. Instead, [the town], whether in good faith or not, deliberately made business decisions which caused [the plaintiff engineer] to question [the town's] commitment to the contract and, thus, bring the federal lawsuit. We hold that such conduct does not result in liability under the Errors or Omissions Clause issued by [the insurer] and decline [the town's] invitation to treat the Errors or Omissions Clause as a performance bond.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 7

Id. at 370-71. In Baylor Heating & Air Conditioning, Inc. v. Federated Mutual Ins. Co., 987 F.2d 415 (7th Cir. 1993), the court held that the insured's decision to stop making payments into an employee pension fund was not a "negligent act, error, or omission," even though the insured allegedly acted in good faith and in reliance on erroneous legal advice. The court held:

> Under [the insured's] logic, any default arising from a mistaken assumption regarding one's contractual liability could be transformed into an insured event. Indeed, refusing to pay a debt in reliance upon erroneous advice of counsel would convert a contractual debt into damage arising from a negligent omission. We dare not imagine the creative legal theories treading just short of malpractice and frivolity that could seek to transform contract obligations into insured events.

Id. at 420-21; see also Cincinnati Ins. Co. v. Metropolitan Properties, Inc., 806 F.2d 1541, 1544-45 (11th Cir. 1986) (insured developer's failure to acquire low-income properties as required under contract with city was not a "negligent act, error, or omission," even if developer's breach resulted from carelessness rather than an intent to defraud, where duty breached was one created by contract, not by law); Pacific Ins. Co. v. Eaton Vance Management, 369 F.3d 584, 593 (1st Cir. 2004) (noting that if an insured's mistaken belief regarding a contractual obligation was sufficient to trigger coverage, insureds would be more likely to adopt "aggressive" interpretations of contractual obligations).

The reasoning of these cases is applicable here. Regardless of whether Massamont in good faith believed that its conduct was permissible under its contract with Westchester, Massamont deliberately made a business decision to transfer part of the program business to Axis. Put another way, the facts set forth in Westchester's demand for arbitration would not support a negligence claim against Massamont. Thus, Westchester's claims against Massamont were not covered under the Policy, and Utica had no duty to defend Massamont in the arbitration proceedings and has no duty to indemnify Massamont against any judgment awarded to Westchester as a result of those proceedings.

      B.     Even If Westchester's Arbitration Demand Had Alleged Conduct Falling Within The Insuring Agreement Of The Policy, Certain Exclusions In The Policy Would Have Barred Or Limited Coverage.

As set forth above, because the conduct alleged in Westchester's demand for arbitration did not fall within the insuring agreement of the Policy, Utica had no duty to defend or indemnify Massamont against Westchester's claims. Moreover, even if Westchester had alleged a "negligent act, error, or omission," certain exclusions in the Policy would have barred or limited coverage for Westchester's claims. The Policy contained the following pertinent exclusions:

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 8

### SECTION III - EXCLUSIONS

This insurance does not apply to:

1.  Any dishonest, fraudulent, malicious, or criminal conduct committed or alleged to have been committed by or at the direction of the insured. If a 'suit' is brought against the insured alleging both 'wrongful acts' within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct, then we will defend the insured in the trial court, but we shall not have any liability for any judgment for dishonest, fraudulent, malicious, or criminal conduct nor shall we have any further obligation to defend after judgment in the trial court.

    This exclusion applies only to insureds who participated in, acted with knowledge of, or acquiesced to such conduct.

    ....

19. "Claims" arising out of or alleging the unauthorized use of trade secrets or confidential or proprietary information.

In its October 23, 2003 demand for arbitration, Westchester alleged that Massamont, in breach of its obligations under the Agency Agreement, "secretly transferred or placed" the program business with Axis, and that prior to the actual transfer, Massamont "secretly engaged in discussions and negotiations" with Axis regarding the program business. Westchester further alleged that Massamont "provided confidential information about the Program Business to Axis," where the Agency Agreement required Massamont to refrain from disclosing any such confidential information. To the extent that any award against Massamont is premised on a finding that Massamont did in fact engage in "dishonest, fraudulent, malicious, or criminal conduct," or conduct in violation of the confidentiality clause of the Agency Agreement, these two exclusions would bar or limit coverage for any such damage award.

C.  Massamont's Failure To Disclose The Transfer Of Program Business And The Subsequent Demand Letter From Westchester Prior To The Inception Date Of The Policy Constituted A Material Misrepresentation Entitling Utica To Rescind the Policy.

As set forth above, Utica had no duty to defend or indemnify Massamont against any of the claims made by Westchester, as Westchester did not allege a "negligent act, error, or omission" within the Policy's insuring agreement. Should Massamont pursue its claim for coverage under the Policy, however, Utica reserves the right to disclaim coverage on the further ground that Utica is entitled to rescission of the Policy premised on Massamont's failure to disclose the transfer of business of Axis, and the subsequent demand letter from Westchester, prior to the inception date of the Policy.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 9

As set forth above, Westchester alleged in its demand for arbitration that on or about June 27, 2003, Massamont secretly struck a deal with Axis to transfer all or substantially all of the program business from Westchester to Axis. On the same day, Massamont submitted its renewal application to Utica. In that application, Massamont disclaimed any knowledge "of any circumstance, allegation, contention or incident which may result in any claim being made against the agency, its predecessor in business, or any of its present or former owners, partners, officers, or directors." If, as Massamont now claims, its transfer of the program business was a "negligent act, error, or omission" within the meaning of the Policy's insuring agreement, Massamont's failure to disclose to Utica that it had transferred the business and thereby potentially exposed itself to a claim was a material misrepresentation entitling Utica to rescind the Policy.[3]

Even more problematic, the application submitted by Massamont indicated that Massamont had a continuing obligation to report any changes occurring after submission of the application but prior to the inception date. Nevertheless, Massamont never advised Utica prior to the Policy's July 30th inception date that Westchester had sent Massamont a demand letter asserting that Massamont had breached the Agency Agreement and caused substantial damage to Westchester for which Westchester intended to seek a recovery. Massamont's failure to advise Utica of this demand letter prior to the Policy's inception date was a further material misrepresentation entitling Utica to void the Policy.

D.    Massamont's Failure To Cooperate With Utica Bars Coverage

The policy provides in Section VI as a "condition" of coverage the following:

1.    **Duties In The Event of "Wrongful Act," "Claim" Or "Suit"**

    c.    You and any other involved insured must:

        (1)    Immediately send us copies of any demands, notices, summonses, subpoenas or legal papers received in connection with the "claim" or "suit";

        (2)    Authorize us to obtain records and other information;

        (3)    Cooperate with us in the investigation, settlement, or defense of the "claim" or "suit"; and

        (4)    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to an insured because of "loss" to which this insurance may also apply.

---

[3]    In this regard, we note that the document attached as Exhibit 3 to Westchester's Statement of Position suggests that Massamont in fact struck its deal with Axis on June 18, 2003, nine days before Massamont submitted its application to Utica.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 10

The Policy further provides that "[n]o action shall lie against [Utica] unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of [the Policy]...."

As noted above, Massamont refused to provide Utica's investigator with copies of the Massamont-Axis correspondence. That correspondence is material to the claim. Massamont's refusal to produce documents constitutes a breach of its duty to cooperate pursuant to the Policy provisions cited above, and Utica therefore disclaims coverage as a result of that failure to cooperate.

E.    Certain Exclusions Cited In Utica's March 4, 2004 Letter Are Not
       Pertinent To Westchester's Claims.

Utica's March 4, 2004 letter cited to certain exclusions in support of its disclaimer of coverage that, upon further review and in consideration of the arguments set forth in your December 6, 2004 letter, are not pertinent to Westchester's claims against Massamont, and Utica hereby notifies Massamont that it no longer relies on these exclusions in disclaiming coverage for Westchester's claims, and expressly disavows any reliance on these exclusions as a basis for its reaffirmance herein of the denial of coverage. These exclusions are as follows.

**SECTION III - EXCLUSIONS**

This insurance does not apply to:

4.    Any liability for money received by an insured or credited to an insured for fees, premiums, taxes, commissions, loss payments, or escrow or brokerage monies.

....

6.    A "claim" by any entity or individual which:

a.    Is wholly or partially owned, operated, managed, or controlled by the insured; or
b.    Did wholly or partially own, operate, manage, or control the insured; or
c.    Is wholly or partially under the same ownership, operation, management, or financial control of the insured.

....

17.   Any "claim" based solely on an insured's status as a fiduciary.

18.   "Claims" made against an insured arising out of the insured's activities as third party administrator of any plan, whether insured or self-insured and whether or not the insured performs such activities.

Utica also referenced the Policy's Retroactive Date of July 30, 2002 in its March 4, 2004 letter. Utica hereby notifies Massamont that it no longer relies on the Policy's Retroactive Date in disclaiming coverage for Westchester's claims, and expressly disavows any reliance on the Policy's Retroactive Date as a basis for its reaffirmance herein of the denial of coverage.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
March 31, 2005
Page 11

     If you or the insured have any additional documents or information pertinent to the issues discussed in this letter, please let me know.  I also would be happy to discuss all or any part of this letter with you at your convenience.

          Very truly yours,

          Russell F. Conn

RFC:kmg/mah:7663-00
Enclosures
cc:    Erin K. Higgins, Esq.
       Mr. Marc Chilton (Utica Claim No. 732751)

221204.1

# **EXHIBIT 7**

2005 14:09 FAX  1212 40.     20      O'MELVENY & MYER LLP NY            004/005

IN RE ARBITRATION BETWEEN )
)
WESTCHESTER FIRE INSURANCE )
COMPANY ("Westchester") )
-and- )
)
)
MASSAMONT AGENCY, INC. ("Massamont") )
)

## ORDER OF THE ARBITRATION PANEL

This Panel, being duly constituted, and having heard the evidence and arguments submitted by counsel, has:

1.  Unanimously determined that Massamont breached the Agency Agreement For The Massamont Metrogard and Diplomax Program covering school and municipality properties in New England between The ACE USA Companies designated hereinafter collectively referred to as "Westchester" and Massamont Insurance Agency, Inc. and Knapp Schenck & Company Insurance Agency, Inc. as Guarantor Effective Date 1/1/2001 (collectively referred to as "Massamont");

2.  As to the question of whether Westchester breached the Contingent Commission Agreement for The Massamont Metrogard and Diplomax Program between Westchester and Massamont Insurance Agency, Inc. effective January 1, 2001, a majority of the Panel was of the opinion that a technical breach may have occurred, but concluded that a net award covering both questions was appropriate;

3.  Awarded $2.6 million ($2,600,000.00) in damages to Westchester.

4.  Determined by majority vote that the award of attorneys fees to the prevailing party would not be appropriate in this case.

The Panel would like to congratulate counsel for both sides for the quality of their work and their professionalism in their representation of their clients in the matter.

Ronald A. Jacks                  Andrew Ian Douglass              William F. Hofmann

Dated: April 26, 2005

949871v2

# EXHIBIT 8

# COVINGTON & BURLING

| | | |
|---|---|---|
| 1201 PENNSYLVANIA AVENUE NW | WASHINGTON, DC | JARRETT A. WILLIAMS |
| WASHINGTON, DC 20004-2401 | NEW YORK | TEL 202.662.5377 |
| TEL 202.662.6000 | LONDON | JWILLIAMS @ COV.COM |
| FAX 202.662.6291 | BRUSSELS | |
| WWW.COV.COM | SAN FRANCISCO | |

May 5, 2005

**BY E-MAIL AND FEDERAL EXPRESS**

Russell F. Conn, Esq.
Conn Kavanaugh Rosenthal Peisch & Ford, LLP
Ten Post Office Square
Boston MA  02109

Re:    *Westchester Fire Insurance Company v. Massamont Insurance Agency, Inc.*
       Utica Mutual File No. 732751

Dear Mr. Conn:

Massamont learned on Tuesday that the arbitration panel in the above arbitration has entered an award against Massamont in the amount of $2.6 million. A copy of the award is attached. Massamont expects that Utica will keep the terms of this award confidential.

It is in Utica's best interests to indemnify Massamont for the full amount of this award without further delay. Otherwise, Utica may find itself liable for substantial consequential damages that could result from a failure promptly to settle this loss. *The award is due and payable now and Utica should be aware that the award has the immediate effect of exhausting Massamont's working capital upon which Massamont relies to continue in operation.* Even then, the award would not be fully satisfied. Additionally, the award skews Massamont's balance sheets which likely will materially and adversely affect its relationships with its carrier and banks. As a direct consequence of any delay in promptly settling this claim, Massamont could suffer irreparable injury to its viability as a going concern. The bulk of Massamont's insurance program business must be renewed in the coming few months and, thus, any significant disruption in the company's relationships with its insurers and banks could have catastrophic consequences. Massamont will hold Utica responsible for all such consequences should Utica persist in its unjustified disclaimer of coverage for this matter and will seek treble damages (as discussed below) if Utica does not promptly resolve this dispute.

Massamont is sufficiently concerned about this scenario that it is willing to release Utica from any liability for bad faith and accept payment of $3,080,285.22 (representing payment for the $2.6 million award plus Massamont's defense costs of $480,285.22 as of the end of March 2005) in full satisfaction of all of Utica's obligations with respect to this matter, provided that full payment is received within 7 days of the date of this letter.

DC: 1779542-1

COVINGTON & BURLING

Russell F. Conn, Esq.
May 5, 2005
Page 2

    In evaluating this settlement proposal, Utica should consider the following observations about the merits of the grounds for disclaiming coverage that Utica first asserted in your March 31, 2005 letter. These observations do not exhaust all the problems with Utica's new coverage positions but nevertheless show that these positions lack merit:

    1.    "Negligent Act, Error, or Omission"

    Your letter asserts that E&O policies such as Massamont's provide coverage only for claims based on negligence (pp. 4-7). That argument is flatly refuted by the Massachusetts Supreme Judicial Court's opinion in *USM Corp. v. First State Ins. Co.*, 652 N.E.2d 613 (Mass. 1995).

    The policyholder in *USM* was found liable for breach of a warranty clause in a contract to provide a turnkey computer system. This was not, however, a case of negligence. The policyholder "was not negligent" and "reasonably relied" on advice from a hardware vendor that performance problems could be overcome. *USM*, 652 N.E.2d at 614. The insurer argued that its E&O policy, which like Utica's policy provided coverage for claims resulting from a negligent act, error or omission, "does not cover liability without fault." *Id.*

    The Supreme Judicial Court disagreed. After noting that "[c]ases involving the words such as 'negligent act, error or omission' ... have *not* consistently determined that an error must be a negligent one if coverage is to be available," *id.* at 615 (emphasis added), the Court held that the E&O policy in question covered the policyholder's non-negligent breach of the warranty clause. *See id.* at 615.

    Accordingly, Utica's position that Massamont's E&O coverage is limited to claims of negligence has no support in Massachusetts law. Indeed, *USM* has been cited by the First Circuit in support of the proposition that acts that "were all intentional in nature" nevertheless fall within the scope of E&O coverage for losses resulting from a "negligent act, error, or omission." *Home Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 229 F.3d 56, 65 n.10 (1st Cir. 2000).

    Since Massamont's E&O policy is clearly governed by Massachusetts law – it was issued to a Massachusetts policyholder covering risks in Massachusetts and was countersigned in Massachusetts – Utica's reliance on cases from other jurisdictions cannot justify its interpretation of Massamont's policy. The sole decision from the First Circuit cited in your letter, *Pacific Ins. Co., Ltd. v. Eaton Vance Management*, 369 F.3d 584 (1st Cir. 2004), stands for the proposition that a policyholder's failure to pay an amount due under a contract is not a loss "by reason of" an error or omission, because the policyholder owed the amount even before committing an error or omission. That is simply not the basis on which Massamont was held liable. The $2.6 million award represents contract damages, not an amount that Massamont would have been required to pay to Westchester had Massamont not been found to have breached the Agreement.

COVINGTON & BURLING

Russell F. Conn, Esq.
May 5, 2005
Page 3

2.    "Dishonest Conduct"

Utica reserves its right at page 8 of your letter to deny coverage for any damage award "[t]o the extent that any award against Massamont is premised on a finding that Massamont did in fact engage in 'dishonest, fraudulent, malicious, or criminal conduct' or conduct in violation of the confidentiality clause of the Agency Agreement...." The arbitration award does not contain any findings that Massamont engaged in any of the conduct enumerated in your letter.

Westchester did not even allege in its Demand for Arbitration that Massamont engaged in any dishonest, fraudulent, malicious or criminal conduct. This was a breach of contract case, not a fraud case. The "dishonest conduct" exclusion does not apply to the award.

While Westchester did allege that Massamont had improperly disclosed certain confidential information, Westchester was unable to prove that it suffered any quantifiable damages as a result of the alleged disclosures. For example, the vice president in charge of the ACE Westchester program, William R. Sharp, testified at the arbitration hearing:

> Q.    Can you quantify for me and for this Panel, in a dollar amount, the harm that resulted to Westchester as a result of the disclosure by Massamont to Axis of this information that you consider to be confidential?
>
> A.    I can't quantify that.

Hearing Transcript at 213. Accordingly, there is no reason to assume that any amount of the $2.6 million award represents a recovery for any alleged disclosure of confidential information.

3.    Rescission for Nondisclosures

Utica belatedly has reserved its right to disclaim coverage on the ground that it is entitled to rescind the policy for failure to disclose the transfer of business to Axis and a "demand letter" from Westchester. The circumstances on which Utica relies all appear to have been known to Utica at the time that it disclaimed coverage on March 4, 2004, without electing to rescind the policy. Even if these circumstances gave Utica a right to rescind the policy in March of 2004, Utica failed to do so within a reasonable time and has lost whatever right to rescind the policy it might have had. *See Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.*, 831 F. Supp. 920, 927 (D. Mass. 1993) ("[a]ctions for rescission must be brought with reasonable promptness") (quotation marks omitted); *see also Howland v. Continental Life Ins. Co.*, 121 Mass. 499, 500 (1877) (holding that eleventh month delay in electing to rescind "was not within a reasonable time").

COVINGTON & BURLING

Russell F. Conn, Esq.
May 5, 2005
Page 4

4.    Failure to Cooperate

Finally, your letter asserts that "Massamont refused to provide Utica's investigator with copies of the Massamont-Axis correspondence" and that this correspondence was "material to the claim" (p. 10). Utica asserts that Massamont thereby breached the cooperation clause in the E&O policy and is not entitled to any coverage.

Massamont does not agree that Utica's investigator was refused access to any material information concerning the claim. Personnel at the company who dealt with the investigator have no recollection of such a refusal. Nor did Utica assert in its March 4, 2004 disclaimer letter that any lack of cooperation had hampered its investigation of the claim. To the contrary, that letter states in its opening paragraph: "Our investigation appears concluded ...."

In any event, a breach of the duty to cooperate "must be 'substantial and material' before it permits an insurer to disclaim liability" and the insurer must demonstrate "actual prejudice" to its interests. *Darcy v. Hartford Ins. Co.*, 554 N.E.2d 28, 32-33 (Mass. 1990). Utica cannot make these showings. Utica evidently did not regard any cooperation problems that may have existed as "substantial and material" or Utica would have raised this issue earlier. Utica could not have been prejudiced because it has never shown any inclination to participate in the defense of the Westchester claim. "[C]ooperation clauses are designed primarily to protect the insurer's interest in avoiding payment on claims which it cannot adequately defend." *Id.* at 34. That interest was not prejudiced here.

Should Utica ignore this demand and persist in its unjustified disclaimer of coverage, not only will Massamont sue for breach of contract, but it also intends to bring claims based on M.G.L. c. 176D and c. 93A for unfair claims settlement practices and/or other unfair or deceptive acts or practices. As you, no doubt, are aware, if Massamont were to prove such conduct and show that it was knowing and willful, then Utica would be liable for at least double and up to treble damages, as well as be liable for all of Massamont's costs, expenses and attorneys' fees related to any such litigation. Moreover, if Utica's failure to live up to its obligations under the policy causes Massamont to go out of business, Utica could be liable for tens of millions of dollars.

COVINGTON & BURLING

Russell F. Conn, Esq.
May 5, 2005
Page 5

Our preference would be to resolve this matter through compromise rather than litigation. In light of the foregoing, I hope that after your client reviews this letter, it will see that Massamont's settlement proposal is quite reasonable and will accept. In any event, I look forward to speaking with you about this matter as soon as possible.

Sincerely,

Robert N. Sayler
Jarrett A. Williams

Enclosure

cc:    Erin K. Higgins, Esq. (via e-mail)

IN RE ARBITRATION BETWEEN )
)
WESTCHESTER FIRE INSURANCE )
COMPANY ("Westchester") )
    -and- )
)
MASSAMONT AGENCY, INC. ("Massamont") )
)

## ORDER OF THE ARBITRATION PANEL

This Panel, being duly constituted, and having heard the evidence and arguments submitted by counsel, has:

1. Unanimously determined that Massamont breached the Agency Agreement For The Massamont Metrogard and Diplomax Program covering school and municipality properties in New England between The ACE USA Companies designated hereinafter collectively referred to as "Westchester" and Massamont Insurance Agency, Inc. and Knapp Schenck & Company Insurance Agency, Inc. as Guarantor Effective Date 1/1/2001 (collectively referred to as "Massamont");

2. As to the question of whether Westchester breached the Contingent Commission Agreement for The Massamont Metrogard and Diplomax Program between Westchester and Massamont Insurance Agency, Inc. effective January 1, 2001, a majority of the Panel was of the opinion that a technical breach may have occurred, but concluded that a net award covering both questions was appropriate;

3. Awarded $2.6 million ($2,600,000.00) in damages to Westchester.

4. Determined by majority vote that the award of attorneys fees to the prevailing party would not be appropriate in this case.

The Panel would like to congratulate counsel for both sides for the quality of their work and their professionalism in their representation of their clients in the matter.

_____    _____    _____
Ronald A. Jacks                     Andrew Ian Douglass              William F. Hofmann

Dated: April 26, 2005

949871v2

# **EXHIBIT 9**

## CONN KAVANAUGH ROSENTHAL PEISCH & FORD, LLP

### COUNSELORS AT LAW

THOMAS E. PEISCH
BOB B. ROSENTHAL
JAMES F. KAVANAUGH, JR.
RUSSELL F. CONN
GEORGE M. FORD
JAMES B. PELOQUIN
BARRY E. GOLD
THOMAS J. GALLITANO
JAMES GRAY WAGNER
ERIN K. HIGGINS
STEVEN E. GURDIN
MICHAEL T. SULLIVAN
CONSTANCE M. MCGRANE

Ten Post Office Square, Boston, Massachusetts 02109

Tel: (617) 482-8200

Fax: (617) 482-6444

WRITER'S DIRECT DIAL: (617) 348-3201
E-MAIL: RCONN@CKRPF.COM

KURT B. FLIEGAUF
RONALD M. JACOBS
CAROL A. STARKEY
JENNIFER M. NORTON
SARA L. GOODMAN
MICHAEL R. BERNARDO
JACOB A. LABOVITZ
CARA A. FAUCI
JOHANNA L. MATLOFF
AMY C. STEWART
BETH NUZZO NEWMARK
SARAH E. WEBER

May 19, 2005

<u>Via Facsimile (202) 662-6291</u>
<u>and Regular Mail</u>

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
Covington & Burling
1201 Pennsylvania Avenue NW
Washington, DC 20004-2401

RE:   <u>Westchester Fire Insurance Company v. Massamont Insurance Agency</u>
      Utica Claim No. 732751

Dear Messrs. Sayler & Williams:

We now have had an opportunity to review in detail the matters set forth in your letter of May 5, 2005. Consistent with its previous decision, Utica disclaims any obligation to indemnify Massamont for the arbitrators' award, as that award results from a claim that is not covered under Utica's policy with Massamont. In addition, Utica reiterates the position set forth in our letter to you of March 31, 2005 declining to pay Massamont's defense costs in the arbitration.

The basis for Utica's position is as set forth in our letter to you of March 31, 2005, supplemented with specific attention to your letter of May 5, 2005 as follows.

1.    "Negligent Act, Error or Omission"

We addressed this coverage issue at some length in our letter of March 31, 2005, *see* pp. 5-7, and will not reiterate those views here.

In your latest letter, you dismiss most of our analysis on the basis that the law we cited was not decided by a Massachusetts appellate court. You further argue that the case of *USM Corp. v. First State Insurance Co.*, 420 Mass. 865 (1995) ("*USM*") is dispositive.

*USM* involved the interpretation of an errors and omissions policy in which the insured had been found liable in an underlying action for having breached an express warranty that a

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
Covington & Burling
May 19, 2005
Page 2

specifications. In the underlying action, the insured specifically was determined not to have been negligent because the insured had reasonably relied upon information from the computer manufacturer in making its representations and warranties to the insured's customer.

Like the Utica policy, the First State policy at issue in *USM* provided coverage for claims against the insured by reason of any "negligent act, error, or omission." In parsing the language of the policy, the Court determined that the word "negligent" modified only the word act, so that even though the court in the underlying action had determined that there was no negligence, there still could be coverage if the claim for which the insured was found liable involved either an "error" or "omission." In the key language of the decision, the Court concluded (with emphasis added) as follows.

"<u>Although the policy does not cover liability because of each and every error resulting from a breach of contract, the error in this case was inherent in the rendering of professional advice.</u> [The consultant] assured [its customer] that it may rely on its professional advice as a consultant that a particular system would meet a particular standard of performance. [Consultant] was not negligent in giving that assurance, or, put another way, it was reasonable [sic] within its professional responsibilities for [consultant] to make such a promise. The policies covered losses of the character that [consultant] incurred."

<u>Id.</u> at 868-69.

In the present case, unlike *USM*, Westchester's claim did not arise from and was not "inherent in the rendering of professional advice." To the contrary, Westchester's claim against Massamont arose from Massamont's breach of its agency agreement with Westchester. That breach had nothing to do with the rendering of professional advice – as was the case in *USM* – but arose from and was related to Massamont's deliberate solicitation of a different carrier, and then the placement with that carrier of an extensive book of business that, by contract, Massamont had agreed to place with Westchester. Further, the arbitration panel order specifically based the award upon Massamont's breach of the agency agreement. There was no finding that Massamont was "negligent," or that it had committed any "error" or "omission."

Simply put, the Utica policy was never intended by the parties to make Utica a guarantor of Massamont's deliberate and calculated business decisions. There simply is no coverage for this claim under the Utica policy.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
Covington & Burling
May 19, 2005
Page 3

2.    Dishonest Conduct

It is not clear from the face of the arbitrators' award whether that award in any way was based upon so-called "dishonest conduct" or claims "arising out of or alleging the unauthorized of trade secrets or confidential proprietary information."

While you have cited trial testimony that you believe is dispositive of the issue, we have not been given an opportunity to review the trial transcripts, any exhibits, or submissions by the parties to the arbitration panel. You will recall that I requested this information in my letter to you of May 12th, and your letter of May 17th indicates we will be given access to these materials.

Accordingly, Utica will continue to reserve its rights on this issue until we have reviewed the materials from the arbitration. We then will notify you of Utica's position accordingly.

3.    Rescission for Non-Disclosure

We have reviewed the issue of rescission with Utica and Utica has decided not to pursue this issue.

4.    Failure to Cooperate

We interviewed Utica's investigator, Robert Burkitt, and Mr. Burkitt confirmed that Massamont refused to produce to him copies of any of its communications with Axis. Moreover, the pertinent clause in Utica's policy requires cooperation with respect to the "investigation" of a claim or suit. Such a clause requires an insured to cooperate not only with respect to the defense of a claim or suit, but with respect to an insurer's determination of coverage. *See Metlife Auto & Home v. Cunningham*, 59 Mass. App. Ct. 583, 589-90 (2003).

We continue to believe the Axis – Massamont communications are germane to the issue of coverage. We further note that your letter of December 6, 2004 asked Utica to revisit the issue of Utica's duty to defend while your letter of May 5th asks Utica, for the first time, to indemnify Massamont with respect to the arbitration award. In view of the ongoing nature of Utica's coverage determination, with respect to both defense and indemnity, the request for this documentation remains germane.

Because your letter indicates that Massamont has no recollection of Mr. Burkitt's request, and because the coverage determination has been ongoing, Utica will withdraw its formal disclaimer on this issue, provided the materials in question are produced promptly. At the same time, Utica fully reserves its rights to modify or clarify its position, as may be appropriate, once it has reviewed the requested materials.

Robert N. Sayler, Esq.
Jarrett A. Williams, Esq.
Covington & Burling
May 19, 2005
Page 4

5.    <u>Your letter of May 17th</u>

    As you suggest, we will contact Mr. Murray and make arrangements to review the arbitration transcripts, exhibits, and filings. Please note we may wish to designate certain materials for copying. We will then let you know if Utica's position changes as a result of our review of these materials.

    In view of its continued denial of coverage, Utica agrees Massamont may take whatever actions it deems appropriate with respect to the arbitration award or Westchester's demands therein.

    Please do not hesitate to contact me if you have any questions or if Utica's position is unclear.

              Very truly yours,

              Russell F. Conn

RFC:kmg:7663-059

cc:    Erin K. Higgins, Esq.
       Mr. Marc Chilton (Utica Claim No. 732751)

226718.1

# **EXHIBIT 10**

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

James M. Dunn ♦
David C. Hunter †
Danielle T. Jenkins *
Robert S. Ludlum †●
Maureen L. Pomeroy
Daniel G. Skrip ♦
Darlene M. Tonucci ▪

\* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT
▪also admitted in FL

John J. Davis
extension 102
Jdavis@piercedavis.com

August 8, 2005

*Certified Mail, Return Receipt Requested*

Russell F. Conn, Esq.
Conn Kavanaugh Rosenthal Peisch & Ford, LLP
Ten Post Office Square
Boston, MA 02109

Re:    Westchester Fire Insurance Company
     vs. Massamont Insurance Agency, Inc.
     Utica Mutual Claim No.:    732751
     Our File No.:    135-0403246

## DEMAND FOR RELIEF UNDER M.G.L. Ch. 93A

Dear Attorney Conn:

    This office has been retained to protect and enforce the rights of Massamont Insurance Agency, Inc. ("Massamont") under an Insurance Agents and Brokers Errors and Omissions Liability Policy issued to Massamont by the Utica Mutual Insurance Company ("Utica Mutual.") As you know, Utica Mutual Policy No. 3445032 EO (the "Policy") carried liability limits of $10,000,000 "each loss"[1] and $11,000,000 "each aggregate," and was effective from July 30, 2003 to July 30, 2004. On October 23, 2003, a liability claimant, Westchester Fire Insurance Company ("Westchester"), sent a Demand for Arbitration to Massamont alleging, among other things, that Massamont breached the terms of an Agency Agreement dated January 1, 2001 and, as a result, caused Westchester to sustain certain unspecified damages. Massamont, in turn, promptly tendered Westchester's claim to Utica Mutual for a defense and indemnification pursuant to the terms and provisions of the Policy.

    Utica Mutual, however, failed to fulfill its duties and obligations to Massamont. Despite numerous requests from Massamont and counsel, Utica Mutual refused to offer any defense to

---

[1] Coverage for "each loss" was subject to a $50,000 deductible.

**PIERCE, DAVIS & PERRITANO, LLP**
August 8, 2005

Page 2 of 14

Massamont whatsoever, either with or without a reservation of rights.[2]  Thus, Massamont was forced to retain counsel at its own cost and expense to defend itself against the Westchester claim – a claim for which Massamont had obtained insurance coverage.  Further, following the Order of Arbitration entered against Massamont on April 26, 2005, wherein the arbitrators awarded Westchester $2.6 million dollars ($2,600,000) in damages, Utica Mutual breached its duty to indemnify Massamont, with full knowledge that such denial threatened Massamont's future financial viability.  In handling Massamont's demand for coverage and in denying all liability to Massamont under its Policy, Utica Mutual not only breached its contract of insurance, but also engaged in unfair or deceptive acts or practices violative of Chapters 93A and 176D of the Massachusetts General Laws.  Massamont has suffered (and continues to suffer) significant damages as a result.  The purpose of this letter is to demand full relief for such damages from Utica Mutual on Massamont's behalf.

### I.    Background

Effective January 1, 2001, Massamont entered into an Agency Agreement to provide professional services to Westchester as a General Agent.  Specifically, Westchester appointed Massamont to handle underwriting duties and responsibilities with respect to the Metrogard and Diplomax Programs covering school and municipal property in New England.  By Amendment dated October 22, 2001, the Agency Agreement was to continue to December 31, 2003, unless previously terminated in accordance with other Agreement provisions.

Referenced as Exhibit A to the Agreement were certain underwriting guidelines which Westchester was permitted to revise or change only after giving Massamont 90 days prior written notice.  (Section IV(A)).  Massamont agreed to follow such guidelines, to maintain a staff of "competent and trained personnel" (Section IV(B)), to keep complete and accurate records of all transactions pertaining to insurance written under the Agreement (Section IV(F)(1)), and to permit Westchester, at its discretion, to perform routine audits of such records in order "to ensure reasonable internal accounting controls."  (Section IV(F)(1)(c)).

According to its Demand for Arbitration, Westchester determined, sometime prior to February 2003, that "the premiums on the Program were not sufficient to generate an adequate underwriting profit."  (See October 23, 2003 Demand for Arbitration, at p. 3).  Westchester blamed the Program's poor performance, at least in part, on various "deficiencies" allegedly discovered during Westchester's November 2002 and April 2003 audits of Massamont's records.  As detailed in Westchester's Demand, Massamont underwriters allegedly failed to consider individual risk characteristics, failed to correctly price windstorm risks, maintained inadequate files on particular risks, and failed to submit accounts to Westchester "in a timely fashion, causing backlogs and delays."  In Westchester's view, Massamont's performance under the

---

2 Nor did Utica Mutual commence an action for declaratory relief in an effort to resolve the coverage dispute prior to the conclusion of the arbitration, as insurers are expressly encouraged by the Massachusetts courts.  See, e.g., Swift v. Fitchburg Mutual Ins. Co., 45 Mass. App. Ct. 617, 624 (1998).

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 3 of 14*

Agency Agreement was "unsatisfactory" and "fell short" of standards required under the Agreement. (Id., at p. 4).

In part as a result of this mounting criticism, the professional relationship between Westchester and Massamont began to sour.[3] In February 2003,[4] Westchester announced a demand for a 40-47% premium rate increase effective July 1, 2003. The timing and size of this increase shocked Massamont. Indeed, Massamont immediately communicated to Westchester that an increase of this magnitude would effectively decimate the Program. As it turns out, this may be precisely what Westchester had in mind. Further, Westchester insisted that, going forward, Massamont employ a risk specific pricing system, rather than the previously-acceptable class-based rating approach. Massamont complained that this new requirement would prove fatal to retaining numerous accounts, particularly those located in southeastern Massachusetts and Rhode Island (one-third of the book of business), as it eliminated all flexibility Massamont needed in order to achieve the overall rate increase desired by Westchester. In short, Westchester made unrealistic and unprecedented demands of Massamont, then took away the precise tools Massamont needed to meet those demands.

For the next several months, Massamont negotiated with Westchester officials in the hopes of softening their stance and, thereby, salvaging the Program. Although Westchester made some concessions to Massamont, it continued to insist upon changes that would ultimately lead to the Program's demise. Around this time, Hilbert Schenck II, President of Massamont, concluded that Massamont could not renew the Agency Agreement with Westchester when it expired on December 31, 2003.

Meanwhile, Massamont did not solicit another carrier for the Program business. Such solicitation by Massamont was prohibited by the Amendment to Agency Agreement dated October 22, 2001, which limited the conditions under which the Agency Agreement could be terminated prior to December 31, 2003 "subject to AGENT agreeing not to seek another company to write the PROGRAM during this period."

In early 2003, however, Axis Specialty Insurance Company ("Axis") approached Massamont to inquire about writing a portion of the Massamont property book.[5] By this time,

---

[3]  Massamont disputed (and continues to dispute) that its performance as General Agent under the Agreement was, in any way, deficient. Yet, it acknowledges, as it must, that Westchester's perceptions of the Program (whether genuine or not) led to the underwriting and pricing changes that subsequently compelled Massamont to respond.

[4]  The timing of this announcement was calculated by Westchester to effectively "handcuff" Massamont. Massamont submitted a proposed 5% increase to Westchester three months earlier, in November 2002, but received no response. Westchester was aware that the bulk of the Program policies came up for renewal on July 1 and, therefore, the business had to be quoted in April or May, at the latest.

[5]  No evidence was introduced at the Arbitration hearing that Massamont approached Axis. Thus, Massamont did not violate its agreement "not to *seek* another company" to write the Program.

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 4 of 14*

Westchester's actions had convinced Mr. Schenck that Westchester in fact had no interest in writing this insurance on terms that, in Mr. Schenck's judgment, were necessary to avoid losing the business to Massamont's competitors. Evidence uncovered during the Arbitration confirmed that Mr. Schenck had good reason to believe this. For example, an internal e-mail dated July 1, 2003, from William Sharp, the Westchester Vice President in charge of the relationship with Massamont, gave this account of Mr. Sharp's discussions with Mr. Schenck about the reasons for Massamont's decision to transfer a portion of the Program business to Axis:

> Axis came back with an indication for wind loads far below what we were asking for. Van [*i.e.,* Hilbert Schenck] also checked around in Bermuda to find out what the market price would be on the cat exposure for his book – and found it to be substantially lower than ours. *The impression that Massamont was getting from us as well was that we would be just as happy not to write any business on the Cape (which I confirmed was correct –* at the completely inadequate premiums that they had been charging).

Claimant's Exhibit 43 (emphasis added).

On the assumption that it would take Axis approximately eight to nine months to conduct its due diligence and complete all necessary filings, Mr. Schenck pursued further discussions with Axis representatives. At the same time, however, Massamont continued to work with Westchester with the expectation and understanding that their relationship would continue through the July 1, 2003 Program renewal date.

To Mr. Schenck's surprise, Axis expressed a ready willingness to assume a portion of the Program business by July 1, 2003, much earlier than previously anticipated. In light of Westchester's obvious displeasure with the Program and diminished appetite for underwriting certain risks, Massamont accordingly placed a number of problem accounts with Axis effective July 1, 2003. It did not cherry-pick accounts by giving Axis only those that were most profitable; on the contrary, Massamont placed with Axis primarily those accounts in which it reasonably assumed Westchester had little or no interest.[6]

Given that even Westchester acknowledged that its actions conveyed the message that it "would be just as happy not to write" the business transferred to Axis, there was no reason for Massamont to suppose that the transfer constituted a breach of the Agency Agreement. Even assuming that the Agency Agreement established an exclusive agency relationship between

---

6 As Westchester later argued, this "assumption" by Massamont was in error; Westchester continued to desire <u>all</u> of the Program business, but only on its terms. This is the type of error for which an Errors and Omissions Policy was intended.

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 5 of 14*

Massamont and Westchester – an assumption that Massamont disputed during the Arbitration[7] – Massamont was entitled to transfer business that Westchester had elected not to write. Section IX of the Agreement, captioned "EXCLUSIVITY (if applicable)," states in Subparagraph B that:

> During the term of this Agreement [Massamont] will not solicit for any other insurance carrier, except [Westchester], the Program business. *If [Westchester] elects not to write such business, then [Massamont] is granted the right to submit such business to other insurance carriers under the same terms and conditions as presented to [Westchester].*

Agreement Section IX(B) (emphasis added).

Nevertheless, by letter dated July 9, 2003, Westchester advised Massamont that it was terminating the Agency Agreement, effective immediately. Westchester's July 9th letter cited as the basis for its termination, *inter alia*, Massamont's alleged violation of Section IX(B) and the Amendment to the Agency Agreement. Mr. Schenck promptly responded by letter dated July 11, 2003. In that letter, he specifically denied that Massamont had breached Section IX(B) of the Agency Agreement on the ground that Westchester had in fact declined to write the business transferred to Axis on the conditions that Massamont had proposed to Westchester.

The Demand for Arbitration ("Demand") followed shortly thereafter on October 23, 2003. In a remarkable about-face from the position taken by Mr. Sharp, Westchester insisted that it had wanted to write the Program business transferred to Axis and insisted that it would have objected to the transfer had it known. Westchester thus directly challenged Mr. Schenck's belief that Westchester had declined the business. Several other aspects of the Demand are worth noting:

- The final paragraph of the Demand states that "Massamont was required to maintain Errors and Omissions insurance" and requests "that you give notice to your insurer of this arbitration demand and the claims asserted herein." Presumably Westchester requested that Massamont notify its E&O carrier (rather than its D&O carrier) because it understood that the claims asserted in the Demand allege errors and omissions by Massamont.

- The Demand at page 7 draws attention to Westchester's statement in its July 9 letter that Westchester "was preserving any and all claims that it had against Massamont for breaching the Agreement and reserved the right to pursue such claims." Utica Mutual therefore was not entitled to assume, for purposes of determining the extent of its duty to

---

[7] Section I(C) of the Agreement states that Massamont's appointment was "non-exclusive." Thus, Westchester "reserve[d] the right to market, at any time, the class(es) of business and types of coverages written in the Program through other producers." Agreement Section I(C). Westchester nevertheless contended in its Demand for Arbitration and in the Arbitration proceedings that the Agreement established an exclusive agency.

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 6 of 14*

defend, that the Demand stated the full extent of the relief Westchester ultimately would seek in the Arbitration.

- The Demand alludes to other alleged breaches of the Agreement. For example, Westchester alleged that Massamont's performance under the Agency Agreement was "unsatisfactory" and "fell short" of required standards and that Massamont had failed to underwrite individual accounts properly such that "losses were incurred repeatedly on accounts" (p. 4).

- The Demand did *not* assert any claim for fraud or seek any tort remedies such as punitive damages from Massamont. The only basis alleged for Westchester claims was breach of the Agency Agreement.

During the Arbitration proceedings, Westchester contended that the Agency Agreement established an *exclusive* agency relationship between Westchester and Massamont that allegedly was breached by Massamont's decision to transfer program business to Axis. Westchester's theory of the case, however, raised the issue whether Westchester had declined to write the business ultimately transferred to Axis. Each side offered testimony and documentary evidence on this issue.

The Arbitration panel issued an Award dated April 26, 2005 against Massamont for $2.6 million. Other than determining that "Massamont breached the Agency Agreement," the Award makes no findings on Westchester's claims. Nevertheless, it appears improbable that the panel would have awarded substantial damages to Westchester unless it had concluded that the Agreement established an exclusive agency *and* that Mr. Schenck had been mistaken in concluding that Westchester had declined to write the business that Massamont offered to Axis.

The Award is covered under the Utica Mutual Policy.

## II.    The Utica Mutual Policy

In Section II(1)(a) of the Policy, Utica Mutual agreed, in part, as follows:

> We will pay on behalf of the insured all "loss" to which this insurance applies.

> We will have the right and the duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend an insured against any "suit" seeking damages for a "wrongful act" to which this insurance does not apply.

"Loss" is defined in Section I(6) as:

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 7 of 14*

> [A]ny amount which an insured becomes legally obligated to pay as damages for any "claim" to which this insurance applies and shall include judgments and settlements.

Section I(1)(e) provides, however, that covered "losses" shall be limited to those which:

> [A]rise out of "wrongful acts" committed in the conduct of the insured's business, wherever committed or alleged to have been committed, by the insured or any person for whose "wrongful acts" the insured is legally liable in rendering or failing to render professional services as:
>
> (1) A General Insurance Agent;
> (2) An Insurance Broker;
> (3) An Insurance Agent; [or]
> . . .
> (5) A Managing, Master or Brokerage General Agent . . . .

"Claim" is defined in Section I(1) as:

> [A] written notice, including service of "suit" or demand for arbitration, received by one or more insureds asking for money or services.

Finally, "wrongful act" is defined in Section I(14) to mean:

> [A]ny negligent act, error, or omission to which this insurance applies.

Thus, by the terms of its Insuring Agreement, Utica Mutual undertook two duties vis-a-vis its insured, Massamont. First, it agreed to defend Massamont against any "suit" (including a demand for arbitration) in which the claimant sought damages (in either money or services) because of a "wrongful act" – i.e., a negligent act, error or omission not otherwise excluded – in rendering or failing to render a professional service. Second, Utica Mutual agreed to pay on behalf of its insured any amount for which Massamont became legally obligated to pay as damages for any covered "claim," subject only to the Policy deductible and limits of liability. Utica Mutual failed to fulfill these duties to Massamont in breach of the Policy and in violation of Massachusetts law.

## III.  Utica Mutual's Breach of the Policy

### A.  The Duty to Defend

As you know, it is well-settled in Massachusetts (as in most jurisdictions) that a liability insurer's duty to defend its insured against covered claims is very broad. _Boston Symphony_

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 8 of 14*

Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 710 (1989). The duty to defend is determined by comparing the allegations of the complaint with the language of the policy. If such allegations are "reasonably susceptible" of embracing a covered claim, then the insurer must assume the insured's defense. Liberty Mutual Ins. Co. v. SCA Servs., Inc., 412 Mass. 330, 332 (1992); Continental Cas. Co. v. Gilbane Building Co., 391 Mass. 143, 146-47 (1984). A probability of recovery under the policy need not be shown in order to invoke coverage; a mere "possibility" of coverage is sufficient. Simplex Technologies, Inc. v. Liberty Mutual Ins. Co., 429 Mass. 196, 199 (1999); Doe v. Liberty Mutual Ins. Co., 423 Mass. 366, 368 (1996); Sterilite Corp. v. Continental Cas. Co., 17 Mass. App. Ct. 316, 319 (1983), rev. den., 391 Mass. 1102 (1984). See Bagley v. Monticello Ins. Co., 430 Mass. 454, 458 (1999) (it is the source from which claimant's injury originates, rather than specific theories of liability alleged, that determines insurer's duty to defend); Garnet Constr. Co. v. Acadia Ins. Co., 61 Mass. App. Ct. 705, 706 (2004) (duty to defend extends even to "dubious" claims). Moreover, if a complaint alleges at least one covered claim, then the insurer must assume defense of the entire action even if some or many other claims fall outside the scope of coverage. Simplex, supra, 429 Mass. at 199; Vappi & Co., Inc. v. Aetna Cas. & Sur. Co., 348 Mass. 427 (1965).

Additionally, a simple comparison of the complaint to the policy is not the end of an insurer's inquiry. An insurer's obligation to defend is "based not only on the facts alleged in the complaint but also on the facts that are known or readily knowable by the insurer." Desrosiers v. Royal Ins. Co. of America, 393 Mass. 37, 40 (1984). Thus, if an insurer, in investigating a claim (as required under its policy and under Massachusetts law), either learns (or could have readily learned) of facts which may invoke coverage, then it must provide a defense to its insured even if the allegations of the complaint do not fall within the scope of the policy. Hingham Mutual Fire Ins. Co. v. Niagara Fire Ins. Co., 46 Mass. App. Ct. 500, 503 (1999). Further, it is also appropriate to consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 282 (1997). See Ruggerio Ambulance Service, Inc. v. National Grange Mutual Ins. Co., 430 Mass. 794, 798 (2000). Finally, in construing the policy, any ambiguity must be interpreted most favorably to the insured. Dilbert v. Hanover Ins. Co., 63 Mass. App. Ct. 327, 335 (2005).

Based on the allegations of Westchester's Demand for Arbitration, combined with the facts known or readily knowable by Utica Mutual and Massamont's objectively reasonable expectations, Utica Mutual clearly owed Massamont a defense against Westchester's claim. The Demand for Arbitration, when read (as required) in its entirety, faulted Massamont for a number of errors or omissions, including, but not limited to, Massamont's sloppy underwriting, record-keeping and reporting. According to Westchester, Massamont's performance under the Agency Agreement was "unsatisfactory" and "fell short" of required standards.

The mere fact that Westchester included, within its Demand, allegations that Massamont later engaged in "secret" discussions with Axis and/or "secretly transferred" a portion of the

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 9 of 14*

Program business to Axis without prior notice to Westchester, does not allow Utica Mutual to escape its defense obligations. Utica Mutual asserts that these allegations trigger the exclusion for "dishonest, fraudulent, malicious, or criminal conduct." For several reasons, that exclusion does not excuse Utica Mutual from its duty to defend.

First, allegations that Massamont engaged in "secret" discussions does not amount to a claim that Massamont acted dishonestly or fraudulently for purposes of the exclusion. The Demand does not allege that Massamont made any misrepresentations to Westchester – it merely alleges that Massamont did not give it advance warning that it was going to transfer Program business that Massamont believed Westchester had no interest in writing.

Second, the exclusion by its own terms requires Utica Mutual to defend Massamont "[i]f a 'suit' is brought against the insured alleging both 'wrongful acts' within the coverage of the policy and dishonest, fraudulent, malicious, or criminal conduct." Even if Utica Mutual were justified in concluding that allegations of "secret" conduct amounted to dishonesty or fraud, it remains the case that the Demand alleges other wrongful acts within the coverage of the policy. Utica Mutual was not free to "pick and choose" from among Westchester's allegations, selecting only those which, in its view, were not covered, while, at the same time, ignoring those which were covered. As stated above, an insurer must defend an entire complaint even if only one claim falls within coverage, and the terms of the exclusion confirm that Utica Mutual was obligated to defend.

Finally, had Utica Mutual properly investigated Westchester's claim, it would have learned facts contradictory to Westchester's allegations which clearly invoked the duty to defend. For example, Massamont did not solicit Axis for Program business. Further, Massamont expected and intended to continue its relationship with Westchester through the July 1, 2003 Program renewal date. Also, effective July 1, 2003, Massamont placed with Axis primarily those "problematic" accounts which, based on Westchester's numerous representations, Massamont reasonably understood and believed Westchester no longer wished to insure.

In view of Massamont's objectively reasonable expectation that any errors or omissions in rendering or failing to render professional services to Westchester as a General Agent under the Agency Agreement would be covered under the Policy, Utica Mutual owed a duty to defend Massamont against the Westchester claim. Utica Mutual breached that duty, thereby causing Massamont to incur approximately $500,000 in defense costs, expenses and attorneys' fees for which Utica Mutual is now legally liable.

B. The Duty to Indemnify

Under Massachusetts law, an insurer that breaches a contractual duty to defend shall be liable "for the natural consequences of [the] breach of contract that places its insured in a worse

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 10 of 14*

position . . . ." <u>Liquor Liability Joint Underwriting Ass'n of Massachusetts v. Hermitage Ins. Co.</u>, 419 Mass. 316, 323 (1995), quoting <u>Polaroid Corp. v. Travelers Indem. Co.</u>, 414 Mass. 747, 764 (1993). This is true even if the denial of coverage was in good faith. <u>Palermo v. Fireman's Fund Ins. Co.</u>, 42 Mass. App. Ct. 283, 290 (1997). Moreover, the breaching insurer must also bear the burden of proving that the claim was not within the policy coverage. <u>Id.</u> Utica Mutual cannot meet that burden and, as a result, is liable for the full amount of the Arbitration award entered against Massamont ($2,600,000), plus interest.

Westchester's claim that Massamont breached the Agency Agreement and, as a result, caused damages, is covered under the terms and provisions of the Utica Mutual Policy. Westchester's "loss" arose out a "wrongful act" within the meaning of the Policy. Massamont's interpretation (or misinterpretation) of the Agency Agreement, its understanding (or misunderstanding) of Westchester's interests vis-a-vis the alleged high risk accounts, and its belief (whether mistaken or not) that Westchester had declined to grant Massamont sufficient underwriting authority to salvage the Program and had made a *de facto* election not to write Program business on the terms Massamont had proposed, all qualify as covered "errors" or "omissions." Further, to the extent Westchester complained that Massamont failed to place certain risks with Westchester in breach of the Agency Agreement, such failure likewise qualifies as an "omission" in the "rendering or failing to render professional services" and, therefore, an insured "loss."

The $2.6 million dollar damage award, of course, remains undifferentiated in terms of the specific harm Westchester allegedly suffered and for which the arbitrators meant to grant compensation. In fact, based on a review of the hearing transcript, it is difficult to comprehend on precisely what basis or evidence the damage award was actually calculated. This is a difficulty, however, with which Massamont need not be concerned. Even if some of Westchester's claims were not covered (which Massamont denies), by unjustifiably refusing to defend Massamont in this matter, Utica Mutual has effectively shouldered the burden of apportioning the award between covered and uncovered claims. And, since no such apportionment can now be made, Utica Mutual must pay the entire award. See <u>Liquor Liability Joint Underwriting Ass'n</u>, 419 Mass. at 323-24 (non-defending insurer held liable for entire settlement amount).

Despite numerous (and sometimes conflicting) statements of its coverage position, it appears Utica Mutual's denial now rests principally on two grounds. First, Westchester's "loss" did not arise out of any "negligent act, error, or omission" and, therefore, did not result from a "wrongful act" within the meaning of the Policy. Second, even if Westchester's "loss" arose from a "wrongful act," Massamont's error or omission (in Utica Mutual's view) had nothing to do with the rendering of professional advice.[8] Without restating Massamont's position on these

---

[8] Utica Mutual raised (and sometimes withdrew) numerous other grounds for denial in its four letters to Massamont dated March 4, 2004; March 31, 2005; May 19, 2005; and June 15, 2005. As best as Massamont can currently

**PIERCE, DAVIS & PERRITANO, LLP**
August 8, 2005

Page 11 of 14

grounds in detail, it should be sufficient to point out that they cannot be sustained in light of Massachusetts law, in general, or the decision of USM Corp. v First State Ins. Co., 420 Mass. 865 (1995), in particular. In USM, the SJC expressly rejected the notion that the term "negligent" modifies anything more than the following word "act." Thus, uncertainty regarding the scope of the word "error" rendered the First State policy in USM ambiguous, just as it renders the words "error" and "omission" ambiguous in the context of the Utica Mutual Policy. Like First State, Utica Mutual must now suffer the consequences of that ambiguity. See also Transcontinental Ins. Co. v. Caliber One Indemnity Co., 367 F. Supp. 2d 994, 1002 (E.D. Va. 2005) (citing decisions from other jurisdictions which have consistently held that insurance protection for a "negligent act, error or omission" covers claims for breach of contract).[9]

With respect to Utica Mutual's reliance on the so-called "professional advice" requirement, the Policy contradicts Utica Mutual's assertion. The Policy provides coverage for "wrongful acts" committed "in rendering or failing to render professional services as (1) A General Insurance Agent; (2) An Insurance Broker; (3) An Insurance Agent; [and] . . . (5) A Managing, Master or Brokerage General Agent . . . ." It contains no such "professional advice" requirement. Nor are the "professional services" specifically enumerated in the Policy either restricted or, in any way, limited to the giving of advice.

Indeed, it is difficult to conceive of a more fundamental component in the rendering or failure to render professional services than the selection of the insurance carrier that is to underwrite the Program accounts. The fact that the party allegedly harmed by the wrongful act of erroneously choosing the wrong carrier is another carrier rather than an insured is of no consequence to Utica Mutual's duty to indemnify Massamont under the Policy. If Massamont had, for example, erroneously chosen a carrier who went into receivership, surely Utica Mutual would not deny coverage for claims arising out of that error on the ground that they did not involve an error in the rendering of professional services.

Utica Mutual's duty is clear – it must immediately pay to Westchester on behalf of Massamont the $2,600,000 in damages awarded by the Arbitration panel, plus interest. The longer Utica Mutual refuses to meet this obligation, the greater the harm will be suffered by its insured.

---

determine, the two grounds cited above – no "wrongful act" and the lack of professional advice – are Utica Mutual's grounds du jour.

[9]    [C]laims-made policies typically afford coverage for claims by reason of any "negligent act, error or omission." What if an insured is held liable for a non-negligent act? Most courts have held that the insured is still entitled to coverage. The strongest argument in favor of that conclusion is that (i) an "error" or "omission" encompasses more than negligent conduct, and (ii) if only negligent errors and negligent omissions were covered, the "error or omission" language would be rendered redundant.

A. Windt, Insurance Claims and Disputes (4th Ed. 2005) (citing USM Corp., supra).

*PIERCE, DAVIS & PERRITANO, LLP*
*August 8, 2005*

*Page 12 of 14*

### IV.    Unfair or Deceptive Acts or Practices

Utica Mutual insists its Policy provides no coverage to Massamont in the circumstances of the Westchester case. It's just not sure why.

In response to Massamont's tender of its defense to Utica Mutual, the company responded by letter dated March 4, 2004, denying coverage on six grounds, ranging from Massamont's alleged execution of the Agency Agreement prior to the "retroactive date," to Exclusion 6 (for claims by an entity "owned, operated, managed, or controlled by the insured"), to Exclusion 18 (for claims arising out of the insured's activities as a "third-party administrator.") Amazingly, one of the grounds upon which Utica Mutual relied – Exclusion 1 for "dishonest, fraudulent, malicious or criminal conduct" – expressly states that Utica Mutual *"will defend"* its insured against such claims, but will not indemnify it for any judgment based upon such conduct.[10]

When Massamont, through counsel, subsequently requested Utica Mutual to reconsider its coverage position and immediately assume Massamont's defense, Utica Mutual "modified" its previous denial by letter dated March 31, 2005. In that letter, Utica Mutual reasserted its previous disclaimer of coverage. Yet, in doing so, it "disavowed" five of its previous six grounds for denial, reaffirmed the only remaining ground (Exclusion 1 for "dishonesty," etc.), then raised four *new* grounds. One of the new grounds for denial cited by Utica Mutual concerned the "wrongful act" definition of the Insuring Agreement and the alleged failure of Westchester's claim to arise out of a "negligent act, error or omission" within the meaning of the Policy. Although Utica Mutual cited numerous out-of-state cases in support of this ground, it neglected to mention the one SJC decision on point (USM Corp. v First State Ins. Co., 420 Mass. 865 (1995)) which directly contradicted its position. Utica Mutual also claimed it was entitled to rescind the Policy, that coverage was eliminated by Exclusion 19 (applicable to claims arising out of the disclosure of "trade secrets or confidential or proprietary information"), and that Massamont had breached the duty of cooperation.

When counsel for Massamont likewise challenged this second denial, Utica Mutual shifted its stance once again. By letter dated May 19, 2005, Utica Mutual restated its denial on the ground that Westchester's claim did not arise of a "negligent act, error or omission," but this time attempted (albeit unsuccessfully) to distinguish the controlling USM decision by fashioning the so-called "professional advice" requirement discussed above. Utica Mutual also continued to rely upon Exclusion 1, but admitted it had "decided not to pursue" its rights to rescind the Policy, and was "withdrawing" its disclaimer based on Massamont's lack of cooperation. Curiously, Exclusion 19 (regarding "trade secrets") was now completely ignored.

---

[10] This denial was sent over eight months *before* the Arbitration hearing began, and more than one year *before* the Arbitration award was issued.

The final incarnation of Utica Mutual's coverage position was set forth in a letter dated June 15, 2005. There, Utica Mutual stood by its no "negligent act, error or omission" ground for disclaimer, as well as Exclusion 1. It also resurrected Exclusion 19 (regarding "trade secrets.") At the end of this letter, Utica Mutual invited Massamont to give counsel a call "[i]f Utica's coverage position is unclear in any way . . .." With all due respect, at this point, Massamont has no confidence that such a conversation would prove enlightening.

Chapter 176D, Section 3 of the Massachusetts General Laws identifies certain unfair or deceptive acts or practices in the business of insurance which, in turn, can give rise to liability under Chapter 93A, Sections 9 and 11. Specifically, in the circumstances of Massamont's demand for insurance protection against the Westchester claim, Utica Mutual has violated the following prohibitions defined as "unfair claim settlement practices" in Chapter 176D, Section 3(9):

(a)    Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(b)    Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(c)    Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; [and]

. . .

(n)    Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

Utica Mutual is clearly intent on denying all coverage to Massamont regardless of the language of the Policy, the allegations of Westchester's Demand for Arbitration, the nature of Westchester's claims or Massamont's defenses, the facts known or readily knowable by Utica Mutual, and/or Massachusetts law. In handling and denying Massamont's claim, Utica Mutual has engaged in a series of unfair or deceptive acts or practices prohibited under Massachusetts law. Such acts or practices have caused significant damages to its insured, for which Massamont is entitled to recovery under Chapter 93A. Further, Utica Mutual's use or employment of such unfair or deceptive acts or practices constituted violations of M.G.L. Chapter 93A, Section 2. Further still, Utica Mutual's repeated refusal to grant relief to Massamont was done in bad faith with knowledge or reason to know that such refusals violated M.G.L. Chapter 93A, Section 2. Massamont is therefore entitled to double or treble the amount of its actual damages from Utica Mutual.

*PIERCE, DAVIS & PERRITANO, LLP*
August 8, 2005

Page 14 of 14

V.     **Demand for Relief**

In light of the above, Massamont hereby demands that Utica Mutual immediately:

1.     Pay the $2,600,000 Arbitration award to Westchester in full, plus any accrued interest;

2.     Reimburse Massamont in full for all costs, expenses and attorneys' fees incurred in or relating to the defense of the Westchester claim, including any such costs, expenses or fees relating to confirmation of the Arbitration award; and

3.     Reimburse Massamont in full for all costs, expenses and attorneys' fees incurred in or relating to the protection and enforcement of Massamont's rights under the Utica Mutual Policy.

Please note that nothing set forth herein shall be deemed as a waiver or relinquishment of any rights or claims of Massamont Insurance Agency, Inc., under the terms and provisions of the Policy issued by Utica Mutual Insurance Company or under any applicable laws. Nor shall the failure to raise or assert herein any actual or potential right or claim be construed as a waiver or relinquishment of same.

We look forward to receiving Utica Mutual's response. If you wish to discuss this matter further, please do not hesitate to contact us.

Very truly yours,

PIERCE, DAVIS & PERRITANO, LLP

John J. Davis

cc:     Hilbert Schenck II, CPCU
         Jarrett A. Williams, Esq.
         Lawrence P. Murray, Esq.

# EXHIBIT 11

# CONN KAVANAUGH ROSENTHAL PEISCH & FORD, LLP

## COUNSELORS AT LAW

THOMAS E. PEISCH
BOB B. ROSENTHAL
JAMES F. KAVANAUGH, JR.
RUSSELL F. CONN
GEORGE M. FORD
JAMES B. PELOQUIN
BARRY E. GOLD
THOMAS J. GALLITANO
NEIL R. SCHAUER
JAMES GRAY WAGNER
ERIN K. HIGGINS
STEVEN E. GURDIN
MICHAEL T. SULLIVAN
CONSTANCE M. MCGRANE

Ten Post Office Square, Boston, Massachusetts 02109

Tel: (617) 482-8200

Fax: (617) 482-6444

WRITER'S DIRECT DIAL: (617) 348-8210
E-MAIL: RCONN@CKRPF.COM

KURT B. FLIEGAUF
RONALD M. JACOBS
CAROL A. STARKEY
JENNIFER M. NORTON
SARA L. GOODMAN
ELISE S. WALD
MICHAEL R. BERNARDO
JACOB A. LABOVITZ
CARA A. FAUCI
JOHANNA L. MATLOFF
AMY C. STEWART
BETH NUZZO NEWMARK
SARAH E. WEBER

August 29, 2005

<u>Via Facsimile (202) 662-6291</u>
<u>and Regular Mail</u>

John J. Davis, Esq.
Pierce, Davis & Perritano, LLP
Ten Winthrop Square
Boston MA  02110-1257

RE:    <u>Westchester Fire Insurance Company v. Massamont Insurance Agency</u>
       Utica Claim No. 732751

Dear Mr. Davis:

We have reviewed your August 8, 2005 letter, and it remains Utica's position, as previously expressed in Utica's letter dated March 4, 2004, and in our letters dated March 31, 2005, May 19, 2005, May 24, 2005, June 1, 2005, and June 15, 2005, that Utica has no obligation to indemnify Massamont against the claims made by Westchester Fire Insurance Company, or to reimburse Massamont for any costs incurred in defending against those claims, because the claims did not arise out of a "negligent act, error or omission" committed in the conduct of Massamont's business in rendering or failing to render professional services. Utica also continues to disclaim coverage on the grounds that, even if the claims alleged by Westchester fell within the coverage of the insuring agreement of Utica's policy, the policy excludes coverage for "dishonest, fraudulent, malicious, or criminal conduct," and for claims arising out of the disclosure of confidential or proprietary information.

We have addressed the bases for Utica's disclaimer at length in the above-referenced letters, and I see no point to rehashing that discussion here. I will, however, address certain points raised in your letter.

First, Massamont did not make "numerous requests" to Utica to provide a defense against Westchester's claims. Massamont received Westchester's demand for arbitration on October 23, 2004. Massamont tendered the demand to Utica on October 29, 2003. On March 4, 2004, Utica disclaimed any obligation to defend or indemnify Massamont on a number of grounds, including the absence of any claim of a "negligent act, error or omission." Massamont <u>did not challenge</u>

John J. Davis, Esq.
August 29, 2005
Page 2

this disclaimer of coverage, and instead retained counsel of its choosing (Burns & Levinson in Boston) to defend the case at Massamont's expense. Massamont and its counsel then proceeded to select an arbitration panel, engage in document and deposition discovery, and submit pre-hearing memoranda and expert reports, all without any notification to Utica that Massamont or its attorneys disagreed with Utica's coverage position. In fact, Massamont did not have any further contact with Utica until December 6, 2004. As of that date, Massamont and Westchester already had concluded four days of fact and expert testimony! We can only surmise that Massamont, realizing that those four days of testimony had gone badly, decided to make a plea for coverage that it knew did not exist.

Second, while your letter goes into great detail about Massamont's alleged mishandling of the program business, Westchester's demand for arbitration was not premised on the alleged shortfalls in Massamont's performance. Instead, as you admit at other places in your letter, the sole claim raised by Westchester in its demand, and pursued by Westchester at the arbitration, was whether Massamont had breached provisions of the Agency Agreement by transferring the program business, as well as confidential information about the program, to Axis. Utica's policy did not provide coverage for this claim.

Third, I fail to see the relevance of your lengthy discussion of Mr. Schenck's motives in transferring the business to Axis. The relevant analysis is whether the claims asserted by Westchester fell within the insuring agreement of the policy, which obligated Utica to defend and indemnify Massamont against losses arising out of negligent acts, errors or omissions committed in the course of rendering or failing to render professional services. Westchester's claim that Massamont, in breach of its contract with Westchester, decided to transfer program business to another carrier did not fall within this insuring agreement.

Fourth, Utica denies that it committed any unfair or deceptive practice in the course of communicating its coverage position to Massamont. Utica consistently has advised Massamont that it was disclaiming any obligation to defend or indemnify Massamont against Westchester's claims on the grounds that Westchester had not alleged a covered claim. Utica's initial disclaimer of coverage, dated March 4, 2004, concluded as follows:

> Summarily, Westchester's claim of Massamont's deliberate and secret breach of the agreement that existed between the parties is not a negligent act, error or omission to which this insurance applies, as explained in the policy excerpts referenced above.

Utica took this same position in the subsequent disclaimer letters sent out by this firm, dated March 31, 2005, May 19, 2005, May 24, 2005, June 1, 2005, and June 15, 2005. The fact that Utica reserved its right to disclaim coverage on other, additional grounds, and then later withdrew certain of those reservations upon further investigation and to address the changed circumstance of Massamont agreeing to provide relevant documents to Utica, is not evidence of bad faith.

John J. Davis, Esq.
August 29, 2005
Page 3

Fifth, Utica specifically denies that it misrepresented pertinent facts or insurance policy provisions in its communications with Massamont, that it failed to acknowledge or act promptly upon communications received from Massamont, that it failed to adopt reasonable standards for the prompt investigation of claims, or that it failed to promptly provide Massamont with an explanation of the basis for its disclaimer of coverage.  As set forth above, Utica at all times has accurately referenced the language of its policy, has promptly responded to the few communications it received from Massamont, has promptly investigated Massamont's claims for coverage, and consistently has advised Massamont that it was disclaiming coverage because of the lack of a claim covered under the policy's insuring agreement.

In view of Utica's continued denial of coverage, we reiterate our prior advice that Massamont should take whatever actions it deems appropriate with respect to the arbitration award and Westchester's demand for payment of the same.

Please do not hesitate to contact me if you have any questions.

Very truly yours,

Russell F. Conn

RFC:mkg:7663-059

cc:    Erin K. Higgins, Esq.
       Mr. Marc Chilton (Utica Claim No. 732751)

233857.1

# EXHIBIT 12

(FILED WITH THE COURT IN HARD COPY)